UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALASSIS COMMUNICATIONS, INC.,

              Plaintiff,

v.

NEWS CORPORATION; NEWS
AMERICA MARKETING,
a/k/a NEWS AMERICA
INCORPORATED, a/k/a NEWS
AMERICA MARKETING GROUP;
NEWS AMERICA MARKETING
FSI, LLC, a/k/a NEWS AMERICA
MARKETING FSI, INC.; and
NEWS AMERICA MARKETING IN-
STORE SERVICES, LLC, a/k/a
NEWS AMERICA MARKETING IN-
STORE SERVICES, INC.

              Defendants.

Case No. _____

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF
AND DEMAND FOR JURY TRIAL**

| | |
|---|---|
| A. Michael Palizzi (P47262)<br>Thomas W. Cranmer (P25252)<br>Larry J. Saylor (P28165)<br>Kimberly L. Scott (P69706)<br>MILLER CANFIELD PADDOCK<br>   and STONE, P.L.C.<br>150 W. Jefferson, Suite 2500<br>Detroit, MI 48226<br>(313) 496-8454<br>palizzi@millercanfield.com<br>cranmer@millercanfield.com<br>saylor@millercanfield.com<br>scott@millercanfield.com | David Mendelson (P53572)<br>THE MENDELSON LAW FIRM, PC<br>355 S. Old Woodward Ave., Ste. 100<br>Birmingham, MI 48009<br>(248) 646-8277<br>dm@mendelsonlaw.net |

*Attorneys for Plaintiff Valassis Communications, Inc.*

**TABLE OF CONTENTS**

**Page**

I.    NATURE OF THE CASE .................................................................1

II.   PREVIOUS LITIGATION ...............................................................2

III.  NEWS' POST-SETTLEMENT UNLAWFUL CONDUCT ........................3

      A.    Schemes Used in the ISP Market ........................................4

      B.    Schemes Used in the FSI Market ........................................9

      C.    News Improperly Threatens to Sue Valassis ...........................10

IV.   OTHER LITIGATION INVOLVING NEWS ...........................................10

V.    THE PARTIES .........................................................................12

      A.    Plaintiff Valassis..........................................................12

      B.    Defendant News Corporation ...........................................13

      C.    Defendant News America Marketing.....................................14

      D.    Defendant News America In-Store ......................................14

      E.    Defendant News America FSI ............................................15

VI.   JURISDICTION AND VENUE .........................................................15

VII.  THE ISP MARKET ...................................................................16

      A.    The Relevant Product Market for ISPs .................................16

      B.    The Relevant Geographic Market for ISPs .............................18

      C.    News Monopolizes the ISP Market......................................18

VIII. NEWS' STRATEGIES USED WITH RETAILERS IN THE ISP
      MARKET ............................................................................20

      A.    Predatory and Economically Unjustified Cash Guarantees ..............20

      B.    Long-Term, Exclusive Contracts with Staggered Expiration
            Dates ......................................................................22

      C.    Right-of-First-Refusal Contracts for New Tactics..........................25

IX.   NEWS' STRATEGIES USED WITH CPGS IN THE ISP MARKET........28

      A.    Long-term, Exclusive Contracts..........................................28

      B.    Schemes to Prevent CPGs from Utilizing Valassis' Retailers...........30

# TABLE OF CONTENTS
(continued)

Page

C.      Right-of-First-Refusal Agreements for Contract Renewals..............32

D.      Requirements Contracts ................................................................32

E.      Increased ISP Prices for CPGs that Buy Valassis' FSIs ..................33

X.      NEWS' EFFORTS TO HARM VALASSIS' REPUTATION IN THE
        ISP MARKET...................................................................................34

A.      Refusing to Remove ISPs Tactics from Retailers' Aisles................34

B.      Removing Valassis' ISP Products from Retailers' Aisles ...............35

C.      Misrepresenting the Breadth of Its Retailer Network ......................35

XI.     THE FSI MARKET...........................................................................36

A.      The Relevant Product Market for FSIs ...........................................36

B.      The Relevant Geographic Market for FSIs ......................................39

C.      News' Dominance in the FSI Market...............................................39

XII.    NEWS MAINTAINS ITS ILL-GOTTEN DOMINANCE IN THE FSI
        MARKET ........................................................................................40

A.      Pricing Schemes Used to Maintain News' FSI Dominance .............40

B.      Long-term, Exclusive, Right-of-First-Refusal, Requirements
        Contracts.......................................................................................44

XIII.   NEWS IMPROPERLY THREATENS TO SUE VALASSIS ...................47

XIV.    INJURY TO COMPETITION..............................................................47

A.      Harm to Retailers...........................................................................48

B.      Harm to CPGs Through Reduced Choice .........................................50

C.      Harm to CPGs by Increased ISP Costs and Diminished ISP
        Value..............................................................................................51

D.      Harm to Consumers of CPGs' Products...........................................53

XV.     ANTITRUST INJURY AND DAMAGE TO VALASSIS..........................53

COUNT I        Monopolization of the ISP Market
               Violation of Section 2 of the Sherman Act,
               15 U.S.C. § 2.................................................................55

**TABLE OF CONTENTS**
(continued)

Page

COUNT II          Predatory Pricing in the ISP Market (Retailers)
                  Violation of Section 2 of the Sherman Act,
                  15 U.S.C. § 2....................................................................56

COUNT III         Attempt to Monopolize the FSI Market
                  Violation of Section 2 of the Sherman Act, 15
                  U.S.C. § 2.......................................................................59

COUNT IV          Exclusive Dealing in the ISP Market (Retailers)
                  Violation of Sections 1 and 2 of the Sherman Act,
                  15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton
                  Act, 15 U.S.C. § 14.......................................................60

COUNT V           Exclusive Dealing in the ISP Market (CPGs)
                  Violation of Sections 1 and 2 of the Sherman Act,
                  15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton
                  Act, 15 U.S.C. § 14.......................................................62

COUNT VI          Exclusive Dealing in the FSI Market (CPGs)
                  Violation of Sections 1 and 2 of the Sherman Act,
                  15 U.S.C. §§ 1 and 2, and Section 3 of the
                  Clayton Act, 15 U.S.C. § 14 .........................................63

COUNT VII         Bundling
                  Violation of Sections 1 and 2 of the Sherman Act,
                  15 U.S.C. § 1 and 2, and Section 3 of the Clayton
                  Act, 15 U.S.C. § 14.......................................................64

COUNT VIII        Tying
                  Violation of Section 1 of the Sherman Act,
                  15 U.S.C. § 1, and Section 3 of the Clayton Act, 15
                  U.S.C. § 14....................................................................67

COUNT IX          Violation of Michigan Antitrust Reform Act,
                  M.C.L. §§ 445.772 and 445.773...................................70

**TABLE OF CONTENTS**
(continued)

**Page**

COUNT X      Violation of Cartwright Act,
Ca. Bus. & Prof. Code §§ 16720, 16726, and
16727 ............................................................................71

COUNT XI      Violation of California Unfair Trade Practices Act,
Ca. Bus. & Prof. Code §§ 17043, 17044, 17070,
and 17071......................................................................72

COUNT XII      Unfair Competition ........................................................74

COUNT XIII      Tortious Interference with Contracts (CPGS) ..............74

COUNT XIV      Tortious Interference with Business Relationships
or Expectancies (CPGS) ...............................................75

COUNT XV      Tortious Interference with Contracts (Retailers)...........76

COUNT XVI      Tortious Interference with Business Relationships
or Expectancies (Retailers)...........................................77

PRAYER FOR RELIEF .........................................................................78

JURY DEMAND ...................................................................................80

Plaintiff Valassis Communications, Inc. ("Valassis") brings this action for damages and injunctive relief under federal antitrust and state laws against Defendants News Corporation; News America Marketing, a/k/a/ News America Incorporated and a/k/a News America Marketing Group ("News America Marketing"); News America Marketing FSI, LLC, a/k/a News America Marketing FSI, Inc. ("News America FSI"); and News America Marketing In-Store Services, LLC, a/k/a News America Marketing In-Store Services, Inc. ("News America In-Store") (collectively referred to as "News," unless the context indicates otherwise). Valassis demands a jury trial and alleges as follows:

## I.        <u>NATURE OF THE CASE</u>

1.        When battling a Goliath, sometimes a single stone is not enough.  In the case of one true corporate Goliath—the News conglomerate—not even a unanimous jury verdict, a $500 million payment, and a federal court order enjoining improper bundling and tying were enough to change its business practices.

2.        Instead of changing its illegal practices, News has utilized unethical, unfair, and anticompetitive strategies to prevent Valassis from gaining a foothold in the market for in-store advertising and promotions ("in-store promotions" or "ISPs") and to eliminate Valassis from the ISP market completely.  ISPs are products that place messages promoting the products of consumer packaged goods

manufacturers ("CPGs") in the aisle space of major supermarket, grocery, drug, and mass merchant chain stores (collectively, "retailers"). Examples of ISPs include shelf coupon dispensers, shelf advertising, floor advertising, and shopping cart advertisements.

3.     News also continues to engage in the same unethical, unfair, and anticompetitive schemes that were the subject of Valassis' earlier litigations in order to maintain its ill-gotten dominance of the free-standing inserts or "FSI" market. FSIs are booklets of coupons which are delivered directly to consumers' homes containing primarily coupons for products manufactured by CPGs.

## II.          **PREVIOUS LITIGATION**

4.     On July 23, 2009, a Michigan jury unanimously found that News America Marketing, News America FSI, and News America In-Store (collectively, "News America") had engaged in unfair competition and tortiously interfered with Valassis when News America leveraged its ISP dominance to coerce CPGs to purchase FSIs from News America rather than Valassis. The jury awarded Valassis $300 million in damages.

5.     Before a federal trial challenging News' conduct under federal antitrust laws, News America agreed to pay Valassis $500 million and signed a ten-year shared mail distribution agreement with Valassis to settle the claims.

2

6.      On June 15, 2011, Judge Arthur J. Tarnow entered an order (Case No. 06-10240, Dkt. #412) (the "Order") prohibiting the parties from engaging in unlawful bundling and tying of any products.

7.      The Order established the legal standard for determining if a party had unlawfully bundled or tied the sale of one product to the purchase of a second product.

8.      The Order also established a three-member expert antitrust panel to assist the court in evaluating practices relating to bundling and tying under the antitrust laws.

9.      The Order only applies to unlawful bundling and tying and not to other violations of the Sherman Act, the Clayton Act, or state antitrust laws, or to claims of tortious interference and unfair competition.

## III.      NEWS' POST-SETTLEMENT UNLAWFUL CONDUCT

10.     In November 2009—following the jury verdict, but before the settlement—Valassis and SuperValu Inc. ("SuperValu") announced that Valassis, rather than News, would place ISPs in SuperValu's grocery aisles starting May 1, 2010.

11.     Shortly thereafter, Winn-Dixie Stores, Inc. awarded Valassis a contract for the placement of ISPs in Winn-Dixie's aisles starting July 2010.

12.     Undeterred by the $500 million settlement and alarmed by Valassis' modest incursion into News' ISP monopoly, News employed a variety of unfair and anticompetitive schemes designed to prevent Valassis from gaining any significant foothold in the ISP market.

