PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2001 K STREET, NW
TELEPHONE (202) 223-7300
WASHINGTON, DC 20006-1047

1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019-6064
TELEPHONE (212) 373-3000

UNIT 3601, OFFICE TOWER A
BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER
202-223-7356

WRITER'S DIRECT FACSIMILE
202-204-7356

WRITER'S DIRECT E-MAIL ADDRESS
kgallo@paulweiss.com

March 12, 2018

**By ECF and Hand Delivery**

The Honorable P. Kevin Castel
U.S. District Court, Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY  10007-1312

    *Valassis Communications, Inc.* v. *News Corporation, et al.*,
      No. 1:17-cv-07378-PKC (S.D.N.Y.)

Dear Judge Castel:

    We write on behalf of Defendants (collectively, "NAM") to set forth the bases of NAM's anticipated motion for summary judgment and a proposed briefing schedule, pursuant to Section 4.A of Your Honor's Individual Practices, should the Court determine that this is the appropriate time to consider such a motion.  There is no conference currently scheduled in this matter.[1]  Summary judgment should be granted because, on the undisputed facts and as a matter of law, Valassis cannot prove antitrust injury or damages relating to any anticompetitive conduct—two required elements of its claims.

    Valassis and NAM are competitors.  NAM has sold in-store promotions ("ISP")—for example, promotional signs attached to a shelf at the grocery store—to consumer packaged goods companies ("CPGs") since the 1990s.  Valassis entered the ISP business in 2010.  Three years later, disappointed by its failure to profit in the marketplace, it filed this lawsuit.  Valassis blames its lack of success on NAM, and claims it is entitled to hundreds of millions of dollars in lost profits under the antitrust laws.  But those claims are dead on arrival.  That is because Valassis's claimed injury, and the damages it seeks to collect, arise from only one source:  non-predatory, above-cost price competition.  Put simply, Valassis's complaint is that NAM

---

[1] Prior to the transfer of this case from Michigan, the parties had stipulated to March 19, 2018 as the deadline for filing dispositive motions.  NAM recognizes that this deadline no longer applies post-transfer, and that this Court has declined to set a date for Final Pretrial Submissions and a Final Pretrial Conference until the pending discovery motions (which include NAM's motion for spoliation sanctions, Dkt. 136) are decided.

competed too hard.  That is not an antitrust violation; indeed, making it one would chill competition and undermine the purpose of the antitrust laws.

To collect antitrust damages, Valassis must prove that its damages are the result of anticompetitive conduct and that the injury for which it seeks compensation is an ***antitrust*** injury—*i.e.*, an injury that flows from the aspect of the defendant's conduct that makes it anticompetitive.  Valassis cannot do either.  Valassis competed against NAM to win contracts with retailers.  The contracts allowed either NAM or Valassis, on an exclusive basis, to place certain forms of ISP in the retailers' stores.  Valassis won several of these exclusive contracts, but claims it should have won more.  While Valassis alleges that NAM engaged in various forms of "anticompetitive" conduct, Valassis's ***entire*** damages claim is based on only one form of conduct—that, after Valassis entered the business, NAM paid retailers "too much."  Without the supposedly increased retailer payments, Valassis's expert admits that "***damages would go away***."  (Ex. A at 179:13–21 (emphasis added).)

The fatal problem for Valassis is that it cannot prove that NAM's payments to retailers were predatory as a matter of law.  And, absent proof of predation, Valassis is left claiming antitrust damages for conduct—above-cost, competitive bidding—that the antitrust laws are designed to ***promote***, not penalize, and for an alleged injury that is the result of ***competition***, not its absence.  See *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323–25 (2007).  The Supreme Court has explained:  "A firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it [is] unable to raise prices."  *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 337–38 (1990) (internal quotation marks and citations omitted).  This describes Valassis's complaint exactly:  Valassis claims to have suffered harm from NAM's non-predatory retailer payments and posits that, if NAM had competed less aggressively, Valassis would have been able to pay retailers less (for the right to sell in-store space to CPGs) and thereby increase its profits.  That may describe an injury to Valassis's bottom line.  But, as the Supreme Court held, directing that summary judgment should be granted for the defendant on similar facts in *Atlantic Richfield*:  "This is not ***antitrust*** injury."  *Id.* at 338.

