# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

VALASSIS COMMUNICATIONS, INC.,

                 Plaintiff,

     v.

NEWS CORPORATION; NEWS
AMERICA MARKETING, a/k/a NEWS
AMERICA, INC., a/k/a NEWS
AMERICA MARKETING GROUP;
NEWS AMERICA MARKETING FSI,
LLC, a/k/a NEWS AMERICA
MARKETING FSI, INC.; and NEWS
AMERICA MARKETING IN-STORE
SERVICES, LLC a/k/a NEWS
AMERICA MARKETING
IN-STORE SERVICES, INC.,

                 Defendants.

Case No. 1:17-cv-07378

HON. P. KEVIN CASTEL

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Michael S. Shuster
Vincent Levy
Benjamin F. Heidlage
Scott M. Danner
Lauren Giudice
Gregory Dubinsky
Evan H. Stein
HOLWELL SHUSTER & GOLDBERG LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(646) 837-5151
mshuster@hsgllp.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 5

    A.   News wields monopoly power in the ISP market. ................................... 5

    B.   ISP suppliers need "critical mass" to compete effectively. ..................... 5

    C.   News excludes competitors by preventing them from reaching critical mass. ........................................................................................ 6

    D.   Valassis attempts to enter the ISP market and News seeks to exclude it. ................................................................................................ 6

    E.   News drives Valassis out of the market, injuring Valassis and competition. ......................................................................................... 8

ARGUMENT ....................................................................................................... 9

  I.   A JURY COULD FIND THAT VALASSIS SUFFERED THE REQUISITE INJURY ................................................................................ 9

    A.   News's anticompetitive conduct, collectively, caused Valassis injury-in-fact. ...................................................................... 10

    B.   Valassis's injury-in-fact is quintessential "antitrust injury." ............... 14

  II.   NEWS CANNOT REDEFINE VALASSIS'S LIABILITY CASE.............................. 15

    A.   Professor Levinsohn estimated damages for the "monopoly-broth" claim. .......... 16

    B.   Professor Levinsohn's model is not limited in the way News asserts. ............................................................................................ 17

    C.   Valassis's damages model cannot be used to redefine Valassis's case. .................................................................................................. 19

  III.   EVEN IF VALASSIS'S INJURY AND DAMAGES ARISE ONLY FROM NEWS'S COMMISSIONS, NEWS'S MOTION STILL FAILS ................................. 21

    A.   News's conduct should be evaluated under, and fails, the rule of reason. ................................................................................................. 21

    B.   News's retailer commissions also fail to pass the price-cost test. ........................ 24

  IV.   NEWS HAS NOT MET ITS BURDEN ON THE REMAINING CLAIMS ................. 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Act, Inc. v. Sylvan Learning Sys., Inc.*,
  2000 WL 34031484 (N.D. Iowa May 8, 2000) ..................................................... 15

*Angelico v. Lehigh Valley Hosp., Inc.*,
  184 F.3d 268 (3d Cir. 1999)..................................................................................... 15

*Apple, Inc. v. Samsung Elecs. Co.*,
  2012 WL 2571719 (N.D. Cal. June 30, 2012) ........................................................ 13

*Aspen Highlands Skiing Corp. v. Aspen Skiing*,
  738 F.2d 1509 (10th Cir. 1984)............................................................................... 10

*Associated Gen. Contractors of California, Inc. v. California State Council of
  Carpenters*,
  459 U.S. 519 (1983) ................................................................................................ 12

*Barry Wright Corp. v. ITT Grinnell Corp.*,
  724 F.2d 227 (1st Cir. 1983) ................................................................................... 24

*Been v. O.K. Indus., Inc.*,
  495 F.3d 1217 (10th Cir. 2007)............................................................................... 23

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) ........................................................................................... 3, 18

*Bonjorno v. Kaiser Aluminum & Chemical Corp.*,
  752 F.2d 802 (3d Cir. 1984)........................................................................ 13, 18, 20

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537, 541 (2d Cir. 1993)............................................................................ 15

*City of Mishawaka, Ind. v. Am. Elec. Power Co.*,
  616 F.2d 976 (7th Cir. 1980)................................................................................... 10

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992).................................................................................. 21

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
  411 F.3d 1030 (9th Cir. 2005), *rev'd sub nom.*, 549 U.S. 312 (2007) ................... 22

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ........................................................................................... 4, 10

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) .................................................................... 9

*Dial Corp. v. News Corp*,
165 F. Supp. 3d 25 (S.D.N.Y. 2016) .............................................. *passim*

*Fido's Fences, Inc. v. Radio Sys. Corp.*,
999 F. Supp. 2d 442 (E.D.N.Y. 2014) .................................................. 14

*Full Draw Prods. v. Easton Sports, Inc.*,
182 F.3d 745 (10th Cir. 1999) ............................................................. 15

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2nd Cir. 2004) .............................................................. 24

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
466 F.3d 961 (11th Cir. 2006) ............................................................. 15

*Hasbrouck v. Texaco, Inc.*,
842 F.2d 1034 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990) ................... 15

*Higgins v. New York Stock Exch.*,
755 F. Supp. 113 (S.D.N.Y.), *aff'd*, 942 F.2d 829 (2d Cir. 1991) .......... 14

*Ideal Steel Supply Corp. v. Anza*,
652 F.3d 310 (2d Cir. 2011) ................................................................ 13

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*,
2017 WL 6524839 (D. Kan. 2017) ...................................................... 22

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
2018 WL 563144 (D. Mass. Jan. 25, 2018) ......................................... 12

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ........................................................... 20

*Insight Equity A.P. X, LP v. Transitions Optical, Inc.*,
2016 WL 3610155 (D. Del. July 1, 2016) ....................................... 21, 22

*Irvin Indus., Inc. v. Goodyear Aerospace Corp.*,
974 F.2d 241 (2d Cir. 1992) ................................................................ 24

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ........................................................................... 18

*Law v. NCAA*,
185 F.R.D. 324 (D. Kan. 1999) ........................................................... 20

*Law v. NCAA*,
    5 F. Supp. 2d 921 (D. Kan. 1998) ............................................................... 13

*Litton Sys., Inc. v. AT&T*,
    700 F.2d 785 (2d Cir. 1983) ............................................................... 10, 22

*Litton Sys., Inc. v. Honeywell, Inc.*,
    1996 WL 634213 (C.D. Cal. July 24, 1996) ............................................... 21

*McGahee v. N. Propane Gas Co.*,
    858 F.2d 1487 (11th Cir. 1988) ................................................................. 25

*MCI Commc'ns Corp. v. AT&T Co.*,
    708 F.2d 1081 (7th Cir. 1983) ............................................................. 20, 21

*Meredith Corp. v. SESAC LLC*,
    1 F.Supp.3d 180 (S.D.N.Y. 2014) ............................................................. 24

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
    806 F.3d 835 (5th Cir. 2015) .................................................................... 20

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006) ........................................................ 14

*New York v. United Parcel Serv., Inc.*,
    2016 WL 4735368 (S.D.N.Y. Sept. 10, 2016) ............................................. 16

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
    875 F.3d 107 (2d Cir. 2017) ............................................................... 10, 25

*Northeastern Telephone v. AT&T*,
    651 F.2d 76 (2nd Cir. 1981) .............................................................. 22, 23

*Novell, Inc. v. Microsoft*,
    505 F.3d 302 (4th Cir. 2007) .................................................................... 15

*Park v. Thomson Corp.*,
    2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) ................................................ 10

*Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*,
    886 F.3d 332 (3d Cir. 2018) .................................................................... 15

*Primetime 24 Joint Venture v. Nat'l Broad.*,
    219 F.3d 92 (2d Cir. 2000) ...................................................................... 15

*R.S.E., Inc. v. Pennsy Supply, Inc.*,
    523 F. Supp. 954 (M.D. Pa. 1981) ............................................................ 21

