UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALASSIS COMMUNICATIONS, INC.,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>NEWS CORPORATION; NEWS AMERICA MARKETING, a/k/a NEWS AMERICA INCORPORATED, a/k/a NEWS AMERICA MARKETING GROUP; NEWS AMERICA MARKETING FSI L.L.C., a/k/a NEWS AMERICA MARKETING FSI, INC.; and NEWS AMERICA MARKETING IN-STORE SERVICES L.L.C., a/k/a NEWS AMERICA MARKETING IN-STORE SERVICES, INC.,<br><br>　　　　　Defendants. | Case No. 1:17-cv-07378-PKC |

### DEFENDANTS' RULE 56(C) OBJECTIONS AND REPLY TO PLAINTIFF'S COUNTERSTATEMENT OF FACTS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC  20006-1047
Tel: (202) 223-7300
Fax: (202) 223-7420

1285 Avenue of the Americas
New York, NY  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Counsel for Defendant*

**SUBJECT TO PLAINTIFF'S AND DEFENDANTS' MOTIONS TO SEAL**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, and Section 4.G of Your Honor's Individual Practices, Defendants respectfully submit these objections and replies to Plaintiff's Counterstatement of Facts (the "Counterstatement").

## NAM'S OBJECTIONS TO THE COUNTERSTATEMENT

Valassis's Counterstatement fails to comply with Local Rule 56.1, which requires that a party's opposition papers include only those facts that are "material" to the motion. *See* S.D.N.Y. L.R. 56.1(b) ("The papers opposing a motion for summary judgment shall include . . . if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."). In response to NAM's 56.1 Statement, which set forth 22 paragraphs of undisputed facts material to the specific grounds on which NAM seeks summary judgment, Valassis lodged *139 additional paragraphs* containing supposedly "additional material facts." Far from a "short and concise" statement of "additional material facts" that are "necessary" in opposing the motion, Valassis's Counterstatement is a regurgitation of its narrative of the entire case, together with legal argument. None of the thirty pages of additional facts submitted by Valassis offer any new facts material to the issue presented by NAM's motion: whether Valassis has any evidence of damages attributable to conduct other than NAM's lawful, above-cost retailer payments. Valassis's so-called "additional material facts" are therefore entitled to no weight. *See Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment.").

To be clear, in asking the Court to disregard Valassis's "additional material facts," NAM is not conceding that those facts are undisputed. Although immaterial to NAM's motion, NAM

disputes, and does not "concede" (Opp. 5), that Valassis will have sufficient evidence for a jury

to find in its favor on any element of its claims (including anticompetitive conduct, market

definition and market power). Were Valassis to overcome summary judgment (and it should

not), many of the supposed facts Valassis puts forward will be hotly contested. The evidence

will show, for example, that the conduct Valassis complains about—such as so-called "long-

term," "staggered," and exclusive contracts (*see* ¶¶ 66–96)—is pro-competitive, responsive to

the preferences and demands of retailers and CPGs, and for those reasons employed by Valassis

itself. The fact remains, however, that any such disputes are immaterial to NAM's summary

judgment motion because the *only* alleged injury for which Valassis purports to have *any*

evidence of damages is "lost profits" due to one form of conduct alone:  NAM's above-cost (and

therefore lawful and non-predatory) retailer payments.

The Counterstatement also improperly attempts to manufacture disputes of fact where

there are none by interjecting argument, immaterial facts, or characterizations, while failing to

actually controvert the substance of the facts asserted by NAM. *See Garvey* v. *Town of

Clarkstown, N.Y.*, 2018 WL 1026379, at *1 n.2 (S.D.N.Y. Feb. 22, 2018) (deeming admitted

responses in which plaintiff "quibbles with defendants' characterization of the fact," . . . 'denies'

a fact in form" but "does not actually controvert the fact in substance," or "makes legal

arguments"); *Baity* v. *Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (recognizing that

response to 56.1 statement was deficient where plaintiff "improperly interject[ed] arguments" or

"speak[s] past Defendants' asserted facts without specifically controverting those same facts");

*Hartley* v. *Rubio*, 785 F. Supp. 2d 165, 171 (S.D.N.Y. 2011) (courts may reject "conclusory or

non-responsive objections" or "responses that simply advocate for a different spin on otherwise

uncontroverted facts"); *Lava Trading Inc.* v. *Hartford Fire Ins. Co.*, 365 F. Supp. 2d 434, 444

(S.D.N.Y. 2005) (Castel, J.) ("[C]haracterization and conclusory description do not create a triable issue of fact.").

The Counterstatement also is deficient insofar as Valassis relies upon inadmissible evidence to support its assertions.  *See* Fed. R. Civ. P. 56(c)(2); S.D.N.Y. L.R. 56.1(d) (each statement "must be followed by citation to evidence which would be admissible").  The Court need not reach any evidentiary issues to resolve summary judgment because the material facts on which NAM's summary judgment motion is based remain undisputed.  We note, however, that scores of paragraphs in Valassis's Counterstatement nevertheless rely upon evidence that Valassis cannot show would be admissible at trial because, among other things, it comes from depositions in prior litigations involving different parties (*e.g.*, ¶¶ 4, 28, 37, 44, 49, 52, 116, 148, 149, 160) and Valassis cannot satisfy its burden of showing an identity of issues between this case and prior litigation that involved different claims, different facts, and different time periods, *see* Fed. R. Civ. P. 32(a)(8); because it pre-dates February 4, 2010, the date on which Valassis released all claims against NAM and agreed not to rely on any allegations that were or could have been made by Valassis prior to that date (*e.g.*, ¶¶ 43, 51, 85); *see* Ex. 54 at 4–5; and/or because it is inadmissible hearsay (*e.g.*, ¶¶ 37, 38, 63).[1]

---

[1] References to "Ex. __" are to the exhibits to the Declaration of William B. Michael in Support of Defendants' Motion for Summary Judgment, filed April 13, 2018, and the Declaration of William B. Michael in Support of Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed June 15, 2018.

References to "Levy Ex. __" are to the exhibits to the Declaration of Vincent Levy in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed May 25, 2018.

References to "Mot." are to NAM's Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed April 13, 2018.

References to "Opp." are to Valassis's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed May 25, 2018.

References to "Reply" are to NAM's Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed June 15, 2018.

NAM sets forth below its specific objections and responses to the Counterstatement. By not addressing all of the alleged facts asserted by Valassis (except to identify why those facts are not material to NAM's motion), NAM does not concede that such allegations are accurate or that the documents or testimony cited by Valassis are admissible. NAM reserves its right to dispute any and all supposed facts asserted by Valassis in the Counterstatement, and to challenge the admissibility of documents and testimony cited by Valassis at the appropriate time.[2]

## I.    THE PARTIES AND THE ISP BUSINESS

1.    Defendant News America Marketing In-Store Services L.L.C. ("NAM") is in the business of selling in-store promotions ("ISP") to manufacturers of consumer packaged goods ("CPGs"), which use ISPs to advertise their own products in retail stores. Ex. 1 ¶ 45; Ex. 2 at 16–17. NAM sells various types of ISP products, including shelf signs and coupon machines. Ex. 1 ¶ 46; Ex. 2 at 16–17.

> **RESPONSE TO PARAGRAPH 1:** Valassis disputes the first statement above to the extent that it is intended to suggest that CPGs use ISPs only to advertise their products, or that ISPs serve the same purposes as, or are reasonably interchangeable with, other advertising products. *See*, *e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 40-54; Levy Ex. 3, Farris Aff. Rep. at ¶¶ 11-12; *see also infra* ¶¶ 28-30. Otherwise, the statements in the preceding paragraph are undisputed.
>
> **REPLY TO RESPONSE TO PARAGRAPH 1**: Valassis does not dispute the facts set forth in Paragraph 1. Indeed, Valassis's own expert (Levinsohn) has acknowledged that ISPs "are advertising materials." Ex. 3 at ¶ 15. Instead, Valassis purports to "dispute[]" a "suggest[ion]" it perceives from the factual statements in Paragraph 1. "[A] dispute over the characterization of certain basic facts and over other extraneous issues" is not sufficient to create a genuine dispute of material fact. *See B.U.S.A. Corp.* v. *Ecogloves, Inc.*, 2009 WL 3076042, at *1 n.2 (S.D.N.Y. Sept. 28, 2009).

2.    NAM entered the ISP business in the mid-1990s. Ex. 2 at 15.

---

[2] For clarity, the footnotes included in NAM's 56.1 Statement and Valassis's Counterstatement are omitted from this Reply 56.1 Statement.

**RESPONSE TO PARAGRAPH 2:** The statement in the preceding paragraph is undisputed.

3.      Plaintiff Valassis Communications, Inc. ("Valassis") began selling ISP to CPGs in 2010.  Ex. 38 at -879 (Valassis "entered into the market in July [2010] with Supervalu, the nation's number two retailer with over 2,000 stores across the country."); Ex. 2 at 15 ("Valassis entered the market in 2010 with an array of in-store promotions products similar to News's products. . . .").

> **RESPONSE TO PARAGRAPH 3:**  The statement in the preceding paragraph is disputed.  Valassis first began selling ISPs to CPGs in 2006, on behalf of Insignia, a one-time competitor to News.  Levy Ex. 45, Valassis 2006 10-K, at 2. In 2010, Valassis began selling its own signs in SuperValu stores.  Levy Ex. 151, VAL-NAM15-000003054.  While Valassis may colloquially be said to have "entered" the ISP market at that time, Valassis disputes that it had overcome (or has ever overcome) barriers to entry and reached the critical mass necessary either to create a competitive constraint on News, or to compete profitably in the business.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73, 82-108; Levy Ex. 12, Hansa Dep. Tr. at 32:10-33:15; Levy Ex. 110, NAM-VAL2-001902457 at 459; Levy Ex. 108, NAM-VAL2-000626063 at 102-03; Levy Ex. 122, VAL2-NAM16-000016509; Levy Ex. 8, Bedell Dep. Tr. at 115:21-25; Levy Ex. 142, VAL2-NAM16-002791576; Levy Ex. 146, VAL2-NAM16-004459941, at slide 8; Levy Ex. 125, VAL2-NAM16-000016669, at pg. 4; *infra* ¶¶  4, 5, 13, 21, 24, 65-104.

> **REPLY TO RESPONSE TO PARAGRAPH 3**:  There is no actual dispute as to whether, as described in Paragraph 3, Valassis first began selling its own ISP products in 2010.  Indeed, Valassis itself asserts in Paragraph 35 that it "entered the ISP market in 2010."  *See infra* ¶ 35.  The remainder of the Response "improperly interject[s] arguments and/or immaterial facts in response to facts asserted" by NAM, and is entitled to no weight.  *See Baity*, 51 F. Supp. 3d at 418.

4.      Between 2010 and 2012, several retailers that previously had multi-year, exclusive contracts with NAM chose to sign multi-year, exclusive contracts with Valassis when their NAM contracts expired, including Supervalu, A&P, Winn-Dixie, Rite Aid, and Family Dollar.  *Compare* Ex. 39 at -054, -059 (Valassis-Supervalu 2009 Contract), Ex. 24 at -122, -125 (Valassis-Supervalu Independents 2010 Contract), *with* Ex. 40 (NAM-Supervalu contracting expiring end of 2009); Ex. 25 at -891 (Valassis-Winn Dixie 2010 Contract), Ex. 26 at -906, -907

(Valassis-Winn Dixie 2012 Contract), *with* Ex. 41 (NAM-Winn Dixie contract expiring April

2010), Ex. 42 (NAM addendum extending Winn Dixie agreement through July 2010); Ex. 13 at

- 279, -280 (Valassis-A&P 2011 contract), *with* Ex. 43 (NAM-A&P contract expiring end of

2010); Ex. 18 at -546, -550 (Valassis-Rite Aid 2012 Contract), *with* Ex. 44 (NAM-Rite Aid

contract expiring end of 2012); Ex. 14 at -335, -341–42 (Valassis-Family Dollar 2012 Contract),

*with* Ex. 46 (NAM-Family Dollar contract ending in 2012), Ex. 45 (NAM-Family Dollar

addendum ending in 2012).)  Indeed, all of the retailers with which Valassis entered into

contracts were retailers that previously had contracts with NAM.  Ex. 11 at 262:25–263:24 ("Q.

You understood that each of the retailers that you had in your network when you took over the

business previously had had a contract with NAM?  A. Yes. Q. Okay.  And that was true for all

of the retailers that you signed up later as well; correct?  A. Correct. Q. You never signed up any

retailers to your network that were not previously in NAM's network; right?  A. We did not sign

up. . . . Q. Okay.  But all the ones that you signed up were ones that switched from being in

NAM's network to being in Valassis's network; right?  A. Correct.").

> **RESPONSE TO PARAGRAPH 4:**  The statements in the preceding paragraph
> are undisputed, but immaterial to News's motion.  News has been a monopolist in
> the ISP market since 1997.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 3, 64-67;
> Levy Ex. 52, KCC000001, at 002; Levy Ex. 34, Gitkin Dep. Tr. at 170:4-172:3;
> Levy Ex. 33, Corsiglia-Keim Dep. Tr. at 278:3-15; Levy Ex. 55,
> MDLZ00002148, at 154; *infra* ¶¶ 21, 31-40.  Valassis attempted to enter the ISP
> market at the request of SuperValu, a retailer dissatisfied with News's possession
> and abuse of monopoly power.  *See* Levy Ex. 1, MacKie-Mason Rep. at 82, 127;
> Levy Ex. 30, Tingle Dep. Tr. at 48:3-49:13; Levy Ex. 155, VAL-NAM15-
> 000158619, at slides 6, 9.  After Valassis attempted to enter the market, News
> deployed anticompetitive strategies to ensure that Valassis did not achieve the
> critical mass necessary to succeed.  Levy Ex. 1, MacKie-Mason Aff. Rep. at
> 67-112; Levy Ex. 113, NAM-VAL2-002071317, at 318; Levy Ex. 60, NAM-
> VAL14-000100862, at 862; Levy Ex. 114, NAM-VAL2-002071328, at 329; Levy
> Ex. 66, NAM-VAL14-000533539, at 540 ("Section 4"); Levy Ex. 65, NAM-
> VAL14-000240643, at 644; Levy Ex. 12, Hansa Dep. Tr. at 53:10-20; *see also*
> *infra* ¶¶ 65-104.

**REPLY TO RESPONSE TO PARAGRAPH 4**:  Valassis admits that the statements in Paragraph 4 are undisputed.  It asserts, however, that Valassis's success in convincing retailers to join its network (and leave NAM's network) immediately following its entry into the ISP business is "immaterial" to NAM's motion.  Insofar as Valassis contends that NAM's alleged "anticompetitive strategies" such as so-called "long-term," "staggered," and exclusive contracts or challenged conduct other than NAM's retailer payments impeded its ability to compete, Valassis's success or failure at winning retailer contracts is immaterial to NAM's motion because NAM's motion asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's ability to successfully win retailer contracts immediately upon entering the business (and in the presence of the challenged conduct other than retailer payments) does go to show, however, *why* Valassis cannot prove damages attributable to any of the other conduct about which it complains.  The remainder of its Response, which "adds argumentative and . . . lengthy narrative . . . the object of which is to 'spin' the impact of the admissions [it] has been compelled to make" is not appropriate, and is entitled to no weight.  *See Goldstick* v. *The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002).

5.     Valassis's ISP business was profitable within its first year.  Ex. 47 at -569 (Q4 2010 Valassis earnings call transcript in which Alan Schultz, then the President and CEO of Valassis, stated: "The in-store business, as we mentioned, we felt it was a very unusual circumstance in the sense that you usually don't have a business that you start in the first half of the year and it's profitable by the fourth quarter.  It was, in fact, profitable by the fourth quarter and contributed from a profit perspective."); Ex. 38 at -881 (September 2010 Valassis investor conference transcript in which Michael Kowaclzyk, then the General Manager of Valassis In-Store, stated: "But as it stands right now, if we were to stop right here, this business would be very, very profitable for Valassis.  It would contribute to our bottom line in a substantial manner."); Ex. 30 at 34:2–35:2 ("Q: Does that indicate that Valassis' in-store business was profitable by the fourth quarter of 2010?  A: Yes, it does.").  Valassis's damages expert calculated that "Valassis' profit margin upon its entry into the third-party ISP market was ███ percent in Q3 2010," and that "from Q3 2010 through Q1 2011, Valassis generated earnings . . .

of $██████ on revenue of $██████, corresponding to an average profit margin of ██ percent." Ex. 3 ¶ 40 & Ex. 4.

> **RESPONSE TO PARAGRAPH 5**:  The statements in the preceding paragraph are undisputed to the extent that Valassis's ISP business earned a profit in its first three quarters in operation, but Valassis disputes what inference should be drawn from that fact.  Notwithstanding any profit earned in its first year in the ISP business, Valassis was unable to obtain a critical mass of retailers.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 82-108, 113-123; *infra* ¶¶ 65-104.  To the extent that the statements are intended to imply that Valassis could have continued to earn a profit after that point despite all of News's exclusionary conduct, the statements are disputed.  Levy Ex. 1, Mackie-Mason Aff. Rep. at 116-122; *infra* ¶¶ 129-142. Among other things, News's conduct prevented Valassis from acquiring a critical mass of retailers and deprived Valassis of the opportunity to earn a profit.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 82-107, 130; Levy Ex. 40, Watson Dep. at 108:12-109:21; Levy Ex. 21, Berg Dep. Tr. at 306:21-307:15.  Indeed, News's own expert opines that operators of larger retailer networks have a natural advantage and that operators of smaller networks could not effectively compete with them, while documents and testimony show that News's anticompetitive conduct, taken as a whole throughout the relevant time period, made it impossible for Valassis to be profitable and caused Valassis to exit.  Levy Ex. 6, Murphy Rep. at ¶¶ 92-93; Levy Ex. 1, MacKie-Mason Aff. Rep. at 116-122; *see also infra* ¶¶ 65-104.

> **REPLY TO RESPONSE TO PARAGRAPH 5**:  Valassis admits the factual statements in Paragraph 5.  While Valassis purports to dispute "what inference should be drawn" from the fact that Valassis's ISP business was profitable within its first year, its damages expert already explained the inference that should be drawn:  absent the increase in NAM's retailer payments, Valassis would have continued to earn the same amount of profit it earned during its first year in the ISP business (despite the presence of the other challenged conduct during that time).  *See infra* ¶¶ 15–17.  The remainder of Valassis's Response, which purports to dispute the "inference" Valassis believes can be drawn from the admitted factual statement, "improperly interject[s] arguments and/or immaterial facts in response to facts asserted" by NAM, and is entitled to no weight.  *See Baity*, 51 F. Supp. 3d at 418.

## II.    NAM'S PAYMENTS TO RETAILERS WERE PROFITABLE

6.    NAM's ISP business has been profitable in every year.  Ex. 1 ¶ 163 & Ex. 21; Ex. 2 at Exs. 11, 77.

> **RESPONSE TO PARAGRAPH 6:** The statement in the preceding paragraph is undisputed to the extent it is meant to refer to the ISP business as a whole.  But the relevant measure of News's profitability is its profitability on contracts for

which it competed with Valassis.  As to those contracts, News's ISP business was deeply unprofitable.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 77, 93, 95 n.354, 102, Ex. 74.  Thus, even if News's overall business was profitable, that fact is immaterial because it identifies the wrong measure of profitability.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102-103; Levy Ex. 2, MacKie-Mason Reb. Rep. at 13-15.  In addition, News's overall profitability includes profit derived from its exercise of market power, because it includes profits on contracts entered before News began making predatory bids in response to Valassis's attempt to enter the market, as well as profits on preemptively renewed contracts as to which News had preempted any competitive bids.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 89-93, 97-98; Levy Ex. 2, MacKie-Mason Reb. Rep. at 15-17.