13.     News' conduct is anticompetitive and tortious and is actionable under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; Sections 2 and 3 of the Michigan Antitrust Act, M.C.L. §§ 445.772 and 445.773; the Cartwright Act, Ca. Bus. & Prof. Code §§ 16720, 16726 and 16727; the California Unfair Practices Act, Ca. Bus. & Prof. Code §§ 17043, 17044, 17070, and 17071; the common law of tortious interference with business relationship or expectancy; the common law of tortious interference with contract; and the common law of unfair competition.

## A.     Schemes Used in the ISP Market

14.     Specifically, News' unethical, unfair, and anticompetitive strategies in the ISP market with respect to retailers include the following:

(a)     Requiring retailers to enter into long-term, exclusive contracts with staggered expiration dates;

(b)     Requiring retailers to give News contracts with rights-of-first-refusal that obligate retailers to contract with News for newly-developed ISPs;

(c)     Prohibiting retailers from contracting with Valassis for ISP products even though News does not produce a comparable or substantially similar ISP; and

       (d)     Giving predatory and economically unjustified cash guarantees to retailers.

15.     News' unethical, unfair, and anticompetitive schemes in the ISP market with respect to CPGs include:

       (a)     Employing long-term, exclusive, right-of-first-refusal and requirements contracts with CPGs;

       (b)     Coercing CPGs to extend those contracts to make them effectively exclusive for five to ten years or more;

       (c)     Preventing CPGs from utilizing the retailer network of News' competitors; and

       (d)     Increasing the ISP prices charged to CPGs that purchase their FSIs from Valassis.

16.     News' unethical, unfair, and anticompetitive schemes in the ISP market with respect to retailers include:

       (a)     Refusing to remove its ISPs from retailers that no longer contract with News;

       (b)     Placing its ISPs at retailers' stores that are under contract with Valassis;

       (c)     Removing Valassis' ISP tactics at stores under contract with Valassis; and

       (d)     Misrepresenting the breadth of News' retailer network.

17.     News' strategies foreclosed a substantial amount of competition in the ISP market and have prevented Valassis from being able to obtain a critical mass of retailers at which Valassis can place its ISPs.

18.     Without a critical mass of retailers, Valassis' ISPs are not a viable alternative to News' ISPs.

19.     News' strategies have increased Valassis' costs to operate in the ISP market, damaged Valassis' business and reputation, artificially affected prices and retailer guarantees in the ISP market, and prevented CPGs and retailers from benefiting from ISP innovations developed by News' competitors.

20.     News' strategies have restrained competition and have allowed News to avoid competing with Valassis on price and quality of services and products, and to avoid competing on innovations in the ISP market.

21.     News' strategies have allowed it to maintain its monopoly in the ISP market.

22.     News' strategies are designed to eliminate Valassis from the ISP market and to prevent any competitor, including Valassis, from gaining any significant market share in the ISP market.

23.     Several CPGs, including Dial Corporation[1], H.J. Heinz Company[2], Henkel Consumer Goods Inc.[3], Foster Poultry Farms[4], Smithfield Foods Inc.[5], HP

---

[1] The Dial Corporation ("Dial") is a consumer packaged goods company that sells personal care and household cleaning products under the Dial, Right Guard, Purex, and Renuzit trademarks.

[2] H.J. Heinz Company is a consumer packaged goods company that sells food products under the Heinz, Classico, Ore-Ida, and Lea & Perkins trademarks.  H.J. Heinz Company, L.P. is the entity contracting with News for ISPs and FSIs.  They are collectively referred to as "Heinz."

Hood LLC[6], BEF Foods, Inc.[7], and Spectrum Brands, Inc.[8], recognize that News' actions are illegal and anticompetitive, and have filed suit against News alleging that "News' competitors are suppressed at both ends of the chain of distribution" in the ISP market due to News' conduct. *See* Third Amended Complaint filed in *The Dial Corporation, et al. v. News Corporation, et al.*, filed in the United States District Court for the Eastern District of Michigan, transferred to the United States District Court for the Southern District of New York, Case No. 2:12-cv-15613 ("Dial Complaint").

24.     These CPGs confirm that "News' competitors [like Valassis] are contractually blocked from serving many [CPGs] and, when they do secure accounts, their distribution is crippled" due to News' exclusionary contracts with

---

[3] Henkel Consumer Goods Inc. ("Henkel") is a consumer packaged goods company that sells products for home care, body care, and cosmetics.

[4] Foster Poultry Farms ("Foster Farms") is a consumer packaged goods company that sells chicken and turkey products, including lunch meats and franks, under the Foster Farm brand.

[5] Smithfield Foods Inc. ("Smithfield Foods") is a consumer packaged goods company that sells products through its subsidiary corporations, The Smithfield Packing Company, Inc., Armour-Eckrich Meats, LLC, John Morrell & Co., Patrick Cudahy, Inc., Curly's Foods Inc., and Farmland Foods, Inc.

[6] HP Hood LLC ("HP Hood") is a consumer packaged goods company that sells products under the Heluva Good, Maggio, and Lactaid trademarks.

[7] BEF Foods, Inc. ("BEF Foods") is a consumer packaged goods company that sells products under the Bob Evans trademark.

[8] Spectrum Brands, Inc. ("Spectrum") is a consumer packaged goods company that sells products under the Black & Decker, Farberware, and Repel trademarks.

retail chains, and that "[t]his later impairment in turn feeds back to further disadvantage News' competitors' ability to sell to [CPGs] because News' distribution network cannot be matched." *Id.*

25.     News has used its monopoly power in ISPs to charge certain CPGs monopoly prices for ISPs, particularly those CPGs that purchase FSIs from Valassis.

26.     The CPGs that filed suit against News have alleged that News' "monopoly prices are substantially higher than the competitive pricing that would have prevailed in the absence of News' unlawful conduct in both relevant markets." *Id.*

27.     News' anticompetitive conduct harms certain CPGs, the buyers of ISPs, by raising the costs of ISPs, reducing the quality and quantity of promotions available to them, stifling innovation, and reducing their ability to compete with other CPGs.

28.     News' anticompetitive conduct also harms the ultimate consumers of CPGs' products by reducing consumer choices and reducing the output of ISP coupons and advertising to consumers.

29.     Because fewer coupons are available to the ultimate consumers, the consumers cannot purchase CPGs' products at lower prices, which results in consumers paying higher prices than would exist in a competitive market.

## B.   Schemes Used in the FSI Market

30.     In the FSI market, News has resorted to the same schemes that a jury previously found constituted unfair competition and tortious interference.

31.     News has continued to leverage its monopoly in the ISP market to coerce CPGs to purchase their FSIs from News and award News long-term, exclusive, right-of-refusal, and requirements contracts.

32.     News has also penalized CPGs who failed to give News their FSI business by charging those CPGs higher ISP prices.

33.     News' strategies are designed to prevent Valassis from winning FSI business, thereby preventing Valassis from materially increasing its market share in the FSI market.

34.     News' strategies have allowed it to maintain its dominance in the FSI market.

35.     News' anticompetitive conduct also harms the ultimate consumers of CPGs' products by reducing consumer choices and reducing FSI coupons and advertising to consumers.

36.     Because fewer coupons are available to the ultimate consumers, the consumers cannot purchase CPGs' products at lower prices, which results in consumers paying higher prices than would exist in a competitive market.

### C.   News Improperly Threatens to Sue Valassis

37.   News improperly uses the threat of litigation to prevent Valassis from selling its ISPs and other products.

38.   News has threatened to sue Valassis for responding to proposal requests submitted by a retailer.

39.   News has also threatened to sue Valassis for efforts to sell ISPs to retailers.

40.   News' litigation threats are designed to prevent Valassis from winning business from these retailers, thereby preventing Valassis from selling its products to retailers and from gaining a foothold in the ISP market.

41.   News' litigation threats have allowed it to maintain its monopoly in the ISP market.

## IV.   OTHER LITIGATION INVOLVING NEWS

42.   Valassis has not been the only target of News' unethical, unfair, and anticompetitive conduct.

43.   News America Marketing and News In-Store have been sued by other ISP competitors, including Floorgraphics, Inc. ("Floorgraphics") and Insignia Systems, Inc. ("Insignia"), for News' use of the same or similar tactics as those alleged here.

44.     The conduct of News America Marketing and News In-Store has successfully eliminated Floorgraphics from the ISP market and pigeonholed Insignia into a niche area of ISPs.

45.     News Corporation has also been sued twice by its own shareholders for engaging in unethical and unfair business practices.

46.     One of those shareholder derivative suits resulted in what is reported to be one of the largest shareholder derivative settlements—$139 million.  *See In re News Corporation Shareholder Derivative Litigation*, Court of Chancery in the State of Delaware, Case No. 6285 (filed in July 2011).

47.     The settlement also obligated News Corporation to implement broad and sweeping ethical changes and to implement corporate governance and compliance procedures.

48.     In another derivative suit, News' own shareholders allege that News is "engaging in illegal monopolistic practices regarding in-store promotion services and FSIs."  *Iron Workers Mid-South Pension Fund v. Keith Rupert Murdoch, et al.*, United States District Court of the Southern District of New York, Case No. 13-cv-3914 (filed June 7, 2013).

49.     The shareholders allege that News America acquired dominance in FSIs and ISPs "through various wrongful acts designed to inhibit competition, including (i) entering into long-term exclusive contracts with retailers; (ii) paying

11

large economically unjustifiable cash payments to retailers to derail competitor contracts; (iii) bundling and predatorily pricing its in-store advertising and promotion products and services with its FSIs; . . . and (vi) even defacing competitors' advertisements." *Id.*

50.　　The shareholders also allege that "[k]nowledge of News America's monopolistic practices reached the highest levels of the Company" and that "News Corp has acknowledged that it has sought to build contract barriers to make it difficult for its competitors to compete." *Id.*

51.　　The shareholders further allege that News "still has not completely remedied News America's illegal business practices." *Id.*

52.　　As noted above, eight CPGs have also sued News for similar unfair, unethical, and anticompetitive conduct in the FSI and ISP markets. *See* Dial Complaint.

V.　　**THE PARTIES**

　　A.　**Plaintiff Valassis**

53.　　Plaintiff Valassis Communications, Inc. is a Delaware corporation with its headquarters and principal place of business located in the City of Livonia, County of Wayne, and State of Michigan.

## B.     Defendant News Corporation

54.     Defendant News Corporation is organized under the laws of Delaware with its headquarters and principal place of business located in New York, New York.

55.     It does business throughout the United States, including the Eastern District of Michigan.

56.     News Corporation is the parent company of Defendants News America Marketing, News America FSI, and News America In-Store.

57.     News Corporation is a multi-national media conglomerate with total assets as of March 31, 2013 of approximately $68 billion and total annual revenues of approximately $35 billion.

58.     On June 28, 2013, News Corporation separated its publishing and media/entertainment businesses into two separate, publicly traded companies—21st Century Fox and News Corp.

59.     The events giving rise to Valassis' claims took place before, and continue after, News Corp.'s separation from 21st Century Fox.

60.     The strategies discussed above were devised, developed, funded, and ultimately approved by News Corporation through its executives, including Rupert Murdoch.

### C.    Defendant News America Marketing

61.    Defendant News America Marketing is a Delaware corporation with its principal place of business located in New York, New York.

62.    It does business throughout the United States, including the Eastern District of Michigan.

63.    News America Marketing is the marketing arm and subsidiary of News Corporation.

64.    It has the responsibility of managing the sale of ISPs and FSIs through Defendants News America In-Store and News America FSI.

65.    News America Marketing, through its Chairman and Chief Executive Officer Paul Carlucci, among others, collaborated with News Corporation to devise, develop, and implement the strategies used, as described above, to win business from CPGs and retailers and to harm Valassis.