The fact that the non-predatory price competition that is the source of Valassis's claimed injury in this case takes the form of a payment, rather than a selling price, does not change the analysis.  "As with predatory pricing, the exclusionary effect of higher bidding that does not result in below-cost output pricing 'is ***beyond the practical ability of a judicial tribunal to control*** without courting intolerable risks of chilling legitimate' procompetitive conduct."  *Weyerhaeuser*, 549 U.S. at 325 (emphasis added) (quoting *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)).  Because Valassis cannot prove that NAM's higher bidding for retailers resulted in below-cost pricing to CPGs, its claims necessarily fail.

Valassis will try to avoid this result in several ways—each of which only confirms the fundamental failing in its claims.  Valassis will argue that its claims arise from a "monopoly broth" consisting of multiple forms of alleged anticompetitive conduct, and therefore its claims can stand without proof of predatory bidding.  But that argument does not work here.

Valassis does not claim damages resulting from any conduct besides NAM's non-predatory retailer payments, and it admits that all the other alleged conduct—including NAM's supposedly "long-term," "staggered" contracts with retailers—pre-existed Valassis's entry into the ISP business, did not stop Valassis from entering and winning retailer contracts before the damages period, and, according to its damages expert, would continue to exist in a competitive "but-for" world in which Valassis not only can compete but would earn hundreds of millions of dollars in profit. (Ex. A at 132:9–22, 135:7–12, 167:17–168:14.) As Valassis's expert put it, NAM's retailer payments are "*the only thing different* between the benchmark period" that he used to calculate Valassis's alleged lost profits "and the damages period." (*Id.* at 178:21–179:21 (emphasis added).)

Valassis also will argue that it *has* proven predation. To do so, however, it relies on the opinion of an expert who concocted a test for predation that could only generously be characterized as "novel." While the expert purports to ground his test in economic theory, that test has never been adopted by any court, contradicts the test adopted by the Supreme Court in *Weyerhaeuser*, depends entirely on a range of "hypothetical" prices rather than the actual prices paid by actual customers in the actual world, and contradicts the expert's own prior opinion in a different case against NAM. Accordingly, the test can and should be rejected as a matter of law.

Finally, Valassis will urge this Court to simply ignore the record in this case and deny summary judgment because that's what was done in a different case, *Dial Corp.* v. *News Corp.* But in addition to involving a different record and different time periods, that case involved a totally different form of claimed injury and damages—alleged overcharges of customers—from those Valassis is claiming here. *Dial* therefore has no application to this motion.

Accordingly, NAM will show that it is entitled to summary judgment because (1) Valassis cannot establish that NAM's payments to retailers, which form the entire basis of its alleged damages, were predatory as a matter of law, and (2) Valassis cannot prove that it suffered an antitrust injury as a result of any allegedly anticompetitive conduct by NAM.[2]

I. **Valassis Cannot Show that NAM's Above-Cost Retailer Payments Were Predatory as a Matter of Law, and Therefore Has No Viable Claim for Antitrust Damages.**

The Supreme Court has held that claims that one competitor excluded another by paying "too much" for an input do not give rise to an antitrust violation unless the payments are

---

[2] NAM also intends to seek summary judgment on Valassis's state law antitrust, unfair competition, and tortious interference claims, as well as federal antitrust claims that relate to the sale of NAM's free-standing insert ("FSI") products. While these claims are asserted in Valassis's complaint, Valassis has not adduced any evidence to support liability or damages for them. Moreover, while the federal and state law causes of action in Valassis's complaint relating to NAM's sale of FSIs have not been formally dismissed from this action, its counsel has acknowledged that Valassis is solely pursuing its ISP claims. *See* Dkt. 131 at 4:9–11 ("The claims that are here now are solely claims relating to News' conduct in the in-store promotions market."); *see also id.* at 18:19–20.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. P. Kevin Castel                                                                                              4

predatory—that is, the cost paid for the input (here, access to retail stores) made the sale of the output (here, ISP sold to CPGs) unprofitable:

> A plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator's outputs. That is, the predator's bidding on the buy side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs.