*Re/Max Int'l v. Realty One*,
   173 F.3d 995 (6th Cir. 1999)......................................................................... 15

*Reddy v. Puma*,
   2006 WL 2711535 (E.D.N.Y. Sept. 21, 2006) ........................................... 15

*Sanitary Milk Producers v. Bergjans Farm Dairy*,
   368 F.2d 679 (8th Cir. 1966)......................................................................... 10

*Sciambra v. Graham News*,
   892 F.2d 411 (5th Cir. 1990)......................................................................... 13

*Serfecz v. Jewel Food Stores*,
   67 F.3d 591 (7th Cir. 1995)........................................................................... 15

*Sprint Nextel Corp. v. AT & T Inc.*,
   821 F. Supp. 2d 308 (D.D.C. 2011) ............................................................. 23

*Suture Exp., Inc. v. Cardinal Health 200, LLC*,
   963 F. Supp. 2d 1212 (D. Kan. 2013) .......................................................... 12

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ............................................. 19

*US Airways, Inc. v. Sabre Holdings Corp.*,
   2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) ............................................. 10

*Washington Alder LLC v. Weyerhaeuser Co.*,
   2004 WL 1717650 (D. Or. 2004)................................................................... 24

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ......................................................................... 22, 23, 24

*White Mule Co. v. ATC Leasing Co. LLC*,
   540 F.Supp.2d 869 (N.D. Ohio 2008) .......................................................... 23

*Xerox Corp. v. Media Sciences Int'l, Inc.*,
   511 F. Supp. 2d 372 (S.D.N.Y. 2007) .......................................................... 14

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*,
   224 F. Supp. 2d 657 (S.D.N.Y. 2002) .......................................................... 14

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
   395 U.S. 100 (1969) ...................................................................................... 14

*ZF Meritor LLC v. Eaton Corp.*,
   2013 WL 6729509 (D. Del. Dec. 20, 2013) ................................................. 20

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ........................................................................ 10, 12, 22

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed.) ......................................... 14, 15

Steven C. Salop, Anticompetitive Overbuying by Power Buyers,
  72 Antitrust L.J. 669 (2005) ....................................................................................... 23

Steven C. Salop, Exclusionary Conduct, Effect on Consumers, and the
  Flawed Profit-Sacrifice Standard, 73 Antitrust L.J. 311 (2006) ............................................... 24

Steven C. Salop, The Raising Rivals Cost Foreclosure Paradigm, Conditional
  Pricing Practices and the Flawed Incremental Price-Cost Test,
  81 Antitrust L.J. 371 (2017) ....................................................................................... 23

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| 56.1 | Plaintiff's Response to Defendants' Statement of Undisputed Facts, Including Plaintiff's Statement of Additional Material Facts |
| CPG | Consumer packaged goods manufacturer |
| Ex. __ | Exhibit __ to the Declaration of Vincent Levy |
| ISP | Third-party in-store promotion |
| Levinsohn Decl. | Declaration of Prof. James Levinsohn submitted in support of Valassis's Opposition to News's Motion for Summary Judgment |
| Levy Decl. | Declaration of Vincent Levy submitted in support of Valassis's Opposition to News's Motion for Summary Judgment |
| News | Defendants (collectively) |
| News Br. | Defendants' Memorandum of Law in Support of their Motion for Summary Judgment |

## PRELIMINARY STATEMENT

News attempts to sidestep scrutiny of its anticompetitive conduct by attacking a case Valassis did not bring.  News asserts that Valassis invokes as a basis for its injury and damages only a narrow species of misconduct, retailer commissions, and that this conduct cannot give rise to antitrust injury because (1) those commissions were above cost and (2) above-cost pricing is non-actionable.  This is not Valassis's case, and even if it were, it would still be triable to a jury.

News has a long-standing monopoly in the market for third-party in-store promotions (ISPs).  News has deployed a "monopoly broth" of overlapping and mutually reinforcing misconduct to maintain that monopoly and harm competition, by depressing its rivals' revenues and raising their costs.  This conduct includes, but is not limited to, high commissions.

Valassis is only News's latest victim.  Other would-be competitors have sued News for basically the same behavior (and settled their claims after defeating motions for summary judgment).  So have its customers (with whom News settled on a class basis).  The evidence here will show, clearly, that News excluded Valassis and injured competition.

Although News takes various potshots at Valassis in its papers, it does not actually take on Valassis's case.  Thus, News does not contest the key antitrust elements of market definition and market power.  Nor does it contest that a jury can find from Valassis's evidence and the opinion of its liability expert that News has purposefully maintained its monopoly by, among other things, entering into long-term, exclusive, staggered contracts with retailers and long-term commitments with CPGs.  News does not address the fact evidence and the opinion of Valassis's liability expert concluding that *all* this conduct worked synergistically to depress Valassis's revenue and raise its costs, ultimately causing Valassis to exit the market.  Nor, remarkably, does it contest that a jury can find that this same conduct (again, taken collectively) caused News's

*customers* to suffer injury—in the form of higher prices, lower output, and fewer choices.  Had it attempted to contest these matters, it would have run headlong into Judge Pauley's adverse decision on summary judgment in *Dial*—the class action brought by News's customers.

News cannot obtain summary judgment in view of its decision to leave these matters uncontested.  <u>First</u>, News is wrong that Valassis only claims injury and damages from News's predatory commissions.  Valassis asserts, as News and its experts well know (because they responded accordingly), that News engaged in a *wide range* of conduct (not just high commissions).  Valassis claims that all of this conduct worked together to harm competition and exclude Valassis (both by raising its costs *and* by depressing its revenues).  By ignoring the case Valassis has brought, and the fact and expert evidence supporting it, News determined not to try to meet its Rule 56 burden to *show* the absence of fact disputes.  The result:  News effectively concedes that a jury can find that its misconduct caused Valassis antitrust injury and damages.

<u>Second</u>, News's motion proceeds on the false premise that Professor Levinsohn "admits that the only conduct that caused Valassis to later suffer a loss of profits—and for which it now seeks to recover treble damages—was [News]'s subsequent, increased payments to retailers." News Br. 2.  He did no such thing.  His damages model is consistent with Valassis's "monopoly-broth" case, as a cursory review of Professor Levinsohn's opening report (Ex. 4) makes clear:

> 54.  . . . I understand from Professor MacKie-Mason [Valassis's liability expert] that News' strategy of entering into long-term, staggered contracts with retailers, paying high cash guarantees, and preemptively extending its contracts, among other conduct, foreclosed Valassis from competing for contracts with retailers. . . .

> 55.  My damages calculation assumes that News' conduct during the 2010 through 2016 period was anticompetitive.  But for News' conduct, Valassis would have been able to bid for more retailer contracts and would have won a higher percentage of open retailer contracts, yielding higher revenues and profits.

Despite this succinct summary of Valassis's case and Professor Levinsohn's assumptions,

including the fact that Professor Levinsohn expresses no opinion *at all* on liability (relying instead on Valassis's liability expert), News argues, wrongly, that Professor Levinsohn and Valassis put at issue only News's predatory retailer commissions.  News relies upon a single answer by Professor Levinsohn to a hypothetical question posed to him at deposition.  As he understood it, he was asked to explain what would happen to his damages calculations if he were to use the same model but, instead of using the profit margin Professor Levinsohn had opined was reasonable, he were to apply Valassis's (negative) profit margin in the real world.  Professor Levinsohn stated that "damages go away" if he were to make that change, which is unsurprising because, in the real world, Valassis lost a lot of money (thanks to News's misconduct).

But it does not follow that Valassis's damages would go away if the commissions are not anticompetitive, whether independently or as part of a monopoly-broth case (that is, working together with the rest of News's misconduct).  Although he was never asked at deposition, if asked at trial, Professor Levinsohn will testify that (1) he would continue to estimate the same (conservative) damages number, using the same model, if News's retailer commissions are not actionable independently but continue to be part of the same monopoly-broth claim for which he estimated damages in his report, and (2) should Valassis's monopoly-broth claim change, he can conform his model to the trial evidence to measure (positive) damages.