**REPLY TO RESPONSE TO PARAGRAPH 6**:  Valassis admits that NAM's ISP business has been profitable in every year.  Its suggestion that "the relevant measure of News's profitability is its profitability on contracts for which it competed with Valassis" is legal argument inappropriate for a Rule 56.1 statement and, in any event, misstates the appropriate legal standard.  Mot. 16 n.7; Reply 10 n.8.  The remainder of its Response, which "adds argumentative and . . . lengthy narrative . . . the object of which is to 'spin' the impact of the admissions [it] has been compelled to make" is not appropriate, and is entitled to no weight.  *See Goldstick*, 2002 WL 1906029, at *1.

7.    Before making a contract proposal to a retailer, NAM prepared a profit

and loss ("P&L") analysis to determine whether its contemplated offer was expected to be

profitable for NAM at the time the offer was made.  Ex. 48 at 357:14–359:6; Ex. 2 at 99

("News's finance team estimated the profitability of each offer it made to retailers.");  Ex. 1

¶ 164.

**RESPONSE TO PARAGRAPH 7:**  The statement in the preceding paragraph is disputed.  These projections are unreliable.  They were put in place as a response to "allegations in prior lawsuits challenging the length of [News's] contracts with retailers for the right to place ISP in their stores, and the payment provisions of those contracts."  Levy Ex. 42, Manzo Decl. at ¶ 23.  Tellingly, News has no system to "support a retailer P&L" or that accurately tracks whether News's contracts with retailers are actually profitable, and is therefore unable to say with any degree of reliability which of its contracts were profitable.  Levy Ex. 9, Campbell Dep. Tr. at 26:4-27:21.  Additionally, News made offers to retailers before profitability projections for those offers were run.  *Compare, e.g.*, Levy Ex. 83, NAM-VAL14-003086530, at 531-532 (Oct. 1-2, 2010, emails from News to Food Lion making offer), with Levy Ex. 69, NAM-VAL14-001316491 (Oct. 4, 2010, internal News email asking finance to run a profit analysis on the proposed offer); compare Levy Ex. 104, NAM-VAL14-007313757 (June 14, 2011, email from News to Kmart stating that "News America has increased its offer to over

███████████ annually.  This amount is nearly ███████ the amount of our current agreement – all guaranteed"), and Levy Ex. 67, NAM-VAL14-000558424 (June 16, 2011, offer from News to Kmart for ███████ per year), with Levy Ex. 115, NAM-VAL2-006312299, at 300 ("Overview" tab) (July 22, 2011 analysis of offer).  To the extent an analysis was prepared but not used or relied upon in making a bid, its preparation is not material.  In addition, as further explained below, News's profitability analyses were unreasonable and unreliable because they did not reflect the actual, subjective expectations of News and because they are premised on News's success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-103; *see also infra* ¶¶ 8-9, 11.

**REPLY TO RESPONSE TO PARAGRAPH 7**:  Valassis does not dispute that NAM consistently prepared P&L analyses to determine whether its contemplated contract offers to retailers were expected to be profitable for NAM at the time the offer was made.  Valassis tries to create a dispute of fact by pointing to isolated instances in which NAM allegedly did not analyze profitability before an offer was made to a retailer, but its claims are demonstrably false or unsupported by admissible evidence.  As to Delhaize (Food Lion), the evidence shows that NAM's Retailer Contract Committee approved an increased offer to Delhaize on September 27, 2010—several days in advance of the offer cited by Valassis—on the basis of a projection that reflected profitability.  Ex. 55 at -606.  And, as to Kmart, Valassis cites no evidence that NAM did not prepare profitability projections.  Valassis's claim that NAM's projections are "unreliable" is just "argumentative . . . 'spin'" that is not responsive to the factual statement in Paragraph 7.  *See Goldstick*, 2002 WL 1906029, at *1; *see also infra* ¶¶ 8, 11.

8.      NAM conducted this analysis by assessing whether the revenue NAM expected to earn from selling ISP into the retailer's stores would exceed the contemplated payment to the retailer and other costs attributable to selling and placing ISP in the retailer's stores.  Ex. 2 at 99; Ex. 1 ¶ 164.

**RESPONSE TO PARAGRAPH 8:**  The statement in the preceding paragraph is disputed.  The evidence shows that News's projections were both objectively unreasonable at the time they were made and that they did not reflect the actual, subjective expectations of News.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-103; *see also infra* ¶ 11.  News's profitability analyses are premised on its success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 99-103; *see also infra* ¶ 11.  Moreover, the projected profitability measures were further inflated because News was aware and documented that its placement rates were declining and continued to decline.  *See, e.g.*, Levy Ex. 68, NAM-VAL14-001215485, at 488 (Oct. 14, 2010, Fiscal Year 2011 Q1 Review) ("InStore: Decrease in Total Revenue due to a decrease in total placements from ███████

████████████"); Levy Ex. 97, NAM-VAL14-006694062, at 065 (Fiscal Year 2011 Q2 Review) ("InStore: Decrease in Total Revenue due to a decrease in total placements from ████████████████"); Levy Ex. 168, NAM-VAL14-001268555 at 559 (Apr. 29, 2011, Fiscal Year 2011 Q3 Review) ("InStore: Decrease in Total Revenue due to a decrease in total placements from ████████ ████████"); Levy Ex. 169, NAM-VAL14-004153844, at 848 (Fiscal Year 2011 Q4 Review) ("InStore: Decrease in Total Revenue due to a decrease in total placements from ███████████████"); Levy Ex. 59, NAM-VAL14-000077393, at 396 (Oct. 14, 2011, Fiscal Year 2012 Q1 Review) ("InStore: Decrease in Total Revenue volume due to a decrease in placements from █████████████"). Despite being aware of (and documenting) the decline in in-store revenue, News continued to prepare projections that ignored this significant decrease in revenue. Levy Ex. 1, MacKie-Mason Aff. Rep. at 99; Levy Ex. 9, Campbell Dep. Tr. at 181:18-182:13; *see also infra* ¶ 11.

**REPLY TO RESPONSE TO PARAGRAPH 8**: Valassis does not dispute that NAM conducted P&L analyses by assessing whether NAM's expected revenue from selling ISP into a retailer's store would exceed the contemplated payment to the retailer and other costs attributable to selling and placing ISP in the retailer's store. As a result, that fact is admitted. *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible"). Instead, Valassis asserts that these analyses were "unreasonable." Valassis has not created a dispute of fact—much less a material one—regarding the reasonableness of NAM's projections.

Valassis first argues NAM's projections did not reflect NAM's "actual, subjective expectations," but it cites no evidence that supports that allegation. Instead, Valassis relies entirely on the speculation and say-so of its own lawyers. Valassis identifies no documents or testimony suggesting that any fact or expert witness actually believed that NAM's P&L projections were faulty in some respect. In fact, the portion of MacKie-Mason's report cited by Valassis expressly contradicts Valassis's assertion that NAM's projections did not accurately reflect its profitability expectations: MacKie-Mason treated "the parameters [he] found in News's documents (such as number of placements) to represent News's expectations at the time the documents were written." Levy Ex. 1, MacKie-Mason Rpt. at 97 n.361. Indeed, MacKie-Mason accepted NAM's projections as "good faith, best estimates in the ordinary course of business by News" and offered no opinion as to whether NAM's projections were unreasonable. Ex. 50 at 38:14–15, 159:6–23; *see also id.* at 39:12–15.

Valassis next claims that the prices NAM used in its projections were unreasonably high because they reflected existing, real world ISP prices that were allegedly "premised on its success in monopoly maintenance." That assertion is insufficient to create a dispute of fact because there is no dispute that—at real world prices—NAM expected its retailer contract offers would be profitable. *See infra* ¶11. There is no support, and Valassis has identified none, for the notion

11

that predation should be measured by reference to hypothetical prices.  Mot. 15–19; Reply at 8–10.  Nor has Valassis  produced any evidence of the prices it claims NAM should have applied.  MacKie-Mason specifically refused to offer an opinion on the "competitive price" that Valassis asserts NAM should have used its in projections.  *See* Ex. 50 at 17:22–18:5; Levy Ex. 1, MacKie-Mason Rpt. at 98 ("Whether an offer is predatory therefore depends on how far below News's monopoly price the competitive price would have been.  ***I have not quantified the competitive price in this case***." (emphasis added)).

Valassis also suggests NAM's projections were unreasonable because NAM allegedly observed declines in ISP placements and revenue but failed to incorporate such declines into its P&L projections.  The evidence Valassis cites, however, does not support its claim.  First, the "Review" documents Valassis cites (*see* Levy Exs. 59, 68, 97, 168, 169) do not establish that NAM's placement rates or revenue were declining at any *particular retailer* to which it made an offer.  Second, as Valassis acknowledges, NAM's projections used actual placement experience "from the prior 12 months."  Opp. at 24; *see also* Levy Ex. 1, MacKie-Mason Rpt. at 98 n.362 ("News's retailer projections typically utilize the prior 13 cycles of actual data as the starting point for projecting future financials.").  NAM's projections therefore necessarily captured the recent trends in placements and revenue that Valassis claims NAM somehow ignored.  Third, Valassis fails to acknowledge that, although NAM was aware of contractions in the advertising market as early as 2010, it nevertheless consistently projected in internal budgeting documents that in-store volume and revenue would ***increase*** overall.  *See* Ex. 56 at -659; *see also* Ex. 57 at -720–21 (acknowledging decline in in-store revenues from 2010 to 2011, but projecting revenue growth in FY 2012 as a result of expanding into new classes of trade, and raising prices incrementally); Levy Ex. 80 at -610.

Finally, Valassis's attempt to manufacture a dispute on the basis that NAM's projections reflected overly optimistic revenue expectations is further belied by the fact that Valassis's own profitability projections consistently showed that Valassis projected that it could earn ***more*** revenue than NAM's so-called "inflated" projections at the same retailers.  Valassis, for example, projected that it would earn ████████████ annually at Delhaize (Food Lion), while NAM estimated that it would achieve ████████████ in annual revenue at Food Lion.  *Compare* Ex. 58 at -056, *with* Levy Ex. 70 at Cell F88.  Likewise, Valassis forecast that it would earn ████████████ in revenue at Kmart over a three-year contract, whereas NAM estimated ████████████ in revenue over the same period.  *Compare* Ex. 59 (Valassis projection estimating revenue of ████████████ in year one, ████████████ in year two, and ████████████ in year three), *with* Levy Ex. 115 at 11 (NAM projection estimating ████████████ in annual revenue).  And Valassis estimated that it would earn ████████████ in annual revenue at Giant Eagle, whereas NAM estimated it would achieve ████████████ in annual revenue.  *Compare* Ex. 61, *with* Ex. 60  at 10.

Valassis's assertion that NAM's projections were unreasonable is thus unsupported by admissible evidence, and fails to create a dispute of fact. *See, e.g.*, *Meredith Corp.* v. *SESAC LLC*, 1 F. Supp. 3d 180, 186 n.3 (S.D.N.Y. 2014) (taking factual statements as established where "plaintiffs' responses consist of improper argument or recitations of different facts" and "where plaintiffs have not cited an evidentiary basis to contest a factually supported statement"); *Scott* v. *City of Mount Vernon*, 2017 WL 1194490, at *1 (S.D.N.Y. Mar. 30, 2017) (response to 56.1 statement deficient where plaintiffs "filed what look more like responses to interrogatories or document requests, levying general objections and numerous responses to each statement, many of which merely recite additional facts Plaintiffs find relevant to the Motion, or which add color and argument to the statements offered by Defendants").

9.      NAM's policy was to only approve an offer to a retailer if the P&L

analysis showed that the offer was expected to generate a profit for NAM's business. Ex. 48 at

357:14–359:6 ("Q. Does NAM have any process in place for determining whether it believes it

will be able to make money when you're bidding for a retailer contract? A. Yeah, I think we

talked a little bit about that earlier. It's a weekly, typically, retail meeting where the Finance

team gets the information from the account executives calling on the retailers themselves and

formulates a P&L. That's—that's how we determine to make a bid or not make a bid on a

retailer. Q. Okay. And you were head of Trade for NAM, which meant you were in charge of

the retail side of NAM's in-store business from 2001 until you became president and CEO in

2014, right? A. Yes. Q. And then you've become—you've been CEO since then; is that right?

A. Yes. Q. And in all that time, can you think of any instance in which, to your knowledge,

NAM bid an amount for a retailer contract that you did not believe would allow you to make

money on that contract? A. No. Q. Okay. I'm sorry. Go ahead. A. No. No. It was our

intention to make money, and we—that's how the company and myself would be compensated.

If we weren't making money, then—then it wouldn't be a good deal for any of us. Q. In the time

that you've been with NAM, has NAM's in-store business in fact been profitable? A. Yes."

(objections omitted)).

**RESPONSE TO PARAGRAPH 9:** The statement in the preceding paragraph is disputed. At the outset, Valassis objects to News's reliance on internal policies when it has refused to produce its policies in response to validly issued discovery requests on the ground of privilege; News should therefore be precluded from relying upon its policies. Dkt. 106, 112, 167; *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Beyond that, News approved numerous offers that News knew or should reasonably have known would not be profitable either because the analyses did not reflect actual beliefs, or else reflected sincerely held but objectively unreasonable beliefs. *See supra* ¶ 8; Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-103; *infra* ¶ 11. News was aware and documented that its placement rates were declining and continued to decline (*see supra* ¶ 8), yet it continued to sign agreements with retailers from 2010 onward using revenue assumptions that ignored the significant decrease observed—all for the purpose of excluding Valassis. *See infra* ¶ 11 (discussing unreasonableness of profitability analysis of offers to Food Lion, Kroger, Ingles, Giant Eagle and others). For example, News's offer to Kmart projected ███████████████. *See, e.g.*, Levy Ex. 115, NAM-VAL2-006312299, at 300 ("Overview" tab). The only projections showing ███████████ relied on a revenue estimate based on a higher number of ISP placements than News knew were being placed in Kmart over the prior year, despite knowing that placements were declining overall. *Id.* at tabs "Overview" and "volume from T Bedell"; *supra* ¶ 8. Further, many of News's offers turned out to be unprofitable ex post, confirming that they were not reasonable when made. Levy Ex. 1, MacKie-Mason Aff. Rep. at 101-102, Ex. 74; Levy Ex. 2, MacKie-Mason Reb. Rep. 12, 30-31, Ex. 100; *see also supra* ¶ 6; *infra* ¶¶ 10, 11 (deals ended up not being profitable). The number of unreasonable offers made, including offers made before or after projections, belies the claim that News had or actually applied a "policy" of approving only offers expected to be profitable. The statement is further disputed to the extent that News's profitability analyses are premised on its success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs. Levy Ex. 1, MacKie-Mason Aff. Rep. at 99-103; *see also supra* ¶¶ 7, 8; *infra* ¶¶ 10, 11.

**REPLY TO RESPONSE TO PARAGRAPH 9.** Valassis does not dispute that NAM's practice was to approve an offer to a retailer only if the P&L analysis showed that the offer was expected to generate a profit for NAM's business, or cite any evidence suggesting that NAM did not have in place or follow such a policy. As a result, that fact is admitted. *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible"). Instead, Valassis responds with argument that NAM's projections were allegedly unreasonable. These arguments are non-responsive to the factual assertion in Paragraph 9 and, in any event, fail to create any dispute of material fact. *See infra* ¶ 11; *supra* ¶ 8.

Valassis's objection to Paragraph 9 also fails. Paragraph 9 does not rely on documents that were withheld on the grounds of privilege. The factual statements

in Paragraph 9 are supported by a voluminous record of testimony and documentary evidence.

10.     The parties' experts agree that such ex ante analyses—which analyze the profitability of an offer at the time the offer is made, but before the contract is entered into—are the proper method for assessing the expected profitability of retailer contracts. Ex. 49 at 235:2–10 ("Q. Okay.  Can you give me your view as to the appropriate method or test of determining whether a bid is predatory?  A. I think the general test that I have used in the past and I would say is what you want to look at is an evaluation of whether the bids were profitable on an ex ante basis, that is, did the person making the bids consider those bids to be profitable."); Ex. 27 at 53:5–54:5 ("A. For the purpose of calculating whether offers, when made, were predatory, I believe that the beliefs about the profitability of those offers at that time, which I have referred to as their ex-ante projections, are the proper basis for doing the predation calculation.  Q. Right. Okay.  Let me read a statement to you – I'll represent to you this comes from your rebuttal report in the Dial case – a sentence, and just see if – 'For the evaluation of the contracts, the expected profit at the time the contract was negotiated is more informative than the ex-post profits years after the contract was signed.' Do you agree with that statement for purposes of determining whether the – whether the offers were predatory?  A. Yes, I think that's a paraphrase of what I just said to you in my live testimony.  Q. Okay.  A. For purposes of predation analysis, that's more informative, yes.").

> **RESPONSE TO PARAGRAPH 10:**  The statement in the preceding paragraph
> is disputed to the extent it states that no other evidence is relevant or that News's
> ex ante analyses were reasonable.  The evidence shows that certain of News's
> retailer contracts were ultimately unprofitable.  Levy Ex. 1, MacKie-Mason Aff.
> Rep. at 102-103, Exs. 73-74; *supra* ¶ 9; *infra* ¶ 11.  Both parties' experts agree
> that this evidence is relevant to the question of whether News's profitability
> analyses were reasonable, or reasonably held, ex ante.  Levy Ex. 1, MacKie-
> Mason Aff. Rep. at 102-103; Levy Ex. 6, Murphy Rep. at Ex. 34; *see also infra*
> ¶ 11.

**REPLY TO RESPONSE TO PARAGRAPH 10**:  Valassis does not dispute the factual statements in Paragraph 10.  Nor could it.  Its expert clearly testified that *ex ante* projections provide the "the proper basis for doing the predation calculation."  Ex. 50 at 52:22–53:11.  As a result, the facts asserted in Paragraph 10 are admitted.  *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible").  Valassis's attempt to "add[] argumentative and . . . lengthy narrative . . . the object of which is to 'spin' the impact of the admissions [it] has been compelled to make" is not appropriate, and is entitled to no weight.  *See Goldstick*, 2002 WL 1906029, at *1.

11.    From 2010 onwards, the P&L analyses conducted by NAM's finance department showed that NAM expected to make a profit on every offer it made to a retailer, with only one possible exception identified by Valassis—Kmart—as to which the evidence is disputed.  [NAM Footnote 2] Ex. 1 ¶¶ 164–165 & Ex. 30; Ex. 27 at 52:19–21, 190:6–16; *see also* Ex. 1 ¶ 302; Ex. 2 at 100–101.

**RESPONSE TO PARAGRAPH 11:**  The statement in the preceding paragraph is disputed.  The evidence shows that News projected losses at another retailer — ███████—before it approved the contract for that retailer.  Levy Ex. 6, Murphy Rep. ¶ 165, Ex. 34.  The evidence also shows that, in addition to the Kmart and ███ offers, under reasonable assumptions, many of News's profitability analyses would have projected lost profits.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102-103; *see also supra* ¶ 8.  Focusing on some of the other larger retailers by way of example, and without limitation:

*Kroger (2011)*.  News made offers to Kroger in 2011 that it did not reasonably expect to be profitable.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 99-102.  First, in making its projections of profitability, News should have but did not allocate the incremental payments on the remaining years under the then-current contract against the incremental revenue received in exchange for the extension; this is necessary to ensure that the incremental revenues that the contract extension would bring exceed the incremental costs, such that the contract extension is actually profitable.  Levy Ex. 102, NAM-VAL14-007086442, at "Overview" tab (Kroger profitability projection); Levy Ex. 1, MacKie-Mason Aff. Rep. at 100.  Properly allocating the incremental cost to the incremental revenue renders the Kroger contract barely profitable for News, assuming the remaining assumptions baked into the projection were sound (and, as explained herein, they were not).  Levy Ex. 1, MacKie-Mason Aff. Rep. at 100; Levy Ex. 11, Garofalo Dep. Tr. at 243:24-248:5.  Second, News created its profitability projection using placement rates for the prior year despite contemporaneous News documents demonstrating that News was aware of a more than ten percent reduction in placements, and

16

projected further declines based on its view of market conditions. *See supra* ¶ 8; Levy Ex. 1, MacKie-Mason Aff. Rep. at 99; Levy Ex. 95, NAM-VAL14-006667708, at 708 (July 2011 email from then-comptroller to then-CFO, sending requested budget scenarios, emphasizing a decrease in pacing in in-store revenues). Third, News's profitability analysis was premised on its success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs. Levy Ex. 1, MacKie-Mason Aff. Rep. at 101. Collectively, this shows the Kroger extension was expected to be unprofitable for News. *Id.* As expected, the Kroger contract was not profitable for News, and News ended up losing almost ██████████ with a contribution margin of ██████████ Levy Ex. 1, MacKie-Mason Aff. Rep. at 102 & Ex. 73. A jury could find that the offer was unreasonable and not expected to be profitable. Levy Ex. 1, MacKie-Mason Aff. Rep. at 101.