### D.    Defendant News America In-Store

66.    Defendant News America In-Store is a Delaware corporation or limited liability company with its principal place of business located in New York, New York.

67.    It does business throughout the United States, including the Eastern District of Michigan.

68.    Its products and services include ISPs.

### E.    Defendant News America FSI

69.    Defendant News America FSI is a Delaware corporation or limited liability company, with its principal place of business located in New York, New York.

70.    It does business throughout the United States, including the Eastern District of Michigan.

71.    Its products and services include FSIs.

## VI.    JURISDICTION AND VENUE

72.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation), 1331 (federal question), and 1367 (supplemental jurisdiction) as this case arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 3, 4, and 6 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26; Sections 2 and 3 of the Michigan Antitrust Reform Act, M.C.L. §§ 445.772 and 445.773; the Cartwright Act, Ca. Bus. & Prof. Code §§ 16720, et seq.; California Unfair Practices Act, Ca. Bus. & Prof. Code §§ 17043, 17044, 17070, and 17071; the common law of unfair competition; and the common law of tortious interference with contracts and business relations and expectancies.

73.    Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c); Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22; and M.C.L. § 445.775.

74.     Each Defendant has transacted a substantial amount of business in Michigan, the conduct complained of occurred in part in Michigan, the harm caused by News' anticompetitive and tortious conduct occurred in substantial part within Michigan, and Plaintiff Valassis is located in Michigan.

75.     In addition, News America and Valassis have consented to the continuing and exclusive jurisdiction of the United States District Court for the Eastern District of Michigan before the Honorable Arthur J. Tarnow for determinations as to whether News America is violating the Order entered June 15, 2011 (Dkt. # 412) in *Valassis Communications, Inc. v. News America Inc., et al.*, Case No. 2:06-cv-10240 ("*Valassis I*").

76.     News' activities have been within the flow of interstate commerce of the United States.

77.     News' activities were intended to and have had a substantial effect on interstate commerce of the United States.

VII.        **THE ISP MARKET**

            A.     **The Relevant Product Market for ISPs**

78.     ISPs consist of several products that are placed in the aisle space at supermarket, grocery, drug, and mass merchant chain stores to promote consumer purchases of products sold by CPGs.

79.     Examples of ISPs include shelf coupon dispensers, shelf advertising, floor advertising, and shopping cart advertisements.

80.     ISP providers contract with retailers to gain access to the retailers' aisle space.

81.     CPGs then contract with ISP providers for access to the retailers' aisle space and for the creation and placement of ISP products in the aisles.

82.     ISPs are designed to influence the significant number of purchasing decisions that are made while the shopper is shopping at the store or at the "moment of decision."

83.     Therefore, national or regional ISPs can impact a substantial amount of sales by affecting shopper decisions where other methods cannot.

84.     ISPs have a number of distinctive features that leave them without a reasonably interchangeable substitute.

85.     ISPs are differentiated from various outside-the-store or pre- and post-purchase promotions, including FSIs, because, among other things, they:

> (a)     Attract shopper attention at the moment of purchase decision;
>
> (b)     Offer intrusive, more visible advertising in a clutter-free environment that the shopper must view;
>
> (c)     Differentiate the brand at the shelf;
>
> (d)     Help the shopper comparison shop;
>
> (e)     Do not require customer action until time of product selection; and

(f)     Appeal to a type of shopper who is not responsive to other advertising methods.

86.     Stores that do not allow ISPs to be placed in their store are not part of the available in-store market.

87.     Trade promotions are different from and are not a substitute for ISPs.

88.     Trade promotions are financial incentives offered by CPGs to individual retail stores to induce the retailer to reduce the price of a product, to display the product in a prominent location within the store, or to feature the product in newspaper ads or mailings.

89.     Whereas ISPs allow CPGs to roll out a promotional campaign nationally, a trade promotion is limited to a single retail store and does not duplicate the geographic reach of ISPs.

**B.     The Relevant Geographic Market for ISPs**

90.     The relevant geographic market for ISPs is the United States, and the relevant regional sub-markets.

91.     CPGs purchase ISPs from News and Valassis for placement within retailers located in the United States.

92.     News and Valassis contract with retailers for access to the retailers' stores located within the United States.

**C.     News Monopolizes the ISP Market**

93.     News monopolizes the ISP market.

18

94.     There is no viable competitor to News in the ISP market that possesses a regional and national retailer network comparable to News' retailer network.

95.     CPGs, the purchasers of ISPs, need regional and national retail coverage for an effective ISP campaign.

96.     CPGs are reluctant to contract with an ISP provider unless it can offer a national reach and has established contracts with retailers.

97.     Without a critical mass of major national retail grocery store chains, an ISP provider cannot effectively compete with News or maintain any significant ISP market share.

98.     In September 2013, News' share of the all commodity volume ("ACV") of grocery, drug, and dollar stores was approximately 83%, 84%, and 61.2% respectively.

99.     ACV represents the total annual sales volume of retailers and quantifies the volume of products sold through retailers.

100.     News' retail network contains a vast majority of the major national retail grocery store chains, which are the most significant stores in the sale of ISPs.

101.     Major CPG's like Dial, Heinz, Henkel, Foster Farms, Smithfield Foods, HP Hood, BEF Foods, and Spectrum Brands, all purchasers of ISPs, agree that News has a monopoly in the ISP market.

102.     According to these CPGs, "to obtain the necessary nationwide coverage, [CPGs] have to deal with one middleman, News, the only vendor with pervasive national access to retail chains by virtue of its exclusive contracts." *See* Dial Complaint.

## VIII.     NEWS' STRATEGIES USED WITH RETAILERS IN THE ISP MARKET

103.     News employs a variety of schemes designed to block its ISP competitors, including Valassis, from gaining access to retailers and from obtaining a sufficient retail network of national and regional retailers.

104.     News' schemes enhance its market power and are a substantial barrier to entry into the ISP market by preventing Valassis and other new entrants access to retailers' aisles, thereby enabling News to suppress competition and prevent new entrants from competing in the ISP market.

105.     News uses its monopoly power in the ISP market to keep competitors like Valassis out of the ISP market or from being able to offer a viable alternative to News' ISPs.

### A.     Predatory and Economically Unjustified Cash Guarantees

106.     News offers retailers cash guarantees in exchange for the retailer granting News the right to place ISPs in that retailer's stores.

107.     As they have done in the past with other competitors, shortly after Valassis entered the ISP market, News began offering predatory and economically

20

unjustified cash payments or "guarantees" to certain retailers for aisle space for ISPs, the relevant input, in order to prevent the retailers from awarding input contracts to Valassis.

108.    Retailers have informed Valassis that News' guarantees were economically unjustified.

109.    For instance, retailers have informed Valassis that News admitted it losing money based on the high guarantees that News had agreed to pay the retailer.

110.    Another retailer told Valassis that News is throwing money at the retailer in order to keep the stores and thereby prevent Valassis from obtaining a contract with the retailer.

111.    One retailer told Valassis that News' guarantee to the retailer was beyond what any competitor would ever offer the retailer.

112.    Upon information and belief, the guarantees caused News' relevant measure of cost of the relevant output, ISPs sold to CPGs for placement in those retailers' stores, to exceed the revenues generated by News in the sale of those outputs to CPGs.

113.    Thus, upon information and belief, the prices (the guarantees) that News pays retailers for aisle space are predatory.

114.    Further, there is a dangerous probability that News, after successfully driving out or excluding competition in the ISP market, will recoup the losses it incurred in driving up input prices either by exercising monopsony power over the input and forcing retailers to accept prices below the levels that would prevail in a competitive market, and/or by exercising monopoly power in the output market and raising output prices to monopolistic levels.

115.    News' cash guarantees are used to preclude competitors, like Valassis, from obtaining a critical mass of retailers and thereby block competitors from gaining any significant foothold in the ISP market.

### B.    <u>Long-Term, Exclusive Contracts with Staggered Expiration Dates</u>

116.    News requires retailers to agree to long-term contracts with overly broad exclusivity provisions that prohibit retailers from allowing other ISP providers from placing ISPs within the retailers' aisles.

117.    For example, News contracted with one retailer for ten years and another retailer for seven years.

118.    News forces retailers to accept contracts that make it difficult for the retailer to terminate the contract.

119.    For instance, many retailers can only terminate their contract with News for cause, which is limited to a material breach of the agreement by News.

120.    News' contracts also require the retailer to give News a lengthy period to cure the breach.  In some cases, a retailer must give News 60 days to cure, but many retailers are required to give News 90 or 120 days to cure.

121.    In at least one instance, a major national retailer can only terminate if there is a "repeated" material breach by News.  "Repeated" is defined as three or more material breaches.

122.    News' contracts also contain terms that extend the length of the contract beyond the original termination date of the contract.

123.    As an example, many of News' contracts give News sixty days after the date of the contract's termination to remove its ISP tactics from the retailer's stores and contain an express provision that only News—and not the retailer—may remove News' ISP tactics from the retailer's stores.

124.    News also employs automatic roll-overs, which automatically renew the contract if the retailer does not give notice of termination six months prior to the original termination date.

125.    In one contract, after the roll-over becomes effective, News is allowed to continue placing ISPs at the retailer three more months after the one-year extension terminates, and News—and only News—is allowed to remove its ISPs from the retailer's stores within thirty days after the three-month period has expired.

23

126.    News uses another scheme to block its competitors from contracting with retailers: News intentionally staggers the expiration dates of its retailer contracts so that in any given year nearly two-thirds of the retailers are unable to contract with a competitor of News.

127.    Marty Garofalo, News America's Executive Vice President of Trade until May 2013, said:

> The last of our four great strengths is our overall strategy for winning the business, and this is a multifaceted strategy. It . . . starts with staggered retail deals, and News America, we intentionally stagger the time of major retail deals to minimize the risk of losing a major number of stores in any one time period . . . . [T]his strategy serves to deter a major competitor from joining the in-store fray because they know it will take a long time and it would be a very hard fought drawn out process to develop the critical mass necessary to be successful in this area.

128.    Marty Garofalo has also said:

> We also stagger the deals to prevent a large percentage of the network from being vulnerable at any specific point in time. . . . This method allows us to concentrate on our key negotiations. It also means that any competitor who wants to develop critical mass for their network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way.

129.    Staggering long-term contracts insures that a competitor will not be able to build a sufficiently large network of retailers to be a viable competitor to News, thereby preserving News' ISP monopoly.

24

130.     News' use of long-term, exclusive contracts with staggered expiration dates, alone or in combination with News' other schemes, forecloses competition for approximately 83% of the ACV of grocery stores, 84% of the ACV of drug stores, and 61.2% of the ACV of dollar stores within the ISP market.

### C.     Right-of-First-Refusal Contracts for New Tactics

131.     News requires retailers to enter into "right of first refusal" contracts.

132.     These contracts require retailers to inform News of any new ISP products developed by potential competitors, and to allow News first rights to contract with the retailer for the exclusive rights to sell those new products at the retailer.

133.     One example is an ISP called the Wedge®, which is exclusively sold by Valassis on behalf of a third party.

134.     The Wedge® was unlike any ISP offered by News.

135.     Specifically, the Wedge® is a motion-activated LED panel that illuminates a CPG's brand equity message when a consumer approaches within 10 feet and provides 180 degrees of visibility.