*Weyerhaeuser*, 549 U.S. at 325. The reasoning behind this bright-line rule is that "[j]ust as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs." *Id.* at 323. Bidding for inputs, therefore, is not merely a neutral form of conduct as far as the antitrust laws are concerned. Rather, "high bidding is ***essential to competition*** and innovation on the buy side of the market." *Id.* at 323–24 (emphasis added).

Despite Valassis's claims that NAM's payments to retailers were "exorbitant," ***there is no dispute that NAM expected its retailer payments would be profitable***—*i.e.*, that the pricing of NAM's outputs, sales of ISP to CPGs, were projected to be above its costs, including retailer payments. In fact, Valassis's liability expert (Dr. MacKie-Mason) testified that NAM expected to make a profit on ***all*** of its retailer payments during the relevant period, except one.[3] (Ex. B at 183:17–184:8.) Furthermore, while both parties' experts agree that the most appropriate way to evaluate whether retailer payments were predatory is based on whether NAM expected those payments to be profitable on an *ex ante* basis, it is likewise undisputed that NAM's ISP business was ***in fact profitable*** in every year during the relevant period.

To get around *Weyerhaeuser*, Dr. MacKie-Mason concocts a theory of "predation" that is at odds with the law and the undisputed record in this case. He concedes, as he must, that NAM's payments to retailers were expected to be profitable—and were profitable—in the real world at actual ISP prices (with *de minimis* exceptions). So, he argues instead that certain of those payments ***might*** have ***become*** unprofitable based on a conjecture that if Valassis had remained in the business and won additional retailer contracts, prices would have fallen by 10–40% as a result. Yet, he admits that he has no idea where in that range prices would actually fall, and cannot testify with any certainty that they would fall ***at all***. (Ex. B at 17:11–18:5.) And, it is undisputed that there is no evidence that ISP prices ***actually*** fell as a result of the retail contracts Valassis actually won. Nor is there any evidence that NAM or Valassis ***expected*** prices to fall if Valassis were to win more such contracts. By using made-up prices to justify calling NAM's conduct "predatory," Dr. MacKie-Mason's opinion appears to be a naked attempt to obscure *the* critical issue in the case in order to assist the plaintiff in surviving summary judgment. In fact, Dr. MacKie-Mason's opinion here contradicts the approach he took as expert for the plaintiffs in *Dial*. There, he purported to apply the same economic theory to NAM's retailer payments, but did not opine that NAM's ISP prices should be discounted at all

---

[3] NAM disputes Dr. MacKie-Mason's contention that its 2011 contract with Kmart was projected to be below cost, but that dispute is not material to Valassis's claims or NAM's defenses, and does not create a genuine issue for trial—particularly given that Valassis is not claiming any damages attributable to the Kmart contract. (Ex. A at 352:19–353:14.) Even if it were, a single instance of below-cost pricing does not constitute predation. *See Buffalo Courier-Express, Inc.* v. *Buffalo Evening News, Inc.*, 601 F.2d 48, 54–55 (2d Cir. 1979).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. P. Kevin Castel                                                                                                      5

for purposes of conducting a predation analysis—a damning admission he now attempts to explain away as a "mistake."

Dr. MacKie-Mason's ersatz predation theory cannot be reconciled with established case law. Not only are we unaware of any antitrust case that has accepted such a theory, it is identical in substance to the theory that the Supreme Court rejected in *Weyerhauser*. There, as here, the plaintiff urged that antitrust liability should attach when the defendant's "conduct made economic sense only because of its anticipated adverse effect upon competition." *Washington Alder LLC* v. *Weyerhaeuser Co.*, 2004 WL 1717650, at *2 (D. Or. July 27, 2004). The Supreme Court held instead that predatory overbidding is not cognizable unless accompanied by evidence of *actual* below-cost pricing in the defendant's output market. *Weyerhaeuser*, 549 U.S. at 325. As discussed, it is undisputed that Valassis cannot show actual below-cost pricing.