In arguing otherwise, News seeks to weaponize the long tenure of its misconduct to absolve it.  Because there was no "clean" benchmark free from News's misconduct, Valassis's damages expert was forced to make reasonable assumptions, as the law permits him to do, about what Valassis's profit margins would have been without News's anticompetitive distortions— which *never* happened.  News now seeks to use this to curtail Valassis's case.  The law does not permit such perversion.  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946).

Third, News's motion is predicated on an irrelevancy:  Professor Levinsohn's views do not come into play here because the elements of Valassis's liability case, including its antitrust injury, were never within his province as a damages expert.  Valassis will rely on fact evidence and Dr. MacKie-Mason, its liability expert, to prove News's misconduct caused Valassis's exit. Meanwhile, Professor Levinsohn *assumes* that Valassis will prevail on its claims, and so the particulars of his damages model have no bearing on liability.  Anyway, Professor Levinsohn's opinion could not establish lack of causation, injury or damages as a matter of law, given the mountain of evidence showing that all of News's misconduct caused Valassis's exit.

Fourth, News is not excused for its bad acts simply because Valassis was able to win two *profit-share* contracts in 2010 that, unsurprisingly, were profitable.  The relevant question here is whether the challenged conduct injures competition.  It does not matter that the defendant did not exclude its victims from *every* single contract.  And, regardless, there is ample evidence showing that News harmed consumers by purposefully keeping Valassis from having access to enough retail space to profitably compete over time.  *That* is the actionable anticompetitive conduct.

In short, News seeks from this Court a ruling as a matter of law that its panoply of misconduct (found actionable in *Dial*) did not harm Valassis—all on the basis of its unfair caricature of Professor Levinsohn's model, and without any scrutiny of the fact evidence supporting Valassis's case.  This is a bridge too far.  And by inviting the Court to ignore Valassis's *actual* monopoly-broth case and focus just on one strand of challenged conduct, News contravenes the Supreme Court's instruction that antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).  The Court should reject News's invitations to legal error.

## FACTUAL BACKGROUND

### A.  News wields monopoly power in the ISP market.

ISPs are promotions, such as signs and coupon machines, placed by a third party at or near the shelf in retail stores (like Kroger or Safeway).  56.1 ¶ 23.  ISP suppliers contract with retailers to place ISPs in their stores, then sell the ISPs to consumer-packaged goods companies (or "CPGs") (like Dial or Heinz—both of which have sued News).  56.1 ¶¶ 25, 26, 160-61.  News concedes that a jury could find that the market for ISPs is properly defined.  News Br. 6.

In this market, News is a monopolist and a monopsonist.  Its share of CPGs' purchases of ISPs—the "output"—has ranged from ██% to ██%, and its CPG customers have accused it of having a "monopoly" and "███████████████" in documents and court filings.  56.1 ¶¶ 33, 37; Ex. 52 at 007, 012; Ex. 55 at 154.  News's share of grocery retailer contracts to place ISPs—the "input"—has varied between ██% and ██% from 2010 to 2015, making it a monopsonist.  56.1 ¶ 36; Ex. 1 at 64.  News has been persistently and extraordinarily profitable, earning margins as high as ██% in the roughly 20 years during which it has had market power.  56.1 ¶ 40.  In *Dial Corp. v. News Corp*, this Court held that a jury could find that News has monopoly power in this market, 165 F. Supp. 3d 25, 35-36 (S.D.N.Y. 2016), a ruling News does not contest here.

### B.  ISP suppliers need "critical mass" to compete effectively.

Because ISPs are signs placed in retail stores, access to retailer shelf and floor space is an essential input.  But access to just a few retailers is not enough.  56.1 ¶ 41.  Instead, obtaining access to a "critical mass" (or nationwide network) of retail stores is "vital" to compete successfully for CPG spending.  Ex. 12 at 32-33; 56.1 ¶¶ 42-49.  Further, the retailer network must include the large, high-quality, "Tier 1" retailers CPGs care most about.  56.1 ¶¶ 44, 46-48.

An ISP supplier that cannot reach "critical mass" is caught in a vicious cycle: without the requisite level of CPG spending, it has less money to pay retailers.  56.1 ¶ 49.  Recognizing this,

News marketed itself to retailers accordingly, extolling its position as by far the largest market participant.  56.1 ¶ 45.  Indeed, in an attempt to make a virtue of News's overwhelming market power, News's liability expert here, Kevin Murphy, goes so far as to assert that larger networks have a supposedly "natural" advantage in securing CPG dollars.  Ex. 6 at ¶¶ 92-93.

### C.  News excludes competitors by preventing them from reaching critical mass.

Leveraging market dynamics, News developed a "proven strategy" to maintain its ISP monopoly by preventing competitors from obtaining critical mass, as News's now-CEO has said:

> [W]e have a proven strategy in place when it comes to our retail network.  Our strategy is to secure long term retail deals. . . .  We also stagger the deals to prevent a large percentage of the network from being vulnerable at any specific point in time . . . This method allows us to concentrate on our key negotiations.  It also means that any competitor who wants to develop critical mass for their network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way.

*Dial*, 165 F. Supp. 3d at 37 (quoting record evidence); Ex. 58 at 965-66.  News buttressed its exclusionary strategy by offering retailers high, and sometimes predatory, commissions that competing ISP suppliers could not match.  *See* 56.1 ¶¶ 11, 90-96.  Over the years, News deployed its "proven strategy" to exclude all would-be competitors who sought to enter, 56.1 ¶¶ 50-52, and News employed it during the damages period, Ex. 15 at 87-88, 91-92; Ex. 49.

### D.  Valassis attempts to enter the ISP market and News seeks to exclude it.

At the urging of a retailer (SuperValu) that wanted competition against News, because it wanted to "take back control of [its] stores" from News, Valassis tried to enter the ISP market in 2010.  Ex. 129 at slides 7, 8.  SuperValu solicited Valassis because Valassis had competed with News for decades in the separate market for free standing inserts (or FSIs), and had a formidable sales force and great relationships with CPGs.  Ex 155 at slide 16; Ex. 129 at slide 14.[1]

---

[1] News paid Valassis $500 million to settle federal and state-law claims relating to News's anticompetitive conduct in the FSI market, including predatory bundling of FSI and ISP offerings.

Valassis tried to compete on the distorted market terms set by News, and had some early success, securing profit-share agreements with retailers. Valassis was profitable over its first three quarters, despite earning revenue of only $██████. Ex. 4 (at Ex. 4). (The market was more than twelve times larger, at $████████. 56.1 ¶ 64.) But News's conduct meant that Valassis could not remain profitable (or retain its model) unless it grew. 56.1 ¶ 146.

Valassis's limited early success thus proved ephemeral in the face of News's deliberate strategy to choke off Valassis's path to critical mass. Using its dominant market position, News, among other things, (1) entered into exclusive "agreements that [went] out as long as" possible and that foreclosed access to "direct competitors (like Valassis)," Exs. 114, 60 at 862; (2) enforced those contracts to preclude Valassis from placing ISPs in stores, including via innovative products News did not offer, 56.1 ¶ 107; (3) "focused" on "staggering" its contracts so that Valassis could not compete for the retail space, Ex. 12 at 53-54; (4) paid guaranteed commissions to retailers that an equally efficient competitor could not match, and that were often predatory, Ex. 1 at 97-103; and (5) insisted on long-term commitments from CPGs that "lock[ed] Valassis] out of otherwise willing [CPG] participants," Ex. 142 at slide 1. *See* 56.1 ¶¶ 65-104.