*Delhaize/Food Lion (2010)*. News made an offer to Food Lion that News did not reasonably believe would be profitable, and which News's finance team did not approve until after it was offered. *Compare* Levy Ex. 83, NAM-VAL14-003086530, at 531-532 (Oct. 1-2, 2010, emails from News to Food Lion making offer), *with* Levy Ex. 69, NAM-VAL14-001316491 (Oct. 4, 2010, internal News email asking finance to run a profit analysis on the proposed offer). Approximately ten days after making the offer, News again conducted a profitability projection. Levy Ex. 70, NAM-VAL14-001317610 at 611. News's projection analyzed the revenue stream of the proposed offer assuming that four banners under that family of stores would support the same volume as the largest banner. Levy Ex. 70, NAM-VAL14-001317610 at 611, Cells C21-H21. News knew, however, that two of the smaller banners, Sweetbay and JH Harvey, could not support that volume. Levy Ex. 70, NAM-VAL14-001317610, at 611, compare Cells F37, J37, *with* cells M37 and N37 (██████████ per store versus approximately ██████████ per store). Approximately two weeks later, News again ran a profitability projection. Levy Ex. 100, NAM-VAL14-007086072, at "Overview" tab. In this projection, News assumed even more placements (and thus even higher revenue) for its offer than it had two weeks before, despite contemporaneously documenting (for budgetary purposes) a decline in in-store revenue due to a decline in placements. *Id.* at "Overview" Tab, Cells E-49, F37 and F88 (██████████); Levy Ex. 68, NAM-VAL14-001215485, at 488 ("InStore: Decrease in Total Revenue due to a decrease in total placements from ██████████"). In addition to overstating total revenue for all banners, News relied on revenue data for individual banners that is facially unsupported. *See* Levy Ex. 100, NAM-VAL14-007086072, at "Overview" tab. For example, as stated previously, News assumed that four banners would support the same volume as the largest banner, despite documenting that two banners could not support that same volume. *Id.*; Levy Ex. 70, NAM-VAL14-001317610, at 611, Cells F37, J37, M37 and N37. Additionally, a third banner, the Bloom banner, had only recently joined News's network, and News only had available five cycles of sales data with which to estimate expected annual placements at Bloom stores. [Valassis footnote 2.] During those five cycles, actual sales of ISPs at Bloom stores averaged only

approximately ███████ per store per cycle. [Valassis footnote 3.]  However, News used a much larger estimate of sales at Bloom stores in its analysis of the profitability of the Delhaize offer: approximately ███████ per store per cycle. [Valassis footnote 4.]  Ultimately, News lost a significant amount of money on this contract.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102 & Ex. 73.  A jury could find that the offer was unreasonable and not expected to be profitable.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-102.

*Ingles (2011)*.  News increased its offer to Ingles by ████ to secure the contract and prevent Valassis from winning it.  Levy Ex. 88, NAM-VAL14-006114403, at 404.  News was aware of a decrease in placements of at least 10% at the time, but failed to take that fact into account in its projections.  *See supra* ¶ 8; Levy Ex. 101, NAM-VAL14-007086411, at "Overview."  News's profitability analysis was also premised on its success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 101.  A change in projected revenue (or increase in costs) of as little as 10% would render this contract renewal unprofitable for News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 101-102 & Exs. 71-72.  And, in fact, the contract was not profitable for News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-102.  A jury could find that the offer was unreasonable and not expected to be profitable.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 101-102 & Exs. 71-72.

*Giant Eagle (2011)*.  News made an offer to Giant Eagle that was predatory.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 97.  In doing so, it increased its payments to Giant Eagle by more than ████ when compared to the prior contract.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 97.  News was aware of a decrease in placements of at least 10% at the time, but failed to take that fact into account.  *See supra* ¶ 8.  News's profitability analyses were also premised on its success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 101.  A change in projected revenue (or increase in costs) of as little as 10% would render this contract renewal unprofitable for News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 101-102 & Exs. 71-72.  And, in fact, the contract was not profitable for News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102.  A jury could find that the offer was unreasonable and not expected to be profitable.

*Others*.  Several other significant contracts and retailer offers, such as News's offer to BI-LO/Winn-Dixie, would have been correctly documented as below-cost ex ante if News had accounted for a decrease in revenue due to the downward trend in sales of ISP placements.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102 & Exs. 72-73.  News's profitability analyses were also premised on its success in monopoly maintenance and News's ability to charge inflated, monopolist prices to CPGs.  Levy Ex. 1, MacKie-Mason Aff Rep. at 101.  Many of these contracts, including News's contract with BI-LO/Winn-Dixie, were ultimately unprofitable.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102 & Exs. 72-73.  In fact, every single contract that News obtained in a competitive situation with Valassis turned out to be unprofitable.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 102.

**REPLY TO RESPONSE TO PARAGRAPH 11.**  Valassis does not dispute that the P&L analyses that NAM's Finance department conducted after 2010 showed that NAM expected to make a profit on every offer it made to a retailer, "with only one possible exception *identified by Valassis*—Kmart—as to which the evidence is disputed."  Nor could it.  As MacKie-Mason acknowledged, none of NAM's contracts (with the possible exception of Kmart) were predatory at actual prices in the real world.  Ex. 50 at 39:16–20 ("Q.  With the possible exception of Kmart . . . you don't identify any retail contracts that you opine are predatory before you adjust the real-world prices downward; correct?  A.  I believe that's correct.").  NAM acknowledged in footnote 2 to its Rule 56.1 Statement (which Valassis misleadingly failed to mention in its Counterstatement) that its contract with ▮▮▮▮ projected as unprofitable.  As NAM explained in that footnote (which Valassis did not dispute), the ▮▮▮▮ contract is immaterial to this motion.  ▮▮▮▮ was a retailer in a new class of trade (office supply) in which NAM had not previously placed ISP products, and the ▮▮▮▮ contract represented less than ▮▮▮▮▮▮▮▮▮▮▮▮ of NAM's revenue. Ex. 1 ¶ 165 & Ex. 33.  Valassis has never claimed that the ▮▮▮▮ contract was predatory, and Levinsohn does not attribute any damages to ▮▮▮▮.

The remainder of Valassis's Response to Paragraph 11 does not dispute what NAM's P&L projections actually show, but instead argues that those projections were not "reasonable."  As discussed above, Valassis's argument as to the reasonableness of NAM's projections fails to create any dispute of material fact.  *See supra* ¶ 8.  As to Valassis's assertions with respect to individual retailer projections:

*Kroger (2011).*  Valassis's argument that NAM should have calculated profitability at Kroger using fewer projected placements fails for the same reasons discussed above.  *See supra* ¶ 8.  Valassis's first criticism of NAM's 2011 offer to Kroger is that NAM failed to account for "incremental payments on the remaining years under the then-current contract against the incremental revenue received in exchange for the extension."  But this creates no material dispute because, as Valassis acknowledges, even after incorporating these adjustments, NAM's contract offer to Kroger was still projected to be profitable.  Valassis also argues that NAM ultimately lost money on its contract with Kroger.  But its expert, MacKie-Mason, arrived at that conclusion by analyzing only the final two years (from 2013 through 2015) of the contract that NAM entered into with Kroger beginning January 1, 2011 and applying his own "adjustments" to NAM's accounting for the contract.  Levy Ex. 1, MacKie-Mason Rpt. at Ex. 73 & 102 n.375 (showing negative margins beginning February 1, 2013).  In any event, the parties agree that the appropriate way to assess predation is on an *ex ante* basis and, as discussed, NAM's *ex ante* projections showed that it expected to be profitable on its contract offer to Kroger.  *See supra* ¶ 10; Levy Ex. 102.

*Delhaize/Food Lion (2010).*  Valassis's suggestion that NAM made an offer to Delhaize prior to projecting profitability is demonstrably incorrect,

and cannot create any genuine dispute of fact. *See Phoenix Light SF Ltd.* v.
*Bank of N.Y. Mellon*, 2017 WL 3973951, at *14 n.28 (S.D.N.Y. Sept. 7,
2017) (mischaracterizations of the record do not raise genuine disputes of
fact); *see also Anderson* v. *Boeing Co.*, 2016 WL 9446648, at *7 n.9 (E.D.
Pa. Aug. 30, 2016) ("[Plaintiff]'s distortion of record evidence cannot
create a genuine dispute of fact"), *aff'd*, 694 F. App'x 84 (3d Cir. 2017).
The evidence shows that NAM's Retailer Contract Committee approved an
increased offer to Delhaize on September 27, 2010—several days in
advance of the offer cited by Valassis—on the basis of a projection that
reflected profitability.  Ex. 55 at -606.

Valassis's argument that NAM should have calculated profitability at
Delhaize using fewer projected placements fails for the same reasons
discussed above.  *See supra* ¶ 8.  Valassis's assertion that NAM's
projections did not account for lower placement rates at smaller
"banners"—the Sweetbay and JH Harvey supermarket chains—is wholly
immaterial.  Those stores represented a mere fraction (███████) of the
total number of Delhaize stores (████████).  Levy Ex. 70.  Notably,
Valassis does not assert that adjusting NAM's projections on the basis of
its argument regarding these smaller chains would have had any effect on
NAM's overall conclusion that it expected to be profitable on its contract
offer to Delhaize.

Valassis's assertion that, because NAM ultimately lost money on its
contract with Delhaize, its *ex ante* projection was unreasonable fails for the
same reasons discussed above.  *See supra* ¶¶ 8, 10.  In addition, Valassis's
argument is undermined by Valassis's own contemporaneous bid for the
same contract.  Valassis projected that it would earn ████████████ in
revenue from a contract with Delhaize/Food Lion—in excess of ███
████ more in revenue than NAM projected.  *Compare* Ex. 58 at -056,
*with* Levy Ex. 70.  The notion that NAM's projection was unreasonably
optimistic is thus counter to the evidence.  In the actual world, the Delhaize
contract failed to meet either NAM or Valassis's revenue expectations as a
result of significant store closures and business challenges experienced by
Delhaize over the life of the contract.  *See* Ex. 62 (reporting elimination of
the Bloom banner and closure of 113 Food Lion stores in 2012).

*Ingles (2011).*  Valassis's argument that NAM should have calculated
profitability at Ingles using fewer projected placements fails for the same
reasons discussed above.  *See supra* ¶ 8. Moreover, Valassis's assertion
that NAM ultimately lost money on its contract with Ingles is simply
untrue.  MacKie-Mason calculated that NAM was ***profitable*** on its contract
with Ingles.  *See* Levy Ex. 1, MacKie-Mason Rpt. at Ex. 73.

*Giant Eagle (2011).*  Valassis's argument that NAM should have calculated
profitability at Giant Eagle using fewer projected placements fails for the
same reasons discussed above.  *See supra* ¶ 8. As discussed, Valassis's

assertion that, because NAM ultimately lost money on its contract with Giant Eagle, its *ex ante* projection was unreasonable also fails.  *See supra* ¶¶ 8, 10.  In addition, Valassis's argument is undermined by Valassis's own contemporaneous bid for the same contract in which Valassis projected that a Giant Eagle contract would result in *more revenue* than NAM had projected.  *Compare* Ex. 60 (███████), *with* Ex. 61 (███████).  That is why (again) Valassis's own expert holds the opinion that *ex ante* projections provide "the proper basis for doing the predation calculation." Ex. 50 at 52:22–53:11.

*Others.*  Valassis's claim that "every single contract that News obtained in a competitive situation with Valassis turned out to be unprofitable" is false and disproven by the analysis of Valassis's own expert that Valassis cites. *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").  MacKie-Mason's calculations specifically show that NAM turned a profit on the majority of such contracts.  *See* Levy Ex. 1, MacKie-Mason Rpt. at Ex. 73 (showing that NAM profited on 8 of 14 contracts for which MacKie-Mason claims that NAM and Valassis competed).  Indeed, MacKie-Mason was specifically asked how many contracts he calculated were *ex post* unprofitable and admitted, contrary to Valassis's false claim, that NAM was profitable on the majority of contracts for which he claimed Valassis and NAM competed:  "Q.  You have 14 contested retailers.  And as I look at your Exhibit 73, it looks like News America ex-post was profitable at eight of them and not profitable at six of them, in light of your – under your set of calculations?  A.  *Yes, I think that's correct.*"  Ex. 50 at 295:5–10 (emphasis added).

Valassis's assertion that *ex post* unprofitability suggests that NAM's projections were somehow unreasonable also is mere lawyers' argument. MacKie-Mason conceded that he conducted no analysis of the reasons *why* NAM was unprofitable at any of the six contracts he identified.  Ex. 50 at 295:11–297:1.  In several cases, the retailers with which NAM contracted suffered substantial business difficulties over the life of the contract, including, in the case of Kmart, the closure of a significant number of stores (thereby reducing the amount of available revenue from advertising in that chain).  Ex. 63 at 290:3–14.

12.     The Kmart contract accounted for ███% of NAM's total ISP revenue.

Ex. 1 at Ex. 33.

**RESPONSE TO PARAGRAPH 12:**  The statement in the preceding paragraph is disputed.  Exhibit 33 to Michael Ex. 1 inappropriately aggregates total revenue inclusive of retailers for which Valassis and News did not compete, across all classes of trade, and over the period 2011-2014; accordingly, the real number is

higher.  Michael Ex. 1, at Ex. 33.  Around the time of extending the Kmart contract, Kmart was News's "largest mass merch network retailer" "worth ███ annually" or "$███ over the new 3 year term of the contract."  Levy Ex. 117, NAM-VAL2-007039239, at 240.  This statement is also disputed insofar as it is intended to state that the bid was unimportant: News entered into a contract with Kmart that News itself documented as predatory in order to "send [Valassis] a message" and to prevent Valassis from getting a foothold in the mass merchandise class of trade.  Levy Ex. 163, VCP00675090, at 096; Levy Ex. 25, Kowalczyk Dep Tr. at 335:4-8; Levy Ex. 1, MacKie-Mason Aff. Rep. at 100-101, 113-115; *see also supra* ¶¶ 7, 11.

**REPLY TO RESPONSE TO PARAGRAPH 12:**  Valassis does not dispute the factual statement in Paragraph 12 that NAM's contract with Kmart accounted for ███ of its total ISP revenue.  As a result, that fact is admitted.  *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible").  The Response, which "adds argumentative and . . . lengthy narrative . . . the object of which is to 'spin' the impact of the admissions [it] has been compelled to make" is therefore not appropriate, and is entitled to no weight.  *See Goldstick*, 2002 WL 1906029, at *1.

13.    Valassis's damages expert did not attribute any damages to Valassis's loss of the 2011 Kmart contract (or any other mass merchandise retailer) to NAM.  Ex. 34 at 352:19–353:14 ("Q. But if you assume that [Kmart] is in the mass class of trade, then there is nothing in your model that suggests Valassis would have won a contract with Kmart in the 'but for' world; right?  A. It's certainly true that in my model, I'm not looking at what you are calling the—is it mass merchandise?  Q. Yes.  A. I'm not looking at that.  Q. Assuming that to be true, there is also nothing in your model that purports to measure damages to Valassis for not winning a contract with Kmart in the actual world, is there?  A. Given your characterization of Kmart being in a sector that is not included in my model, then the model would not attribute any damages to that." (objection omitted)).

**RESPONSE TO PARAGRAPH 13:**  The statement in the preceding paragraph is disputed and immaterial to the liability case, given that Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.  Valassis's damages model assumes, consistent with its liability theory, that Valassis reaches "critical mass" and is thereby able to win 40% of

CPG spending on a network that attracted national CPG spending. Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 18-19; Levinsohn Decl. at ¶¶ 8-9; Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73. That assumption, in turn, depends on Valassis winning a broad network of retailers, of which Kmart could have been a part but for News's conduct. Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73, 100-101. As News's own expert opines, adding stores to an ISP supplier's network increases the value of the other stores in the network because of CPGs' desire to place programs broadly across a collection of stores in a single purchase. Levy Ex. 6, Murphy Rep. at ¶¶ 15, 92-94. Thus, the loss of Kmart contributed to the inability to reach critical mass, which itself resulted in Valassis's exclusion and resulting damages.

**REPLY TO RESPONSE TO PARAGRAPH 13:**  Valassis does not dispute that its damages expert attributes no damages to Valassis's loss of the 2011 Kmart contract (or any other mass merchandise retailer) to NAM. While Valassis asserts various arguments as to how Levinsohn "assumes" liability, Valassis cites no *evidence* showing that Levinsohn's model attributes any damages that are linked to Valassis's failure to win a contract with Kmart. *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible"). Nor could it. Levinsohn clearly admitted that his model did not attribute damages to Valassis's loss of mass merchandiser contracts such as Kmart. Ex. 51 at 352:19–353:14. The remainder of Valassis's Response, which "adds argumentative and . . . lengthy narrative . . . the object of which is to 'spin' the impact of the admissions [it] has been compelled to make" is not appropriate, and is entitled to no weight. *See Goldstick*, 2002 WL 1906029, at *1.

## III.   VALASSIS ONLY CLAIMS DAMAGES RESULTING FROM NAM'S RETAILER PAYMENTS

14.   Valassis's damages expert, Dr. James Levinsohn, measures Valassis's alleged damages using a "benchmark" model that compares Valassis's performance during a "benchmark" time period with its performance during the "damages" period. Ex. 3 ¶¶ 58–60. Levinsohn adopts the first three quarters of 2010—the period immediately following Valassis's entry into the ISP business—as his "benchmark" period. Ex. 3 ¶¶ 25, 59.

**RESPONSE TO PARAGRAPH 14:**  The preceding paragraph is immaterial to the liability case, given that Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability. Moreover, the first statement in the preceding paragraph is disputed. Professor Levinsohn measured damages by comparing Valassis's performance in the "actual world" with its performance in the "but-for world," a hypothetical construct of the world

as it would have existed in the absence of the challenged anticompetitive conduct. Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 11-12; Levinsohn Decl. ¶¶ 12-13. Although some variables used to measure Valassis's profits in the but-for world were derived from a benchmark period, many were not.  Professor Levinsohn, in fact, made adjustments to contracting practices in his model of the but-for world to control for News's anticompetitive contracting practices during the benchmark period.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 64-66, 74-78.  The second statement in the preceding paragraph is undisputed to the extent that Professor Levinsohn used a benchmark period consisting of the first three quarters of 2010 as part of his analysis to derive some (but not all) of the variables used to calculate damages in his model.

**REPLY TO RESPONSE TO PARAGRAPH 14**:  Valassis does not dispute that Levinsohn calculates damages using a benchmark model.  Nor does Valassis dispute that this model compares Valassis's performance during a "benchmark" period to its performance during the "damages" period and is based on the assumption that, absent the challenged conduct, Valassis would have won retailer contracts during the damages period at the same rate it won retailer contracts during the benchmark period.  Levinsohn then derives Valassis's supposed "lost profits" by comparing Valassis's actual profits during the damages period to its "but-for" profits based on the same assumption—that, absent the challenged conduct, Valassis would have won retailer contracts at the "win rate" from the benchmark period.  *See* Levy Ex. 4, Levinsohn Rpt. ¶ 56.  Levinsohn thus uses the benchmark period to "estimate or approximate what otherwise would have happened during the period of time during which the alleged anticompetitive conduct did occur"—*i.e.*, the "Damages Period."  *Id*. ¶ 58.  To the extent Valassis asserts that Levinsohn "made adjustments to contracting practices in his model" in order to derive damages, that assertion fails to create any material dispute of fact, as discussed below.  *See infra* ¶ 19.