136.     When News learned that Schnuck Markets, Inc. ("Schnucks") was considering using the Wedge®, News asserted that Schnucks was prohibited from contracting with Valassis for the Wedge®, even though News did not have a comparable ISP product.

25

137.    News also threatened to sue Valassis if it continued to solicit business from Schnucks.

138.    Valassis advised News that it was not aware of News' purported contract with Schnucks and that it had not encouraged or enticed the retailer to breach any contract with News.

139.    News nonetheless maintained its threats.

140.    Shortly after Valassis introduced the Wedge®, News began offering a competing product that it also called the "Wedge."

141.    News' "Wedge" is a cardboard triangular promotion that does not have a digital component.

142.    News' use of the trademarked term, the "Wedge," causes confusion in the marketplace and is an attempt to misrepresent to CPGs and retailers that News' product is similar to or the same as the product offered by Valassis.

143.    News prevents retailers from contracting with Valassis, even for other types of ISPs even when News did not have comparable or substantially similar ISP products.

144.    For example, Valassis tried placing an ISP called the "Video Edge" at Safeway, Inc. ("Safeway"), Ahold USA ("Ahold"), Giant Eagle, Inc. ("Giant Eagle"), and Publix Super Markets, Inc. ("Publix").

145.    Although News did not have a comparable or substantially similar ISP to Valassis' Video Edge, News prohibited retailers from contracting with Valassis for the Video Edge.

146.    Valassis also tried placing an ISP called "Pop Signs" or "Deal Pop" at Kroger, Schnucks, Tops Markets, LLC ("Tops"), and Food Lion.

147.    Although News did not have a comparable or substantially similar ISP to Valassis' Pop Signs, News prohibited retailers from contracting with Valassis for the Price Pop.

148.    News' use of right-of-first-refusal clauses, alone or in combination with News' other schemes, forecloses competition for approximately 83% of the ACV of grocery stores, 84% of the ACV of drug stores, and 61.2% of the ACV of dollar stores within the ISP market.

149.    News' right-of-first-refusal clauses eliminate bargaining, discourage innovation, and allow News, a monopolist in the ISP market, to free-ride and profit from the ingenuity of its potential competitors without having to expend research and development costs.

150.    Right-of-first-refusal clauses result in higher overall prices in the market and stymie innovation as competitors opt against expending resources to develop new and better ISP products.

## IX.     NEWS' STRATEGIES USED WITH CPGs IN THE ISP MARKET

151.     News implements a variety of schemes designed to unlawfully acquire and maintain the ISP business of CPGs.

152.     News' schemes prevent CPGs from awarding Valassis their business, even if CPGs prefer Valassis as their ISP provider.

153.     News' schemes prevent Valassis from gaining access to CPGs and obtaining any significant share of the CPG business.

154.     News' schemes foreclose competition, enhance its market power, and are a substantial barrier to entry into the ISP market, enabling it to suppress competition and prevent new entrants from competing in the ISP market.

### A.     Long-term, Exclusive Contracts

155.     News requires CPGs to give News highly restrictive exclusive long-term contracts to place the CPGs' ISPs within retailers' aisles.

156.     The term of the contracts is often two, three, four or more years.

157.     News also forces CPGs to accept contracts that make it difficult for the CPGs to terminate their ISP contract with News.

158.     In some cases, the contract can only be terminated for breach of material obligations or if the CPG files bankruptcy.

159.     In other cases, the CPG can only terminate the contract for gross negligence or intentional misconduct by News.

28

160.    News' contracts also require the CPG to give News a lengthy period to cure the breach, in some instances, sixty or more days.

161.    If the CPG terminates the contract for any reason other than an uncured breach of contract, some contracts require the CPG to return all rebates and signing bonuses.  In some instances, News does not allow the CPG to pro-rate the amount returned to reflect the extent the original term of the contract was not executed.

162.    News' contracts also contain terms that extend the length of the contract beyond the original termination date of the contract.

163.    News employs automatic roll-overs, in which the contract is automatically renewed if the retailer does not give notice of termination ninety days prior to the original termination date.

164.    According to Dial, Heinz, Henkel, Foster Farms, Smithfield Foods, HP Hood, BEF Foods, and Spectrum Brands, News extends the contracts to make them effectively exclusive for longer periods such as a decade or more, without the CPGs seeking competitive bidding under a request for proposal process.

165.    If a CPG does not award News a long-term, exclusive contract, News imposes a financial penalty on the CPG through increased ISP rates.

166.     News' use of long-term, exclusive contracts with staggered expiration dates, alone or in combination with News' other contract provisions, forecloses competition in at least 70% to 85% of the ISP market.

B.     **Schemes to Prevent CPGs from Utilizing Valassis' Retailers**

167.     Before Valassis entered the ISP market, News would reduce ISP rates paid by certain CPGs if News' retailer network decreased.

168.     After Valassis entered the ISP market, News imposed policies that made it economically unviable for CPGs to use another ISP provider for the placement of ISPs at a retailer that leaves News' network.

169.     News will not adjust the ISP rates to reflect that its retailer network has decreased in size or quality.

170.     Specifically, if News loses a contract with a regional or national retailer chain, News requires CPGs to substitute another retailer that may not be comparable to the retailer that was lost.

171.     The substituted retailer may have fewer stores, lower consumer sales, and/or lack the regional or national geographic coverage desired by CPGs.

172.     When CPGs would prefer to select stores within Valassis' retailer network for placement of their ISPs, they cannot do so because News' pricing structure effectively requires CPGs to take all or none of News' retailer network.

173.     If the CPG declines to accept News' substituted retailer, News does not lower the CPG's ISP price to reflect the decreased size or quality of the substituted retailer.

174.     By refusing to lower the ISP price to reflect the decreased size and quality of the substituted retailer, News makes it economically unviable for a CPG to also purchase ISPs for placement within a retailer network of News' competitors.

175.     News uses this pricing scheme knowing that CPGs are not in a financial position to purchase promotions for placement in both News' and Valassis' retailer networks.

176.     News' pricing structure prevents CPGs from contracting with News' competitors, like Valassis.

177.     Because of News' monopoly power in the ISP market, CPGs are forced to award their ISP business to News and forego their choice of ISP providers or mix of retailers.

178.     News' use of long-term, exclusive contracts with staggered expiration dates, alone or in combination with News' other contract provisions, forecloses competition in at least 70% to 85% of the ISP market.

### C.  <u>Right-of-First-Refusal Agreements for Contract Renewals</u>

179.    News forces CPGs to give News a right-of-first-refusal, which obligates the CPG to offer a new contract to News when the CPG's contract terminates.

180.    The right-of-first-refusal often prevents the CPG from putting its ISP business out for bid, thereby preventing competition for the CPG's ISP contract.

181.    If a CPG does not award News such a right-of-first-refusal, News imposes a financial penalty on the CPG through increased ISP rates and reduced access to the retailers' aisles.

182.    News' use of long-term, exclusive contracts with staggered expiration dates, alone or in combination with News' other contract provisions, forecloses competition in at least 70% to 85% of the ISP market.

### D.  <u>Requirements Contracts</u>

183.    News' contracts obligate the CPG to purchase all or virtually all of its ISPs from News.

184.    If a CPG does not purchase the amount of ISPs set forth in the contract with News, News imposes a financial penalty on the CPG through increased ISP rates and reduced access to the retailers' aisles.

185.    Alternatively, News requires the CPG to extend the term of the contract until the CPG satisfies the requirements.

186.    News' use of long-term, exclusive contracts with staggered expiration dates, alone or in combination with News' other contract provisions, forecloses competition in at least 70% to 85% of the ISP market.

### E.    Increased ISP Prices for CPGs that Buy Valassis' FSIs

187.    News uses its ISP dominance to improperly influence CPGs' purchasing decisions in the ISP and other markets.

188.    For example, News penalizes CPGs with higher ISP pricing if the CPG awards all or part of its FSI business to Valassis.

189.    Aware that CPGs need News' ISP retailer network, News offers certain CPGs an ISP "rebate," an ISP "discount," or otherwise better ISP prices in exchange for FSI business.

190.    Although News calls it a volume discount, "value for volume" or "value added," this same behavior was deemed unlawful in 2009 by a Wayne County jury.

191.    Purchasing ISPs and FSIs together does not result in any cost or other efficiencies that benefit CPGs, such as increased quality, significantly lower costs, or the introduction of new or better products that would result in discounts, rebates, or other reduced ISP pricing based on the volume of FSIs sold to CPGs.

192.    Rather, News' pricing practices are penalties used by News to punish CPGs for contracting with Valassis.

**X.**     **NEWS' EFFORTS TO HARM VALASSIS' REPUTATION IN THE ISP MARKET**

193.    In addition to the strategies set forth above, News also uses a variety of tricks and misrepresentations designed to mislead CPGs and retailers into believing that Valassis' ISPs are of inferior quality, or that Valassis is unable to effectively implement CPGs' ISP programs.

194.    News' misrepresentations and tricks harm Valassis' reputation, cause Valassis to incur increased costs when it has to replace ISPs or otherwise compensate CPGs, create confusion among CPGs and retailers, harm CPGs since News' tactics are aimed in part at the CPGs that purchase ISPs from Valassis, and harm retailers since News' tactics are being implemented in part through the retailers and at their stores.

**A.    Refusing to Remove ISPs Tactics from Retailers' Aisles**

195.    When News loses a retailer contract to Valassis, News will not remove its ISPs from the retailer's aisles.

196.    For instance, when Valassis was awarded an exclusive retailer contract by SuperValu, News continued placing ISPs at SuperValu for six months after SuperValu informed News that its contract was terminated.

197.    At Associated Wholesale Grocers, Inc. ("AWG"), News was informed that the retailer contract was terminated and that an exclusive contract had been

awarded to Valassis, yet News continued placing its ISPs at certain stores within the AWG network.

### B.   Removing Valassis' ISP Products from Retailers' Aisles

198.    News removes Valassis' ISPs from the aisles of retailers that have contracts with Valassis.

199.    For instance, a store manager at a Super Save store in Texas informed Valassis that one of News' representatives removed Valassis' ISPs and replaced them with News' ISPs.

200.    As another example, an agent hired by Valassis to place Valassis' ISPs at stores informed Valassis that News had removed Valassis' ISPs from Harvest Fare stores located in Baltimore, Maryland.

### C.   Misrepresenting the Breadth of Its Retailer Network

201.    News misrepresents that certain stores are part of its retailer network when in fact they are not.

202.    For instance, Valassis has been the exclusive ISP provider for Rite Aid Corporation and Family Dollar Stores, Inc. since January 2013.

203.    As of November 8, 2013, News still misrepresented on its website that these stores are part of its retailer network.

204.    In July 1, 2013, News falsely represented on its website that it had 58,500 retailers in its network, when News only had approximately 52,500 retailers in its network.

205.    On a number of occasions, News has misrepresented to CPGs and retailers that a certain cycle of ISPs is "owned" by News when it is actually under contract with Valassis.

## XI.        THE FSI MARKET

### A.        The Relevant Product Market for FSIs

206.    FSIs are multi-colored promotions and advertising booklets containing coupons that are distributed directly to consumers' homes.

207.    FSIs are sold by News and Valassis to CPGs.

208.    Each booklet contains pages purchased by multiple CPGs.

209.    The principal purchasers of FSIs are CPGs.

210.    Because of the unique characteristics of FSIs, if the price of FSIs were to rise, CPGs would not significantly alter their FSI strategy.

211.    As such, FSI prices are not effectively constrained by other promotional devices, particularly other forms of advertising.