The fact that NAM's retailer payments were indisputably non-predatory under *Weyerhaeuser* is fatal to Valassis's claims. Valassis's damages expert (Dr. Levinsohn) conceded that his model does not measure damages resulting from *any* conduct other than the supposed increase in retailer payments after Valassis's entry—including NAM's allegedly "long-term," "staggered" retailer contracts or "preemptive renewals" of those contracts. (Ex. A at 132:9–22, 135:7–12, 167:17–168:14.) Indeed, when asked whether he could reliably estimate damages for any of the challenged conduct, setting aside NAM's retailer payments, Dr. Levinsohn testified: "I think I could reliably estimate damages, **but that reliable estimate would come out around zero**." (*Id.* at 178:21–179:21 (emphasis added).)

That is no accident. Valassis's own damages model confirms that, whatever labels Valassis may try to put on the other conduct (besides NAM's retailer payments) that it alleges was anticompetitive, none of that alleged conduct actually prevented Valassis from being able to compete. It is undisputed that all of the other contract features Valassis tries to attack pre-existed Valassis's entry into the ISP business and were present during the "benchmark" period (just after Valassis's entry), where Valassis achieved the same contract "win rate" and level of profitability that its expert claims it would have maintained in a competitive "but-for" world. (*See, e.g.*, Ex. A at 179:13–17 ("[D]uring the benchmark period, the other alleged anticompetitive conduct is for the most part already present, and these commissions are the delta. They are the new thing.")). Indeed, Dr. Levinsohn assumes that all of these same contract features would continue to exist in the but-for world—NAM's retailer payments are "the only thing different." (*Id.* at 179:17–19.) It is likewise undisputed that *Valassis's* contracts in the actual world had those same features: Valassis itself had exclusive contracts with retailers; Valassis's contracts were, on average, the same length or longer than NAM's; Valassis's contracts did not all start and end at the same time, but rather had what Valassis calls "staggered" expirations; and Valassis sometimes renewed contracts more than a year in advance of their expirations (which Valassis calls "preemptive").

Nor does the fact that Valassis failed to win more contracts in the real world mean that NAM's payments to retailers were harmful to competition. As the Supreme Court observed in *Weyerhaeuser*, "[a] more efficient firm might bid up input prices to acquire more inputs as a

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. P. Kevin Castel					6

part of a procompetitive strategy to gain market share in the output market." 549 U.S. at 323. Here, it is undisputed that NAM was the more efficient firm. Valassis's experts admit that Valassis had higher costs than NAM (independent of payments to retailers), and do not even purport to offer any opinions with respect to Valassis's efficiency. (Ex. B at 93:14–94:4; Ex. A at 203:5–10, 273:23–274:5.)

Valassis thus repeats here the same error that led a panel of antitrust experts to reject its claims that NAM had engaged in illegal "bundling and tying" conduct in an earlier phase of this litigation: to establish an antitrust claim, "Valassis cannot simply argue that its costs would have been lower if it did not have to compete as aggressively for customers." (Ex. C at 23.) That NAM paid more to retailers and succeeded, while Valassis struggled to match NAM's payments and failed, is evidence of competition at work.

Because NAM's non-predatory retailer payments are non-actionable as a matter of law, and because Valassis cannot show damages for any other challenged conduct, NAM is entitled to summary judgment on all claims. *See Fleischman* v. *Albany Med. Ctr.*, 639 F.3d 28, 29–30 (2d Cir. 2011) (per curiam) (proof of damages is an essential element of an antitrust claim).

## II.     Valassis Cannot Establish Antitrust Injury.

That Valassis's entire claim for antitrust damages arises from conduct that the antitrust laws treat as *per se* lawful—non-predatory bidding for retailer payments—is sufficient grounds to grant summary judgment on its own. But Valassis's failure to prove that NAM's retailer payments were predatory as a matter of law points to another fundamental failing of its claim: Valassis cannot show that NAM's conduct caused antitrust injury—an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To prevail on its antitrust claims, Valassis must show that its injury "***reflect[s] the anticompetitive effect*** either of the violation or of anticompetitive acts made possible by the violation." *Id.* (emphasis added). Valassis cannot make that showing because the only "injury" it complains of is an injury to ***Valassis***, and not to competition.