Making its intentions clear, and using terminology only a habitual monopolist would have the chutzpah to use, News implemented "Project Preempt"—"a pre-emptive strategy to renew" key retailer contracts "to avoid a competitive bidding situation." *E.g.*, Ex. 20 at 132-33; Ex. 65 at 644. News used its market power, including its incumbency in retail stores and its monopoly war chest, to secure extensions of already long-term and exclusive retailer contracts to ensure that those contracts would never come up for re-bid. 56.1 ¶¶ 71-77. Certain key retailers, including Kroger, with its massive networks of stores, never came on the market. 56.1 ¶¶ 78-84.

As detailed in the report of Valassis's liability expert, Dr. Jeffrey MacKie-Mason, the

effects of News's different strands of exclusionary conduct were "cumulative," creating "synergies between them." Ex. 2 at 21. The combined effect of all of the conduct was, as intended, to squeeze Valassis's margins on the revenue and cost sides. Ex. 2 at 19-34. This is the sort of evidence that News's motion ignores, and which it hopes to keep from a jury.

**E. News drives Valassis out of the market, injuring Valassis and competition.**

As a result of News's actions, viewed collectively, Valassis was denied the opportunity to compete for, let alone secure, a critical mass of retail space, and therefore could not garner enough revenue from CPGs to remain viable—just as News intended. 56.1 ¶¶ 106-34; Ex. 58 at 965-66. Thus, for example, CPGs told Valassis it did not have the requisite "coverage" (that is, the ability to place ISPs at enough, or the right, retailers). Ex. 135 at slide 40. CPGs also testified that "███████████████████████████████████████████," Ex. 37 at 248; *see also* 56.1 ¶¶ 115-20. To make matters worse, even CPGs that *did* wish to place ISPs in Valassis's artificially constrained network were precluded from doing so by News's long-term spending contracts. Ex. 56 at 554; Ex. 154 at 12; *see also* 56.1 ¶¶ 126-28. Valassis estimated at the time that, in the limited retail space it had access to, it missed out on as much as 45% of national ISP campaigns, resulting in the loss of tens of millions of dollars in revenue (and profit) annually, because it lacked critical mass. Ex. 135 at slides 36-41; 56.1 ¶¶ 129-34, 137.

With its ability to win CPG revenue depressed by News's exclusionary strategy, and with its costs driven up by News's offers, Valassis, and the competitive process itself, were weakened. Valassis attempted to regain its earlier profitability by increasing prices to CPGs. 56.1 ¶ 135. Having forced Valassis into the catch-22 of adopting that strategy or becoming still weaker, News now invokes that fact as a sign that competition from Valassis was not useful.[2]

---

[2] It is in this context that Valassis employees thought its ISP prices were "too low." *Contra* News. Br. 10-11.

In July 2013, Valassis's CFO explained to its CEO the predicament Valassis was in:

> [News]'s dominance in this marketplace is evident, and their tactics of bidding up retailer contracts coupled with their CPG contracts which leverage CPGs to buy from them, using Kroger and Safeway as the primary attractions, make this business unprofitable for us from both a short and long term perspective.  News America will continue to pressure us until we exit this business.  They have way too much market power today for us to compete effectively.

Ex. 148 at 866.  Out of desperation, Valassis's CFO proposed trying to sell Valassis's ISP business to News (as another would-be competitor had earlier done, 56.1 ¶ 52).  *Id.*  When that failed, Valassis declared defeat, sued News, and exited the grocery segment.  56.1 ¶¶ 136-42.

But for News's anticompetitive conduct, Valassis would have reached critical mass and persisted as a viable competitor.  *See* Ex. 1 at 130; *see also* 56.1 ¶¶ 143-47.  Its inability to do so was to the detriment not just of Valassis, but of competition and consumers; CPGs would have enjoyed lower prices, higher quality, more choices, and more innovation.  Ex. 1 at 123-26; 56.1 ¶¶ 148-61.  Indeed, CPGs alleged as much in their own monopolization suit against News.  *See Dial*, 165 F. Supp. 3d at 38.  News again does not try to show that these points are undisputed.

## ARGUMENT

## I.   A JURY COULD FIND THAT VALASSIS SUFFERED THE REQUISITE INJURY

News's motion is predicated on the absurdity that Valassis has not suffered the requisite injury.  The motion thus involves two questions:  "One is the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact.'  The other is the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir. 2007) (citation omitted).  Both criteria are met here because a jury can easily find that News deployed a panoply of exclusionary actions that

worked synergistically to force Valassis from the market—a classic form of antitrust injury.[3]

**A. News's anticompetitive conduct, collectively, caused Valassis injury-in-fact.**

To survive summary judgment on causation and injury-in-fact, "[i]t is enough that the illegality"—here, News's synergistic, anticompetitive conduct—could be found by a jury to be "a material cause of the [antitrust] injury." *US Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709, at *16 (S.D.N.Y. Mar. 21, 2017). There are surely disputes of fact on this point.

1. As earlier recounted, the evidence shows that News entered into staggered, long-term, and exclusive contracts with retailers for the purpose of keeping direct competitors (like Valassis) from achieving the critical mass necessary to compete. 56.1 ¶¶ 41-52, 65-104. The record provides ample evidence that this conduct injured consumers, 56.1 ¶¶ 148-61, and neither News's brief nor its Rule 56.1 statement shows otherwise. The anticompetitive nature of News's "monopoly broth" of misconduct is thus conceded for purposes of this motion.[4]

The evidence also shows News's anticompetitive conduct depressed Valassis's revenue and raised its costs to the point of becoming "a material cause" of Valassis's exit, 56.1 ¶¶ 105-47, as Valassis's liability expert concluded, Ex. 1 at 112-23, and just as News intended, Ex. 58 at 965-66. Among other things, News used exclusive, long-term, staggered contracts to constrict access to retail space—preventing Valassis from placing signs in most (and all the most important) retailers. 56.1 ¶¶ 106-20; Ex. 27 at 211-12 (Valassis's ISP head of sales: "If you

---

[3] Contrary to News's assertion (Br. 14), "parties bear no 'special burden' when opposing summary judgment in an antitrust action." *Park v. Thomson Corp.*, 2007 WL 119461, at *2 (S.D.N.Y. Jan. 11, 2007). As in all cases, the movant bears the burden of "identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 116 (2d Cir. 2017).

[4] "It is the mix of various ingredients . . . in a monopoly broth that produces the unsavory flavor." *City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980). *See, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."); *Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 815-16 (2d Cir. 1983) (same); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277-78 (3d Cir. 2012) (same); *Sanitary Milk Producers v. Bergjans Farm Dairy*, 368 F.2d 679, 691 (8th Cir. 1966) (same); *Aspen Highlands Skiing Corp. v. Aspen Skiing*, 738 F.2d 1509, 1522 n.18 (10th Cir. 1984).

don't have the right retailers, you don't have a business."). News muted the limited demand for Valassis's retail network by means of CPG contracts that "lock[ed] [Valassis] out of otherwise willing participants." Ex. 142, at slide 1; 56.1 ¶¶ 126-28. And, as to the few retailers that did come up for bid, News made clear its "intent to keep [Valassis] out at all costs," Ex. 142 at slide 1, including by cutting retailers "big checks" that neither Valassis nor a hypothetical equally efficient competitor could match, Ex. 146 at slide 8; 56.1 ¶¶ 121-25. "Each of the alleged forms of challenged conduct worked in combination to . . . exclud[e] competition." Ex. 1 at 67.

In response to this evidence and the opinion of Valassis's liability expert, News proffered the report of a liability expert, Kevin Murphy. If Valassis was complaining only about News's commissions (as News now asserts), that was apparently lost on Murphy. Murphy addressed the entire scope of the alleged misconduct, and tried to defend it on the basis that the alleged misconduct was efficient, that large networks have "natural" advantages in earning more CPG revenues, and that having a single, dominant ISP supplier is "pro-competitive." Ex. 6 at 31-42. Whether this Orwellian opinion can withstand cross-examination is a proposition we look forward to testing, but the point here is that News's own expert appears to acknowledge that News's conduct (although he calls it natural and pro-competitive) depressed Valassis's revenues.