15.     During the benchmark period, Valassis won 41% of the retailer contracts available for competition and earned a profit margin of approximately ██% on its ISP sales, according to Levinsohn's calculations.  Ex. 3 ¶¶ 40, 71 & Ex. 4.

**RESPONSE TO PARAGRAPH 15:**  Valassis disputes the statement in the preceding paragraph to the extent it is meant to suggest that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model or calculations; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.  The statement in the preceding paragraph is otherwise undisputed, but immaterial to News's motion. Because Valassis's early contracts with both SuperValu and Winn Dixie included profit-sharing agreements, Valassis was virtually assured of profitability on those contracts, even on very little revenue.  Levy Ex. 162, VCP00674565, at 566-568 (Winn Dixie Contract); Levy Ex. 151, VAL-NAM15-000003054, at 056-058 (SuperValu contract).  Thus, Valassis was profitable over its first three quarters in

the business (Q32010-Q12011), despite earning revenue of only ███████ during that period.  Levy Ex. 4, Levinsohn Aff. Rep. at Ex. 4; Levy Ex. 2, MacKie-Mason Reb. Rep. at 22; *infra* ¶ 64.  Valassis was ultimately forced to move away from the profit-share model that had permitted it to be profitable on little revenue during its first three quarters in business.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 122; *infra* ¶ 130.  The panoply of conduct challenged by Valassis here (*see infra* ¶¶ 65-105) worked collectively to raise Valassis's costs and depress its revenues.  Levy Ex. 2, MacKie-Mason Reb. Rep. at 20-21; *infra* ¶ 99.

**REPLY TO RESPONSE TO PARAGRAPH 15:**  Valassis does not dispute that, during the benchmark period, it won 41% of the retailer contracts available for competition and earned a profit margin of approximately ███ on its ISP sales, according to Levinsohn's calculations.  The remainder of its Response, is nothing more than "a dispute over the characterization of certain basic facts and over other extraneous issues" which cannot create a genuine dispute of material fact.  *See B.U.S.A. Corp.*, 2009 WL 3076042, at *1 n.2.

16.     According to Levinsohn's calculations, Valassis's win rate and profit margins were lower during the damages period than they were during the benchmark period.  Ex. 3 ¶¶ 62, 71.

**RESPONSE TO PARAGRAPH 16:**  Valassis disputes the statement in the preceding paragraph to the extent it is meant to suggest that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model or calculations; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.  The statement in the preceding paragraph is also disputed because part of the benchmark period is also part of the damages period, but undisputed to the extent that Valassis won fewer retailer contracts and its profit margins decreased after the end of 2010.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 56, 59, 62.

**REPLY TO RESPONSE TO PARAGRAPH 16:**  Valassis does not dispute that it won fewer retailer contracts and had a lower profit margin after the end of what Levinsohn identified as his "benchmark" period.  The remainder of its Response is nothing more than "a dispute over the characterization of certain basic facts and over other extraneous issues" which cannot create a genuine dispute of material fact.  *See B.U.S.A. Corp.*, 2009 WL 3076042, at *1 n.2.

17.     Levinsohn opines that in a "but-for world," Valassis would have maintained during the damages period the same retail contract win rate (41%) and ISP profit margin (approximately ███%) that it had during the benchmark period.  Ex. 3 ¶¶ 71, 82.

**RESPONSE TO PARAGRAPH 17**:  Valassis disputes the statement in the preceding paragraph to the extent it is meant to suggest that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model or calculations; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.  The statement in the preceding paragraph is also disputed to the extent it misstates Professor Levinsohn's opinions.  For purposes of calculating damages, Professor Levinsohn assumed that Valassis's retailer contract win-rate during the but-for world would equal the win rate in the benchmark period.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶ 72.  But he did not merely assume that Valassis's profit margin in the but-for world would match its profit margin in the benchmark period.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶ 82.  To estimate Valassis's profits in the but-for world, Professor Levinsohn estimated various inputs and variables, some of which were not obtained by observing the benchmark period, and calculated the difference between Valassis's but-for revenue and its but-for costs.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 63-81.  Professor Levinsohn opined that his estimate was reasonable, in part, because it was consistent with Valassis's profit margins in the benchmark period.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶ 82.  Professor Levinsohn further reserved the right to modify his calculations of profitability to the extent the jury finding required it.  Levy Ex. 5, Levinsohn Dep. Tr. at 74:18-75:22, 78:6-19; Levinsohn Decl. ¶¶ 9-10, 14.

**REPLY TO RESPONSE TO PARAGRAPH 17**:  Valassis does not dispute that Levinsohn opined that "Valassis would have continued to win 41 percent of the market share" of contestable retailer contracts "during the Damages Period."  Levy Ex. 4, Levinsohn Rpt. ¶ 71.  Nor does Valassis actually dispute that the profit margin that Levinsohn calculated in the "but for" world was essentially the same as Valassis's profit margin during the benchmark period.  In particular, Levinsohn opined that "Valassis' but-for profit margin ranges from ███████ during the second half of 2010 to ██████████ in 2016, with an average profit margin of ██████████ . . . . consistent with Valassis's actual profit margin of ███████ during the benchmark period." *Id.* ¶ 82.  The remainder of its Response is nothing more than "a dispute over the characterization of certain basic facts and over other extraneous issues" which cannot create a genuine dispute of material fact.  *See B.U.S.A. Corp.*, 2009 WL 3076042, at *1 n.2.

18.   NAM's retailer payments as a percentage of its ISP revenue increased

after the benchmark period, according to Levinsohn's calculations.  Ex. 3 ¶ 47 & Ex. 5.

**RESPONSE TO PARAGRAPH 18**:  Valassis disputes the statement in the preceding paragraph to the extent it is meant to suggest that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model or calculations; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.  The statement in the preceding paragraph is otherwise undisputed.

26

**REPLY TO RESPONSE TO PARAGRAPH 18:**  Valassis does not dispute the factual statements in Paragraph 18.  As a result, those facts are admitted.  *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible").  The balance of its Response is "a dispute over the characterization of certain basic facts and over other extraneous issues" which cannot create a genuine dispute of material fact.  *See B.U.S.A. Corp.*, 2009 WL 3076042, at *1 n.2.

19.     The alleged increase in NAM's retailer payments after Valassis's entry is

"the only thing different between the benchmark period . . . and the damages period" that

Levinsohn identified.  Ex. 34 at 132:9–22, 178:11–179:21.

**RESPONSE TO PARAGRAPH 19:**  The statement in the preceding paragraph is disputed.  First, given the vagueness of the hypothetical question that elicited the quoted deposition testimony, the testimony is necessarily ambiguous, and in any event does not say what News says it does; Valassis noted its objections to the question that elicited the testimony at the time, and it was not reformulated.  Levy Ex. 5, Levinsohn Dep. Tr. at 178:10-179:7; Levinsohn Decl. ¶¶ 16-18.  Second, to the extent that the statement implies that the relevant comparison for purposes of Professor Levinsohn's damages model is between the benchmark period and the actual world (rather than between the but-for world and the actual world), the statement is immaterial because it does not accurately convey how Professor Levinsohn's model measures damages.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 11-12.  Valassis also disputes paragraph 19 to the extent that it assumes the various elements of News's overlapping conduct can be evaluated independently; Valassis's liability expert opines that News's conduct operated synergistically.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 3, 67, 107-108 & n.398; Levy Ex. 2, MacKie-Mason Reb. Rep. at 20-21.  Professor Levinsohn, in fact, made adjustments to contracting practices in his model of the but-for world to control for News's anticompetitive contracting practices during the benchmark period.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 64-66, 74-78.  Finally, Valassis disputes that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model, calculations, or testimony; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.

**REPLY TO RESPONSE TO PARAGRAPH 19:**  None of Valassis's assertions creates a material dispute of fact.

First, Valassis tries to get around Levinsohn's admission by submitting a self-serving declaration in which he purports to explain what he thought he was answering in his deposition.  A simple comparison with Levinsohn's testimony

makes clear that this new "explanation" bears no relationship to what Levinsohn actually said.

Here are the questions that Levinsohn was asked at his deposition and the answers that he gave:

> Q.  Let's look at Exhibit 5 again.  So, let's assume a world that – where NAM's commissions look exactly like they do in Exhibit 5, okay?  And all of the other alleged conduct is exactly as Valassis has alleged it, but Valassis is not making the allegation that any part of the increase that you show in your chart after 2010 is anticompetitive.  Okay?  Are you with me?

> A.  Is a fair way to interpret this that the Court – *I should assume that the Court says there is nothing – no problem with the commissions but the other stuff is anticompetitive?*

> Q.  You could view it that way.  I don't think it makes a difference.

> A.  It's easier for me to think about it that way.

> Q.  *Fine.  So, the Court looks at this chart and it says that there is no problem with this increase after 2010, okay?  All of the other alleged conduct is the same.  You are asked to come up with damages.*  Could you reliably say that Valassis's win rate and the amount that it would pay retailers in the "but for" world after 2010 would be the same as what you observe in the 2010 benchmark?

> A.  I think *I could reliably estimate damages, but that reliable estimate would come out around zero, and let me explain why that is so*.

> Q.  Okay.

> A.  The -- during the benchmark period, the other alleged anticompetitive behavior is for the most part already present, and *these commissions are the delta.  They are the new thing*.  And now*, if you tell me that the only thing different between the benchmark period I have selected and the damages period, that the differentiating factor just went away, then my intuition says damages would go away*.

Ex. 51 at 177:25–179:21 (emphasis added).

Here is how Levinsohn tries in his new declaration to re-characterize his testimony:

> For purposes of the hypothetical, therefore, I understood that I was asked to use the same benchmark model that I had employed, but to draw on the entire Damages Period as my "benchmark" to infer Valassis's but-for profit margin.  In other words, *I understood that I was asked to assume that profits in the but-for world and the actual world were the same*.  I responded that Valassis suffers zero damages in that scenario.  Given the hypothetical, my response was a truism.

Dkt. 227 ¶ 17 (emphasis added).

And here is how Valassis describes Levinsohn's testimony in its brief:

> [Levinsohn] responded that, *if he made no other changes to his model other than to swap Valassis's real-world profit margin for the number he had calculated*, "my intuition says damages would go away."

Opp. at 18–19 (emphasis added).

There is simply no basis in the record for Valassis and Levinsohn's wholesale re-invention of Levinsohn's testimony.  Levinsohn was not asked to "swap" any calculations in his model.  Nor was he asked to assume anything about "profit margin."  The words "profits" and "margin" appear nowhere in the question Levinsohn was asked or in the answer he gave.

There also was nothing "vague" or "ambiguous" about the testimony as Valassis contends here.  Levinsohn was asked directly whether he could say what Valassis's damages would be if the Court were to determine that the increase in NAM's retailer payments after 2010 was lawful and not anticompetitive.  He responded that his "reliable estimate [of damages] would come out around zero," and offered "to explain why that is so."  Ex. 51 at 179:8–11.  Levinsohn then explained why that is necessarily the case as a result of the way he constructed his damages model:  (1) the increase in commissions "are the delta," "the only thing different between the benchmark period [he] selected and the damages period"; and (2) as a result, absent liability for the commissions, "damages would go away."  *Id.* at 179:13–21.

Not only does that explanation speak for itself, Levinsohn plainly understood the question he was answering because he re-framed it himself in a way that was "easier for him to think about."  *Id.* at 178:11–19 ("Is a fair way to interpret this that the Court – I should assume that the Court says there is nothing – no problem with the commissions but the other stuff is anticompetitive?").  Indeed, Levinsohn made the same admission—that the retailer commissions are the only difference between his benchmark period and the damages period earlier in his deposition:

"I only have the benchmark period to work with, because after the third quarter of 2010, the predatory commissions kicked in. . . . [A]fter that, the -- there is no longer a period of fair competition from which to draw inferences." *Id.* at 46:24–47:8.

As a result, there is no reason for the Court to credit Levinsohn's "explanation" or Valassis's mischaracterization of the testimony in determining whether there is a genuine dispute of material fact on this issue. In any event, Levinsohn's declaration proves the point that he admitted in his deposition, which is that all of the damages he calculates are attributable to the increase in NAM's retailer payments, and not to any other conduct. His declaration states that his damages estimate would be "the same" if (1) NAM's retailer payments are found unlawful standing alone, or (2) the payments are found unlawful as part of a "broth" that includes other alleged conduct. Dkt. 227 ¶¶ 8–9, 11. Saying that damages would be the same regardless of whether the payments are viewed in isolation or in combination with other conduct simply means there are no damages attributable to the other conduct. Levinsohn further concedes the point that NAM's retailer payments are the only differentiating factor that generates damages in his model by admitting that he would have to make "adjustments" to his model if NAM's payments were found to be lawful. *Id.* ¶ 14; *see* Reply 6.

Second, Valassis disputes Paragraph 19 to the extent it suggests that various elements of NAM's conduct can be evaluated independently. This argument is immaterial. Regardless of whether NAM's conduct can be evaluated independently or not, Levinsohn testified that his model, in fact, measures the difference between the benchmark period and the damages period, and that the only difference between those periods is attributable to the increase in retailer commissions. Ex. 51 at 178:21–179:21.

Third, Valassis quibbles over terminology and objects "*to the extent* that the statement implies that the relevant comparison for purposes of Professor Levinsohn's damages model is between the benchmark period and the actual world (rather than between the but-for world and the actual world)." The terminology to which Valassis purports to object was used by Levinsohn himself. There is no dispute as to how Levinsohn's model measures damages: he derives damages by assuming that Valassis's retailer contract "win rate" during the "benchmark" period would have continued during the "damages period" if NAM's challenged conduct was not present. *See* Levy Ex. 4, Levinsohn Rpt. ¶¶ 56–61, 72. If there were no difference between NAM's alleged conduct in the benchmark period and its alleged conduct in the damages period, then he has no basis to claim that there are any damages based on his model. That is why Levinsohn admitted that if the retailer payments—which are the only conduct he found to be different between the two periods—are lawful, then "damages would go away."

Fourth, Valassis claims that Levinsohn actually made some other adjustments to his model of the but-for world. But neither Valassis nor Levinsohn claims that

these "adjustments to contracting practices in his model" create any damages. Nor could they.  As noted above, it is only Levinsohn's conclusion that NAM's *conduct* changed between the benchmark period and the damages period—*i.e.*, the difference in NAM's retailer payments—that results in any damages.  Levinsohn himself "explain[ed] why that is so."  Ex. 51 at 179:8–11.  Because "[the increased retailer] commissions are the delta" and the "new thing" in the damages period that was not present in the benchmark period, "damages would go away" if that "differentiating factor just went away."  *Id.* at 179:13–179:21.

Finally, Valassis resorts to a meaningless assertion about the legal inferences that can be drawn from Levinsohn's testimony.  But "a dispute over the characterization of certain basic facts" simply is not sufficient to create a genuine dispute of material fact.  *See B.U.S.A. Corp.,* 2009 WL 3076042, at *1 n.2.

20.    The other alleged conduct, including NAM's alleged use of "long-term,"

"staggered," and "exclusive" retailer contracts, was "already present" during the benchmark

period.  Ex. 34 at 124:14–21, 132:9–22, 178:21–179:21; *see also* Ex. 2 at 73.

> **RESPONSE TO PARAGRAPH 20:**  Valassis does not dispute that News engaged in anticompetitive conduct during the benchmark period, including the conduct referenced in paragraph 20, but disputes the inference News apparently draws—that because the conduct was present during the benchmark period it is immune from antitrust scrutiny or cannot give rise to damages.  It is further disputed that all of the misconduct challenged by Valassis was present during the benchmark, or that News's contracting practices affected Valassis's margins in the same way during the benchmark period as they did afterwards.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 106, 115-116.  For example, News hired a former Valassis employee to act as a black knight after the benchmark period. Levy Ex. 72, NAM-VAL14-001363913.  It signed a contract with Food Lion after the benchmark period that precluded Food Lion from even ▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮; Food Lion did not have similar restrictions during the benchmark period.  Levy Ex. 77, NAM-VAL14-002566685, at 685-686.  News also pre-emptively renewed key contracts, such as Kroger, after the benchmark period.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 115-116; *id.* Ex. 111, NAM-VAL2-002037794.  News also prohibited CPGs from contracting with Valassis for ISP tactics that News did not offer after the benchmark period.  *See, e.g.*, Levy Ex. 105, NAM-VAL14-007386065 at 065-067.  Finally, Valassis disputes that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model, calculations, or testimony; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.

**REPLY TO RESPONSE TO PARAGRAPH 20:**  Valassis does not dispute that various forms of allegedly anticompetitive contracting practices that it claims NAM employed were "already present" during the benchmark period Levinsohn used in his damages model.  Instead, Valassis purports to dispute the "inference" that the presence of all of the challenged conduct (other than the increase in NAM's retailer payments) during the benchmark period means that such conduct "cannot give rise to damages."  But that is precisely the inference that its own expert drew.  *See supra* ¶ 19.  The remainder of its Response "improperly interject[s] arguments and/or immaterial facts in response to facts asserted by" NAM, and is entitled to no weight.  *See Baity*, 51 F. Supp. 3d at 418.

21.     The alleged presence of such other conduct, including NAM's alleged use of "long-term," "staggered," and "exclusive" retailer contracts, during the benchmark period did not prevent Valassis from winning 41% of available retailer contracts and generating an ISP profit margin of approximately ██% in that period.  Ex. 3 ¶¶ 40, 71 & Ex. 4.

**RESPONSE TO PARAGRAPH 21:**  It is undisputed that Valassis won 41% of available contracts and had a margin of ██ during the benchmark period, but the volume of available contracts (that is, contracts up for bid) during that period (a mere two) was artificially depressed by virtue of News's staggering of contract termination dates and other anticompetitive conduct.  The statement is further disputed to the extent that it implies that News did not prevent Valassis from being profitable after the benchmark period, because Valassis had profit share arrangements during the benchmark period, and News's conduct collectively prevented Valassis from obtaining a critical mass of retail shelf space, and thus maintaining profitable contracts with retailers.  Levy Ex. 4, Levinsohn Aff. Rep. at ¶ 62; Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73, 82-108; Levy Ex. 146, VAL2-NAM16-004459941, at slide 8; Levy Ex. 147, VAL2-NAM16-004616359; Levy Ex. 148, VAL2-NAM16-004741862, at 866; *see also infra* ¶¶ 65-104.  Indeed, News's own expert opines that operators of larger retail networks have a natural advantage in the relevant market and that operators of smaller networks could not effectively compete with them, while documents and testimony show that News's anticompetitive conduct, taken as a whole, impaired Valassis's ability to be profitable and caused it to exit.  Levy Ex. 6, Murphy Rep. at ¶¶ 92-93.  Valassis also disputes the statement to the extent that it implies that the various components of News's anticompetitive conduct can be evaluated independently; as Professor MacKie-Mason opines, the conduct operated synergistically.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 3, 67, 107-108 & n.398; Levy Ex. 2, MacKie-Mason Reb. Rep. at 20-21.  The statement is also irrelevant to Defendants' summary judgment motion and thus does not constitute an undisputed material fact showing that there is no genuine issue to be tried.  Finally, Valassis disputes that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model, calculations, or testimony; Professor Levinsohn, as a

damages expert, *assumes* liability and provides no expert opinion on the subject of liability.