212.    Accordingly, there is a low cross-elasticity of demand between FSIs and other forms of marketing, advertising, or display efforts.

213.    FSIs target shoppers before they enter the store.

214.    The consumer's decision to clip the coupon for use in shopping is made prior to the shopping trip, and a relationship with the retailer is not required to distribute the coupons to the shopper.

215.    FSIs are not reasonably interchangeable with ISPs or other forms of advertising to consumers.

216.    FSIs and ISPs are complements but not substitutes for each other.

217.    FSIs and ISPs are separate and distinct products, as there is demand from CPGs for FSIs to be sold separately from ISPs, and such separate sales are common.

218.    FSIs are separate and distinct from ISPs and other promotional products in numerous respects, leaving FSIs without a reasonably interchangeable substitute.

219.    The unique characteristics of FSIs include, but are not limited to:

(a)    The ability to reach 60 to 74 million households weekly, or to target subsets of this group, reflecting an unmatched level of interest and penetration;

(b)    An efficient distribution system, which provides an extremely cost-effective way to reach a large population;

(c)    A low cost per coupon redeemed;

(d)    Provision of a tangible form of special product-specific offer that is collected and stays with the coupon-clipper until the time of purchase;

(e)    Ability to target a particular type of buyer who prepares in advance of shopping for those items that he or she intends to

37

buy, and is thereby induced to seek out a particular item based on the FSI;

(f)  Ability to provide a sufficiently diversified collection of CPG offerings that are available at a single local retail outlet for the coupon-clipper; and

(g)  No single marketing alternative accomplishes more marketing objectives, which include but are not limited to the ability to: increase retailer sell-in and support; drive traffic to retailer; drive incremental volume to retailers and manufacturers; build brand awareness, image, and equity; attract new customers to the brand; and reward customer loyalty.

220.   Moreover, the cost, reach, and effectiveness of FSIs and ISPs differ.

221.   There are no cost justifications or savings from selling or purchasing FSIs and ISPs together.

222.   Thomas Leprine, who was News America's Vice President of Business Operations in 2009, testified that the production of ISPs is "completely independent" of the production of FSIs.

223.   Mr. Leprine also testified that getting more or less volume of FSIs has no effect on the costs or efficiencies of ISPs.

224.   Mr. Leprine also testified that selling more (or less) volume of ISPs had no effect on the costs or efficiencies of FSIs.

225.   Mr. Leprine also testified that there are no operating or variable cost savings when a CPG purchases or News produces both FSIs and ISPs.

### B.    The Relevant Geographic Market for FSIs

226.    The relevant geographic market for FSIs is the United States, and its regional sub-markets.

227.    CPGs purchase FSIs from News and Valassis for delivery to consumers' homes in the United States.

228.    Consumers of CPGs' products use the FSI coupons at retailers located in the United States.

### C.    News' Dominance in the FSI Market

229.    In 2012, 91% of the 305 billion coupons distributed to consumers in the United States were distributed through FSIs.

230.    Valassis and News sold approximately $718,365,000 worth of FSI page volumes in 2012.

231.    Valassis and News are the only two providers of FSIs in the United States, between them capturing 100% of the FSI market.

232.    News and Valassis waged a relatively even competitive battle for FSIs until News began leveraging its ISP monopoly in 2000

233.    During that time, the market share of Valassis and News hovered around 50%, with one company having slightly more in some years and the reverse happening in other years.

234.     Between 2002 and 2006, News' FSI market share grew from 44% to 63%, compelling News to declare that the market was no longer a duopoly, meaning, of course, that News had monopolized the FSI market.

235.     News reported to its investors in June 2013 that it controls 65% of the FSI market.

## XII.     NEWS MAINTAINS ITS ILL-GOTTEN DOMINANCE IN THE FSI MARKET

236.     News uses its dominance in the ISP market to make it economically unviable for certain CPGs to give their FSI business to Valassis.

237.     By employing a variety of schemes, News coerces certain CPGs to purchase News' FSIs in order for the CPG to gain access to News' national and regional retailer network in the ISP market.

238.     The schemes block Valassis from gaining access to CPGs and allow News to unlawfully maintain its ill-gotten dominance in the FSI market.

### A.     Pricing Schemes Used to Maintain News' FSI Dominance

239.     When CPGs consider purchasing FSIs from Valassis rather than News, News threatens to raise the price the CPGs must pay for News' ISP products.

240.     This price increase is accomplished in a variety of ways.

241.     For some CPGs, News raises prices by "revoking" ISP "discounts" that News had previously provided to the CPG.

40

242.    For other CPGs, News raises prices by imposing higher ISP prices as a penalty for the CPG's purchase of FSIs from Valassis rather than News.

243.    Still other CPGs are told by News that the price differential between the ISP price with an FSI contract as compared to the ISP price without an FSI contract represents a "volume" discount.

244.    In reality, no such volume discount exists.

245.    For other CPGs, News offers rebates, bonuses, or free ISPs or ISP cycles that, when factored into the FSI pricing offered to those CPGs, results, upon information and belief, in News selling FSIs below News' incremental costs to produce and distribute the FSI.

246.    When CPGs have resisted News' economic pressure and purchased FSIs from Valassis, News has imposed ISP pricing penalties in the hope that the increased ISP prices would cause that particular CPG to choose News' FSIs in the future.

247.    Certain CPGs prefer to award Valassis their FSI business, but News' financial pressure prevents them from doing so and economically coerces those CPGs to sign long-term FSI and ISP contracts with News.

248.    There are many examples of News using its monopoly in ISPs to win FSI business.

249.    One example is a CPG who reported to Valassis that News gave the CPG a proposal that tied FSIs to ISPs.

250.    The CPG reported that if it gave Valassis its FSI business, News would increase its ISP rates.

251.    The CPG also told Valassis that even if Valassis' FSI price was lower, it would not make economic sense to give Valassis its FSI business because of how News' proposal was structured.

252.    News told another CPG that it would receive reduced pricing on ISPs if the CPG gave News at least 75% of its FSI business.

253.    News told one CPG that its ISP prices would increase by 20% if the CPG no longer ran FSIs with News.

254.    Another CPG told Valassis that, even though Valassis had a lower FSI price, News offered more "value added" because News gave the CPG two free ISP programs.

255.    Yet another CPG told Valassis that its "aggressive proposal was not sufficient to win" the CPG's business "considering the single source advantages," i.e. the FSI and ISP pricing, offered by News.

256.    An agent for another CPG reported that, since the CPG was planning to execute both in-store and FSI campaigns this year, the in-store savings with News outweighed the savings from using Valassis for the FSI.

257.    Other CPGs reported receiving "rebates" on ISPs from News when the CPGs gave News their FSI business.

258.    CPGs have told Valassis that it is not competitive nor could Valassis be competitive because of News' subsidized bundled pricing.

259.    Another CPG said that it would buy FSIs from Valassis, but Valassis' ISP retailer network "did not have value" and the CPG worried about the ISP "penalty" it would be charged by News.

260.    Yet another CPG said Valassis' FSI rate was lower than or competitive to News' FSI rate, but it was "not in the ball park" when compared to News' overall pricing (or, as the CPG put it, "the total value based on everything we would buy from News," which included ISPs).

261.    One CPG told Valassis that it wins "the battle for consultation, analytics and [Valassis'] service model approach," but Valassis lost on price because News offered a "bundled" deal that included News' ISPs.

262.    In each of the examples above, Valassis was harmed in one of two ways.

263.    In many of the examples, Valassis did not win the CPG's FSI business even though in many cases Valassis' FSI price was lower than News' price.

264.     If Valassis did win the FSI contract, the price paid by the CPG was lower than would have existed in a competitive market in which Valassis did not have to compete against or match News' in-store pricing schemes.

**B.**     **Long-term, Exclusive, Right-of-First-Refusal, Requirements Contracts**

265.     News also uses its power over ISP pricing to obtain long-term, exclusive right-of–first-refusal contracts with FSI customers that, in certain cases, also obligate the FSI customer to purchase virtually all of its FSIs from News.

266.     If the CPG does not award News a long-term, exclusive right-of-first-refusal, requirements contract, News imposes a financial penalty on the CPG through increased ISP rates.

267.     As confirmed by the experiences of Dial, Heinz, Henkel, Foster Farms, Smithfield Foods, HP Hood, BEF Foods, and Spectrum Brands, News forces CPGs to enter into two, three, or four-year contracts that News "routinely extends to make them exclusive for multiple additional years."

268.     News' contracts also contain terms that extend the length of the contract beyond the original termination date of the contract.

269.     News employs automatic roll-overs, which automatically renew the contract if the CPG does not give notice of termination ninety days prior to the original termination date.

270.     In some cases, the contract is automatically renewed or extended if the CPG fails to purchase a certain amount of FSIs during the original contract term.

271.     In combination, News' use of long-term, exclusive and right-of-refusal contracts has resulted in contracts that are eight, ten, or more years in duration.

272.     News also forces CPGs to accept contracts that make it difficult for them to terminate their FSI contract with News.

273.     In some cases, the contract can only be terminated for breach of material obligations or if the CPG files bankruptcy.

274.     In other cases, the CPG can only terminate the contract for gross negligence or intentional misconduct by News.

275.     News' contracts also require the CPG to give News a lengthy period to cure the breach, in some instances, sixty or more days.

276.     If the CPG terminates the contract for any reason other than an uncured breach of contract, some contracts require the CPG to return all rebates and signing bonuses.

277.     In some instances, News does not allow the CPG to pro-rate the amount returned to reflect the extent the original term of the contract was not executed.

278.    News employs right-of-first-refusal contracts that give News first rights to sell FSIs to the CPG before the CPG offers Valassis the option to sell FSIs to the CPG.

279.    Right-of-first-refusal contracts prevent CPGs from putting their FSI business out for bid, thereby foreclosing competition for the CPG's FSI business.

280.    News' contracts contain provisions that penalize a CPG if it places an FSI within a Valassis FSI insert.

281.    One penalty utilized by News is to force the CPG to pay News the amount that News would have received had the CPG purchased the FSI from News rather than Valassis.   This results in the CPG paying twice for the same FSI without receiving a second FSI that is distributed to consumers.

282.    In other instances, News will "short rate" and substitute its prevailing rate card rates for all contracted business (i.e., business contracted both before and after the determination is made that the CPG has not provided News with a right of first refusal).

283.    News' "prevailing rate card rates" are substantially higher than any contracted rate paid by any CPG for FSIs.

284.    News' use of long-term, exclusive contracts with staggered expiration dates forecloses competition in 65% of the FSI market.

## XIII.　　　NEWS IMPROPERLY THREATENS TO SUE VALASSIS

285.　　In addition to the above, News threatens to sue Valassis if it responds to proposal requests from companies seeking to purchase FSIs, ISPs, or other products from Valassis.

286.　　For example, Valassis received a request for proposal from Five Below, Inc. ("Five Below"), a retailer, for a media plan for the 2013 holiday season.

287.　　Upon learning that Valassis received the request for proposal, News sent Valassis a letter threatening to sue Valassis if it even responded to Five Below's request for proposal.

288.　　Valassis advised that it was merely responding to a request for proposal, that it was not aware of News' purported contract with Five Below, and that it had not encouraged or enticed the retailer to breach any contract with News.