Valassis posits a but-for world in which retailers receive ***less*** in payments for access to their stores, while customers pay the same or more to purchase ISPs and total output remains the same. Far from complaining about alleged conduct that harms consumer welfare, Valassis concedes that the only difference between the but-for world and the actual world is that Valassis will make more profit and NAM will make less. The antitrust laws are not designed to protect Valassis's profitability. While Valassis complains that NAM's retailer contracts were too long, and that not enough of them expired in each year, its damages expert does not even purport to measure any damages to Valassis based on contract length, staggering, or preemptive renewals, as discussed above. To the contrary, he assumes that in the but-for world, retailer contracts would, on average, be the ***same length*** as they were in the actual world, and that the ***same percentage of contracts would expire each year*** as did in the actual world. (Ex. A at 144:3–11.) Likewise, while Valassis's liability expert claims that NAM caused harm to

competition by charging CPGs "monopoly prices" for ISP, Valassis's damages expert assumes that in the but-for world Valassis would charge CPGs prices that were *as high or higher than* NAM's actual "monopoly" prices. (*Id.* at 205:13–21.) The only "differentiating factor"—and, as discussed, the only source of Valassis's claimed damages—is the level of NAM's retailer payments, which Valassis claims would be lower in the but-for world, thereby easing the competitive pressure on Valassis and allowing it to earn higher profits. (*Id.* at 178:21–179:21.)

Valassis points to the alleged increase in NAM's retailer payments after Valassis's entry into the ISP business as being inherently suspect and subject to condemnation. But that is completely wrongheaded as a matter of basic economics and bedrock antitrust law. In a properly functioning ISP marketplace, competition incentivizes ISP providers to compete for retailer space, which logically will include increased bidding for that space. "Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs." *Weyerhaeuser*, 549 U.S. at 323. Thus, when an ISP provider increases its bid for a retailer in response to a competitive challenge, this is not anticompetitive behavior but instead precisely the behavior that the antitrust laws are designed to foster. *See id.* If this competition puts margin pressure on ISP providers and exposes the vulnerabilities of a less efficient competitor, and even drives the less efficient competitor out of the business entirely, that is a product of a *healthy* competitive marketplace.

The Supreme Court's decision in *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328 (1990), controls this case. There, the defendant was assumed to have engaged in conduct that (at the time) was considered a *per se* violation of the antitrust laws—vertical maximum-price-fixing—by engaging in an aggressive strategy that involved "drastically lower[ing]" prices in "direct head-to-head competition" with the plaintiff. *Id.* at 332. The plaintiff characterized the defendant's pricing as "below-market," "artificially low," and "uncompetitive," and alleged that the defendant used "threats, intimidation, and coercion" to ensure that these prices were adhered to. *Id.*

The Supreme Court held that, as a matter of law, a competitor's loss of sales or profits to another competitor as a result of non-predatory price competition does not constitute an antitrust injury. The Court recognized that the effect of the defendant's conduct—which, unlike any of the conduct alleged here, was *per se* illegal—was to increase the defendant's sales and market share, and to drive many independent competitors "out of business." *Id.* Nevertheless, it held that the defendant was entitled to summary judgment because the plaintiff, a competitor, could not establish antitrust injury in the absence of a showing that the prices were *predatory*. The Court emphasized that even an injury "causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, 'since "[i]t is inimical to [the antitrust] laws to award damages" for losses stemming from continued competition.'" *Id.* at 334 (alterations in original) (quoting *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 (1986)). And "in the context of pricing practices, *only predatory pricing has the requisite anticompetitive effect.*" *Id.* at 339 (emphasis added).

Hon. P. Kevin Castel 8

Summary judgment should be granted here for the same reason: Valassis may have been injured in the form of lost profits by NAM's ability to profitably offer higher retailer payments, but that is not an injury that the antitrust laws recognize.

### III. The *Dial* Summary Judgment Opinion Is Inapplicable Here.

Valassis undoubtedly will argue that summary judgment is inappropriate in light of Judge Pauley's decision denying summary judgment in the *Dial* case. NAM respectfully submits that summary judgment in *Dial* was incorrectly decided, but that is not an issue this Court needs to address. Regardless of its merits, the summary judgment decision in *Dial* has no bearing on the questions presented by NAM's motion here for two reasons.