In *Dial*, moreover, Judge Pauley had no difficulty concluding that News's conduct must be tried to a jury: "Viewing the duration of the contracts, their staggered end dates, and the guarantees *as a whole*," the Court held, "plaintiffs [*i.e.*, consumers] raise material questions of fact as to whether the effect of these contracts was to 'substantially foreclose' rivals," including Valassis, "from obtaining a toehold in the third-party ISP marketplace." 165 F. Supp. 3d at 33 (emphasis added). Judge Pauley also held specifically that whether all of News's challenged conduct caused Valassis's exit was a "question of fact for the jury." *Id.* at 33 n.3.

11

News's half-hearted assertion that, despite News's conduct, Valassis was not precluded from winning two profitable contracts in 2010 misses the point.  *E.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *23 (D. Mass. Jan. 25, 2018) (denying summary judgment on "causation" where defendant argued challenged conduct did not entirely prevent competitor's entry).[5]  A jury can readily find that, in light of the widely acknowledged need for an ISP supplier to obtain critical mass to succeed, a two-retailer network, and a 7% market share, was patently insufficient to permit Valassis to remain profitable (56.1 ¶¶ 41-49, 146)—or to exert pressure on CPG prices.  *See Dial*, 165 F. Supp. 3d at 33.  Indeed, the point of News's anticompetitive conduct was to prevent competitors from reaching critical mass, and *that* is the conduct Dr. MacKie-Mason concluded injured both Valassis and consumers.  Ex. 1 at 82-102.  News disagrees (News Br. 20), but that is an issue for trial.

2.  Instead of addressing the opinion of Valassis's liability expert or the fact evidence establishing that News caused Valassis to suffer an injury-in-fact—including internal documents showing that Valassis's costs were raised and that (for the few stores it had access to) it lost tens of millions in revenue (and thus profit) annually because it lacked critical mass, 56.1 ¶¶ 129-34, 137—News goes all in on Valassis's damages expert, Professor Levinsohn.  But that gambit must fail because Valassis does not rely *at all* on Professor Levinsohn for its liability case.  This is not an antitrust class action where a viable damages model is needed to establish injury-in-fact for absent class members.  Valassis intends to rely for its liability case on its own documents and News's, the testimony of percipient witnesses, and the opinion of its *liability* expert.  Professor

---

[5] *See also, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("An agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market."); *Suture Exp., Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1228 (D. Kan. 2013) ("The Clayton Act, however, is not expressly limited to contracts which completely exclude the purchase of a competitor's goods and courts have construed the Act as applying to contracts that are not 100% exclusive." (citing *ZF Meritor*, 696 F.3d at 283)).

Levinsohn's report is offered by Valassis for another purpose altogether:  He *assumes* liability and estimates the amount of damages Valassis will seek when News is found liable.

In focusing on Professor Levinsohn's report, News's motion conflates the concepts of injury and damages, but they are distinct.  Injury is an element of the *liability* case, and damages are the *measure* of injury once liability is established.  Indeed, "[o]nce a jury has properly found causation of antitrust injury from unlawful activity"—also referred to as the "fact of damages"—the defendant's liability is established, and the plaintiff may then quantify the "extent" or "amount" of damages to be awarded "without strict proof of what act caused which injury as long as the damages are not based upon speculation or guesswork."  *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 813 (3d Cir. 1984).[6]

And even if Professor Levinsohn's report were somehow relevant to liability and said what News contends it does—both of which are inaccurate or at least genuinely disputed—News would have succeeded in nothing more than creating a fact dispute.  Neither Professor Levinsohn's testimony, nor Valassis's profitability on two *profit-share* contracts in 2010, could establish a lack of causation as a matter of law.  Again, there is a mountain of evidence, none of which is addressed by News, showing that *all* of its conduct drove Valassis from the market. 56.1 ¶¶ 105-47; *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 327-28 (2d Cir. 2011) ("but-for causation is an issue of fact for the jury" (citation omitted)).  News's failure to address that evidence is enough to defeat News's motion.  *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 114 n.9, 121-22 (1969) (plaintiff provided "proof of some damage" by showing

---

[6] *See also Sciambra v. Graham News*, 892 F.2d 411, 415 (5th Cir. 1990) (plaintiff need only show "an antitrust violation and *the fact of damage*" (emphasis added)); *Apple, Inc. v. Samsung Elecs. Co*., 2012 WL 2571719, at *28 (N.D. Cal. June 30, 2012) ("even if Apple did not point to evidence of amount of damages, such a failure would not be fatal to Apple's antitrust counterclaim"); *Law v. NCAA*, 5 F. Supp. 2d 921, 926-27 (D. Kan. 1998) ("Once plaintiffs establish that defendant's anticompetitive activity was a material cause of 'some' of their injury . . . the remainder of the damage inquiry is judged under the amount of damage standard.").

defendant "prevented [plaintiff] from establishing an effective distribution system").[7]

**B. Valassis's injury-in-fact is quintessential "antitrust injury."**

Because a jury could easily find that News's anticompetitive conduct collectively excluded Valassis from the market, the rest of the antitrust-injury inquiry is straightforward. The injury Valassis suffered is undoubtedly "a conventional form of antitrust injury." *Higgins v. New York Stock Exch.*, 755 F. Supp. 113, 116 (S.D.N.Y.), *aff'd*, 942 F.2d 829 (2d Cir. 1991).

That's because the "injury (of direct exclusion from the marketplace) is exactly the type that antitrust laws were designed to prevent and flows from the competition-reducing aspect of [defendant's] conduct." *Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 381-82 (S.D.N.Y. 2007). Thus, "where a competitor-plaintiff seeks to remove the alleged restraint on competition so he may be free to compete—such that the [competitor]'s interest coincides with the public interest in vigorous competition—he satisfies the antitrust injury requirement." *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) (quotation marks and citations omitted); *see also Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 669 (S.D.N.Y. 2002) (same).

Just as in those cases, Valassis's injury is intrinsically tied to the competitive harm identified by Valassis's liability expert and News's consumers in *Dial*: News maintained monopoly power and injured consumers precisely by preventing Valassis from reaching critical mass and ultimately causing its exit. 56.1 ¶¶ 105-47 (Valassis), 148-61 (CPGs). Thus, Valassis's claimed injury-in-fact is the type of injury the antitrust laws are designed to prevent.

News's reliance on *Brunswick* and *Atlantic Richfield* is misplaced: Courts have

---

[7] *See also, e.g.*, 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 397 at 417 (3d ed.) ("Those who are excluded (or foreclosed) from participating in a market suffer some economic injury"); *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442, 452 (E.D.N.Y. 2014) ("[D]efendants' exclusionary practices have impeded [Fido's] ability to compete for market share, resulting in economic harm to Fido's.").

repeatedly applied those cases to hold that an unlawfully excluded competitor suffers antitrust injury.[8]  Valassis bases liability on a range of conduct, much of which has nothing to do with pricing, and all of which harmed Valassis and consumers.  News does not argue that the other conduct did not take place, or did not harm consumers.[9]  That's enough to show antitrust injury.

Dial provides further support.  It held that a jury would decide whether "the generalized monopoly profits obtained by News Corp. are a result of—and 'flow from'—its exclusive deals with retailers and other . . . alleged anticompetitive conduct."  165 F. Supp. 3d at 33, 38.  News tries to distinguish Dial on the ground that Valassis and CPGs suffered different types of injuries, but "[t]he injury suffered by a competitor need not be the exact injury suffered by consumers." Reddy v. Puma, 2006 WL 2711535, at *4 (E.D.N.Y. Sept. 21, 2006).  "[S]o long as the competitor's injury flows from the same alleged anticompetitive acts" challenged by consumers, the competitor has met the antitrust injury requirement.  Id.  That is true here.