**REPLY TO RESPONSE TO PARAGRAPH 21:**  Valassis does not dispute that it won 41% of available contracts and had a profit margin of ▮ during the benchmark period.  Nor does Valassis address, let alone dispute, the fact that NAM's alleged use of "long-term," "staggered," and "exclusive" retailer contracts, during the benchmark period did not prevent Valassis from winning 41% of available retailer contracts and generating an ISP profit margin of approximately ▮ in that period.  As a result, that fact is admitted.  *See* S.D.N.Y. L.R. 56.1(c), (d) (statements of fact deemed admitted unless "specifically controverted" and "each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible").  The remainder of Valassis's Response, which "adds argumentative and . . . lengthy narrative . . . the object of which is to 'spin' the impact of the admissions [it] has been compelled to make" is not appropriate, and is entitled to no weight.  *See Goldstick*, 2002 WL 1906029, at *1.

22.     Because "the only thing different between the benchmark period . . . and the damages period" that Levinsohn identified is the alleged increase in NAM's retailer payments, the only damages that Levinsohn claims to measure are attributable entirely to such payments.  Accordingly, Levinsohn admits that, absent NAM's liability for the alleged increase in its retailer payments, "damages would go away."  Ex. 34 at 178:11–179:21.

**RESPONSE TO PARAGRAPH 22:**  The statement in the preceding paragraph is disputed.  First, Professor Levinsohn measures the damages caused by the entirety of News's anticompetitive conduct, does not parse out the various strands of that conduct or attribute damages to each strand (which both Dr. MacKie-Mason and Professor Levinsohn have opined would be an incorrect approach), and does not believe, or opine, that if any one strand of conduct is (erroneously) pulled out, all damages simply disappear.  *See* Levinsohn Decl. at ¶¶ 14-15.  Second, the deposition testimony cited by News is ambiguous given the vagueness and incompleteness of the hypothetical posed to the witness.  Valassis noted, and maintains, its objections to the question that elicited the testimony.  Levy Ex. 5, Levinsohn Dep. Tr. at 178:10-179:7.  Third, to the extent that the statement implies that the relevant comparison for purposes of Professor Levinsohn's damages model is between the benchmark period and the actual world (as opposed to between the but-for world and the actual world), the statement is immaterial because it does not accurately convey how Professor Levinsohn's damages model measures damages, or how damages should be measured (a point on which Professor Levinsohn and News's damages expert disagree).  Levy Ex. 4, Levinsohn Aff. Rep. at ¶¶ 11-12.  Fourth, Valassis disputes that the various aspects of News's anticompetitive conduct can be

analyzed independently, or that the level of commissions alone foreclosed competition. Levy Ex. 2, MacKie-Mason Reb. Rep. at 20-21; Levinsohn Decl. at ¶¶ 11-15.  Finally, Valassis disputes that the Court could draw any conclusions relevant to liability from Professor Levinsohn's model, calculations, or testimony; Professor Levinsohn, as a damages expert, *assumes* liability and provides no expert opinion on the subject of liability.

**REPLY TO RESPONSE TO PARAGRAPH 22:**  Valassis does not dispute that "damages would go away" if NAM's retailer payments are found to be lawful.  Its other responses are the same as those it lodged in response to Paragraph 19, and fail to create any genuine dispute of fact for the same reasons.  *See supra* ¶ 19.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(b)

**I.    News Has Market Power In The Third-Party In-Store Promotions Market**

A.    Third-Party In-Store Promotions Are A Unique Product.

23.    Third-Party In-Store Promotions ("ISPs") are promotions placed by a third-party at or near the shelf of retail stores (such as Kroger or Safeway) on behalf of consumer-packaged goods manufacturers CPGs (such as Dial and Heinz).  Levy Ex. 1, MacKie-Mason Aff. Rep. at 4-6, 16-17, 31-60; *see also, e.g.*, Levy Ex. 3, Farris Aff. Rep. at ¶¶ 11-13.

**RESPONSE TO PARAGRAPH 23:**  Paragraph 23 does not contain any additional material facts.  *See supra* ¶ 1.

24.    During the time period at issue in this case, there was one incumbent ISP provider—News, the defendant in this case—and one new entrant—Valassis, the plaintiff.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 4; Levy Ex. 74, NAM-VAL14-001505129, at 131-132.  News has been the dominant player in the market since it entered in 1997; Valassis attempted to enter the market in 2010 and was forced out by News's anticompetitive conduct before it could obtain the critical mass of retailer store space necessary to compete effectively with News or to place a competitive constraint on News's ability to overcharge CPGs.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 15-21.

**RESPONSE TO PARAGRAPH 24:** Paragraph 24 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

25.     ISP providers, like News and Valassis, enter contracts with retailers to gain access to the shelves and aisles where ISPs are placed.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 6-8; Levy Ex. 75, NAM-VAL14-001584083, at 135-136.

**RESPONSE TO PARAGRAPH 25:** Paragraph 25 does not contain any additional material facts.  *See supra* ¶¶ 1-4.

26.     Having obtained access, ISP suppliers then sell the ISPs—both the physical signs and the service of installing and removing them—to CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 4-8; Levy Ex. 3, Farris Aff. Rep. at 12; Levy Ex. 75, NAM-VAL14-001584083, at 136.

**RESPONSE TO PARAGRAPH 26:** Paragraph 26 does not contain any additional material facts.  *See supra* ¶¶ 1-4.

27.     CPGs use ISPs to reach consumers in a retailer's store, at the "moment of truth," or the time when consumers are electing whether they should purchase a CPG product, and if so, which CPG product to purchase.  *See*, *e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 33-39; Levy Ex. 17, Perkins Dep. Tr. at 182:14-184:14; Levy Ex. 53, MARS_VALASSIS-00266, at 275, 332-333, 335; Levy Ex. 156, VAL-NAM15-000159846, at pg. 8.

**RESPONSE TO PARAGRAPH 27:** Paragraph 27 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

28.     CPGs, the consumers of ISPs, consider third-party in-store promotions to be a distinct product for marketing purposes.  *See*, *e.g.*, Levy Ex. 3, Farris Aff. Rep. at 4, 26-49; Levy Ex. 35, Hendrix Dep. Tr. at 333:4-334:19; Levy Ex. 37, Merritt Dep. Tr. at 273:15-274:4.

**RESPONSE TO PARAGRAPH 28:** Paragraph 28 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

29.    CPGs thus find ISPs are not substitutable with other marketing and advertising products.  *See, e.g.*, Levy Ex. 3, Farris Aff. Rep. at 11-12, 28, 37-38, 45-46; Levy Ex. 1, MacKie-Mason Aff. Rep. at 34-37; Levy Ex. 75, NAM-VAL14-001584083, at 095, 129.

**RESPONSE TO PARAGRAPH 29:** Paragraph 29 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

30.    News concedes for purposes of this motion that there is a genuine dispute of fact on the question of whether ISPs are a distinct and well-defined product market.  News Br. at 6.

**RESPONSE TO PARAGRAPH 30:** Paragraph 30 is legal argument that is improper in a Rule 56.1 Statement.  NAM maintains that market definition is immaterial to its motion for summary judgment, which asserts only that Valassis's claims fail because it cannot prove damages resulting from anything other than lawful conduct—above-cost and non-predatory bidding.  If Valassis's claims were to proceed to trial (and they should not), NAM would show that there is no "market" for ISPs because, among other reasons, CPGs routinely substitute third-party ISP for a variety of other advertising and marketing products.  *See, e.g.*, Ex. 1 ¶¶ 237–254.

B.    News Has Long Dominated The Market For ISPs.

31.    News has dominated the market for ISPs for more than twenty years since it entered the market in 1997.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 2-3, 65-67.

**RESPONSE TO PARAGRAPH 31:** Paragraph 31 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

32.    News's market power is demonstrated by its ability, among other things, to retain a large market share, control both the prices paid by CPGs for ISPs and the

commissions paid to retailers to obtain access to shelves and aisles where ISPs are placed, exclude competitors, and maintain a persistently high profit margin.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 2, 3, 29-31, 54-60, 64-66, 124-25, 129-130, Exs. 30-34.

> **RESPONSE TO PARAGRAPH 32:**  Paragraph 32 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

33.     Between 2009 and 2014, News's market share in the market for ISP spending by CPGs ranged from ██ to ██.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 3, 66; Levy Ex. 137, VAL2-NAM16-001359283, at 301, 313.

> **RESPONSE TO PARAGRAPH 33:**  Paragraph 33 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

34.     News maintained its dominant market share in substantial part by excluding competitors, as detailed below.  *See infra* at ¶¶ 65-104. In 2002, when News faced limited competition from another ISP supplier, Floorgraphics, News held an ██ market share of retailer contracts in the food class of trade for placement of shelf signs and coupon machines, but that number rose to ██ by 2006, after News excluded Floorgraphics.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 64.  Even for the floor signs that Floorgraphics had introduced to the market, News's share of retailer contracts rose from ██ when Floorgraphics remained in the market in 2002 to ██ (as measured by ACV) by 2006, after News excluded Floorgraphics.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 63-64; *see also infra* ¶¶ 52, 145.

> **RESPONSE TO PARAGRAPH 34:**  Paragraph 34 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

35.     At the time Valassis entered the ISP market in 2010, News was the only significant ISP provider.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 64; *see also* Levy Ex. 74, NAM-VAL14-001505129, at 131-132.

> **RESPONSE TO PARAGRAPH 35:**  Paragraph 35 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

36.     By 2014, despite Valassis's attempts to enter the market and compete with it, News retained a dominant market share of retailer contracts in the food class of trade.  *See* Levy Ex. 1, MacKie-Mason Aff. Rep. at 18-19, 64, 66, Ex. 42.  In particular, News's market share of retailer contracts in the food class of trades was ███ in 2012 and grew to ███ by 2014.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 64.  And after improperly forcing Valassis to exit the grocery and then drug classes of trade in 2014 and 2015 respectively, News regained a ███ share of each.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 15 n.39, 66-67, 108; Levy Ex. 2, MacKie-Mason Reb. Rep. at 19.

> **RESPONSE TO PARAGRAPH 36:**  Paragraph 36 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

37.     Unsurprisingly, market participants, including News's own CPG customers, have recognized that News is a monopolist in the ISP business.  *E.g.*, Levy Ex. 52, KCC000001 at 012; Levy Ex. 33, Corsiglia-Keim Dep. Tr. at 278:3-15; Levy Ex. 55, MDLZ00002148, at 154; Levy Ex. 41, Welch Dep. Tr. at 230:7-17.

> **RESPONSE TO PARAGRAPH 37:**  Paragraph 37 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

38.     Likewise, Goldman Sachs, whom News hired when considering selling its

ISP business in 2011, recognized that "███████████████████████████████

██████████████████████" Levy Ex. 50, CPG_GS_0004036, at 037.

> **RESPONSE TO PARAGRAPH 38:**  Paragraph 38 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

39.     As a result of its ability to exclude competitors and keep barriers to entry

high, News been able to charge supracompetitive prices to CPGs while paying under-

competitive commissions to retailers.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 3, 59, 124-125,

129-130.

> **RESPONSE TO PARAGRAPH 39:**  Paragraph 39 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

40.     News's power has meant that News was also atypically and persistently

profitable: News's profit margins were significantly higher than the closest comparable firms,

earning margins as high as ████.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 3, 29-31, Exs. 30-34.

> **RESPONSE TO PARAGRAPH 40:**  Paragraph 40 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

## II.     News Harms Competitors, Competition And Consumers, By Engaging In A Strategy Designed To Prevent Entrants From Reaching "Critical Mass"

A.     Critical Mass Is Essential To Success In The ISP Market.

41.     Access to just a few retailers is not sufficient to be successful in the ISP

market.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 67.

> **RESPONSE TO PARAGRAPH 41:**  Paragraph 41 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail

because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

42.     Instead, an ISP supplier must have a "critical mass" of retailers in its

network to compete effectively to sell ISPs to CPGs, and to obtain profitable retailer contracts.

Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73; Levy Ex. 12, Hansa Dep. Tr. at 32:10-33:15;

Levy Ex. 14, Kroc Dep. Tr. at 81:25-85:6.

> **RESPONSE TO PARAGRAPH 42:**  Paragraph 42 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

43.     News's current CEO has previously described this fundamental market

reality as follows:

> A big part of being successful with our package goods clients is having the critical mass to deliver promotions that move volume. By staggering the deals we can concentrate on key negotiations. But perhaps more importantly, this strategy serves as a deterrent to other major competitors from joining the In-Store fray—because they know that it will be a long hard fought, drawn out process to develop the critical mass necessary to be successful in this arena. . . .  Part and parcel with the concept of critical mass of retail stores is News America Marketing's ability to deliver to retailer's national consumer promotion dollars.

Levy Ex. 108, NAM-VAL2-000626063, at 102-103.

> **RESPONSE TO PARAGRAPH 43:**  Paragraph 43, which relies on quoted material from 2004 that pre-dates Valassis's release of claims against NAM, *see* Ex. 54 at 4–5, is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

44.     An ISP supplier's ability to offer ISP with wide distribution (or across a

sufficient retailer network) is important to CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-

73; Levy Ex. 34, Gitkin Dep. Tr. at 170:25-171:23.

**RESPONSE TO PARAGRAPH 44**: Paragraph 44 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

45.     Recognizing this feature of the ISP business, News marketed itself to

retailers accordingly, extolling its position as by far the largest market participant.  Levy Ex. 166,

NAM-VAL14-002593689 at 91; *see also* Levy Ex. 94, NAM-VAL14-006655750, at 751.

**RESPONSE TO PARAGRAPH 45**: Paragraph 45 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

46.     Relatedly, CPGs also prefer "Tier 1" retailers that sell a relatively high

volume of products, in industry parlance those with high ACV (all commodities volume).  Levy

Ex. 1, MacKie-Mason Aff. Rep. at 67-73; Levy Ex. 16, Naze Dep. Tr. at 98:11-102:23.

**RESPONSE TO PARAGRAPH 46**: Paragraph 46 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

47.     In short, "critical mass" requires both high quality and quantity of retailers

as well as nation-wide coverage.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73; Levy Ex. 75,

NAM-VAL14-001584083, at 151; Levy Ex. 7, Aversano Dep. Tr. at 110:22-111:5.

**RESPONSE TO PARAGRAPH 47**: Paragraph 47 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

48.     Most of the CPG demand for ISP is for national promotions rather than

smaller distribution: for example, ███ of News's in-store promotions revenue is for programs

with placements in at least 35 of News's 38 geographic sales markets.  Levy Ex. 1, MacKie-

Mason Aff. Rep. at 70. To attract national promotion spending, it is necessary to have a network

of retail stores with nationwide reach and high ACV.  Levy Ex. 1, MacKie-Mason Aff. Rep. at

67-73; Levy Ex. 14, Kroc Dep. Tr. at 81:25-85:6.

> **RESPONSE TO PARAGRAPH 48**:  Paragraph 48 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

49.     Without enough retailers, new entrant ISP providers are thus caught in a

vicious cycle because they cannot attract enough CPG spending (including, notably, for national

promotions), or secure the CPG revenue needed to add more retailers.  Levy Ex. 1, MacKie-

Mason Aff. Rep. at 67-73; Levy Ex. 34, Gitkin Dep. Tr. at 171:12-17; Levy Ex. 13, Kroc Dep.

Tr. at 269:14-270:13; Levy Ex. 71, NAM-VAL14-001322150, at 151.

> **RESPONSE TO PARAGRAPH 49**:  Paragraph 49 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

B.     News's Anticompetitive Scheme Intentionally Raised Barriers To Entry And
       Caused All Entrants In The ISP Market To Exit, Injuring Competition.

50.     News has ensured that no third-party supplier of in-store promotions was

ever able to secure the critical mass necessary to compete effectively with News and become a

financially viable competitor.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 112.

> **RESPONSE TO PARAGRAPH 50**:  Paragraph 50 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

51.     News has long had a "proven strategy" to deny competitors critical mass

and exclude them from the market:

> What's more, we have a proven strategy in place when it comes to
> our retail network.  Our strategy is to . . . secure long-term retail
> deals where the revenue-share remains constant over the term of
> the agreement. For instance, the . . . Kroger deal is for 7 years, . . .
> Ahold's agreement is for 8 years and . . .  Safeway's is for 10

years. . . .  We also stagger the deals to prevent a large percentage
of the network from being vulnerable at any specific point in
time. . . .  For example, in Fiscal '07 our contracts with HyVee and
Hannaford are up for renewal, in Fiscal '08 it's Giant Eagle,
Supervalu and Wakefern and not until Fiscal '09 do we have to
renegotiate with Publix.  This method allows us to concentrate on
our key negotiations.  It also means that any competitor who wants
to develop critical mass for their network would have to dedicate a
lot of money over a considerable amount of time in order to break
into the in-store game in any significant way.

Levy Ex. 58, NAM07-LF-00300958, at 965-966.

> **RESPONSE TO PARAGRAPH 51:**  Paragraph 51 which relies on quoted
> material from 2007 that pre-dates Valassis's release of claims against NAM, *see*
> Ex. 54 at 4–5, is immaterial to NAM's motion for summary judgment, which
> asserts only that Valassis's claims fail because its only claimed damages are
> attributable entirely to lawful, competitive conduct—above-cost and non-
> predatory bidding for retailer contracts.

52.    News deployed these and other anticompetitive strategies to exclude its

only early competitors from the ISP market, notably Floorgraphics and Insignia.  Levy Ex. 1,

MacKie-Mason Aff. Rep. at 76-82, 112; Levy Ex. 43, Floorgraphics Compl. at ¶¶ 13-16.

Floorgraphics eventually sold its remaining business to News, eliminating it as a competitor to

News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 14.

> **RESPONSE TO PARAGRAPH 52:**  Paragraph 52 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

**III.    Valassis Attempted To Enter The ISP Market In 2010, But Was Excluded By
News's Anticompetitive Strategy**

A.    Valassis Tried To Enter The ISP Market At The Behest Of Dissatisfied Retailer
SuperValu.

53.    Valassis tried to enter the ISP market at the behest of SuperValu, a retailer

dissatisfied with News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 82, 127; Levy Ex. 30, Tingle

Dep. Tr. at 48:3-49:13.

**RESPONSE TO PARAGRAPH 53:**  Paragraph 53 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

54.     SuperValu, frustrated by "News America control[ling] the message at the shelf sometimes blocking [SuperValu] out in [its] own stores," wanted "greater control of the in-store message," and analyzed the prospects of either re-negotiating its contract with News, or creating an independent media that could provide the flexibility that News did not.  Levy Ex. 155, VAL-NAM15-000158619, at pp. 6, 9; *see also*, *e.g.*, Levy Ex. 40, Watson Dep. Tr. at 20:12-22:8.

**RESPONSE TO PARAGRAPH 54:**  Paragraph 54 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

55.     Valassis, then a public company with more than $2 billion in annual revenue, was uniquely positioned to challenge News.  *See* Levy Ex. 46, Valassis 2008 10-K; Levy Ex. 129, VAL2-NAM16-000407393, at slide 14; Levy Ex. 1, MacKie-Mason Aff. Rep. at 96, 122-123; Levy Ex. 24, Czanko Dep. Tr. at 121:12-20.

**RESPONSE TO PARAGRAPH 55:**  Paragraph 55 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

56.     Valassis had competed with News for decades in the separate market for FSIs, advertisements distributed to consumers at their home as inserts in newspapers.  Levy Ex. 46, Valassis 2008 10-K, at 4, 6; Levy Ex. 155, VAL-NAM15-000158619, at slide 16; Levy Ex. 129, VAL2-NAM16-000407393.

**RESPONSE TO PARAGRAPH 56:**  Paragraph 56 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

57.     Valassis had a large sales force, great relationships with CPGs and retailers, and extensive experience selling advertising and promotional products to CPGs in other markets.  Levy Ex. 155, VAL-NAM15-000158619, at slide 16; Levy Ex. 129, VAL2-NAM16-000407393, at slide 14; Ex. 135, VAL2-NAM16-000977505, at slide 10; Levy Ex. 1, MacKie-Mason Aff. Rep. at 103, 122; Levy Ex. 164, Berg Dep. Tr. at 28:25-29:15.