289.　　News nonetheless maintained its threats.

290.　　News also threatened to sue Valassis if it continued to solicit business from Schnucks.  *See* ¶¶ 131-139.

## XIV.　　　INJURY TO COMPETITION

291.　　Competition in the FSI and ISP markets is damaged by News' illegal conduct.

Case 1:17-cv-07378-PKC   Document 1   Filed 11/08/13   Page 53 of 89

292.    This damage manifests itself in different ways, as described in more detail below.

## A.    Harm to Retailers

293.    News' conduct harms retailers by reducing retailers' choice and coercing retailers to contract with News for ISP placements within the retailer's stores based on, among other things, the unjustifiably high and predatory cash guarantees that News gives retailers.

294.    These guarantees have no correlation to the revenues generated from selling ISPs to CPGs for placement at the retailer's stores.

295.    Before Valassis entered the ISP market, News possessed monopsony power in the ISP market that allowed News to purchase the relevant input, retailers' aisle space, at prices (or cash guarantees) that were lower than would have existed in a competitive market.

296.    Shortly after Valassis entered the ISP market, News began offering retailers economically unjustified and predatory guarantees in order to prevent the retailers from awarding input contracts to Valassis.

297.    Upon information and belief, News' guarantees caused its relevant measure of costs for the output, ISPs sold to CPGs for placement in those retailers' stores, to exceed the revenues generated by News in the sale of those outputs to CPGs.

48

298.    There is a dangerous probability that News will succeed in excluding competitors from the ISP market.

299.    There is a dangerous probability that News will recoup its investment in below-cost pricing by reducing the price of the input (aisle space in retailers' stores) to monopsonistic levels and/or by increasing the price of the output (ISPs sold to CPGs) to monopolistic levels.

300.    In addition to and in combination with the cash guarantees, News employs other anticompetitive practices to harm retailers, including (a) long-term, exclusive contracts with staggered expiration dates; (b) right-of-first-refusal contracts for new tactics; (c) refusing to remove its ISPs from retailers' aisles when it no longer has a contract with the retailer; (d) removing Valassis' ISPs from retailers' stores; and (e) misrepresenting the breadth of News' retailer network.

301.    These anticompetitive practices, alone or in combination, suppress competition on the merits by preventing retailers from contracting or bargaining with other ISP providers.

302.    News' anticompetitive practices, alone or in combination, raise barriers to entry into the ISP market by new competitors and discourage innovation.

303.    The effect of News anticompetitive practices is to preserve News' monopoly power in the ISP market.

### B.        Harm to CPGs Through Reduced Choice

304.    News' conduct harms CPGs by reducing CPGs' choice and coercing CPGs to choose FSIs from News based on the ISP penalty imposed on CPGs if they choose Valassis as the CPG's FSI-provider.

305.    News' conduct further reduces CPGs' choice by forcing CPGs to choose ISPs from News because no other ISP provider possesses the critical mass of national and regional retailers to effectively compete with News' retailer network and thereby provide a comparable or viable alternative to News' ISPs.

306.    By preventing retailers from contracting with ISP providers offering ISPs not offered by News (like the Wedge®), News limits the ISP offerings available to CPGs.

307.    News' conduct suppresses competition on the merits in the FSI and ISP markets.  Certain CPGs would prefer to contract with Valassis, but they are coerced into contracting with News based not on the merits of News' products, but on the financial penalties they would suffer if they contracted with Valassis.

308.    If News' conduct continues and forces Valassis eventually to exit the FSI market or become competitively irrelevant, News will obtain a monopoly that will allow News to increase FSI prices to all CPGs, even those that do not utilize significant (or any) ISPs.

309.    If News' conduct continues and forces Valassis eventually to exit the ISP market, News will become the only national and regional ISP provider, which will allow News to increase ISP prices to all CPGs, even those that purchase their FSIs from News.

310.    This anticompetitive conduct, alone or in combination, suppresses competition on the merits by preventing CPGs from contracting or bargaining with Valassis and raising barriers to entry into the ISP market by new competitors.

311.    The effect is to preserve News' monopoly power in the ISP market and to maintain its dominance in the FSI market.

### C.    Harm to CPGs by Increased ISP Costs and Diminished ISP Value

312.    News' conduct increases the price of ISPs paid by CPGs that purchase their FSIs from Valassis.

313.    News' conduct increases the costs paid by CPGs when the CPG purchases an ISP from Valassis.

314.    By not removing its ISPs from a retailer no longer under contract with News or by installing ISPs in a store under contract with Valassis, News diminishes the value of the ISPs purchased by CPGs that are placed in competition next to News' ISPs.

315.    By removing Valassis' ISPs from stores under contract with Valassis, News interferes with CPGs' ISP programs and prevents CPGs from obtaining the full value of those programs.

316.    News' unlawful conduct allows it to maintain its dominance in the FSI market.  If News' conduct continues and forces Valassis to eventually exit the FSI market or become competitively irrelevant, News will obtain a monopoly that will allow News to increase FSI prices to all CPGs, even those that do not utilize significant (or any) ISPs.

317.    If News' conduct continues and forces Valassis eventually to exit the ISP market, News will become the only national and regional ISP provider.

318.    This will allow News to increase ISP prices to all CPGs, even those that purchase their FSIs from News.

319.    News' anticompetitive conduct, alone or in combination, suppresses competition on the merits by preventing CPGs from contracting or bargaining with Valassis and raising barriers to entry into the ISP and FSI markets by new competitors.

320.    News' anticompetitive conduct preserves News' monopoly power in the ISP market.

321.    News' anticompetitive conduct threatens to allow News to achieve monopoly power in the FSI market.

### D.   Harm to Consumers of CPGs' Products

322.   News' anticompetitive conduct harms the consumers of CPGs' products.

323.   By limiting retailer and CPG choice (as described above), News reduces consumer choices by reducing the output of FSI and ISP coupons and advertising to consumers.

324.   Because fewer coupons are available to consumers, they cannot purchase CPGs' products at lower prices, which results in consumers paying higher prices than would exist in a competitive market.

## XV.   ANTITRUST INJURY AND DAMAGE TO VALASSIS

325.   Valassis, as a competitor of News in the FSI and ISP markets, has suffered injury as the proximate result of News' anticompetitive and unlawful conduct.

326.   News' strategies have increased Valassis' costs to operate in the FSI and ISP markets.

327.   They have also damaged Valassis' business and reputation.

328.   They have prevented CPGs and retailers from purchasing ISP innovations developed by Valassis or sold by Valassis on behalf of other ISP providers.

329.     News' strategies have restrained competition by allowing News to avoid competing with Valassis on price and quality of FSI and ISP services and products.

330.     News' strategies have also allowed News to avoid competing on innovations in the ISP market.

331.     Valassis' injury constitutes antitrust injury because it flows from that which makes News' acts unlawful, and is of the type the antitrust laws were intended to prevent.

332.     News' unlawful conduct has the effect of foreclosing Valassis and other competitors from competing on the merits with News for FSIs, ISPs, and retailer aisle space.

333.     News' conduct prevents Valassis and other competitors from offering ISP products within a retailer network that is comparable to News' network.

334.     In certain instances, Valassis is forced either to forego contracting with CPGs or to match News' FSI prices which, upon information and belief, are set below News' incremental costs.

335.     Valassis is forced either to forego contracting with retailers or to pay retailers the same or more than exorbitant and economically unjustified guarantees paid by News, which cause News' costs incurred in placing ISPs in those retailers' stores to exceed the revenues News receives from CPGs for those ISPs.

<u>COUNT I</u>

**Monopolization of the ISP Market**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

336.    Plaintiff incorporates all previous paragraphs herein by reference.

337.    News has monopolized the relevant market for the sale of ISPs in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

338.    News has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to acquire or maintain market power in the relevant ISP market.

339.    News has monopsonized the input of the ISP market—access to retailers' aisle space—through, among other things, long-term, exclusive retailer contracts with staggered expiration dates; right-of-first-refusal clauses for new ISP tactics; and excluding access to the input by increasing the cost of the input through cash guarantees paid to the retailers.

340.    News has monopolized the output of the ISP market—sales of ISPs to CPGs—through, among other things, long-term, exclusive contracts with CPGs; preventing CPGs from utilizing the retailer network of News' competitors; right-of-first-refusal contracts; requirements contracts; and increased ISP prices for CPGs that purchase FSIs from Valassis.

341.    News has also monopolized the ISP market by, among other things, removing Valassis' ISP tactics from stores under contract with Valassis, refusing

to remove News' ISP tactics at stores under contract with Valassis, installing News' ISP tactics at stores under contract with Valassis, and misrepresenting the breadth of News' retailer network.

342.    The ISP market is characterized by high barriers to competitive entry and expansion.

343.    News' anticompetitive conduct, individually or taken as a whole, has unlawfully excluded and suppressed competition for access to retailers' aisle space and the sale of ISPs to CPGs.

344.    News' conduct is intended to eliminate competition in the ISP market and achieve a monopoly for News.

345.    Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

346.    If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

## COUNT II
### Predatory Pricing in the ISP Market (Retailers)
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

347.    Plaintiff incorporates all previous paragraphs herein by reference.

348.    Valassis and News are competitors in the ISP market.

349.    News has willfully and purposefully engaged in predatory pricing designed to monopolize the ISP market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

350.    News offers predatory cash payments or "guarantees" to certain retailers for access to the retailers' aisle space, the relevant input, in order to prevent the retailers from awarding input contracts to Valassis.

351.    Upon information and belief, the guarantees have caused News' incremental cost of the relevant output, ISPs sold to CPGs for placement in those retailers' stores, to exceed News' revenues generated in the sale of those outputs to CPGs.

352.    Further, there is a dangerous probability that News, after successfully driving out or excluding competition in the ISP market, will recoup the losses it incurred in driving up input prices either by exercising monopsony power over the input and forcing retailers to accept prices below the levels that would prevail in a competitive market, and/or by exercising monopoly power in the output market and raising output prices to monopolistic levels.

353.    Competition in the ISP market as a whole is damaged by News' predatory pricing.

354.    The ISP market is characterized by high barriers to competitive entry and expansion.

355.     News' anticompetitive conduct has unlawfully excluded and suppressed competition for access to retailers' aisle space and the sale of ISPs to CPGs.

356.     Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

357.     Valassis needs access to retailers' aisle space in order to place its ISPs, purchased by CPGs, within the retailers' stores.

358.     News' predatory cash guarantees prevent Valassis from being able to obtain a critical mass of retailers at which Valassis can place its ISPs.

359.     Without access to retailers' aisles, Valassis is unable to offer CPGs an ISP product that is a viable alternative to News' ISPs, and Valassis cannot effectively compete with News or maintain any significant ISP market share.

360.     News' conduct is intended to eliminate competition in the ISP market and achieve a monopoly for News.

361.     By driving Valassis from the market through the use of anticompetitive tactics, News will become the only national and regional provider of ISPs.

362.     If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

## COUNT III

### Attempt to Monopolize the FSI Market
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

363.    Plaintiff incorporates all previous paragraphs herein by reference.

364.    News has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to monopolize the FSI market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

365.    News' actions manifest a specific intent to monopolize (and thereby eliminate competition in) the FSI market.

366.    News has attempted to monopolize the FSI market by utilizing, among other things, pricing schemes that make it economically unviable for CPGs to purchase FSIs from Valassis; long-term, exclusive contracts with CPGs; right-of-first-refusal contracts that prevent CPGs from negotiating with Valassis for their FSIs; requirements contracts; and threats to sue Valassis for responding to proposal requests submitted by purchasers of FSIs.