*First*, Valassis's claims in this case are fundamentally different from the claims in *Dial* in at least one key respect: the *Dial* plaintiffs sought, and their damages expert purported to measure, damages based on the **combined** effect of **all** the forms of anticompetitive conduct alleged in that case. *See Dial Corp.* v. *News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016). Here, by contrast, the only damages evidence that Valassis presents is premised on alleged lost profits due to "the prices paid by [NAM] in their contracts with retailers," *id.* at 32, and its expert has put forward an entirely different model of damages based **solely** on the effect of increased, but still profitable, retailer payments. (Ex. A at 132:9–22, 178:21–179:21.) That difference has two important consequences: (1) unlike Valassis, the *Dial* plaintiffs did not fail to **submit** evidence of damages arising from the majority of the challenged forms of conduct (and NAM did not argue as much); and (2) Judge Pauley's reasoning that NAM's retailer payments need not have been below-cost to constitute part of the *Dial* plaintiffs' damages claim for multiple forms of challenged conduct does not apply in this case, where Valassis concedes that NAM's retailer payments are the only basis for its claimed damages.[4]

*Second*, the *Dial* plaintiffs claimed that they suffered antitrust injury in the form of an alleged overcharge by NAM on ISP prices to its customers, *i.e.*, CPGs. NAM does not dispute that alleged overcharges could constitute an antitrust injury, and for that reason did not seek summary judgment in *Dial* on antitrust injury grounds. But Valassis does not seek relief for alleged overcharges to customers, nor could it—as a competitor, higher prices "would have worked to [Valassis's] advantage." *Atl. Richfield*, 495 U.S. at 337. Rather, it claims that it made

---

[4] In *Dial*, Judge Pauley declined to dismiss the CPG plaintiffs' claims that NAM's retailer contracts were exclusionary, despite a failure to prove predatory overbidding under *Weyerhaeuser*. Judge Pauley's ruling was predicated on the Third Circuit's decision in *ZF Meritor*, where the court declined to apply the price-cost test to claims of exclusionary contracting based on a finding that price did not operate as the "lone exclusionary tool." *Dial Corp.*, 165 F. Supp. 3d at 32 (citing *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 268–69 (3d Cir. 2012)). Judge Pauley likewise concluded, on the summary judgment record in *Dial*, that "the prices paid by [NAM] in their contracts with retailers are not the clearly predominant mechanism of exclusion. Rather, the length of the exclusive contracts and their staggered terms may also foreclose competition." *Id.* Even assuming that *ZF Meritor* applies in this Circuit, Valassis's claims cannot satisfy the test in that case because the **one and only** form of conduct from which Valassis asserts it was damaged is NAM's alleged overpayments to retailers. (Ex. A at 70:12–71:15, 179:13–21.) Thus, regardless of whether such payments were the predominant mechanism of exclusion asserted in *Dial*, they clearly are in this case.

Hon. P. Kevin Castel                                                                                                                 9

less money *as a competitor* because NAM's conduct allegedly prevented it from paying retailers less for access to their stores.

        This result—that one set of plaintiffs may have a triable cause of action under the antitrust laws while another, claiming to sue about the same or similar conduct, does not—is in no way anomalous.  Rather, it is the whole point of the antitrust injury requirement:  "even in cases involving *per se* violations" of the antitrust laws, which this case does not, "the right of action under § 4 of the Clayton Act is available only to those private plaintiffs who have suffered antitrust injury."  *Id.* at 344.  That requirement thus "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition"—like those claimed by Valassis here—"from supporting suits by private plaintiffs for either damages or equitable relief."  *Id.* at 342.  Because Valassis cannot prove that NAM's payments to retailers were predatory under the test established by the Supreme Court for proving predation, Valassis cannot show that its alleged lost profits stem from anything other than competition itself.  Such losses do not support an antitrust claim.

                                      \*                 \*                 \*

        If the Court determines that this is an appropriate time to receive briefing on summary judgment, and subject to any pre-motion conference the Court may wish to schedule, NAM proposes the following schedule, to which Valassis has agreed:

        **April 2, 2018**:  Motion for summary judgment due.

        **May 14, 2018** (or 6 weeks after such other motion deadline as the Court may set):  Opposition to motion for summary judgment due.

        **June 4, 2018** (or 3 weeks after such other opposition deadline as the Court may set):  Reply in support of motion for summary judgment due.

        Respectfully submitted,

        /s/ Kenneth A. Gallo
        Kenneth A. Gallo

cc:    Counsel of Record (by ECF)