## II.   NEWS CANNOT REDEFINE VALASSIS'S LIABILITY CASE

Because News cannot win summary judgment on the case Valassis has actually brought, it engages in a game of ventriloquism.  To that end, News asserts that Valassis's damages analysis measures only the effect of News's commissions; and asks the Court to infer that

---

[8] See, e.g., Primetime 24 Joint Venture v. Nat'l Broad., 219 F.3d 92, 103-04 (2d Cir. 2000) (competitor threatened with exclusion by anticompetitive conduct suffers antitrust injury); Novell, Inc. v. Microsoft, 505 F.3d 302, 315-17 (4th Cir. 2007) (same); Gulf States Reorganization Grp., Inc. v. Nucor Corp., 466 F.3d 961, 967-68 (11th Cir. 2006) (same); Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 753-55 (10th Cir. 1999) (same); Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 274-75 (3d Cir. 1999) (same); Re/Max Int'l v. Realty One, 173 F.3d 995 (6th Cir. 1999) (same); Serfecz v. Jewel Food Stores, 67 F.3d 591, 597 (7th Cir. 1995) (same); Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1042-43 (9th Cir. 1987) (same), aff'd, 496 U.S. 543 (1990) (lost business is antitrust injury).

[9] This case is therefore unlike cases cited by News in which the claimed injury arose entirely from conduct deemed procompetitive as a matter of law.  See Phila. Taxi Ass'n, Inc v. Uber Techs., Inc., 886 F.3d 332, 338, 341 (3d Cir. 2018) (complaint "deficient in averring conduct that is, in fact, anticompetitive"); Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 541, 547 (2d Cir. 1993) (plaintiff had "not shown that defendants' activities have had any adverse impact on price, quantity, or output"); Act, Inc. v. Sylvan Learning Sys., Inc., 2000 WL 34031484, at *4 (N.D. Iowa May 8, 2000) (plaintiff's only claimed injury was loss of contract, and defendant's conduct in competing for contract found procompetitive); see also 2 Areeda & Hovenkamp, Antitrust Law ¶ 335f, at 73-74 (3d ed. 2007) (where no anticompetitive conduct, absence of "antitrust injury" necessarily follows).

Valassis's liability theory of "antitrust injury" is similarly limited.  That argument fails. Valassis's damages model is not limited in the way News asserts, and, in any event, the limitation News invents in Valassis's model is no basis to throw out this case.

### A. Professor Levinsohn estimated damages for the "monopoly-broth" claim.

Professor Levinsohn has explained that he sought to measure the damages Valassis suffered as a result of *all* the conduct by News that Dr. MacKie-Mason found to be anticompetitive.  *See, e.g.*, Ex. 4 ¶¶ 6, 11, 54-55; Ex. 5 at 193 ("[M]y assumption" is that Dr. MacKie-Mason "would prevail on all of his liability claims.").  He assumed that News's monopoly broth of misconduct was anticompetitive and that, in its absence, Valassis would have remained as a viable competitor to News.  Ex. 4 ¶¶ 9, 11-12, 54-55; *see also* Ex. 1 at 67.

Professor Levinsohn estimated damages as the difference between Valassis's actual profits and the unimpeded, or "but-for," profits it would have earned in a hypothetical, "but-for world" in which News did not engage in misconduct.  Valassis's actual profits were observable, but Professor Levinsohn needed to estimate Valassis's but-for profits.[10]

To do so, Professor Levinsohn drew upon Valassis's real-world profits during what he deemed to be a reasonable "benchmark period."  Ex. 4 ¶ 11.  Ideally, one would use as a benchmark "a period during which the alleged anti-competitive conduct did not take place," or, as Professor Levinsohn describes it, "what would have happened in a 'fair fight,'" but here, News's history of anticompetitive conduct means "there was never a truly 'fair fight' to use as the benchmark."  *Id.*  Still, Professor Levinsohn opined that it was reasonable—in fact, conservative—to assume that Valassis's unimpeded profit margin (and its contract win rate) would be approximately equal to Valassis's actual margin (and win rate) during the first three

---

[10] *New York v. United Parcel Serv., Inc.*, 2016 WL 4735368, at *10 (S.D.N.Y. Sept. 10, 2016) ("[T]he use of but-for worlds is commonplace in assessing damages in many different scenarios.").

quarters of 2010.  *Id.*  Although that period included several elements of challenged conduct, the margins in that period were used as a relatively reasonable approximation of the margins that would obtain under fair market conditions.  *Id.*; *see also* Ex. 1 at 129-30.[11]

Because News's misconduct contaminated the benchmark, Professor Levinsohn did not rely only on real-world data to calculate but-for profits.  For instance, as to News's unlawful contract staggering, Professor Levinsohn assumed that a greater number of contracts would come up for competition every year in the but-for world (40 percent) than in the benchmark period.  As to the exclusionary length of retailer contracts, Professor Levinsohn assumed that the average contract would be significantly shorter in the but-for world—2.5 years, rather than nearly 4.5 years in the actual world.  These assumptions, ignored by News here, were made to account at least in part for the harmful effects of News's anticompetitive conduct in the benchmark period.

Professor Levinsohn used these and other variables to calculate but-for profits, and then took the difference between actual and but-for profits.  Ex. 4 ¶¶ 56-61, 68-75.  This is a standard approach to estimating antitrust damages—and one consistent with Valassis's liability case.

**B.  Professor Levinsohn's model is not limited in the way News asserts.**

News asserts that Professor Levinsohn's model is limited to evaluating the effect of News's commissions, but that is not true.  Professor Levinsohn's model does not use *News's* commissions at all.  Ex. 5 at 64.  He conservatively relies on *Valassis's* relative costs during the benchmark period to estimate a but-for profit margin.  Valassis's margins went down after the benchmark, but Professor Levinsohn does not opine that this was caused by any single form of

---

[11] That is because Valassis had negotiated profit-share arrangements that more nearly approximated competitive margins.  *See* Ex. 4 ¶¶ 11, 51; Ex. 5 at 46 (discussing use of profit share).  Valassis was later forced to move to a guaranteed model as a result of News's conduct, taken collectively, and its margins were further depressed on account of the high commissions News was paying, and because News had kept Valassis from having critical mass and locked up CPG revenues, all of which depressed Valassis's revenues and profits.  56.1 ¶¶ 129-34, 137.

misconduct, let alone that it was solely due to News's commissions.  And, as set forth above, the fact evidence and the opinion of Valassis's liability expert show that News's conduct, taken as a whole, depressed Valassis's margins in two ways:  (1) It not only raised Valassis's costs, but (2) it *also* lowered Valassis's revenues, by preventing it from reaching critical mass and locking up CPG dollars.  *See* pp. 6-9, 10-12, above.  Indeed, News excluded its competitors primarily by suppressing revenues.  Ex. 58 at 965-66.  In the but-for world, Valassis would have had higher revenues, lower costs, and thus higher margins.

And it is perverse in the extreme for News to take swipes at Professor Levinsohn's assumptions when News itself created the conditions requiring him to make these assumptions in the first place.  Having recognized that News's misconduct was always present, and that this made it impossible for him to observe Valassis's unaffected profit margin, he was entitled to make reasonable assumptions that he considered to be conservative.  *Bonjorno*, 752 F.2d at 813; *see also* p.13 & n.6, above.  It does not follow that Professor Levinsohn *blessed* News's omnipresent misconduct, let alone that he meant to limit Valassis's liability case.  And "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted."  *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (quotation marks omitted); *see also Bigelow*, 327 U.S. at 265 ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

In arguing that Valassis relies solely on the level of News's commissions for its damages calculation, News cites a response by Professor Levinsohn to a hypothetical question at his deposition, where he was asked what would happen to the damages number calculated by his model if he were to assume that none of the increase in commissions that took place after the

18

benchmark period was the result of anticompetitive conduct.  He responded that, if he made no other changes to his model other than to swap Valassis's real-world profit margin for the number he had calculated, "my intuition says damages would go away."  Ex. 5 at 179.  That is "an unremarkable mathematical observation."  Levinsohn Decl. ¶ 16.