> **RESPONSE TO PARAGRAPH 57:** Paragraph 57 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

58.     In November 2009, Valassis and SuperValu signed an agreement whereby Valassis would serve as SuperValu's ISP provider.  Levy Ex. 151, VAL-NAM15-000003054.

> **RESPONSE TO PARAGRAPH 58:** Paragraph 58 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

59.     The contract differed from News's ISP contracts in key respects as it "moved [SuperValu] away from a revenue per store to a revenue share model," allowed SuperValu insight into the financial aspects of the Valassis's profits from sales of advertisements to CPGs to place in SuperValu's stores, and provided SuperValu control over what ISP products were placed in its stores.  Levy Ex. 40, Watson Dep. Tr. at 30:2-12, 79:5-8, 138:18-139:4; Levy Ex. 151, VAL-NAM15-000003054, at 055-058; Levy Ex. 152, VAL-NAM15-000003122, at 123-125.

> **RESPONSE TO PARAGRAPH 59:** Paragraph 59 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

60.     Valassis also committed to meeting the concerns that retailers had with News by offering innovative products and greater control to retailers.  Levy Ex. 161, VAL-

NAM15-000181787, at 787-788; Levy Ex. 24, Czanko Dep. Tr. 54:4-18, 65:22-67:6; Levy

Ex. 121, VAL2-NAM16-000016502, at pp. 19-21.

> **RESPONSE TO PARAGRAPH 60:**  Paragraph 60 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

61.     In addition to SuperValu, Valassis secured a contract with Winn Dixie, a

grocery chain in the South.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 18; Levy Ex. 162,

VCP00674565; Levy Ex. 122, VAL2-NAM16-000016509, at pp. 3-9, 10-12.

> **RESPONSE TO PARAGRAPH 61:**  Paragraph 61 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

62.     Like its agreement with SuperValu, Valassis's contract with Winn-Dixie

included a profit-sharing arrangement.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 106; Levy

Ex. 162, VCP00674565 at 567-568.

> **RESPONSE TO PARAGRAPH 62:**  Paragraph 62 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

63.     Valassis thus innovated and offered a new business model in response to

what SuperValu (and other retailers) found lacking in News's model.  Levy Ex. 1, MacKie-

Mason Aff. Rep. at 127; Levy Ex. 36, Kota Dep. Tr. at 41:7-43:12; Levy Ex. 40, Watson Dep.

Tr. at 138:18-139:4; Levy Ex. 24, Czanko Dep. Tr. at 54:4-18, 65:22-67:6; Levy Ex. 56,

SAFEWAY0551, at slide 5.

> **RESPONSE TO PARAGRAPH 63:**  Paragraph 63 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

64.     Because it had negotiated profit-share arrangements, Valassis was

profitable over its first three quarters in the business (Q3 2010-Q1 2011), despite earning

revenue of only ▮▮▮▮▮▮ during that period.  Levy Ex. 4, Levinsohn Aff. Rep. Exs. 4, 6. By

way of comparison, the combined total ISP revenue of News, Insignia, and Valassis over the

same period was approximately ▮▮▮▮▮▮.  Levy Ex. 120, NAM-VAL2-007737213, at "7-4-

17" tab; Levy Ex. 47, Insignia 2010 10-K; Levy Ex. 48, Insignia 2011 10-K.

> **RESPONSE TO PARAGRAPH 64**:  Paragraph 64 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims
> fail because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

B.    <u>News Excluded Valassis By Choking Off Its Access To Critical Mass Through A
      Panoply Of Anticompetitive Conduct.</u>

65.    After News learned that Valassis and SuperValu entered into a ISP

agreement it immediately took to improperly preventing Valassis from making any additional

inroads into the ISP market.  *See, e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 82-111.

> **RESPONSE TO PARAGRAPH 65**:  Paragraph 65 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

**Exclusivity**

66.    A near universal feature of News's retailer contracts is that they have

broad exclusivity provisions that exclude any other third party from placing similar programs in

that retailer and prevented competitors from developing competing retailer networks.  Levy

Ex. 1, MacKie-Mason Aff. Rep. at 13, 74-75.

> **RESPONSE TO PARAGRAPH 66**:  Paragraph 66 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

67.    News's retailer contracts typically contained exclusivity provisions similar

to the following:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████ Levy Ex. 1,

MacKie-Mason Aff. Rep. at 83; Levy Ex. 79, NAM-VAL14-002567623, at 626-627.

> **RESPONSE TO PARAGRAPH 67**:  Paragraph 67 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

> 68.    These provisions prevented Valassis, and any other potential entrant

wishing to compete with News, from placing ISPs in the retailers under News's contract.  Levy

Ex. 1, MacKie-Mason Aff. Rep. at 82-86; Levy Ex. 60, NAM-VAL14-000100862, at 862; Levy

Ex. 160, VAL-NAM15-000174108, at 011.

> **RESPONSE TO PARAGRAPH 68**:  Paragraph 68 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

> 69.    These provisions have been described as a key part of News's business.

*See*, *e.g.*, Levy Ex. 32, NAM-VAL14-007313167 at 3167.

> **RESPONSE TO PARAGRAPH 69**:  Paragraph 69 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

> 70.    News's exclusivity provisions restricted retailers from permitting direct

competitors from placing products in the retailers' store even when News did not offer the same

product that its competitors offered.  *E.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 126; Levy

Ex. 81, NAM-VAL14-002572566, at 568; Levy Ex. 85, NAM-VAL14-006028688, at 693.

> **RESPONSE TO PARAGRAPH 70**:  Paragraph 70 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

**Long Term Contracts & Preemptive Renewal**

71.     News attempted to secure unnecessarily long-term exclusive retailer contracts to preclude competition for those retailers' shelf space.  Levy Ex. 114, NAM-VAL2-002071328, at 329; Levy Ex. 12, Hansa Dep. Tr. at 54:4-14.

> **RESPONSE TO PARAGRAPH 71:**  Paragraph 71 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

72.     News's grocery retailer contracts averaged 4.5 years in length.  Levy Ex. 2, MacKie-Mason Reb. Rep. at 23; *see also* Levy Ex. 94, NAM-VAL14-006655750 at 760.

> **RESPONSE TO PARAGRAPH 72:**  Paragraph 72 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

73.     News tried to and often signed retailers with higher ACV to longer contracts.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 87, Ex. 67.

> **RESPONSE TO PARAGRAPH 73:**  Paragraph 73 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

74.     In addition, News sought "wind-down" provisions, which operated "essentially as a six-month extension" (or for however long the period lasted) on top of the set contract duration, along with "evergreen" or autorenewal provisions.  Levy Ex. 14, Kroc Dep. Tr. at 49:20-50:14, 52:10-53:3.

> **RESPONSE TO PARAGRAPH 74:**  Paragraph 74 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

75.     News also conceived of and executed "Project Preempt," a strategy of preemptively renewing contracts long before they were to expire, in order to prevent them from coming up for bid—the very same strategy News successfully used previously (and improperly)

to lock up FSI agreements.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 89-93; Levy Ex. 57,

NAM07-01005353, at 353; Levy Ex. 20, Verdun Dep. Tr. at 132:13-133:17.

> **RESPONSE TO PARAGRAPH 75:**  Paragraph 75 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

76.    Applying the Project-Preempt strategy, News employees proactively set

out to exploit News's incumbency position and extend News's retailer contracts because "we

don't want deals to get . . . close to expiration" and therefore come up for bid by Valassis. Levy

Ex. 91, NAM-VAL14-006379442, at 443; *see also e.g.*, Levy Ex. 109, NAM-VAL2-000990717,

at 717; Levy Ex. 17, Perkins Dep. Tr. at 33:11-34:6; Levy Ex. 89, NAM-VAL14-006160543, at

543.

> **RESPONSE TO PARAGRAPH 76:**  Paragraph 76 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

77.    After Valassis entered the market and pursuant to Project Preempt, News

systematically sought to extend existing contracts as early as possible and for as long as possible,

thereby preventing competition on those contracts and precluding competition as to those

retailers.  *See* Levy Ex. 1, MacKie-Mason Aff. Rep. at 89-93; *see also*, *e.g.*, Levy Ex. 62, NAM-

VAL14-000184561; Levy Ex. 61, NAM-VAL14-000183368; Levy Ex. 94, NAM-VAL14-

006655750, at 762.

> **RESPONSE TO PARAGRAPH 77:**  Paragraph 77 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

78.    For example, News's executives had a "pre-emptive strategy to renew

Kroger."  Levy Ex. 65, NAM-VAL14-000240643, at 644.

**RESPONSE TO PARAGRAPH 78**:  Paragraph 78 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

79.     Kroger was the largest grocery retailer that participates in the ISP market, and winning this contract would have increased Valassis's store count significantly; denying Valassis even the opportunity to bid for the contract in and of itself drastically narrowed the paths available for Valassis to secure critical mass.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 115.

**RESPONSE TO PARAGRAPH 79**:  Paragraph 79 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

80.     In 2006, News had signed a seven-year agreement with Kroger. Levy Ex. 86, NAM-VAL14-006029265, at 266.

**RESPONSE TO PARAGRAPH 80**:  Paragraph 80 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

81.     In 2010, News engaged in "a pre-emptive strategy to [try to] renew Kroger" through 2018, although the contract was not to expire before January 2013.  Levy Ex. 92, NAM-VAL14-006384499; Levy Ex. 65, NAM-VAL14-000240643, at 644.

**RESPONSE TO PARAGRAPH 81**:  Paragraph 81 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

82.     Kroger originally expressed hesitation towards the early, seven-year renewal that News was seeking to negotiate.  Levy Ex. 116, NAM-VAL2-006335249, at 249; Levy Ex. 96, NAM-VAL14-006692249, at 250.

**RESPONSE TO PARAGRAPH 82**:  Paragraph 82 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

83.     In July 2011, News successfully extended the Kroger contract through 2015 without a competitive bid from Valassis.  *See* Levy Ex. 1, MacKie-Mason Aff. Rep. at 115. In exchange, News agreed to a predatory payment of more than ███████ during the term of the existing contract, and ███████ per year for the final two years.  *See* Levy Ex. 111, NAM-VAL2-002037794 at 795, 796; *supra* ¶ 11.

> **RESPONSE TO PARAGRAPH 83**:  The statement in Paragraph 83 that NAM "agreed to a predatory payment" is an improper legal conclusion that has no place in a Rule 56.1 statement and it is unsupported by evidence.  The undisputed facts show that NAM projected that its 2011 contract with Kroger would be profitable. *See supra* ¶ 11.  The remainder of Paragraph 83 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

84.     Using these tactics with Kroger and other retailers, News prevented Valassis from contracting with the large, national retailers with sufficient ACV to elicit interest in Valassis's network from CPG customers.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 87-93.

> **RESPONSE TO PARAGRAPH 84**:  Paragraph 84 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

**Staggering**

85.     Another cornerstone of News's anticompetitive strategy was staggering its retail contracts.  As News's current CEO Martin Garofalo previously explained:

> The last of our four strengths is our overall strategy for winning the business.  This winning formula . . . starts with staggered retail deals. . .  News America Marketing intentionally staggers the time of major retail deals to minimize the risk of losing a major number of stores in any short term time period . . .  But perhaps more importantly this strategy serves as a deterrent to other major companies from joining the In-Store fray - because they know that it will be a long—hard fought drawn out process to develop the critical mass necessary to be successful in this arena.

Levy Ex. 108, NAM-VAL2-000626063, at 101-102; *see also* Levy Ex. 1, MacKie-Mason Aff. Rep. at 93-95; Levy Ex. 15, Mixson Dep. Tr. at 91:24-92:7, 87:20-88:2; Levy Ex. 12, Hansa Dep. Tr. at 53:10-20; Levy Ex. 114, NAM-VAL2-002071328, at 329.

> **RESPONSE TO PARAGRAPH 85:**  Paragraph 85 which relies on quoted material from 2004 that pre-dates Valassis's release of claims against NAM, *see* Ex. 54 at 4–5, is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

86.     After Valassis entered, News worked to shore up and ensure that its retail contracts were adequately staggered, with the then-head of the retailer group noting in a Management Board meeting that "[w]e want to structure the extensions so that we stagger the end dates of the contracts."  Levy Ex. 113, NAM-VAL2-002071317, at 318; *see also* Levy Ex. 51, CPG_VALASSIS_0013780; Levy Ex. 10, Dittrich Dep. Tr. at 69:2-10; Levy Ex. 49, NAM-VAL2-000353499.

> **RESPONSE TO PARAGRAPH 86:**  Paragraph 86 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

87.     News even reorganized its retailer sales force and created a new position that placed an executive in charge of, among other things, "[m]anag[ing] [News'] staggered retail contract expiration strategy."  Levy Ex. 63, NAM-VAL14-000186770, at 771.

> **RESPONSE TO PARAGRAPH 87:**  Paragraph 87 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

88.     For example, after Valassis signed SuperValu wholesale, News used its staggering strategy to prevent Valassis from contracting with all SuperValu stores: it locked up as many SuperValu independent retailers (which comprised a large proportion of SuperValu stores) as possible using a "one page contract template enabling the account directors to rapidly

sign independent stores" and stagger their end dates.  Levy Ex. 73, NAM-VAL14-001384144, at

145; Levy Ex. 98, NAM-VAL14-007056588, at 589-90; Levy Ex. 99, NAM-VAL14-

007056602.  News itself recognized that the individual stores would not be valuable to CPGs

unless grouped in a way with "critical mass sufficient to elicit interest from [News'] customers";

by preventing Valassis from obtaining those stores, News ensured Valassis would not be able to

build its retail network and obtain critical mass.  *See* Levy Ex. 84, NAM-VAL14-003089147.

> **RESPONSE TO PARAGRAPH 88:**  Paragraph 88 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

89.     By way of another example, News also used staggering, along with

preemptive renewals, to exclude Valassis from the Drug class of trade.  Levy Ex. 1, MacKie-

Mason Aff. Rep. at 95.  News entered into ISP contracts with CVS and Rite Aid in late

2009/early 2010.  Levy Ex. 82, NAM-VAL14-002578990, at 991; Levy Ex. 78, NAM-VAL14-

002567553.  Shortly before signing the Rite Aid contract, News realized that the CVS and Rite

Aid contracts it had just negotiated were set to expire on the same day, December 31, 2012, and

began to evaluate (even before the Rite Aid contract was signed) the choices for extending one of

the two contracts in order to ensure that the deals would not expire on the same day.  Levy

Ex. 106, NAM-VAL2-000006756; *see also* Levy Ex. 90, NAM-VAL14-006344856, at 856-857.

In October 2010, with more than two years left on those contracts, News successfully extended

the CVS contract through December 31, 2014, paying CVS higher guaranteed payments and

keeping the contract from Valassis for an additional two years.  Levy Ex. 76, NAM-VAL14-

002566577.  Then, in the Summer of 2012, two years before the 2010 extension even went into

effect, News executives again approved extending the CVS contract, adding two years more

years to extend the agreement through 2016 — all before the 2010 extension went into effect.

Levy Ex. 1, MacKie-Mason Aff. Rep. at 91; Levy Ex. 87, NAM-VAL14-006087741, at 742.

> **RESPONSE TO PARAGRAPH 89**:  Paragraph 89 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

**Increased & Predatory Guarantees**

90.     With revenues depressed by conduct that prevented Valassis from obtaining critical mass, News also sought to drive up Valassis's costs by drastically increasing its offers to retailers.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 96-107, Ex. 27.

> **RESPONSE TO PARAGRAPH 90**:  Paragraph 90 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

91.     For example, right off the bat upon learning that SuperValu had signed a contract with Valassis, News offered to increase News's payments to SuperValu by ▮ if SuperValu stayed with News.  *See* Levy Ex. 112, NAM-VAL2-002042979, at 979, 981.

> **RESPONSE TO PARAGRAPH 91**:  Paragraph 91 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis does not point to any evidence that the offer to SuperValu referenced in Paragraph 91 was expected to be unprofitable for NAM; in any event, Valassis won the SuperValu contract.

92.     News continued to increase its guaranteed payments to retailers in response to Valassis's entry "to protect [News's] store network."  Levy Ex. 80, NAM-VAL14-002568605, at 619; *see also e.g.*, *id.* at 607; Levy Ex. 1, MacKie-Mason Aff. Rep. at 96-97; Levy Ex. 118, NAM-VAL2-007646053; Levy Ex. 40, Watson Dep. Tr. at 231:5-16, 243:13-22.

> **RESPONSE TO PARAGRAPH 92**:  Paragraph 92 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

93.     Part of the goal was to drive up Valassis's costs, and therefore drive it

from the business.  Levy Ex. 64, NAM-VAL14-000227651.

> **RESPONSE TO PARAGRAPH 93:**  Paragraph 93 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

94.     News's own liability expert opines that News had supposedly natural

advantages by virtue of having market power that meant it could bid more than a hypothetical,

equally efficient competitor with the same marginal costs.  Levy Ex. 6, Murphy Rep. at ¶ 16.

> **RESPONSE TO PARAGRAPH 94:**  Paragraph 94 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  Paragraph
> 94 does not claim, and is not supported by evidence, that NAM engaged in
> bidding that NAM expected would be unprofitable.

95.     As explained above in Paragraphs 8, 9, and 11 of Valassis's Response to

Defendants' Statement of Undisputed Facts, many of News's offers were predatory.  *See supra*

¶¶ 8, 9, 11; Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-102.  Indeed, every single contract that

News negotiated in a bidding situation with Valassis turned out to be not profitable to News.

Levy Ex. 1, MacKie-Mason Aff. Rep. at 97-103.

> **RESPONSE TO PARAGRAPH 95:**  There is no dispute that NAM expected its
> retailer contracts would be profitable, with two potential exceptions:  Kmart (for
> which the parties dispute the evidence) and ████, which accounted for a *de
> minimis* amount of NAM's overall ISP revenue.  *See supra* ¶¶ 11–13.  As
> MacKie-Mason acknowledged, none of NAM's contracts (with the possible
> exception of Kmart) were predatory at actual prices in the real world.  Ex. 50 at
> 39:16–40:1 ("Q.  With the possible exception of Kmart . . . you don't identify any
> retail contracts that you opine are predatory before you adjust the real-world
> prices downward; correct?  A.  I believe that's correct.")  Furthermore, Valassis's
> claim that "every single contract that News negotiated in a bidding situation with
> Valassis turned out to be not profitable to News" is demonstrably false.  *See supra*
> ¶ 11.

96.     As a result of the excessive commissions it guaranteed to retailers, News

███████ for four years straight, 2012-2015, on the contracts News bid away from Valassis.

Levy Ex. 2, MacKie-Mason Reb. Rep. 12, 30-31, Ex. 100.

> **RESPONSE TO PARAGRAPH 96:**  Paragraph 96 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  In
> addition, Valassis's own citations show that the assertion in paragraph 96 is false:
> according to MacKie-Mason, NAM in fact was *profitable* on 8 of the 14 retailer
> contracts for which he asserts that NAM and Valassis competed.  *See supra* ¶ 11.
> Further, the results of MacKie-Mason's analysis suggesting that such contracts
> were unprofitable for NAM in the aggregate are driven by "adjustments" that
> MacKie-Mason applied to NAM's accounting for those contracts—which serve to
> make them appear less profitable—as well as underperformance at certain large
> retailers that skew the overall results.  Levy Ex. 1, MacKie-Mason Rpt. at Ex. 73.
> For example, if Kmart and Delhaize (Food Lion) were set aside—two retailers
> that experienced a significant number of store closures over the life of their
> contracts with NAM, *see supra* ¶ 11—NAM would have been profitable in the
> aggregate on the so-called contested contracts, even under Valassis's "adjusted"
> calculations.  *See* Levy Ex. 1, MacKie-Mason Rpt. at Ex. 73.  In any event,
> whether NAM ultimately was unprofitable at any of these retailers is immaterial
> because there is no dispute that the appropriate test for predation is whether
> NAM's contract offers were expected to be profitable on an *ex ante*—not *ex
> post*—basis.  *See supra* ¶ 10.