367.    News' anticompetitive conduct, individually or taken as a whole, has unlawfully excluded and suppressed competition for the sale of FSIs to CPGs in the FSI market.

368.    News' conduct has foreclosed competition in 65% of the FSI market.

369.    News' conduct is intended to eliminate competition in the FSI market and achieve a monopoly for News.

370.     The FSI market is characterized by high barriers to competitive entry and expansion.

371.     If allowed to continue, News has a dangerous probability of achieving a monopoly as News has already gained substantial market share in the FSI market, News has used anticompetitive tactics to maintain its market share, the FSI market is highly concentrated, and the barriers to entry are high.

372.     Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

373.     If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

## COUNT IV

### Exclusive Dealing in the ISP Market (Retailers)
### Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14

374.     Plaintiff incorporates all previous paragraphs herein by reference.

375.     News has unlawfully restrained trade and has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to acquire or maintain a monopoly in the relevant ISP market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Section 3 of the Clayton Act, 15 U.S.C. § 14.

376.     News has restrained trade and monopsonized the relevant input to the ISP market by limiting competitors' access to retailers' aisle space by utilizing

long-term, exclusive retailer contracts with staggered expiration dates and right-of-first-refusal clauses for new ISP tactics.

377.   News' anticompetitive conduct, individually or taken as a whole, has unlawfully excluded and suppressed competition for access to retailers' aisle space and the sale of ISPs to CPGs.

378.   News' contracts have foreclosed competition for approximately 83% of the ACV of grocery stores, 84% of the ACV of drug stores, and 61.2% of the ACV of dollar stores within the ISP market.

379.   The anticompetitive effects of News' contracts with retailers outweigh their procompetitive benefits, if any.

380.   News' conduct is intended to eliminate competition in the ISP market and achieve a monopoly for News.

381.   The ISP market is characterized by high barriers to competitive entry and expansion.

382.   Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

383.   If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

## COUNT V

### Exclusive Dealing in the ISP Market (CPGs)
### Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14

384.    Plaintiff incorporates all previous paragraphs herein by reference.

385.    News has unlawfully restrained trade and has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to acquire or maintain a monopoly in the relevant ISP market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Section 3 of the Clayton Act, 15 U.S.C. § 14.

386.    News has restrained trade and monopolized or attempted to monopolize the ISP market through long-term, exclusive requirements contracts with CPGs that contain right-of-first-refusal clauses.

387.    News' anticompetitive conduct, individually or taken as a whole, has unlawfully excluded and suppressed competition for the sale of ISPs to CPGs.

388.    News' long-term, exclusive requirements contracts have foreclosed competition in at least 70% to 85% of the ISP market.

389.    The anticompetitive effects of News' contracts with retailers outweigh their procompetitive benefits, if any.

390.    News' conduct is intended to eliminate competition in the ISP market and achieve a monopoly for News.

391.     The ISP market is characterized by high barriers to competitive entry and expansion.

392.     Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

393.     If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

## COUNT VI

**Exclusive Dealing in the FSI Market (CPGs)**
**Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,**
**and Section 3 of the Clayton Act, 15 U.S.C. § 14**

394.     Plaintiff incorporates all previous paragraphs herein by reference.

395.     News has unlawfully restrained trade and has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to acquire a monopoly in the relevant FSI market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

396.     News has restrained trade and attempted to monopolize the FSI market through long-term, exclusive contracts with CPGs, right-of-first-refusal contracts, and requirements contracts.

397.     News' anticompetitive conduct, individually or taken as a whole, has unlawfully excluded and suppressed competition for the sale of FSIs to CPGs.

398.    News' long-term, exclusive, right-of-refusal, requirements contracts with CPGs have foreclosed competition in at least 65% of the ISP market.

399.    The anticompetitive effects of News' contracts with retailers outweigh their procompetitive benefits, if any.

400.    News' conduct is intended to eliminate competition in the FSI market and achieve a monopoly for News.

401.    The FSI market is characterized by high barriers to competitive entry and expansion.

402.    Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

403.    If unabated by this Court, News' actions will continue to cause increasing harm to competition in the FSI market.

## COUNT VII

### Bundling
### Violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14

404.    Plaintiff incorporates all previous paragraphs herein by reference.

405.    News has unlawfully restrained trade and has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to acquire a monopoly in the relevant FSI market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Section 3 of the Clayton Act, 15 U.S.C. § 14.

406.    News has unlawfully bundled FSIs and ISPs.

407.    After allocating all discounts and rebates attributable to the entire bundle of products to the competitive product, FSIs, News has sold FSIs below their incremental cost, defined as the sum of the cost of goods sold in accounting usage, marketing and/or distribution costs, research and development costs reasonably attributable to FSIs, and other costs shown to be directly avoidable if a unit of output of FSIs were not produced.

408.    The effect of News' bundles is to lessen competition substantially in the market for FSIs and foreclose competition in at least 65% of the FSI market.

409.    Valassis is unable to offer CPGs a competitive or economically equivalent bundle of ISPs and FSIs because News has prevented Valassis from contracting with retailers for access to the retailers' aisle space.

410.    By preventing Valassis from contracting with retailers, News has prevented Valassis from obtaining a critical mass or network of retailers at which Valassis can place ISPs.

411.    The result is that Valassis' retailer network is much smaller than News' network of retailers.

412.    News has thus prevented Valassis from possessing a significant and effective product that can be sold in competition with News' bundle of FSIs and

65

ISPs and that is reasonably capable of providing CPGs with an economically equivalent value.

413.     Valassis does not sell FSIs in combination with another product or products such that the combination overlaps substantially with News' bundle of FSIs and ISPs and is reasonably capable of providing CPGs with economically equivalent value.

414.     The probable effect of News' bundling of FSIs and ISPs is to lessen competition substantially in the FSI market.

415.     News' conduct is intended to eliminate competition in the FSI market and achieve a monopoly for News.

416.     If allowed to continue its conduct, News has a dangerous probability of achieving a monopoly, as News has already gained substantial market share in the FSI market, News has used anticompetitive tactics to maintain its market share, the FSI market is highly concentrated, and the barriers to entry are high.

417.     Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

418.     News America's conduct violates the Order (Dkt. #412) entered in *Valassis I*, which prohibits News America' unlawful bundling of any products.

419.     Accordingly, Valassis also is filing a motion seeking expedited discovery of News America's bundling of FSIs and ISPs in *Valassis I*, in accordance with the Order.

420.     Valassis' claims against News America for its unlawful bundling of FSIs and ISPs, as alleged in the motion seeking expedited discovery, are being pleaded here in the alternative to the relief allowed under the Order.

421.     They also are being pleaded here because News Corporation was not a named as a defendant in *Valassis I*.

422.     Valassis seeks damages from News Corporation for unlawful bundling.

423.     If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

## COUNT VIII

### Tying
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14

424.     Plaintiff incorporates all previous paragraphs herein by reference.

425.     News has unlawfully restrained trade and has willfully and purposefully engaged in a pattern of anticompetitive conduct designed to acquire a monopoly in the relevant FSI market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Section 3 of the Clayton Act, 15 U.S.C. § 14.

426.     News has unlawfully tied purchases of ISPs (the tying product) to purchases of FSIs (the tied product).

427.     ISPs and FSIs are separate products and services.

428.     Due to the unique characteristics of each, FSIs and ISPs have a low cross-elasticity of demand and are not reasonably interchangeable with each other or with other services or products.

429.     News prices FSIs and ISPs, when purchased separately, such that the CPG has no economically practical option other than to participate in the tying arrangement and purchase FSIs and ISPs from News.

430.     Further, News has sufficient economic power in the market for ISPs in the United States to restrain competition in the FSI market appreciably.

431.     News' share of the ACV of grocery, drug, and dollar stores is approximately 83%, 84% and 61.2% respectively.

432.     The tying arrangements affect a substantial volume of commerce in the FSI market, comprising numerous transactions that have value in the millions of dollars, such that the foreclosure caused thereby produces anticompetitive effects in the FSI market, and/or the arrangement presents a substantial threat that News will acquire market power in the FSI market.

433.     The effect of News' bundles is to lessen competition substantially in the market for FSIs and foreclose competition in at least 65% of the FSI market.

434.     The tying of FSIs and ISPs does not achieve any efficiency gains that benefit CPGs, such as increased quality, significantly lower costs, or the introduction of new or better products.

435.     If any efficiency does exist, the efficiencies do not substantially outweigh the competitive harms caused by News' tying arrangement.

436.     Valassis has suffered antitrust injury and damage as the proximate result of News' unlawful conduct.

437.     News America's conduct violates the Order (Dkt. #412) entered in *Valassis I*, which prohibits News America' unlawful tying of any products.

438.     Accordingly, Valassis also is filing a motion seeking expedited discovery of News America's tying of FSIs and ISPs in *Valassis I*, in accordance with the Order.

439.     Valassis' claims against News America for its unlawful tying of FSIs and ISPs, as alleged in the motion seeking expedited discovery, are being pleaded here in the alternative to the relief allowed under the Order.

440.     They also are being pleaded here because News Corporation was not a named as a defendant in *Valassis I*.

441.     Valassis seeks damages from News Corporation for unlawful tying.

442.     If unabated by this Court, News' actions will continue to cause increasing harm to competition in the ISP market.

69

## COUNT IX

### Violation of Michigan Antitrust Reform Act, M.C.L. §§ 445.772 and 445.773

443.     Plaintiff incorporates all previous paragraphs herein by reference.

444.     Defendants' actions as alleged herein violate Sections 2 and 3 of the Michigan Antitrust Reform Act, M.C.L. §§ 445.772 and 445.773.

445.     News' coercive conduct violates the Michigan Antitrust Reform Act by bundling FSIs and ISPs; tying of the purchases of ISPs to purchases of FSIs; using of long-term, exclusive retailer contracts with staggered expiration dates and right-of-first-refusal clauses for new ISP tactics; paying predatory and exclusionary cash guarantees to retailers; using long-term, exclusive requirements ISP contracts with CPGs that contain right-of-first-refusal clauses; using long-term, exclusive FSI contracts with CPGs, right-of-first-refusal contracts, and requirements contracts; improperly maintaining News ISP monopoly; and attempting to monopolize the FSI market.

446.     News' unfair and deceptive conduct has injured competition, forced Valassis to either forgo business or match the below cost and predatory prices that News charges certain CPGs and retailers, and suppressed competition by reducing the choices available to CPGs while allowing News to charge certain CPGs unlawful monopoly prices.

447.     News has flagrantly violated the Michigan Antitrust Reform Act.

448.     Valassis has suffered antitrust injury and damage in the state of Michigan as the proximate result of News' unlawful conduct.

## COUNT X

### Violation of Cartwright Act,
### Ca. Bus. & Prof. Code §§ 16720, 16726, and 16727

449.     Plaintiff incorporates all previous paragraphs herein by reference.

450.     Valassis and News are each engaged in commerce in and affecting the state of California.

451.     Defendants' actions as alleged herein violate the Cartwright Act, Ca. Bus. & Prof. Code §§ 16720, 16726 and 16727.

452.     News' coercive conduct violates the Cartwright Act by bundling FSIs and ISPs; tying of the purchases of ISPs to purchases of FSIs; using of long-term, exclusive retailer contracts with staggered expiration dates and right-of-first-refusal clauses for new ISP tactics; paying predatory and exclusionary cash guarantees to retailers; using long-term, exclusive requirements ISP contracts with CPGs that contain right-of-first-refusal clauses; using long-term, exclusive FSI contracts with CPGs, right-of-first-refusal contracts, and requirements contracts; improperly maintaining News ISP monopoly; and attempting to monopolize the FSI market.