As his report and testimony make clear, however, Professor Levinsohn's view is that there *would be* measurable damages if the jury concluded that (1) the commissions were not independently anticompetitive, but (2) News's conduct, taken collectively, worked to exclude Valassis and harm competition as Dr. MacKie-Mason opines.  *See* Levinsohn Decl. ¶ 3.  In that situation, he would continue to use the same model and estimate of damages, because Valassis's principal claim here, and the claim for which Professor Levinsohn measured damages, would be unchanged.  As he explains, it does not matter whether the commissions are independently legal or illegal.  *Id.* ¶¶ 11-13.  Indeed, a century of case law holds that conduct may be anticompetitive when reviewed in combination with other conduct, even if each strand of misconduct is legal when reviewed alone (which we do not concede).  *E.g.*, *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *1-2 (N.D. Cal. Nov. 13, 2008) ("the past century's jurisprudence" establishes that "'anticompetitive' conduct may include otherwise *legal* conduct" and that "courts must consider all of an alleged monopolist's related conduct in the aggregate"); *see* p.10, n.4, above.

**C.  Valassis's damages model cannot be used to redefine Valassis's case.**

News's argument also misses the mark completely because, at the risk of repeating ourselves, no answer by Professor Levinsohn in a deposition could dislodge the showing of antitrust injury that Valassis will establish through *fact evidence* and its *liability expert*.

In this setting, a purported weakness or inconsistency in a damages model can provide material for cross-examination on the appropriate measure of damages to be awarded upon a finding of liability; it is, however, irrelevant to *liability*, and could not be a basis for summary

19

judgment. *Law v. NCAA*, 185 F.R.D. 324, 329 (D. Kan. 1999) ("If [the damages expert]'s testimony was internally inconsistent, however—and the Court does not agree that it was—that fact was a matter for the jury to consider in evaluating his opinion.").[12]  Courts recognize the distinction between a liability case and a model used to quantify damages, and have rejected attempts to leverage a (perceived) flaw in a damages model into a wholesale attack on the plaintiff's liability case. *E.g.*, *Law*, 185 F.R.D. at 330 (rejecting argument for judgment where "plaintiffs did not rely solely on [its damages expert] to establish fact of injury"); *see also Bonjorno*, 752 F.2d at 811-12.  In truth, because of its obvious flaws, this is rarely attempted.

        News cites no case that supports its position here.  And Valassis is aware of none.  News does cite several cases that require plaintiffs to "disaggregate" between damages caused by lawful and unlawful conduct.  *See, e.g.*, News Br. 14, 20, 22 (citing *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081 (7th Cir. 1983)).  But there is no need to disaggregate damages where, as here, the antitrust claim is that a host of anticompetitive conduct acts synergistically.  *See, e.g.*, *ZF Meritor LLC v. Eaton Corp.*, 2013 WL 6729509, at *2-3 (D. Del. Dec. 20, 2013); *see also Bonjorno*, 752 F.2d at 813 ("[T]he theory of the section two violation here is not that any one act in itself is unlawful, but that all the acts taken together show the willful acquisition or maintenance of a monopoly . . . .  When the antitrust injury is of an indivisible nature, the courts have permitted a relaxed standard of proof in calculating damages."); *MCI*, 708 F.2d at 1161 ("Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another.").  And,

---

[12] *See also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 852 (5th Cir. 2015) ("The defendants had the opportunity to show whether the benchmark period was correct on cross examination."); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1262-63 (10th Cir. 2014) (finding that with respect to the benchmark period used by an expert, "[i]t is for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions").

again, *Dial* rejected the same argument News makes here.  165 F. Supp. 3d at 38.[13]

## III.   EVEN IF VALASSIS'S INJURY AND DAMAGES ARISE ONLY FROM NEWS'S COMMISSIONS, NEWS'S MOTION STILL FAILS

Regardless, Valassis suffered the requisite injury even under News's misbegotten view, because News's commissions *were* anticompetitive.  That is true whether they are reviewed under the "rule of reason,"[14] as Valassis asserts they should be, or under the price-cost test.

### A.  News's conduct should be evaluated under, and fails, the rule of reason.

News's assertion that Valassis has no damages without News's high commissions—even if it's assumed to be true despite all the evidence that News's conduct deprived Valassis of profits by lowering its *revenues*, 56.1 ¶¶ 106-20, 126-28, 131-34—could not change the outcome.  The commissions in this case were paid on multi-year, deliberately staggered contracts with exclusivity provisions designed to shut out direct competitors.  A jury may find that the commissions were an essential ingredient of News's monopoly broth of misconduct (as News now posits), and that without them there is no injury, or it may not.  But "given the synergistic nature of [News's contracting] practices in relation to [Valassis's] primary claim that it was excluded," the contracts (including the payment terms) must be examined as any other exclusive-dealing arrangement—under the rule of reason.  *Litton*, 700 F.2d at 816; *see* p.10, n.4, above.

Judge Pauley recognized as much in *Dial*, as the law required him to do.  And he was not

---

[13] In the few "disaggregation" cases cited by News where judgment was granted as a matter of law, a damages analysis was the *only* evidence presented to establish injury-in-fact, or plaintiffs had made clear their unwillingness or inability to disaggregate damages.  *R.S.E., Inc. v. Pennsy Supply, Inc.*, 523 F. Supp. 954, 965 (M.D. Pa. 1981); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992).  Neither situation is present here: Professor Levinsohn has always explained he could modify his model if the jury's finding required it, and opines that there would be positive damages.  *E.g.*, Ex. 5 at 74-75, 136; Levinsohn Decl. ¶¶ 11-13, 18.  And the cases show that, if it turns out that News is liable but that the damages model is somehow inadequate, the remedy will be a new trial solely for damages, not judgment as a matter of law.  *E.g.*, *MCI*, 708 F.2d at 1166-67 (so holding); *Litton Sys., Inc. v. Honeywell, Inc.*, 1996 WL 634213, at *1 (C.D. Cal. July 24, 1996) (same).

[14] Under the "rule of reason," conduct is anticompetitive if it "foreclose[s] competition in such a substantial share of the relevant market so as to adversely affect competition."  *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, 2016 WL 3610155, at *4 (D. Del. July 1, 2016).

21

alone in holding that the rule of reason applies when a defendant's pricing is only one part of a broader, mutually reinforcing, exclusionary scheme. *See, e.g.*, *ZF Meritor*, 696 F.3d at 277, 280.[15]  Indeed, to hold otherwise would suggest, absurdly, that a multifaceted anticompetitive scheme bolstered by anticompetitive pricing practices should face relaxed scrutiny.

This case has nothing to do with *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, a plain-vanilla predation case concerning the purchase of sawlogs "on the open bidding market."  549 U.S. 312, 315 (2007).  There, the non-pricing acts, which the Supreme Court did not even describe, did *not* act synergistically with the bids.  *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1034 (9th Cir. 2005), *rev'd sub nom.*, 549 U.S. 312 (2007) (conduct included "making misrepresentations to state officials in order to obtain sawlogs from state forests.").  As Judge Pauley recognized, here but unlike in *Weyerhaeuser*, "the prices paid by News Corp. in their contracts with retailers are not the clearly predominant method of exclusion.  Rather, the length of the exclusive contracts and their staggered terms may also foreclose competition."  165 F. Supp. 3d at 32; *see* 56.1 ¶¶ 106-14 (contracting practices depressed revenues).  The rule of reason applies.[16]

Even if News's non-bidding conduct is ignored, the rule of reason still applies because News has market power over *both* inputs—*i.e.*, access to retailer shelves—*and* outputs—*i.e.*, the sale of ISP tactics to CPGs.  Ex. 1 at 61-67.  So, the "price-cost" test is inapt, per *Weyerhaeuser*:

If the predatory firm's competitors in the input market and the output market are the

---

[15] *See also Insight Equity*, 2016 WL 3610155, at *5 (because plaintiff "has not alleged that price was [defendant's] predominant mechanism of exclusion . . . the price-cost test does not apply and the appropriate standard is the general rule of reason analysis"); *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litig.*, 2017 WL 6524839, at *7 (D. Kan. 2017) (refusing to apply price-cost test where alleged "rebate program involved anticompetitive conduct—beyond pricing itself—that was designed to" protect monopoly).