**Other News Conduct Regarding Retailers**

97.     As News had done in the past to successfully exclude prior competitors,

News also engaged in improper and anticompetitive conduct for the purpose of creating barriers

to entry, keeping Valassis's revenues depressed, raising Valassis's costs, and preventing Valassis

from obtaining critical mass.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 108-111.

> **RESPONSE TO PARAGRAPH 97:**  Paragraph 97 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

98.     For example, News sold products to be placed into SuperValu past the

termination date of News's contract.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 109; Levy

Ex. 107, NAM-VAL2-000008076, at 077.  News used the fact that it had sold placements

beyond the contract termination date to extend its contract with SuperValu, to the detriment of both SuperValu and Valassis.  *See*, *e.g.*, Levy Ex. 56, SAFEWAY0551, at 553.

> **RESPONSE TO PARAGRAPH 98:**  Paragraph 98 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

> 99.    As another example, News retained a former Valassis employee as a

consultant, who viewed himself as News's "Black Knight," in an effort to raise Valassis's costs in counterbidding situations to such an extent that News would eventually win those contracts back.  *See*, *e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 106; Levy Ex. 72, NAM-VAL14-001363913, at 913; Levy Ex. 64, NAM-VAL14-000227651.

> **RESPONSE TO PARAGRAPH 99:**  Paragraph 99 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

> 100.    As another example, News entered into contracts with retailers that

███████████████████████████████████████████.  Levy Ex. 77, NAM-VAL14-002566685, at 686.

> **RESPONSE TO PARAGRAPH 100:**  Paragraph 100 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

## CPG Agreements

> 101.    Further depressing Valassis's revenues, News also intentionally designed

long-term, exclusive contracts with CPGs to lock up advertising dollars so that Valassis (or other competitors) could not generate revenue for the retailers with which Valassis contracted.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 108-111. *See*, *e.g.*, Levy Ex. 93, NAM-VAL14-006419565; Levy Ex. 119, NAM-VAL2-007646896, at 913.

**RESPONSE TO PARAGRAPH 101:**  Paragraph 101 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

102.   These long-term contracts shared economic features with rights of first refusal, and thus suppressed CPGs' limited demand for Valassis's network.  *See*, *e.g.*, Levy Ex. 93, NAM-VAL14-006419565, at 565.

**RESPONSE TO PARAGRAPH 10:**  Paragraph 102 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

103.   Once CPGs entered into such commitments, CPGs were locked in, regardless of whether News lost important retailers to Valassis: when Valassis won retailer contracts from News, News refused to refund money to CPGs to allow them to place ISPs in those stores that subsequently contracted with Valassis, instead "holding [CPGs] to the store count [they] contract."  Levy Ex. 130, VAL2-NAM16-000409784, at 786; Levy Ex. 54, MARS_VALASSIS-09217, at 218.

**RESPONSE TO PARAGRAPH 103:**  Paragraph 103 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

104.   As a result, many CPGs that wanted to contract with Valassis could not because their advertising dollars were locked up with News despite the CPG's intent that those products be placed in stores for which News no longer had a contract.  *See*, *e.g.*, Levy Ex. 1, MacKie-Mason Aff. Rep. at 111; Levy Ex. 25, Kowalczyk Dep. Tr. at 175:6-178:25; Levy Ex. 56, SAFEWAY0551, at 554.

**RESPONSE TO PARAGRAPH 104:**  Paragraph 104 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

IV.   **News's Anticompetitive Conduct, Taken Collectively, Injured Valassis And Thereby Harmed Competition and Consumers**

A.   <u>News's Conduct Injured Valassis's Business By Preventing It From Reaching The Critical Mass Necessary To Succeed, Thus Keeping Its Revenues Depressed And Eventually Resulting In Its Exit From The Market.</u>

105.   News's conduct had its intended effect of preventing Valassis from assembling a network of retailers with the critical mass necessary to attract CPG spending on national campaigns, thus keeping its revenues low relative to its costs and forcing it from the market.  *See supra* ¶¶ 50-52, 65-104; Levy Ex. 58, NAM07-LF-00300958, at 966.

> **RESPONSE TO PARAGRAPH 105:**  Paragraph 105 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.
>
> i.   <u>News's Retailer Contracting Practices Limited The Retailer Contracts Available For Bid Each Year, Preventing Valassis From Growing Its Retailer Network.</u>

106.   As Valassis recognized, contracts with retailers are a "must have" to make money in the ISP business; "without them," Valassis would "fail[]."  Levy Ex. 122, VAL2-NAM16-000016509.  Because News used exclusive contracts, however, Valassis could not place signs in those retailers' stores during those time periods.  *See supra* ¶¶ 66-70.

> **RESPONSE TO PARAGRAPH 106:**  Paragraph 106 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

107.   Valassis tried to innovate so it could sell new products in retailers under exclusive contracts with News: for instance, Valassis developed a new product called the Wedge, which it tried to market to retailers that were under contract with News because News did not sell the same product.  Levy Ex. 140, VAL2-NAM16-002183948.  But due to the breadth of News's exclusivity agreements, there was limited opportunity to place Valassis's innovative product.  Levy Ex. 140, VAL2-NAM16-002183948.  Even retailers who were interested in the product

were forbidden by News from purchasing the Wedge from Valassis, despite retailer protests that News did not offer a similar tactic.  *See*, *e.g.*, Levy Ex. 105, NAM-VAL14-007386065.

> **RESPONSE TO PARAGRAPH 107:**  Paragraph 107 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

108.    News further limited Valassis's ability to assemble an attractive retailer network in which it could place signs by using long-term contracts with staggered end dates, and renewing its contracts more than a year before expiration to avoid competitive bidding.  *See supra* ¶¶ 71-89.  Because of these contracting practices, only very few retailers came up for bid each year, as illustrated in charts Valassis prepared to track the potential availability of retailer contracts for bidding.  *See*, *e.g.*, Levy Ex. 132, VAL2-NAM16-000511520; Levy Ex. 144, VAL2-NAM16-003208771; Levy Ex. 157, VAL-NAM15-000161543; *see also* Levy Ex. 24, Czanko Dep. Tr. at 38:12-25.

> **RESPONSE TO PARAGRAPH 108:**  Paragraph 108 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

109.    Summarizing the state of play in early 2012, the first general manager of Valassis's in-store business explained that "most" retailers were "too early in current deal [with News] to even ponder" joining Valassis's network, while "[t]he biggies," Kroger and Safeway, were "6 months away from that conversation."  Levy Ex. 126, VAL2-NAM16-000020024.  As it would turn out, due to News's preemptive renewals and related conduct, contracts with the "biggies" never expired while Valassis was in the market.  Levy Ex. 24, Czanko Dep. at 80:12-82:9; Levy Ex. 22, Berg Dep. Tr. at 242:7-13.  In the meantime, Valassis was forced to sell ISPs as best it could in the few retailers it was able to sign into its network.  *See*, *e.g.*, Levy

Ex. 154, VAL-NAM15-000157228, at pg. 8 ("We are getting our 'fair share' based on the value of our network but it's not enough.").

> **RESPONSE TO PARAGRAPH 109:** Paragraph 109 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

110.   Valassis's ability to track competitive bidding opportunities was itself hindered by News's retailer contracts, which often prevented retailers from disclosing when the contracts would end.  Levy Ex. 21, Berg Dep. Tr. at 264:6-18; Levy Ex. 26, Minnick Dep. Tr. at 237:3-14; *see also* Levy Ex. 77, NAM-VAL14-002566685, at 686.

> **RESPONSE TO PARAGRAPH 110:** Paragraph 110 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

111.   But even where Valassis did have correct information as to the termination date of News's retailer contracts, News's deliberately "preemptive" renewals had the effect of extending News's contracts even further, preventing Valassis from winning the business for even longer. Levy Ex. 1, MacKie-Mason Aff. Rep. at 89-93; Levy Ex. 2, MacKie-Mason Reb. Rep. at 28. For example, Valassis noted in a March 2011 tracking chart that Kroger's contract with News was set to expire in 2013, almost two years later.  Levy Ex. 132, VAL2-NAM16-000511520, at "By SN Rank" tab.  Although that information was accurate at the time, News preemptively renewed the deal in July 2011, almost two years prior to its expiration.  Levy Ex. 111, NAM-VAL2-002037794.  As a result, Valassis never had a chance to bid on the nation's largest grocery retailer and a cornerstone of News's network.  Levy Ex. 24, Czanko Dep. Tr. at 80:12-82:9; Levy Ex. 22, Berg Dep. Tr. at 242:7-13.  And even if Valassis had had the chance to bid, it could not have profitably matched the offer News made, which leveraged its incumbent position by paying a bonus on the existing contract, and was predatory.  *See supra* ¶ 11.

**RESPONSE TO PARAGRAPH 111:** Paragraph 111 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

112.    Kroger was not alone; News induced a number of other retailers to renew early, further limiting Valassis's ability to bid on retailer contracts and thereby expand its network and make it more attractive to CPGs.  *See*, *e.g.*, Levy Ex. 139, VAL2-NAM16-002158181; Levy Ex. 132, VAL2-NAM16-000511520, at "By SN Rank"; *see also supra* ¶¶ 71-84.

**RESPONSE TO PARAGRAPH 112:** Paragraph 112 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

113.    Moreover, because News focused its long-term contracts and preemption strategy on the most important retailers, the contracts with key retailers like Kroger and Safeway — the "biggies" — never expired until after Valassis had announced its exit from the market.  Levy Ex. 24, Czanko Dep. Tr. at 87:11-14, 76:18-25.

**RESPONSE TO PARAGRAPH 113:** Paragraph 113 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

114.    And, compounding the strength of its market power, certain of News's contracts prevented retailers from even discussing a new contract with Valassis while the retailer was under contract with News.  Levy Ex. 77, NAM-VAL14-002566685, at 685-686.

**RESPONSE TO PARAGRAPH 114:** Paragraph 114 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

ii.    <u>Because It Could Not Grow Its Retailer Network, Valassis Could Not Reach  The Critical Mass Necessary To Attract CPG Spending.</u>

115.    By limiting Valassis's opportunities to add retailers to its network or to place products in stores under exclusive contracts with News, News precluded Valassis from winning

key "Tier 1" retailers and reaching the "critical mass" it needed to attract spending (i.e., revenue) from CPGs — just as News intended.  *See supra* ¶¶ 43, 85 (discussing evidence that News designed its retailer contracting practices specifically to make competition a "long . . . drawn out process").

> **RESPONSE TO PARAGRAPH 115:**  Paragraph 115 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

116.    Thus, the overwhelming reason why CPGs chose not to devote spending on "national" campaigns (or "buys") with Valassis was that Valassis did not have the key "Tier 1" stores in its network: for example, one CPG testified that "the only problem" with Valassis was

███████████████████████████████████████████████████

█████████████████████████████████████"  Levy Ex. 37, Merritt Dep. Tr. at 248:3-12. Another CPG, testifying as a corporate representative, recalled that his colleague "wished that Valassis had greater coverage, more reach, more options, within the retail environment because it would give [HP] Hood more options and in theory would be better for our brand planning." Levy Ex. 39, Ross Dep. Tr. at 243:15-244:2.

> **RESPONSE TO PARAGRAPH 116:**  Paragraph 116 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

117.    The CPG testimony is consistent with feedback provided to Valassis while it remained in the ISP market: according to a survey of CPGs conducted by Valassis sales people, a principal reason for "missed national programs" was Valassis's "lack of coverage."  Levy Ex. 135, VAL2-NAM16-000977505, at slide 40; *see also*, *e.g.*, Levy Ex. 134, VAL2-NAM16-000613184, at 185; Levy Ex. 128, VAL2-NAM16-000394013, at 015.

> **RESPONSE TO PARAGRAPH 117:**  Paragraph 117 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail

because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

118.    Current and former Valassis employees understood that Valassis struggled to sell ISPs because its network lacked key retailers and critical mass: Suzie Brown, formerly executive vice president in charge of sales at Valassis, testified that "an important reason . . . for why Valassis struggled to sell in-store products to CPGs" was that Valassis "had a really small percentage of the retailers that had in-store products in their stores and that it was very hard to compete with such a small component of the retail network; that [Valassis was] not a must-have solution because [Valassis] didn't have critical mass with the retailers."  Levy Ex. 23, S. Brown Dep. Tr. at 208:9-24.

> **RESPONSE TO PARAGRAPH 118:**  Paragraph 118 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

119.    Likewise, Joe Mirabelli, the former head of Valassis's in-store sales team testified that "primarily" the reason Valassis did not sell more ISPs was that "if you don't have the right real — retail mix, it kind of doesn't matter.  We — I've always viewed this is we are in the real estate market, we are not in the in-store product market.  So if you don't have the right retailers, you don't have a business."  Levy Ex. 27, Mirabelli Dep. Tr. at 211:24-212:20.

> **RESPONSE TO PARAGRAPH 119:**  Paragraph 119 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

120.    Valassis's sales team was effective, and able to sell content commensurate with the value of the network of stores Valassis had, but this was not enough to overcome the obstacles News has placed in Valassis's path to critical mass.  Levy Ex. 138, VAL2-NAM16-002107453; *see also id.* at 454; Ex. 154, VAL-NAM15-000157228, at slide 8 ("We are getting our 'fair share' based on the value of our network but it's not enough.").

**RESPONSE TO PARAGRAPH 120:**  Paragraph 120 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

iii.    News Prevented Valassis From Winning The Few Retailer Contracts That Did Become Available For Bid Each Year, Including By Offering Guaranteed Payments That No Equally Efficient Competitor Could Match.

121.    Faced with its inability to win CPG spending due to the poor quality of its

network, Valassis recognized that it needed to add high quality (grocery) retailers to its network.

*See*, *e.g.*, Levy Ex. 156, VAL-NAM15-000159846 at pg. 15; Ex. 123, VAL2-NAM16-

000016529, at pg. 30.

**RESPONSE TO PARAGRAPH 121:**  Paragraph 121 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

122.    As Valassis also recognized, however, News was intent on making it difficult or

impossible for Valassis to win the few retailer contracts that did become available each year.

*See*, *e.g.*, Levy Ex. 141, VAL2-NAM16-002782790, at slide 2; Levy Ex. 142, VAL2-NAM16-

002791576, at slide 1; Levy Ex. 125, VAL2-NAM16-000016669, at pg. 6.

**RESPONSE TO PARAGRAPH 122:**  Paragraph 122 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

123.    News's efforts to block Valassis from winning the few retailers available for

competition took several forms: News entered into a contract with Kmart that News itself

documented as predatory in order to "send [Valassis] a message" and to prevent Valassis from

getting a foothold in the mass merchandise class of trade.  Levy Ex. 25, Kowalczyk Dep. Tr. at

335:4-8; Ex.163, VCP00675090, at 096; Ex. 1, MacKie-Mason Aff. Rep. at 100-101, 113;

Ex. 115, NAM-VAL2-006312299, at 300 "Overview" tab; Levy Ex. 125, VAL2-NAM16-

000016669, at pg. 6; *see also supra* ¶¶ 7, 11.  Moreover, because News understood that it was

improperly interfering with a contract that Valassis had reached with Kmart, News agreed to defend Kmart "from all third party claims, suits or other proceedings relating to, arising out of, in connection with, or concerning the formation, negotiation, drafting, execution or acceptance of" News's offer. Ex. 171, NAM-VAL14-002567046 at 047; Ex. 1, MacKie-Mason Aff. Rep. at 114; Ex. 172, NAM-VAL2-002034677 (June 14, 2011 letter from Kmart to News terminating agreement); Ex. 170, NAM-VAL14-000244499 (June 16, 2011 internal News email) ("[Kmart representative] shared the following. The new contract is very similar to our agreement. . . . we can bid again in 16 months"); Ex. 173, VAL-NAM15-000158570.

> **RESPONSE TO PARAGRAPH 123:** Paragraph 123 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

124. News also prevented Valassis from winning the few available retailers contracts by making offers to retailers that Valassis could not possibly match given its inability to win CPG spending. Levy Ex. 132, VAL2-NAM16-000511520, at Row 14; Levy Ex. 144, VAL2-NAM16-003208771, at slide 2; Levy Ex. 131, VAL2-NAM16-000507273, at slide 3; *see supra* ¶¶ 8, 9, 11.

> **RESPONSE TO PARAGRAPH 124:** Paragraph 124 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

125. By constricting the number of contracts available for bidding through its contracting practices, and then making bids no competitor could profitably match, News prevented Valassis from winning the retailer contracts it needed to obtain critical mass and attract CPG spending. Levy Ex. 1, MacKie-Mason Aff. Rep. at 82-103.

> **RESPONSE TO PARAGRAPH 125:** Paragraph 125 is immaterial because the allegation that NAM made "bids no competitor could profitably match" does not establish that NAM expected its contracts would result in below-cost pricing. The

undisputed facts show that NAM expected to make a profit on every offer it made to a retailer with the exception of ████, and—possibly—Kmart (which the parties dispute).  *See* Ex. 1 at Ex. 30.  Both contracts are immaterial to NAM's motion because they accounted for a *de minimis* amount of NAM's total revenue and Valassis's damages expert (Levinsohn) did not attribute any damages to NAM's ████ contract or its Kmart contract.  *See supra* ¶¶ 11–13, 95.

iv.    News Further Impaired Valassis's Ability To Sell To CPGs By Locking Up  CPG Spending In Long-Term Commitments.

126.    As noted earlier, News entered long term spending agreements with CPGs that often had the effect of requiring CPGs to spend twice to place ISPs in the same stores.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 119; *see also supra* ¶¶ 101-104.

> **RESPONSE TO PARAGRAPH 126**:  Paragraph 126 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

127.    Valassis identified "Existing [News] contracts with CPGs" as one of the "threats" to its ISP business.  Levy Ex. 154, VAL-NAM15-000157228, at pg. 12; *see also*, *e.g.*, Levy Ex. 142, VAL2-NAM16-002791577, at slide 1; Levy Ex. 145, VAL2-NAM16-004015076, at 078.

> **RESPONSE TO PARAGRAPH 127**:  Paragraph 127 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

128.    Valassis's retailer partners also noted that Valassis's struggles in the ISP business were attributable in part to News's long-term spending commitments with CPGs. E.g., Levy Ex. 56, SAFEWAY0551, at 554.

> **RESPONSE TO PARAGRAPH 128**:  Paragraph 128 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

v.    Lacking Critical Mass, Valassis Could Not Remain Profitable, And Was Forced To Exit The Market.

129.    As a result of all of News's conduct, Valassis could not attract enough revenue from CPGs to cover its guaranteed payment obligations to the retailers already in its network — let alone to add new retailers to its network, and thus reach the necessary critical mass. *See, e.g.,* Levy Ex. 158, VAL-NAM15-0001616211; Levy Ex. 159, VAL-NAM15-000166777; Levy Ex. 146, VAL2-NAM16-004459941, at slide 8.

> **RESPONSE TO PARAGRAPH 129:**  Paragraph 129 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

130.    In response to News's high, guaranteed retailer offers, Valassis was forced to move away from the profit-share model that had permitted it to be profitable on very little revenue during its first three quarters in business. *See* Levy Ex. 1, MacKie-Mason Aff. Rep. at 122; Levy Ex. 153, VAL-NAM15-000156430, at 431.  As Valassis's former head of its in-store business Mr. Berg illustrated, in describing the shift in the SuperValu contract, News's "significant guarantees" "caused [Valassis] significant pressure on [its] profit share" deals.  Levy Ex. 21, Berg Dep. at 306:21-307:15.  Eventually Valassis "felt, backed into a corner that [it] needed to protect and defend [its agreement] and extend it with a guarantee based on the conditions that News was putting forth." *Id.*  Valassis was forced to move away from a profit share not only as a result of News's guaranteed commissions, but also because News's conduct prevented Valassis from acquiring a critical mass of retailers.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 122; Levy Ex. 40, Watson Dep. Tr. at 108:12-109:21.