453.     News' conduct has injured competition, forced Valassis to either forgo business or match the below cost and predatory prices that News charges certain

CPGs and retailers, and suppressed competition by reducing the choices available to CPGs while allowing News to charge certain CPGs unlawful monopoly prices.

454.     Valassis has suffered antitrust injury and damage in the state of California as the proximate result of News' unlawful conduct.

## COUNT XI

### Violation of California Unfair Trade Practices Act, Ca. Bus. & Prof. Code §§ 17043, 17044, 17070, and 17071

455.     Plaintiff incorporates all previous paragraphs herein by reference.

456.     Valassis and News are each engaged in commerce in and affecting the state of California.

457.     Defendants' actions as alleged herein violate the California Unfair Practices Act, Ca. Bus. & Prof. Code §§ 17043, 17044, 17070, and 17071.

458.     News has sold FSIs at less than its costs, as defined in Ca. Bus. & Prof. Code § 17026, for the purpose of injuring competitors and destroying competition.

459.     News America bundles FSIs and ISPs in order to discourage CPGs from purchasing FSIs from Valassis, and to injure Valassis and destroy competition.

460.     Based on analysis conducted in *Valassis I*, News' average FSI billing rate was approximately $4.42 prior to the parties' settlement in 2010.

461.   Upon information and belief, News' average FSI billing rate today is approximately 10% lower today, or about $3.98.

462.   Based on analysis conducted in *Valassis I*, News' average FSI cost was approximately $3.27 prior to the parties' settlement in 2010.

463.   Upon information and belief, News' average FSI cost today is approximately $3.20 to $3.27.

464.   Based on analysis conducted in *Valassis I*, News' FSI rates, after allocating all discounts and rebates attributable to the entire bundle of products to FSIs, were in the range of $1.12 to $3.12.

465.   Today, upon information and belief, News' FSI rates, after allocating all discounts and rebates attributable to the entire bundle of FSI and ISP products to FSIs, is below News' costs.

466.   News sells FSIs below its cost of FSIs with the purpose to induce or encourage CPGs to purchase FSIs from News rather than Valassis, and with the effect of diverting trade from and injuring Valassis, and destroying competition.

467.   News' unfair and deceptive conduct has injured competition, forced Valassis to either forgo business or match the below cost and predatory prices News charges certain CPGs and retailers, and suppressed competition by reducing the choices available to CPGs while allowing News to charge certain CPGs unlawful monopoly prices.

468.     News' unlawful conduct has allowed News to perpetuate its monopoly in the ISP market and threatens to create a monopoly in the FSI market.

469.     Valassis has suffered antitrust injury and damage in the state of California as the proximate result of News' unlawful conduct.

## COUNT XII
### Unfair Competition

470.     Plaintiff incorporates all previous paragraphs herein by reference.

471.     Valassis and News each are engaged in commerce in and affecting the state of Michigan through their sales and distribution of advertisements in the FSI and ISP markets.

472.     News has engaged in unfair and deceptive trade practices.

473.     Specifically, News' actions are anticompetitive, unethical, and oppressive.

474.     News' actions, described above, have caused significant damage to Valassis in the form of lost sales and profits.

475.     News' actions, if unabated by this Court, pose the dangerous risk of continued harm to the competitive market and, ultimately, to consumers.

## COUNT XIII
### Tortious Interference
### with Contracts (CPGs)

476.     Plaintiff incorporates all previous paragraphs herein by reference.

477.    Valassis, as described above, had contracts with hundreds of CPGs to whom Valassis sells FSIs and ISPs.

478.    News is, and at all pertinent times was, aware of the contracts between Valassis and these CPGs.

479.    News has intentionally and unlawfully interfered with the contracts between Valassis and the CPGs by the acts described above.

480.    News' actions were intended to, and did, interfere with Valassis' contracts with CPGs, causing their causing their disruption, termination, or other similar act.

481.    CPGs who have used and would otherwise continue to use Valassis as their FSI or ISP provider have been unlawfully coerced by News to disrupt, terminate, or otherwise not perform under their contracts with Valassis and to place their FSIs with News, or to use News as their ISP provider.

482.    Valassis has suffered significant financial harm as a direct and proximate result of News' wrongful conduct.

## COUNT XIV

**Tortious Interference
with Business Relationships or Expectancies (CPGs)**

483.    Plaintiff incorporates all previous paragraphs herein by reference.

484.    Valassis has business relationships with hundreds of CPGs to whom Valassis sells or proposes to sell FSIs and ISPs.

485.     Valassis also has reasonable business expectancies with hundreds of CPGs to whom Valassis proposes to sell FSIs and ISPs.

486.     News is, and at all pertinent times was, aware of the relationships and/or expectancies between Valassis and these CPGs.

487.     News has intentionally and unlawfully interfered with the relationships between Valassis and the CPGs by the acts described above.

488.     News' actions have caused the CPGs to terminate or alter their business relationships or expected relationships with Valassis.

489.     CPGs who have used and would otherwise continue to use Valassis as their FSI or ISP provider have been unlawfully coerced by News to place their FSIs with News, or to use News as their ISP provider.

490.     The termination of these business relationships and expectancies has caused significant financial harm to Valassis.

## COUNT XV

### Tortious Interference
### with Contracts (Retailers)

491.     Plaintiff incorporates all previous paragraphs herein by reference.

492.     Valassis had contracts with hundreds of retailers to whom Valassis paid for access to the retailer's aisle space.

493.     News is, and at all pertinent times was, aware of the contracts between Valassis and these retailers.

76

494.     News has intentionally and unlawfully interfered with the contracts between Valassis and the retailers by the acts described above.

495.     News' actions as described above were intended to, and did, interfere with Valassis' contracts with retailers, causing their disruption, termination, or other similar act.

496.     Retailers who have used and would otherwise continue to use Valassis as the ISP provider within their stores have been unlawfully coerced by News to disrupt, terminate or otherwise not perform under their contracts with Valassis and to use News as the ISP provider within their stores.

497.     Valassis has suffered significant financial harm as a direct and proximate result of News' wrongful conduct.

## COUNT XVI

### Tortious Interference
### with Business Relationships or Expectancies (Retailers)

498.     Plaintiff incorporates all previous paragraphs herein by reference.

499.     Valassis has business relationships with hundreds of retailers to whom Valassis paid or would have paid for access to the retailers' aisle space and/or to whom Valassis sold or would have other advertising and promotional products.

500.     Valassis also has reasonable business expectancies with hundreds of retailers from whom Valassis proposes to purchase access to the retailers' aisle space and/or to whom Valassis sold or would have other advertising and

promotional products.

501.     News is, and at all pertinent times was, aware of the relationships and/or expectancies between Valassis and these retailers.

502.     News has intentionally and unlawfully interfered with the relationships between Valassis and the retailers by the acts described above.

503.     News' actions have caused the retailers to terminate or alter their business relationships or expected relationships with Valassis.

504.     Retailers who have used and would otherwise continue to sell access to their aisle space to Valassis have been unlawfully coerced by News to sell aisle space to News.

505.     Retailers who have used and would otherwise continue to purchase advertising and promotional products from Valassis have been unlawfully coerced by News to purchase advertising and promotional products from News.

506.     The termination of these business relationships and expectancies has caused significant financial harm to Valassis.

## **PRAYER FOR RELIEF**

WHEREFORE, Valassis respectfully requests that this Honorable Court:

A.     Declare that News' conduct constitutes:

    (1)     Violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

    (2)     Violations of Section 3 of the Clayton Act, 15 U.S.C. § 14;

(3)     Violations of the Michigan Antitrust Reform Act, M.C.L. §§ 445.772 and 445.773;

(4)     Violations of the Cartwright Act, Ca. Bus. & Prof. Code §§ 16720, 16726, and 16727;

(5)     Unfair Competition;

(6)     California Unfair Practices Act, Ca. Bus. & Prof. Code §§ 17043, 17044, 17070, and 17071;

(7)     Tortious Interference with Contracts; and

(8)     Tortious Interference with Business Relationships or Expectancies;

B.     Enter judgment in favor of Valassis against News;

C.     Permanently enjoin the conduct described above of News and their agents and employees;

D.     Award Valassis its actual damages suffered as a result of News' unlawful acts and agreements in the FSI and ISP markets in an amount in excess of $560 million, as provided in 15 U.S.C. §15, M.C.L. § 445.778, and Ca. Bus. & Prof. Code §§ 16750 and 17082;

E.     Award Valassis three times its actual damages, as provided in 15 U.S.C. §15, M.C.L. § 445.778, and Ca. Bus. & Prof. Code §§ 16750 and 17082;

F.      Award Valassis its costs and attorney fees, as provided in 15 U.S.C. §
        15, M.C.L. § 445.778, and Ca. Bus. & Prof. Code §§ 16750 and
        17082;

G.      Award Valassis interest, as provided in 15 U.S.C. § 15, M.C.L. §
        445.778, and Ca. Bus. & Prof. Code § 16761; and

H.      Grant any other relief that this Court deems appropriate, just, and
        equitable.

## JURY DEMAND

Plaintiff requests a trial by jury on all causes of action.

            Respectfully submitted,

            MILLER, CANFIELD, PADDOCK & STONE, PLC

            By: s/ A. Michael Palizzi_____
                  A. Michael Palizzi (P47262)
                  Thomas W. Cranmer (P25252)
                  Larry J. Saylor (P28165)
                  Kimberly L. Scott (P69706)
                  150 W. Jefferson, Suite 2500
                  Detroit, MI  48226
                  (313) 963-6420

            THE MENDELSON LAW FIRM, PC
                  David S. Mendelson (P53572)
                  355 S. Old Woodward Avenue, Ste. 100
                  Birmingham, MI 48009
                  (248) 646-8277

                  *Attorneys for Plaintiff*
                  *Valassis Communications, Inc.*

Dated: November 8, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 8, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

MILLER, CANFIELD, PADDOCK & STONE, PLC

By: <u>s/ A. Michael Palizzi</u>

A. Michael Palizzi (P47262)
150 W. Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420

21625868.4\112253-00005

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

County in which action arose __Wayne__

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Valassis Communications, Inc.

**DEFENDANTS**
News Corporation; News America Marketing; News America Marketing FSI, LLC; News America Marketing In-Store Services, LLC

**(b)** County of Residence of First Listed Plaintiff __Wayne__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Miller, Canfield, Paddock and Stone, P.L.C.
150 W. Jefferson Ave., Suite 2500, Detroit, MI 48226, (313) 963-6420
(see attachment for complete list of attorneys)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sherman Act, 15 U.S.C. 1 and 2; Clayton Act, 15 U.S.C. 14, 15(a) and 26

Brief description of cause:
Monopolization, predatory pricing, exclusive dealing, and bundling and tying in the free-standing insert and in-store program markets.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE __Tarnow__  DOCKET NUMBER __06-10240__

DATE
November 8, 2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                        ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other      ☒ Yes
            court, including state court? (Companion cases are matters in which  ☐ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

   If yes, give the following information:

   Court: Eastern District of Michigan

   Case No.: E.D. Mich. Case No. 06-10240

   Judge: E.D. Mich. - Judge Arthur Tarnow

   Notes : Pursuant to Dkt. #412 in Case No. 06-10240, Judge Tarnow has continuing and exclusive jurisdiction regarding claims of bundling and tying.