[16] News hints in a footnote that *Dial* is inconsistent with *Northeastern Telephone v. AT&T*, 651 F.2d 76, 95 & n.28 (2nd Cir. 1981).  News Br. 24 n.13.  But in *Northeastern Telephone*, as in *Weyerhaeuser*, pricing allegations were at "the 'heart of [plaintiff]'s case.'"  651 F.2d at 86.  More importantly, the court there found that every category of challenged conduct was procompetitive as a matter of law, and thus did not address the question at issue.  *Id.* at 96.

> same, then predatory bidding can also lead to the bidder's acquisition of monopoly power
> in the output market. In that case, . . . the monopsonist could, under certain market
> conditions, also recoup its losses by raising output prices to monopolistic levels. *See*
> [Steven C. Salop, Anticompetitive Overbuying by Power Buyers, 72 Antitrust L.J. 669,
> 679-682 (2005) ("Salop")] (describing a monopsonist's predatory strategy that depends
> upon raising prices in the output market).

549 U.S. at 321 n.2; *see also id.* at 321 ("This case does not . . . present a risk of significantly

increased concentration in the market in which the monopsonist sells.").

The Supreme Court's instruction that a monopsonist/monopolist may still act

anticompetitively even when making superficially "above cost" bids for inputs is controlling

here. Indeed, News's bids still foreclose an equally efficient competitor, and injure competition,

because as a monopsonist/monopolist, News may *simultaneously* make predatory bids to retailers

in the input market while recouping that investment by charging monopolistic prices to CPGs in

the output market. *See* Salop, *supra*, at 697, 706 (cited in *Weyerhaeuser*, 549 U.S. at 321 n.2).[17]

As Dr. MacKie-Mason shows, that's just what happened. Ex. 1 at 96-108. And News

never contests this showing. In fact, notwithstanding that Valassis previously noted this critical

distinction made by *Weyerhaeuser*, Dkt. 182 at 9, News's brief ignores the Supreme Court's

instructions completely. Its silence, once again, speaks volumes.

In sum, the rule of reason applies, and the record shows that News can't satisfy it. News

does not dispute that a jury can find that News's conduct, taken as a whole, substantially

foreclosed competition, or that News's conduct harmed consumers by raising prices and

otherwise. 56.1 ¶¶ 41-52, 65-104 (News's conduct), 105-47 (exclusion of Valassis), 148-61

---

[17] *See also* Steven C. Salop, The Raising Rivals Cost Foreclosure Paradigm, Conditional Pricing Practices and the Flawed Incremental Price-Cost Test, 81 Antitrust L.J. 371, 380-381 (2017); *Sprint Nextel Corp. v. AT & T Inc.*, 821 F. Supp. 2d 308, 323-26 (D.D.C. 2011) (describing harms resulting from dual monopsony and monopoly); *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d 869, 888 n.12 (N.D. Ohio 2008) ("I note that monopsonist buyers who also have a monopoly in the output market pose the greatest threat to competition."); *Been v. O.K. Indus., Inc.,* 495 F.3d 1217, 1232 n.10 (10th Cir. 2007) ("The danger of increased consumer prices is especially acute when the monopsonist resells in a monopolized market").

(harm to CPGs); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 221 (S.D.N.Y. 2014)

(denying summary judgment, because under rule of reason "[t]he weighing of [the parties]

contentions is properly left for trial" (citing *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386

F.3d 485, 507 (2nd Cir. 2004)).  That is enough to deny News's motion.

### B.  News's retailer commissions also fail to pass the price-cost test.

In any event, a jury can conclude that News's bids do not satisfy even the price-cost test,

because News could not have reasonably expected the bids to have been profitable for an

"equally efficient competitor."  *Cf. Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 232

(1st Cir. 1983) (Breyer, J.); *Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245

(2d Cir. 1992) (price-cost test looks to "reasonably anticipated" costs).

To begin, News's internal projections unreasonably assumed that News would retain its

ability to charge monopoly prices to CPGs—and thus artificially inflated News's projected

revenue and profitability.  If Valassis had obtained critical mass, News's monopoly prices would

have been pushed down toward more competitive levels.  56.1 ¶ 7-8, 11, 90-96; Ex. 1 at 102.[18]

News's projected profitability models were further inflated because, while News

consistently predicted in internal business documents that placements would *fall*, News's

profitability projections blithely assumed that placements would not change, instead mirroring

actual placements from the prior 12 months.  56.1 ¶ 11.  In fact, *every single* contract that News

---

[18] Although News mocks Dr. MacKie-Mason's analysis in its brief, it never bothers to explain what is wrong with it
as a matter of economics.  In fact, News's expert agreed that, in a monopoly maintenance case like this one, "I don't
think the firm as a whole would necessarily lose money, but you would want to see that they engage in conduct and
bid in ways that would be unprofitable absent the ability to exclude rivals." Ex. 31 at 311-12; *see also* Steven C.
Salop, Exclusionary Conduct, Effect on Consumers, and the Flawed Profit-Sacrifice Standard, 73 Antitrust L.J. 311,
373 (2006) (same).  Nor does News cite any legal authority rejecting Dr. MacKie-Mason's approach; as noted above
(p.22), *Weyerhaeuser* is inapposite as it did not concern a defendant that could leverage a monopsony over inputs to
secure monopoly over outputs.  And the district court there did not require the plaintiff show below-cost pricing
under *any* assumptions.  *See Washington Alder LLC v. Weyerhaeuser Co.*, 2004 WL 1717650, at *2 (D. Or. 2004).

won in a bidding situation with Valassis turned out to be unprofitable in its execution.  56.1 ¶ 6.[19]

News also argues that even if some of its bids were predatory, not enough were.  There is a dispute of fact as to how many bids were predatory.  56.1 ¶ 11.  But even just a few acts of predation may be anticompetitive where, as here, the bidder targets key contracts.  *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1505 (11th Cir. 1988) ("Reducing the price to particular customers . . . is sufficient to create a jury issue." (citation omitted)); 56.1 ¶¶ 90-96.

## IV.   NEWS HAS NOT MET ITS BURDEN ON THE REMAINING CLAIMS

News devotes less than a page, and none of its Rule 56.1 statement, to the remaining claims.  News's argument, devoid of record citation, is "facially deficient" and should be denied.  *Compare Nick's Garage*, 875 F.3d at 115-16 ("[A]n assertion by the defendant that the plaintiff 'has not produced any evidence,' without more, does not show that the plaintiff has insufficient evidence."), *with* News Br. 25 (asserting only that "Valassis has not adduced any evidence").

## <u>CONCLUSION</u>

The Court should deny News's motion for summary judgment and permit the case to proceed to a trial on the merits.

Dated: May 25, 2018

*Of counsel*:

Michael S. Shuster
Vincent Levy
Benjamin F. Heidlage
Scott M. Danner
Lauren Giudice
Gregory Dubinsky
Evan H. Stein

By:  /s/ Vincent Levy_____
     HOLWELL SHUSTER & GOLDBERG LLP
     750 Seventh Avenue, 26th Floor
     New York, NY 10019
     (646) 837-5151
     vlevy@hsgllp.com

     *Attorneys for Plaintiff*

---

[19] Both parties' experts agree that ex post unprofitability is relevant in assessing the reasonableness of ex ante profitability projections.  56.1 ¶ 10.