> **RESPONSE TO PARAGRAPH 130:**  Paragraph 130 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

131.    With its costs driven up by News's high retailer offers, and its ability to win CPG revenue driven down by News's strategy of blocking Valassis from reaching critical mass and the long-term CPG commitments, Valassis began to lose money.  *See, e.g.*, Levy Ex. 147, VAL2-NAM16-004616359; Levy Ex. 134, VAL2-NAM16-000613184, at 186.

> **RESPONSE TO PARAGRAPH 131:**  Paragraph 131 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

132.    As a result of being left out of national ISP campaigns due to its poor retailer network and CPGs long-term spending commitments with News, Valassis suffered harm to its business in the form of lost revenue.  *E.g.*, Ex. 135, VAL2-NAM16-000977505 at slide 41; Ex. 124, VAL2-NAM16-000016539 at pg. 8. For example, an internal analysis of Valassis's ISP business found that CPGs placed only about 55% of all "national" ISP campaigns in Valassis's network, and that the failure to win more national campaigns cost Valassis more than ███████ dollars in just the first half of 2011.  Ex. 135, VAL2-NAM16-000977505, at slides 36-41.

> **RESPONSE TO PARAGRAPH 132:**  Paragraph 132 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

133.    Because the bulk of costs in Valassis's ISP business were fixed (in the form of retailer commissions), Valassis's lost revenue translated directly into lost profits.  *See* Ex. 143, VAL2-NAM16-003121350, at 350 (recognizing that "[a] majority of the costs in this business are retailer guarantees"); Ex. 129, VAL2-NAM16-000407393, at slide 34 (per-tactic, or variable, cost of ISPs only small fractional of per-tactic price); *see also* Ex. 135, VAL2-NAM16-000977505, at slides 13-29 (same).

> **RESPONSE TO PARAGRAPH 133:**  Paragraph 133 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

134.     Valassis tried to increase revenue by offering innovative products to retailers subject to exclusive contracts with News, but News's contracts cut off this source of revenue as well, and thus caused Valassis further injury to its business in the form of lost revenues (and profits).  *See* Ex. 140, VAL2-NAM16-002183948; Ex. 105, NAM-VAL14-007386065.

> **RESPONSE TO PARAGRAPH 134:**  Paragraph 134 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

135.     Valassis attempted to regain its earlier profitability by increasing prices — the only lever in the profitability formula over which it retained control — but it was unable to make up the shortfall News's conduct caused.  Levy Ex. 156, VAL-NAM15-000159846, at pp. 17-20.

> **RESPONSE TO PARAGRAPH 135:**  Paragraph 135 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

136.     After losing ███████████████, Valassis realized it was trapped in the vicious cycle News had created for it.  Levy Ex. 143, VAL2-NAM16-003121350 at 350; Levy Ex. 153, VAL-NAM15-000156430, at 431.

> **RESPONSE TO PARAGRAPH 136:**  Paragraph 136 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

137.     An internal strategy memorandum from Valassis's CFO to its CEO, dated July 2013, explained the predicament Valassis was in:

> We have shown that we can win business, but not at a profit. [News]'s dominance in this marketplace is evident, and their tactics of bidding up retailer contracts coupled with their CPG contracts which leverage CPGs to buy from them, using Kroger and Safeway as the primary attractions, make this business unprofitable for us from both a short and long term perspective. News America will continue to pressure us until we exit this business.  They have way too much market power today for us to compete effectively.

Levy Ex. 148, VAL2-NAM16-004741862, at 866.

> **RESPONSE TO PARAGRAPH 137:**  Paragraph 137 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

138.    Hoping to avoid litigation if possible, Valassis's CFO proposed trying to sell Valassis's ISP business to News.  Levy Ex. 148, VAL2-NAM16-004741862, at 865-866.  As Mr. Recchia explained in his deposition, "[i]f we weren't going to make a go of it in the [ISP] business, then whatever we could do to create as much shareholder value as we could, we should do," including selling its ISP business to News.  Levy Ex. 28, Recchia Dep. Tr. at 231:3-12, 16:14-22.

> **RESPONSE TO PARAGRAPH 138:**  Paragraph 138 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

139.    Valassis announced its exit from the key grocery segment of the ISP market in March 2014, and stopped competing for new grocery retailer contracts.  *See, e.g.*, Levy Ex. 149, VAL-NAM15-000000260; Levy Ex. 136, VAL2-NAM16-001182776. As Valassis's CEO explained, "given long-term losses and the anticompetitive conditions in the in-store marketplace, we have come to the conclusion that thoughtfully exiting the business is our only viable option."  Levy Ex. 127, VAL2-NAM16-000045068.

> **RESPONSE TO PARAGRAPH 139:**  Paragraph 139 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

140.    Valassis's exit from the grocery segment of the market not only caused Valassis to lose revenue and profits; the exit also injured Valassis's relationship with CPGs.  *See, e.g.*, Levy Ex. 136, VAL2-NAM16-001182776, at 777.

**RESPONSE TO PARAGRAPH 140:**  Paragraph 140 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

141.    In 2015, News bid away Valassis's sole retailer in the drug segment.  Levy Ex. 165, Schelby Dep. Tr. at 160:3-18.

**RESPONSE TO PARAGRAPH 141:**  Paragraph 141 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

142.    Today, Valassis places signs in only a single dollar-chain retailer (Family Dollar).  Levy Ex. 29, Schelby Dep. Tr. at 57:10-13.

**RESPONSE TO PARAGRAPH 142:**  Paragraph 142 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

vi.    But For News's Conduct, Valassis Could Have Remained As A Viable Competitor To News.

143.    But for News's conduct, it is "highly likely" that Valassis would have remained in the ISP business and been profitable.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 112.  Valassis was uniquely well situated, had a solid sales force, and strong relationships with CPGs and retailers, as SuperValu had recognized when it recruited Valassis to compete with News.  Levy Ex. 129, VAL2-NAM16-000407393, at slide 14; Levy Ex. 1, MacKie-Mason Aff. Rep. at 122-23.

**RESPONSE TO PARAGRAPH 143:**  Paragraph 143 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

144.    More contracts would have been available for bidding if News did not enter into long-term, staggered contracts and if News did not renew them preemptively; Valassis would have won more of the available contracts if News did not make bids so high that no equally

efficient competitor could match them, and it would have won some of the ones it did win at lower cost. Levy Ex. 1, MacKie-Mason Aff. Rep. at 122. With less burdensome exclusivity provisions, Valassis would have been able to place innovative products that News did not offer in more stores. Levy Ex. 105, NAM-VAL14-007386065 at 065-067. With more retailers, Valassis would have sold more signs to CPGs and earned more revenue. Levy Ex. 1, MacKie-Mason Aff. Rep. at 122. Similarly, without long-term spending commitments, Valassis would have earned more revenue from CPGs. *See, e.g.*, Levy Ex. 80, NAM-VAL14-002568605, at 615; Levy Ex. 142, VAL2-NAM16-002791577, at slide 1; Levy Ex. 145, VAL2-NAM16-004015076, at 078; Levy Ex. 130, VAL2-NAM16-000409784, at 786. With more revenue from CPGs, Valassis could have profitability matched News's retailer bids, making it able to win retailer contracts on a sustainable, persistent basis. Levy Ex. 1, MacKie-Mason Aff. Rep. at 122.

> **RESPONSE TO PARAGRPAH 144:** Paragraph 144 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

145.    Further demonstrating that News's conduct worked, Valassis was not the first would-be entrant that News had effectively squeezed out of the market through its anticompetitive conduct; it had previously forced out Floorgraphics, Insignia, and others by depriving them of the critical mass necessary to obtain the sort of revenues necessary to compete with News. Levy Ex. 1, MacKie-Mason Aff. Rep. at 76-82, 112; Levy Ex. 43, Floorgraphics Compl. at ¶¶ 13-19; *see also Insignia Systems, Inc. v. News America Marketing In-Store, Inc.*, 661 F. Supp. 2d 1039 (D. Minn. 2009) (denying News's summary judgment motion).

> **RESPONSE TO PARAGRAPH 145:** Paragraph 145 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

146.     Valassis's ability to earn a profit during its first few quarters in the ISP market despite having only two retailers resulted from the fact that both contracts (with SuperValu and Winn-Dixie) included a profit-sharing element, which assured that Valassis would turn some profit on those deals, even if revenue was low.  Levy Ex. 162, VCP00674565; Levy Ex. 151, VAL-NAM15-000003054.  And Professor MacKie-Mason's economic analysis shows that success in the ISP market requires the long-term, sustained ability to achieve critical mass: a 7% market share of CPG spending is not sufficient.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 67-73; Levy Ex. 2, MacKie-Mason Reb. Rep. at 22.  Indeed, Valassis itself recognized that its "in-store initiative[] REQUIRE[S] 200, 300, 400, 500% growth, year-over-year, in order to survive and become a force in the marketplace."  Levy Ex. 167, VAL2-NAM16-002782040 at 040.

>    **RESPONSE TO PARAGRAPH 146:**  Paragraph 146 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

147.     According to an economic analysis by Dr. MacKie-Mason, with critical mass, and the resulting ability to match News's retailer bids, Valassis would have remained in the market as a viable, profitable competitor to News.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 122-123.

>    **RESPONSE TO PARAGRAPH 147:**  Paragraph 147 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.

B.     CPGs Suffered Harm As A Result Of Valassis's Exclusion.

148.     By entering into long-term, staggered, and exclusive retailer contracts that denied competitors in the relevant market the opportunity to acquire a critical mass of stores, News did not just harm its competitors; it also injured its own CPG consumers by depriving them of the ability to choose between ISP providers.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 124; Levy

Ex. 35, Hendrix Dep. Tr. at 337:8-14; Levy Ex. 38, Muir Dep. Tr. at 110:5-111:13; Levy Ex. 41,

Welch Dep. Tr. at 230:7-17, 239:7-17, 312:12-314:13.

> **RESPONSE TO PARAGRAPH 148:** Paragraph 148 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's assertions about supposed injuries to "CPG consumers" from other alleged conduct have nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments.  *See* Reply 4 & n.2.

149.    Indeed, even while Valassis was in the market, News's CPG consumers believed

that News was a monopolist in the market.  Levy Ex. 52, KCC000001, at 002, 007, 012; Levy

Ex. 44, Dial Compl. at ¶¶ 134-136.

> **RESPONSE TO PARAGRAPH 149:** Paragraph 149 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's assertion about how "CPG consumers" perceived NAM has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments.  *See* Reply 4 & n.2.

150.    According to an economic analysis by Dr. MacKie-Mason, News's intentional

exclusion of competitors caused prices of ISPs to CPGs to be above but-for levels and decreased

output.  Levy Ex. 1, MacKie Mason Aff. Rep. at 124-26.

> **RESPONSE TO PARAGRAPH 150:** Paragraph 150 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's assertion that NAM overcharged CPGs has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit* from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from claiming any injury on the basis of alleged overcharges, Valassis's damages model contemplates that Valassis would be able to charge CPGs *more* in the "but-for" world absent NAM's challenged conduct than the supposedly supra-competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17, 199:8–14, 238:20–23, 239:16–21.

151.     According to an economic analysis by Dr. MacKie-Mason, News's historical

exclusion of competitors allowed it to raise prices charged to CPGs.  Levy Ex. 1, MacKie-Mason

Aff. Rep. at 125.

> **RESPONSE TO PARAGRAPH 151:**  Paragraph 151 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's
> assertion that NAM overcharged CPGs has nothing to do with the alleged injury
> for which Valassis seeks damages here—lost profits caused by NAM's retailer
> payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit*
> from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from
> claiming any injury on the basis of alleged overcharges, Valassis's damages
> model contemplates that Valassis would be able to charge CPGs *more* in the "but-
> for" world absent NAM's challenged conduct than the supposedly supra-
> competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17,
> 199:8–14, 238:20–23, 239:16–21.

152.     According to Dr. MacKie-Mason's economic analysis, News reduced the rate at

which it raised prices when Valassis entered.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 125.

> **RESPONSE TO PARAGRAPH 152:**  Paragraph 152 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's
> assertion that NAM overcharged CPGs has nothing to do with the alleged injury
> for which Valassis seeks damages here—lost profits caused by NAM's retailer
> payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit*
> from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from
> claiming any injury on the basis of alleged overcharges, Valassis's damages
> model contemplates that Valassis would be able to charge CPGs *more* in the "but-
> for" world absent NAM's challenged conduct than the supposedly supra-
> competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17,
> 199:8–14, 238:20–23, 239:16–21.

153.     According to Dr. MacKie-Mason's economic analysis, prior to Valassis's entry,

prices for two of News's tactics increased at an average rate of ███ and ███████ per cycle; after

Valassis's entry, the rate of increase declined to ███████ and ██████ per cycle.  Levy Ex. 1,

MacKie-Mason Aff. Rep. at 125, Exs. 75, 76, 84 & 85.

> **RESPONSE TO PARAGRAPH 153:**  Paragraph 153 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail

because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts. Valassis's assertion that NAM overcharged CPGs has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments. *See* Reply 4 & n.2. Indeed, Valassis, as a competitor, would *benefit* from higher prices to CPGs. *See* Mot. 10–11 & n.4; Reply 4 n.2. Far from claiming any injury on the basis of alleged overcharges, Valassis's damages model contemplates that Valassis would be able to charge CPGs *more* in the "but-for" world absent NAM's challenged conduct than the supposedly supra-competitive prices that NAM charged in the real world. Ex. 51 at 195:22–196:17, 199:8–14, 238:20–23, 239:16–21.

154.     According to Dr. MacKie-Mason's economic analysis, News's atypically high

long-term margins in ISP are indicative of supra-competitive prices. Levy Ex. 1, MacKie-Mason

Aff. Rep. at 125.

> **RESPONSE TO PARAGRAPH 154:** Paragraph 154 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts. Valassis's assertion that NAM overcharged CPGs has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments. *See* Reply 4 & n.2. Indeed, Valassis, as a competitor, would *benefit* from higher prices to CPGs. *See* Mot. 10–11 & n.4; Reply 4 n.2. Far from claiming any injury on the basis of alleged overcharges, Valassis's damages model contemplates that Valassis would be able to charge CPGs *more* in the "but-for" world absent NAM's challenged conduct than the supposedly supra-competitive prices that NAM charged in the real world. Ex. 51 at 195:22–196:17, 199:8–14, 238:20–23, 239:16–21.

155.     Not having obtained critical mass, Valassis could not exert meaningful

competitive pressure on News's ability to overcharge CPGs, as demonstrated by the admissions

of News's executives that they did not consider Valassis's ISP prices to be relevant to their

pricing decisions. Levy Ex. 20, Verdun Dep. Tr. at 86:9-12; Levy Ex. 18, Schulman Dep. Tr. at

88:24-89:4.

> **RESPONSE TO PARAGRAPH 155:** Paragraph 155 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts. Valassis's assertion that NAM overcharged CPGs has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer

payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit* from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from claiming any injury on the basis of alleged overcharges, Valassis's damages model contemplates that Valassis would be able to charge CPGs *more* in the "but-for" world absent NAM's challenged conduct than the supposedly supra-competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17, 199:8–14, 238:20–23, 239:16–21.

156.    In fact, News was able to raise prices from 2007 through 2013, despite Valassis's

entry in the ISP market.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 26; Levy Ex. 103, NAM-

VAL14-007305095, at 097; Levy Ex. 7, Aversano Dep. Tr. at 184:7-20.

> **RESPONSE TO PARAGRAPH 156:**  Paragraph 156 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's assertion that NAM overcharged CPGs has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit* from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from claiming any injury on the basis of alleged overcharges, Valassis's damages model contemplates that Valassis would be able to charge CPGs *more* in the "but-for" world absent NAM's challenged conduct than the supposedly supra-competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17, 199:8–14, 238:20–23, 239:16–21.

157.    According to Dr. MacKie-Mason's economic analysis, if an ISP provider had

been able to compete with News, ISP prices would have decreased, and output increased.  Levy

Ex. 1, MacKie-Mason Aff. Rep. at 124-25.

> **RESPONSE TO PARAGRAPH 157:**  Paragraph 157 is immaterial to NAM's motion for summary judgment, which asserts only that Valassis's claims fail because its only claimed damages are attributable entirely to lawful, competitive conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's assertion that NAM overcharged CPGs has nothing to do with the alleged injury for which Valassis seeks damages here—lost profits caused by NAM's retailer payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit* from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from claiming any injury on the basis of alleged overcharges, Valassis's damages model contemplates that Valassis would be able to charge CPGs *more* in the "but-for" world absent NAM's challenged conduct than the supposedly supra-competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17, 199:8–14, 238:20–23, 239:16–21.

158.    News's domination of the ISP market stifled innovation, to the detriment of

CPGs.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 126; Levy Ex. 133, VAL2-NAM16-000518424,

at slide 6); Levy Ex. 40, Watson Dep. Tr. at 256:14-24.

> **RESPONSE TO PARAGRAPH 158**:  Paragraph 158 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's
> assertions about supposed injuries to "CPGs" from an alleged "stifl[ing]" of
> innovation have nothing to do with the alleged injury for which Valassis seeks
> damages here—lost profits caused by NAM's retailer payments.  Reply 4 n.2.

159.    News has not introduced innovative, new ISP products while competitors News

has excluded did (i.e., Floorgraphics's floor signs; Insignia's price signs; Valassis's Wedge).

Levy Ex. 1, MacKie-Mason Aff. Rep. at 126.

> **RESPONSE TO PARAGRAPH 159**:  Paragraph 159 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.

160.    In 2012, CPGs themselves sued News for monopolizing the ISP market and

harming CPGs by charging higher prices.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 126.  *See*,

*e.g.*, Levy Ex. 33, Corsiglia-Keim Dep. Tr. at 278:3-15.

> **RESPONSE TO PARAGRAPH 160**:  Paragraph 160 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  Valassis's
> assertion that NAM overcharged CPGs has nothing to do with the alleged injury
> for which Valassis seeks damages here—lost profits caused by NAM's retailer
> payments.  *See* Reply 4 & n.2.  Indeed, Valassis, as a competitor, would *benefit*
> from higher prices to CPGs.  *See* Mot. 10–11 & n.4; Reply 4 n.2.  Far from
> claiming any injury on the basis of alleged overcharges, Valassis's damages
> model contemplates that Valassis would be able to charge CPGs *more* in the "but-
> for" world absent NAM's challenged conduct than the supposedly supra-
> competitive prices that NAM charged in the real world.  Ex. 51 at 195:22–196:17,
> 199:8–14, 238:20–23, 239:16–21.

161.    CPGs presented sufficient evidence of News's anticompetitive conduct and harm

to CPGs to survive summary judgment.  Levy Ex. 1, MacKie-Mason Aff. Rep. at 126; *Dial v.*

*News*, 165 F. Supp. 3d 25, 33 (S.D.N.Y. 2016).

> **RESPONSE TO PARAGRAPH 161:**  Paragraph 161 is immaterial to NAM's
> motion for summary judgment, which asserts only that Valassis's claims fail
> because its only claimed damages are attributable entirely to lawful, competitive
> conduct—above-cost and non-predatory bidding for retailer contracts.  The fact
> that a different set of plaintiffs, alleging a different theory of damages, premised
> on different claimed injuries, was able to survive a different motion for summary
> judgment in a different case has no bearing on the outcome of NAM's motion.

Dated:  June 15, 2018                     Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP

By:  /s/ Kenneth A. Gallo
Kenneth A. Gallo (kgallo@paulweiss.com)
Jane B. O'Brien (jobrien@paulweiss.com)
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300

William B. Michael (wmichael@paulweiss.com)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Counsel for Defendants*