UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
VALASSIS COMMUNICATIONS, INC.,

                       Plaintiff,                              17-cv-7378 (PKC)

          -against-

                                            OPINION AND
                                            <u>ORDER</u>

NEWS CORPORATION, et al.,

                       Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        When a consumer enters a supermarket, she may see an instant coupon dispenser

on a shelf or a cardboard structure in an aisle promoting a specific product.  These types of

displays are generically referred to as in-store promotions ("ISPs").  Providers of ISPs pay

supermarket retailers for the exclusive right to place ISPs in the retailer's entire chain of stores.

Having locked up the chain, the ISP provider then markets its ability to place ISPs to

manufacturers and distributers of consumer packaged goods ("CPGs").  CPGs then pay ISP

providers to place ISPs for their products into the retailer's stores.  In addition to supermarkets

(i.e. the "food" segment), similar arrangements are made in the "drug" and "dollar" segments of

the ISP market.

        One ISP provider, Valassis Communications, Inc., brings an assortment of claims,

including, monopolization, predatory pricing, and exclusive dealing claims, against the dominant

player in the market, News Corporation and its affiliates (collectively, "News").[1]

---

[1] The affiliates named as defendants are News America Marketing, News America Marketing FSI L.L.C., and News America Marketing In-Store Services L.L.C.

News now moves for summary judgment dismissing all of Valassis's claims.  For reasons that will be explained, that motion will be granted in part and denied in part.

THE COMPLAINT AND THE PROCEDURAL HISTORY OF THE ACTION

For most of its life, this action has been pending in the Eastern District of Michigan.  Three years and ten months after filing, it was transferred to this district and assigned to the undersigned.

Valassis alleged eight counts of federal antitrust violations and eight counts of state law violations, numbered below according to the complaint.  Specifically, Valassis alleged violations of sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act: (I) monopolization of the ISP market in violation of 15 U.S.C. § 2; (II) predatory pricing in the ISP market in violation of 15 U.S.C. § 2; (III) attempted monopolization of the market for free-standing inserts ("FSIs"), a form of coupon distribution, in violation of 15 U.S.C. § 2; (IV) exclusive dealing with retailers in the ISP market in violation of 15 U.S.C. §§ 1&2 and 15 U.S.C. § 14; (V) exclusive dealing with CPGs in the ISP market in violation of 15 U.S.C. §§ 1&2 and 15 U.S.C. § 14; (VI) exclusive dealing with CPGs in the FSI market in violation of 15 U.S.C. §§ 1&2 and 15 U.S.C. § 14; (VII) bundling in violation of 15 U.S.C. §§ 1&2 and 15 U.S.C. § 14; and (VIII) tying in violation of 15 U.S.C. § 1 and 15 U.S.C. § 14.  Valassis also alleged state law claims under (IX) the Michigan Antitrust Reform Act, (X) the California Cartwright Act, (XI) the California Unfair Trade Practices Act, (XII) the common law of unfair competition, and (XIII)-(XVI) the common law of tortious interference.

Judge Tarnow, to whom the case was then assigned, dismissed Valassis' bundling and tying claims (Counts VII and VIII) and later transferred the suit to the Southern District of New York.  (Docs. 60; 115).

Valassis has confirmed that it is no longer pursuing its FSI-related claims.  (Doc. 131; Oct. 20, 2017 Tr. at 4:9-11).  The Court accordingly dismisses Counts III, VI, and XI.  With respect to the remaining claims, News's motion will be granted with respect to so-called predatory bidding allegations and otherwise denied.

THE UNDISPUTED FACTS

The following facts are undisputed except where otherwise noted.  The Court has drawn all reasonable inferences in favor of Valassis, as the nonmovant.  See Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).

Both Valassis and News are in the business of selling ISPs, in-store promotions, to CPGs.  (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1).  ISP providers place such things as shelf signs and coupon machines into retail stores.  (Id.).  To place ISPs into retail stores, ISP providers must obtain contracts with individual retailers.  (Pl. 56.1 ¶ 25; Def. 56.1 Resp. ¶ 25).  CPGs then purchase these ISPs from the ISP providers and use them to advertise CPG products in the retail stores.  (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1).

*News's Alleged Anticompetitive Conduct*

News entered the ISP market in 1997 and has been the dominant player in the market since its entry.  (Pl. 56.1 ¶¶ 24, 31, 35; Def. 56.1 Resp. ¶¶ 24, 31, 35).  During the period at issue, News had only one competitor as an ISP provider, Valassis.  (Id.).  Over the course of Valassis's ISP business, Valassis and News competed in the "food," "drug," and "dollar" segments of the ISP market.  (Levinsohn Report at Ex. 10).

News engaged in a variety of conduct that Valassis alleges was anticompetitive.  This conduct includes entering into long-term contracts with retailers; staggering the expiration dates of those contracts; employing exclusivity provisions; employing "wind-down" provisions

that allowed News's presence at retailer stores to continue past the contract end date; employing autorenewal provisions; preemptively renewing contracts with retailers before the contracts expired; employing provisions that prohibited retailers from discussing potential contracts with News's competitors; obtaining long-term, exclusive commitments from CPGs; and increasing its guaranteed commissions to retailers to win contracts while Valassis was a market participant (collectively, the "alleged anticompetitive conduct").  (Def. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20; Pl. 56.1 ¶¶ 66-69, 70-89, 99-114; Def. 56.1 Resp. ¶¶ 66-69, 70-89, 99-114).  News's current CEO has highlighted some of this conduct when discussing News's "proven strategy," noting that News aims to "secure long-term retail deals where the revenue-share remains constant over the term of the agreement[,] . . . [and] stagger the deals to prevent a large percentage of the network from being vulnerable at any specific point in time."  (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51).[2]

News's exclusive long-term contracts with food retailers averaged 4.5 years in length.  (Pl. 56.1 ¶ 72; Def. 56.1 Resp. ¶ 72).  Some contracts, like those with Ahold, Kroger, and Safeway, ranged from seven to ten years.  (Pl. 56.1 ¶¶ 51, 80; Def. 56.1 Resp. ¶¶ 51, 80).  These contracts employed exclusivity provisions, which News's Vice President of Sales has described as "the crux of [News's] agreement and payment model."  (Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69).

---

[2] News argues that statements made by News's CEO prior to February 4, 2010 (Pl. 56.1 ¶¶ 43, 51, 85) are inadmissible at trial, and thus should not be considered on summary judgment, as a result of a settlement agreement signed on that date by Valassis and News.  In the settlement agreement, Valassis released all then-existing claims against News.  (Doc. 244-5).  Though the statements by News's CEO were made in 2004 and 2007, Valassis's present claims do not arise from these statements or the conduct described therein.  Instead, the statements are offered and considered as some evidence of News's understanding of market dynamics and later intent in adopting market strategies.  In an analogous context, the Second Circuit has held that where the statute of limitations for a Title VII employment discrimination claim expired on a certain date, "any discrete acts occurring before that date are not actionable," but a court may still consider those acts as relevant "background evidence."  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176 (2d Cir. 2005); see also Domenech v. New York City Employees' Ret. Sys., No. 15-CV-2521 (ILG), 2016 WL 2644892, at *4 (E.D.N.Y. May 9, 2016) ("Although [plaintiff's] attempted termination is not actionable (the plaintiff released that claim as part of a settlement), . . . it is evidence of retaliatory intent.").
.

News preemptively renewed contracts with CVS, Kroger, and others as part of what News called "Project Preempt," years before they were set to expire because News "[didn't] want deals to get . . . close to expiration" for fear of losing the contract to Valassis.  (Pl. 56.1 ¶¶ 75-78 , 81-83, 89, 111-112; Def. 56.1 Resp. ¶¶ 75-78, 81-83, 89, 111-112).  News sometimes used these preemptive renewals to effectuate the staggering of end dates on its retailer contracts.  (Pl. 56.1 ¶¶ 85, 89; Def. 56.1 Resp. ¶¶ 85, 89).  Some retailer contracts never became available during Valassis's tenure, including contracts with Safeway and Kroger, the largest food retailer in the ISP market.  (Pl. 56.1 ¶¶ 79, 108-09, 111, 113; Def. 56.1 Resp. ¶¶ 79, 108-09, 111, 113).  When retailer contracts did become available, News competed with Valassis for these contracts by increasing its guaranteed retailer commissions "to protect [its] store network."  (Pl. 56.1 ¶¶ 83, 91-94; Def. 56.1 Resp. ¶¶ 83, 91-94).  Further, pursuant to its long-term, exclusive contracts with CPGs, News held CPGs to the number of stores for which they contracted, regardless of whether News lost retailers to Valassis.  (Pl. 56.1 ¶¶ 101-04; Def. 56.1 Resp. ¶¶ 101-04).

*Valassis's Exit From the ISP Market*

In order to become a viable competitor in the ISP business in the long run, an ISP provider must obtain more than just a few retailers—it must obtain a "critical mass."  (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51).  To achieve such a critical mass, an ISP provider must accumulate a large number of retailers and establish a retailer network that has nationwide reach; the retailers should be high quality retailers (i.e. retailers that sell a relatively high volume of products and thus have a high "all commodities volume" ("ACV")).  (Pl. 56.1 ¶¶ 44-48; Def. 56.1 Resp. ¶¶ 44-48).  Without a critical mass of retailers, a new ISP provider will not be able to attract enough CPG spending to generate the revenue needed to contract with more retailers.  (Pl. 56.1 ¶ 49; Def. 56.1 Resp. ¶ 49).  In discussing News's strategy, its current CEO has acknowledged that

"[a] big part of being successful with our [CPG] clients is having the critical mass to deliver promotions that move volume." (Pl. 56.1 ¶ 43; Def. 56.1 Resp. ¶ 43). News's liability expert, Kevin Murphy, has similarly opined that an ISP provider with a large retail network has a "natural advantage" when competing with an operator of a smaller network. (Def. 56.1 ¶¶ 5, 21; Pl. 56.1 Resp. ¶¶ 5, 21). In its brief, News acknowledges that "[a]ccess to retailers is a key input for an ISP business." (Def. Brief at 6).

Valassis entered the ISP business in 2010. (Def. 56.1 ¶¶ 2-3; Pl. 56.1 Resp. ¶¶ 2-3). During its tenure, Valassis obtained contracts with retailers that included Supervalu, A&P, Winn-Dixie, Rite Aid, and Family Dollar. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4). Valassis's ISP business was profitable over the first three quarters. (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5). However, Valassis was unable to obtain a critical mass of retailers and exited the food ISP segment in 2014 and the drug segment in 2015. (Pl. 56.1 ¶¶ 136-42; Def. 56.1 Resp. ¶¶ 136-42). Valassis now only places signs in Family Dollar. (Id.).

Valassis's liability expert, Jeffrey MacKie-Mason, opined that News's conduct ensured that no ISP provider was ever able to secure a critical mass of retailers and that but for News's anticompetitive conduct, it is "highly likely" that Valassis would have reached critical mass, remained profitable, and persisted as a viable competitor to News. (Pl. 56.1 ¶¶ 50, 105, 143-47; Def. 56.1 Resp. ¶¶ 50, 105, 143-47). Moreover, News's current CEO has suggested that the goal of News's strategy was to make it more difficult for competitors to obtain a critical mass of retailers. Specifically, he stated that "[News's strategy] means that any competitor who wants to develop critical mass for their network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way." (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51). Additionally, he stated "[News's] strategy serves as a

deterrent to other major competitors from joining the In-Store fray—because they know that it will be a long hard fought, drawn out process to develop the critical mass necessary to be successful in this arena."  (Pl. 56.1 ¶ 43; Def. 56.1 Resp. ¶ 43).

Valassis's employees have testified that Valassis's lack of critical mass led to its inability to succeed as an ISP provider.  (Pl. 56.1 ¶¶ 118-19; Def. 56.1 Resp. ¶ 118-19).  Valassis's internal surveys indicate that some CPGs did not contract with Valassis because of its limited retailer network and lack of coverage.  (Pl. 56.1 ¶¶ 117; Def. 56.1 Resp. ¶¶ 117).  Prior to Valassis's entry, News had two other competitors in the ISP business, Floorgraphics and Insignia.  (Pl. 56.1 ¶¶ 34, 52, 145; Def. 56.1 Resp. ¶¶ 34, 52, 145).  According to MacKie-Mason, both exited the ISP business within a few years of entry because they were also unable to obtain a critical mass of retailers.  (Id.).

While Valassis was unable to attract CPG revenue due to a lack of critical mass, Valassis's costs increased as a result of competing with News's guaranteed retailer commissions. (Pl. 56.1 ¶¶ 90, 97, 101, 105, 125, 129-136; Def. 56.1 Resp. ¶¶ 90, 97, 101, 105, 125, 129-136). As a result, Valassis eventually began losing money.  (Pl. 56.1 ¶¶ 131, 136; Def. 56.1 Resp. ¶¶ 131, 136).  Valassis's exit from the market injured its relationship with some CPGs.  (Pl. 56.1 ¶ 140; Def. 56.1 Resp. ¶ 140).  According to MacKie-Mason, had Valassis persisted, CPGs would have enjoyed lower prices, higher quality, more choices, and more innovation.  (Pl. 56.1 ¶¶ 148-61; Def. 56.1 Resp. ¶¶ 148-61).

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit

under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

"In the context of antitrust cases, summary judgment may be appropriate because protracted litigation chills pro-competitive market forces." Dial Corp. v. News Corp., 165 F.

Supp. 3d 25, 29 (S.D.N.Y. 2016) (citing PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101, 104 (2d Cir. 2002)). "All inferences drawn in favor of the non-movant 'must be reasonable in light of competing inferences of acceptable conduct.'" Id. (citing Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1995)).

DISCUSSION

I.     Valassis's Federal Antitrust Claims

Valassis asserts that News engaged in a variety of anticompetitive conduct, which ultimately prevented Valassis from obtaining a critical mass of retailers and forced it to exit the ISP business in violation of sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. News argues that this Court should grant summary judgment in its favor on Valassis' federal antitrust claims because Valassis has not presented evidence upon which a reasonable jury could find that Valassis suffered antitrust injury.

Specifically, News argues that it did not engage in predatory pricing as a matter of law and because all of Valassis's damages result from News's alleged predatory pricing, Valassis suffered no antitrust injury and summary judgment is warranted on all of Valassis's federal claims. Viewing the summary judgment record as a whole and drawing every reasonable inference in favor of Valassis as the non-movant, the Court concludes that Valassis has not presented sufficient evidence that News engaged in predatory pricing through its use of retailer commissions and thus dismisses Valassis's standalone predatory pricing claim under section 2 of the Sherman Act (Count II). However, the Court holds that a reasonable trier of fact could find that Valassis suffered antitrust injury as a result of the other alleged anticompetitive conduct. Accordingly, this Court denies News's motion as to the remaining federal antitrust claims.

a.   The Price-Cost Test Disposes of Valassis's Standalone Claim of Predatory
Pricing and Bars Consideration of News's Retailer Commissions as Part of
a "Monopoly Broth"

In its motion papers, Valassis urges the Court not to analyze News's retailer

payments in isolation and to instead consider the payments as "only one part of a broader,

mutually reinforcing, exclusionary scheme."  (Pl. Br. at 22).  Valassis argues that the Court

should apply the rule of reason analysis to News's "monopoly broth" of conduct rather than the

price-cost test for predatory pricing or bidding as articulated in Brooke Grp. Ltd. v. Brown &

Williamson Tobacco Corp., 509 U.S. 209 (1993) and Weyerhaeuser Co. v. Ross-Simmons

Hardwood Lumber Co., 549 U.S. 312 (2007).  But Valassis plainly puts forth a standalone claim

of "Predatory Pricing in the ISP Market (Retailers)" under section 2 of the Sherman Act

(Complaint, Count II).  The Court concludes that the price-cost test applies to Valassis's

predatory pricing claim and dismisses Count II because Valassis has not presented sufficient

evidence to satisfy that test.  Moreover, the Court concludes that even with respect to claims

where Valassis has asserted a "monopoly broth" of conduct, a pricing or bidding practice cannot

properly be considered part of that "broth" unless the practice is predatory under the price-cost

test.

i.   Valassis Has Not Presented Sufficient Evidence to Establish That
News's Retailer Payments Are Predatory Under the Price-Cost Test

Predatory pricing and predatory bidding claims are analytically similar, and are

both governed by the price-cost test.  Weyerhaeuser, 549 U.S. at 321.  Predatory pricing is a

strategy whereby the predator "reduces the sale price of its product (its output) to below cost,

hoping to drive competitors out of business," and then when the "competition is vanquished,"

raises output prices to recoup what it lost.  Id. at 318.  To succeed on a claim of predatory pricing

under section 2 of the Sherman Act, a plaintiff must show that (1) "the prices complained of are

below an appropriate measure of [the defendant's] costs" and (2) "the [defendant] had . . . a dangerous probability[] of recouping its investment in below-cost prices." Brooke Grp., 509 U.S. at 223–24.

Predatory "bidding" occurs on the input side of the market rather than the output side.[3]  Weyerhaeuser, 549 U.S. at 320.  The strategy of a predatory bidder is to purchase inputs at such high prices that "rival buyers cannot survive (or compete as vigorously)" and then when the predatory bidder obtains "monopsony" power (a buyer's monopoly), it will either purchase its inputs at prices "below the competitive level" or increase its prices in the output market to recoup what it lost. Id. at 320-21, 321 n.2.  To succeed on a claim of predatory bidding, a plaintiff must show that (1) "the alleged predatory bidding led to below-cost pricing of the predator's outputs" and (2) "the defendant has a dangerous probability of recouping the losses incurred in bidding up input prices." Id. at 325.

The price-cost test applies to Count II of Valassis's complaint, the standalone predatory pricing claim.  In Count II of its complaint, Valassis alleges that News engaged in "predatory pricing" in violation of section 2 of the Sherman Act by offering cash "guarantees" to certain retailers "for access to the retailers' aisle space . . . in order to prevent the retailers from awarding . . . contracts to Valassis."  (Compl't ¶ 350).  Valassis further alleges that the guarantees caused News's "incremental cost of . . . ISPs sold to CPGs for placement in those retailers' stores[] to exceed News's revenues generated in the sale of those outputs to CPGs."  (Compl't ¶ 351).  Valassis does not allege any other exclusionary conduct on the part of News in Count II nor does it purport that the retailer payments were part of any "monopoly broth" or

---

[3] "Bidding," in this context, is a short-hand term for the process of purchasing a unit of input.  Here, the negotiation and determination of payments by ISP providers to retailers constitute the "bidding," while the prices ISP providers charge CPGs for ISP products are the "pricing."

exclusionary scheme in Count II.  News's payments to retailers constitute transactions for the purchase of inputs by News from retailers—the inputs being access to retailer aisles.  (See Def. Brief at 6 ("Access to retailers is a key input for an ISP business.")).  As such, Valassis's claim of "predatory pricing" based on these payments is properly analyzed under the price-cost test discussed in Weyerhaeuser for predatory bidding.[4]

Count II must be dismissed because Valassis has not presented evidence which would permit a reasonable jury to conclude that News's retailer guarantees were predatory under the price-cost test.  News challenges the sufficiency of Valassis's evidence only with respect to the first prong of the Weyerhaeuser price-cost test.  In other words, News challenges whether the retailer payments "led to below-cost pricing of [News's] outputs"—these outputs being the ISPs News sells to CPGs.

Valassis's primary evidence of predatory bidding is the expert opinion of Jeffrey MacKie-Mason.  MacKie-Mason opines that News's retailer payments increased when Valassis entered the ISP market and decreased when Valassis left.  (MacKie-Mason Report at 96-97). MacKie-Mason chose to focus on the profitability of the specific retailer contracts that News won over Valassis in determining whether News's retailer payments were predatory, rather than the effect of retailer payments to News's ISP business as a whole.[5]  (MacKie-Mason Rebuttal Report at 11).  He ultimately concludes that News's bids to certain retailers were predatory.  To

---

[4] Valassis argues that Weyerhaeuser is inapposite because Weyerhaeuser "did not concern a defendant that could leverage a monopsony over inputs to secure monopoly over outputs," citing footnote 2 of the Weyerhaeuser decision.  (Pl. Br. at 22-23, 24 n.18).  Footnote 2 appears to discuss the second prong of the price-cost test (recoupment), making the observation that monopsonists may recoup their costs after the exit of a rival either by decreasing payments on inputs or increasing prices on outputs.  Weyerhaeuser, 549 U.S. at 321 n.2.  Nowhere in Weyerhaeuser does the Court indicate that it intended to limit the application of the price-cost test to monopsonists that did not also wield monopoly power in the output market.  The Court declines to read Weyerhaeuser so narrowly.

[5] It is undisputed that News's ISP business, as a whole, has been profitable in every year.  (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6).

reach this conclusion, he adopts the Ordover-Willig definition of predation, which provides: "Predatory objectives are present if a practice would be unprofitable without the exit it causes, but profitable with the exit. Thus, although a practice may cause a rival's exit, it is predatory only if the practice would not be profitable without the additional monopoly power resulting from the exit." (MacKie-Mason Report at 97).

To determine whether News's retailer payments would be "unprofitable without the exit," MacKie-Mason assumes that the prices News would have charged CPGs for ISP products would have been lower than the prices News actually charged had Valassis not exited the ISP market. (MacKie-Mason Report at 98). He refers to this hypothetical price as the "competitive ISP price." (Id.). MacKie-Mason does not quantify what the competitive ISP price is, rather he calculates the profitability of each of News's contested retailer contracts in the event that the competitive price is 10%, 15%, 20%, 30%, and 40% below actual ISP prices. (Id.). In deposition, MacKie-Mason clarified that he does not opine that News's prices would actually have dropped by 10%-40% had Valassis remained in the market and that he opines only to what News's profitability would have been in the event that the prices dropped 10%-40%. (MacKie-Mason Dep. at 17:7-18:5). Unsurprisingly, the lower that MacKie-Mason assumed the competitive price to be, the more retailer payments turned out to be "predatory" by his calculations. (MacKie-Mason Report at 101-02). Because he renders no opinion as to what the competitive price should be, it is unclear which retailer payments, aside from Kmart, he concludes were actually predatory. (See id.).[6]

---

[6] MacKie-Mason concludes that the Kmart payment was exclusionary, that the Ingles payment and the Giant Eagle payment were the "next-most likely offers to have been exclusionary," while "the next-most likely" were the 2015 BI-LO/Winn Dixie payment and the 2011 Delhaize payment. (MacKie-Mason Rebuttal Report at 30).

MacKie-Mason's opinion does not create a genuine dispute of material fact as to whether News employed predatory bidding.  To the extent that MacKie-Mason's analysis is an application of the first prong of the price-cost test, he strays from the standard adopted by this Circuit and others.[7]  See, e.g., Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, 88 (2d Cir. 1981) (adopting the Areeda & Turner test); (MacKie-Mason Dep. at 188:11-13 (I'm not using Areeda & Turner, no.")).  Moreover, his standard is contrary to Weyerhaeuser and the policy considerations underlying it.  In Weyerhaeuser, the parties were competing sawmills.  Weyerhaeuser, 549 U.S. at 314-15.  The plaintiff argued that the defendant drove it out of business by "bidding up the price of sawlogs [a necessary input] to a level that prevented [the plaintiff] from being profitable."  Id.  The district court had held that the jury could have reasonably concluded that defendant's conduct was anticompetitive, reasoning in part, as MacKie-Mason does now, that the defendant's conduct "made economic sense only because of its anticipated adverse effect upon competition."  Washington Alder LLC v. Weyerhaeuser Co., No. CV 03-753-PA, 2004 WL 1717650, at *2 (D. Or. July 27, 2004) (emphasis added).  The Ninth Circuit affirmed.  In reversing, the Supreme Court held that the price-cost test, as enunciated in Brooke Group, applied to predatory bidding claims.  Weyerhaeuser, 549 U.S. at 325.  Elaborating on the first prong of the test, the Court noted that "bidding on the buy side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs" and "only higher bidding that leads to below-

---

[7] The Second Circuit has adopted what has become known as the Areeda & Turner test.  Irvin Indus., Inc. v. Goodyear Aerospace Corp., 974 F.2d 241, 245 (2d Cir. 1992).  This test compares the actual prices charged for output against reasonably anticipated average variable cost.  Id.; see also Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, 88 (2d Cir. 1981) ("We agree with Areeda and Turner that in the general case at least, the relationship between a firm's prices and its marginal costs provides the best single determinant of predatory pricing.  Thus, prices below reasonably anticipated marginal cost will be presumed predatory, while prices above reasonably anticipated marginal cost will be presumed non-predatory.  And because marginal cost cannot be determined from conventional accounting methods, we will use average variable cost as its surrogate.") (citations omitted) (footnote omitted).

cost pricing in the relevant output market will suffice as a basis for liability for predatory bidding." Id.

As the Supreme Court noted, "higher bidding that does not result in below-cost output pricing" may have anticompetitive effects, but such conduct is "beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate procompetitive conduct." Id. The Court was explicit in its desire to create a bright-line rule with which competitors could comply when engaging in pricing and bidding practices. The test put forth by MacKie-Mason to evaluate News's retailer payments injects speculation and complexity into the price-cost test, requiring a competitor to predict what "competitive prices" would look like if a rival were to successfully enter the market before determining the lawfulness of a retailer payment. Such speculation risks chilling legitimate pricing and bidding practices that the Supreme Court has labeled "the very essence of competition." Id. at 323. A reasonable jury could not find predatory bidding in light of Weyerhaeuser.

Without hypothesizing competitive ISP prices, and instead using actual prices, MacKie-Mason testified that, with the exception of Kmart, he did not identify "any retail contracts [to be] predatory before [] adjust[ing] the real-world prices downward." (Pl. 56.1 ¶ 95; Def. 56.1 Resp. ¶ 95; MacKie-Mason Dep. at 39:16-40:1). In his rebuttal report, MacKie-Mason acknowledges that his "analysis of the profitability of News's offers at status quo prices is virtually identical to News's own analysis of the profitability of its offers." (MacKie-Mason Rebuttal Report at 15). News's internal profit and loss analyses ("P&L" reports) were prepared before making a contract proposal to a retailer and projected whether the offer to the retailer would be profitable to News. (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7). From 2010 onward, it is

undisputed that the P&L reports projected that News expected to make a profit on every offer it made to a retailer, except for Kmart.  (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11).

On the Kmart contract, Valassis asserts that News's P&L report projected the contract to be unprofitable.[8]  Though News disputes the implications of the Kmart P&L, the disagreement does not amount to a genuine dispute of material fact because evidence of below-cost pricing related to "a single bid for a single contract" is not sufficient to support a predatory bidding claim.  Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC, 414 F. App'x 334, 336–37 (2d Cir. 2011) (summary order) (affirming the dismissal of a predatory pricing claim and noting that "[i]n a business environment in which the competing parties have entered into numerous contracts with numerous parties for the provision of rented advertising space, an allegation that one of those contracts provides below-cost prices for services is insufficient to allege predatory pricing").

Valassis also cites to the ultimate profitability of the fourteen contracts that News won over Valassis.  Eight of these fourteen contracts turned out to be profitable for News, while the other six turned out to be unprofitable.  (MacKie-Mason Report at Ex. 73).  The parties' experts agree that in analyzing whether retailer payments were predatory, the proper standard looks to the expected profitability at the time the retailer payment is made, not the ultimate profitability of that contract ex post.  (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10).  Though ex post profitability of a contract is relevant, the fact that a minority of contested contracts ultimately were unprofitable for News, without more, is not sufficient evidence to permit a reasonable jury to find that News engaged in predatory bidding.  Count II is dismissed.

---

[8] In projecting the profitability of the Kmart contract, News created five scenarios under different sets of projected parameters.  (MacKie-Mason Report at 100-01).  In two of the scenarios, News projected a loss with incremental profit margins of -138% and -60%.  In three of the scenarios, News estimated earning incremental profit margins of 1.1% to 9%.  (Id.).

ii.   The Price-Cost Test Bars Consideration of News's Retailer
Payments in a "Monopoly Broth"

Valassis urges that the price-cost test has no bearing where Valassis claims that

News's retailer payments were only one ingredient in a "monopoly broth" of misconduct and

that the Court should apply the rule of reason to the entire broth regardless of whether the retailer

payments comport with the price-cost test.  The Court acknowledges the Third Circuit's holding

in ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 269 (3d Cir. 2012) and Judge Pauley's holding

in Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 32 (S.D.N.Y. 2016), which Valassis has cited

for the proposition that the price-cost test applies only where predatory pricing is not the "clearly

predominant mechanism of exclusion."

The Court also acknowledges that in analyzing antitrust claims alleging a variety

of anticompetitive conduct, courts must tow the line between two competing considerations.

First, the Court must avoid "tightly compartmentalizing the various factual components" of a

plaintiff's claims and "wiping the slate clean after scrutiny of each."  City of Groton v.

Connecticut Light & Power Co., 662 F.2d 921, 928–29 (2d Cir. 1981) (quoting Continental Ore

Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962)).  At the same time, it is

unlikely that multiple independently lawful acts can come together to create an unlawful

monopoly "broth" from which antitrust injury can arise.  See Pac. Bell Tel. Co. v. Linkline

Commc'ns, Inc., 555 U.S. 438, 457 (2009) (holding "price-squeezing" claims not cognizable

under the Sherman Act); see also City of Anaheim v. S. California Edison Co., 955 F.2d 1373,

1376 (9th Cir. 1992) ("[I]f all we are shown is a number of perfectly legal acts, it becomes much

more difficult to find overall wrongdoing.").

In Linkline, the defendant was a DSL internet provider that owned infrastructure

and facilities needed to provide DSL service to DSL customers.  Linkline, 555 U.S. at 442-43.

- 17 -

Plaintiffs were competing DSL providers, who leased infrastructure from the defendant.  Id. Plaintiffs brought suit alleging that the defendant raised its wholesale prices on infrastructure and lowered its retail prices for DSL services so as to unlawfully "squeeze" plaintiffs' profit margins and force them out of business in violation of section 2 of the Sherman Act.  Id.  The Supreme Court rejected plaintiffs' price squeezing claim because the claim was merely "an amalgamation of a meritless claim at the retail level"—i.e. a predatory pricing claim where pricing was not below cost—"and a meritless claim at the wholesale level"—i.e. a refusal to deal claim where the defendant had no antitrust duty to deal.  Id. at 452.  It reasoned that "[i]f there is no duty to deal at the wholesale level and no predatory pricing at the retail level, then a firm is certainly not required to price both of these services in a manner that preserves its rivals' profit margins."  Id. at 457 ("Two wrong claims do not make one that is right.").  Of particular relevance, the Supreme Court noted that "[r]ecognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm the Court sought to avoid in Brooke Group: Firms might raise retail prices or refrain from aggressive price competition to avoid potential antitrust liability."  Id. at 451-52.

In monopoly broth claims, it is not the case that "if there is a fraction of validity to each of [a plaintiff's] claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act."  City of Groton, 662 F.2d at 928–29.  Rather, "[t]he proper inquiry is whether, qualitatively, there is a 'synergistic effect.'" Id. (citing Northeastern Telephone Co. v. American Telephone & Telegraph Co., 651 F.2d 76, 95 n.28 (2d Cir. 1981)).  If the evidence underlying each form of alleged anticompetitive conduct is "utterly lacking," there can be no synergistic effect.  Northeastern Telephone, 651 F.2d at 95 n.28 (acknowledging the requirement that courts not "tightly compartmentalize" a plaintiff's

claims but nonetheless determining that there was no synergistic effect where the plaintiff alleged a variety of exclusionary conduct including predatory pricing).

That a defendant's pricing or bidding practices pass muster under the price-cost test does not immunize other anticompetitive conduct.  See Dial Corp., 165 F. Supp. 3d at 32; ZF Meritor, 696 F.3d at 269, 278 ("Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a per se rule of non-liability under the antitrust laws for all contractual practices that involve above-cost pricing. . . . Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful."); see also Northeastern Telephone, 651 F.2d at 95 (holding that plaintiff failed to prove that five of six types of conduct were anticompetitive, including the defendant's pricing practices, and remanding for a new trial on the sixth alleged method of exclusion).  But, in this Court's view, the price-cost test applies even when pricing is not the "predominant method of exclusion."

Though the law prohibits courts from "tightly compartmentalizing" Valassis's individual allegations of anticompetitive conduct and "wiping the slate clean" after evaluation of each, not all actions of an alleged violator may be properly considered by a jury as ingredients in a "monopoly broth."  This is especially so where, as here, Valassis has alleged that one ingredient in the broth is payments to retailers because such payments are so often "the very essence of competition" that the Supreme Court has created an explicit safe harbor to shield such payments from antitrust liability when they do not lead to below-cost pricing.  Weyerhaeuser, 549 U.S. at 323.  Competition on the buy side of the market benefits when high but lawful payments are made by ISP providers to retailers.  Id. at 324 n.4 ("Higher prices for inputs

obviously benefit existing sellers of inputs.").  Higher payments by ISP providers permits greater price competition among retailers leading to lower prices for retail consumers.

If the Court were to allow Valassis to present to the jury a monopoly broth claim inclusive of News's retailer payments, no jury instruction the Court could give regarding how to evaluate those payments would prevent "courting intolerable risks of chilling legitimate procompetitive conduct." Id. at 325 (warning of the "risk of chilling procompetitive behavior with too lax a liability standard" for predatory bidding).  Like the price-squeezing claim in Linkline, Valassis's monopoly broth claim, if permitted to include retailer payments that do not result in below-cost pricing, "would invite the precise harm the [Supreme Court] sought to avoid in Brooke Group" and Weyerhaeuser.  Linkline, 555 U.S. at 451-52.  Namely, a rational economic actor would temper its bidding for inputs in order to "avoid potential antitrust liability." Id.

Thus, the Court holds that when a pricing or bidding practice is lawful under the price-cost test, the evidence that the practice is anticompetitive is so "utterly lacking" that there can be no synergistic effect between the practice and other alleged anticompetitive conduct.  See Northeastern Telephone, 651 F.2d at 95 n.28.  Pricing or bidding practices that are above-cost under Brooke Group or Weyerhaeuser, therefore, cannot properly be considered an ingredient of a plaintiff's monopoly broth claim.  Whether the alleged anticompetitive conduct that remains can sustain the claim depends on the strength of the evidence underlying that conduct.  See id.

      b.  Valassis Has Presented Sufficient Evidence of Antitrust Injury with Respect to its Remaining Federal Antitrust Claims

News argues that Valassis has failed to show antitrust injury with respect to the remaining federal antitrust claims (Counts I, IV, V) because Valassis's damages expert, James Levinsohn, attributes all of Valassis's damages to News's retailer payments.  This Court

concludes Valassis has presented sufficient evidence of antitrust injury stemming from the alleged anticompetitive conduct other than the retailer payments and, in any case, Levinsohn's testimony and report do not attribute all damages to News's retailer commissions.

> i. Valassis Has Presented Sufficient Evidence of Antitrust Injury in the Form of Exclusion From the ISP Market

Though Valassis has brought claims under sections 1 and 2 of the Sherman Act and section 3 of Clayton Act, the requirement that plaintiff show antitrust injury applies to each of these claims.  This is so because under section 4 of the Clayton Act, a plaintiff has a private right of action to sue for damages that result from a violation of the federal antitrust laws.  15 U.S.C. § 15.  Specifically, section 4 provides, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15.  To bring suit under § 4, therefore, a private plaintiff must show that a defendant engaged in anticompetitive conduct and that the plaintiff suffered "antitrust injury" as a result.  Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 339–40 (1990).  To establish antitrust injury, a plaintiff must show that "the injuries alleged would not have occurred but for [the defendant's] antitrust violation."  In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 66 (2d Cir. 2012).  The violation "need not be the *sole* cause of the plaintiffs' alleged injuries."  Id. It need only be "a substantial or materially contributing factor in producing that injury."  Id. (quotation marks omitted).

Importantly, antitrust injury is not merely "injury causally linked to an illegal presence in the market."  Atl. Richfield, 495 U.S. at 334 (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  Rather, antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

unlawful." Id.  A competitor's "[e]xclusion from a market is a conventional form of antitrust

injury" because it is "exactly the type [of injury] that antitrust laws were designed to prevent and

flows from the competition-reducing aspect of [defendant's] conduct." Higgins v. New York

Stock Exch., 755 F. Supp. 113, 116 (S.D.N.Y.), aff'd sub nom. Higgins v. New York Stock

Exch., Inc., 942 F.2d 829 (2d Cir. 1991) (citation omitted); Xerox Corp. v. Media Scis. Int'l, Inc.,

511 F. Supp. 2d 372, 381–82 (S.D.N.Y. 2007); see also Chapdelaine Corp. Secs. & Co. v.

Depository Trust & Clearing Corp., No. 05-CV-10711 (SAS), 2006 WL 2020950, *4 (S.D.N.Y.

July 13, 2006) (noting that exclusion from the market amounts to antitrust injury where the

exclusion resulted from the defendant's alleged anticompetitive conduct and "decreases the

number of alternatives available to consumers of [plaintiff's] products"); Full Draw Prods. v.

Easton Sports, Inc., 182 F.3d 745, 754 (10th Cir.1999) ("[W]e find it hard to imagine a closer

connection between anticompetitive effect and injury than the destruction of [one of two

competitors] and the loss of competition in the . . . market.").

        In parsing the antitrust injury requirement, courts have distinguished the fact of

injury from the amount of damages.  See, e.g., U.S. Football League v. Nat'l Football League,

644 F. Supp. 1040, 1052–53 (S.D.N.Y. 1986), aff'd, 842 F.2d 1335 (2d Cir. 1988) (discussing

"the distinction between proof of antitrust injury and proof of antitrust damages"); Jacobi v.

Bache & Co., 377 F. Supp. 86, 93 (S.D.N.Y. 1974), aff'd, 520 F.2d 1231 (2d Cir. 1975) ("In

order to recover in a private antitrust action under § 4 of the Clayton Act, . . . plaintiffs must

establish a causal connection between the alleged antitrust violation and some injury to them.

This fact of legal injury must be established with certainty, although at this stage the precise

amount of damages may remain somewhat speculative.").

Proof of the fact of injury informs the question of the defendant's liability, while proof of amount in damage determines an award.  Fact of injury is an essential element of a claim under section 4 of the Clayton Act.  See U.S. Football League, 704 F. Supp. at 479 ("The NFL's entire argument in this regard is based on the erroneous assertion that an award of [attorney's] fees for an antitrust violation requires proof of some threshold level of 'damages,' in addition to the fact of injury."); Sciambra v. Graham News, 892 F.2d 411, 415 (5th Cir. 1990) ("If a plaintiff can demonstrate that the defendant violated the antitrust laws and can establish the fact of damage, the plaintiff has established the defendant's liability for purposes of section 4 [of the Clayton Act]."); Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 414, 419 (3d Cir. 1993) (same).  A plaintiff satisfies his or her burden of proving the fact of injury by proof of "some damage flowing from the [antitrust violation]" and "inquiry beyond this minimum point goes only to the amount and not the fact of damage."  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9, 123-24 (1969) (citation omitted) (noting that a factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts[,] . . . their tendency to injure plaintiffs' business, . . . [and] the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs").

"If there is sufficient proof of [the] 'amount of damages,' . . . section 4 entitles the plaintiff to recover threefold this amount;" however, if "there is insufficient proof of the amount of damages, . . . proof of an antitrust violation and the fact of damage is a sufficient basis for an award of nominal damages."  Sciambra, 892 F.2d at 415–16 (citing U.S. Football League v. Nat'l Football League, 842 F.2d 1335, 1376–79 (2d Cir.1988)).

For the purpose of this motion, News argues that Valassis has not presented sufficient evidence that News's retailer payments were anticompetitive, but does not challenge the sufficiency of the evidence with respect to News's other alleged anticompetitive conduct (News's "contracting practices").  Accordingly, the Court will assume that the contracting practices were anticompetitive in deciding this motion.  With respect to Valassis's remaining federal antitrust claims, therefore, the question becomes whether Valassis has presented sufficient evidence from which a reasonable jury could conclude that Valassis has suffered antitrust injury as a result of News's contracting practices.

Valassis's asserted antitrust injury is exclusion from the ISP market, which is a "conventional form of antitrust injury" and "exactly the type [of injury] that antitrust laws were designed to prevent," especially since Valassis was the only competing provider of ISP products.  See Higgins, 755 F. Supp. at 116; Xerox Corp., 511 F. Supp. at 381–82.  A jury could reasonably conclude, based on the evidence and MacKie-Mason's opinion, that News's contracting practices were a "substantial or materially contributing factor" in causing Valassis's exit from the market because they prevented Valassis from obtaining a critical mass of retailers.  See In re Publ'n Paper, 690 F.3d at 66.  Specifically, a reasonable fact-finder could conclude that the long-term, staggered, exclusive contracts, and preemptive renewals severely limited the number of retailer contracts that became available during Valassis's tenure and caused large retailers like Kroger and Safeway, which made up a large percentage of participating retailers, to never become available.[9]  A reasonable jury could also conclude that Valassis's lack of critical mass and News's long-term CPG commitments deterred CPGs from contracting with Valassis based on MacKie-Mason's expert opinion, Kevin Murphy's opinion, Valassis's internal studies,

---

[9] For scale, MacKie-Mason estimates that Kroger and Safeway represented 34% of the ACV (all commodities volume) of food retailers participating in the ISP market in 2012.  (MacKie-Mason Rebuttal Report at 28).

statements of Valassis employees, and statements made by News's own CEO about the intended impact of News's contracting practices. Ultimately, the jury could conclude that Valassis's inability to attract CPG revenue materially contributed to its exit from the ISP market to the detriment of CPG customers, who were left with only one ISP provider.

Thus, even if Levinsohn's damages model attributes all of Valassis's damages to News's retailer payments, as News argues, Valassis has still presented sufficient evidence to create a genuine issue for trial as to whether it suffered antitrust injury in the form of exclusion from the ISP market as a result of News's contracting practices. As Levinsohn noted in his report and testimony, he assumed liability and opined only on the measure of damages in the event that the jury found that News's combined conduct was anticompetitive. (Def. 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13). In other words, he assumed the fact of injury and opined only on the amount of damages. News reads too much into Levinsohn's opinion on damages. Levinsohn is neither a judge nor an antitrust lawyer. Any defect in Levinsohn's opinion on the amount of damages does not undermine Valassis's ability to prove the fact of injury. See Sciambra, 892 F.2d at 415–16 (citing U.S. Football League, 842 F.2d at 1376–79). In any event, as the Court discusses next, Levinsohn does not attribute damages solely to the retailer payments.

ii.   Levinsohn's Report and Testimony Do Not Attribute Damages
Solely to News's Retailer Payments

In calculating Valassis's damages, Levinsohn assumed that liability had been established based on all of News's alleged anticompetitive conduct. (Def. 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13). Levinsohn estimated damages by comparing the profits that Valassis made in the actual world to profits that Valassis would have made in a "but-for" world where News did not engage in the alleged anticompetitive conduct. (Levinsohn Report at 2). He used a "benchmark" approach to calculate damages. (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14). In doing so, he considered

the first three quarters of 2010 as his "benchmark" period and the period from quarter three of 2010 through 2016 as the "damages" period.  (Levinsohn Report at 19).

In creating the "but-for" world, Levinsohn assumed that the rate at which Valassis won retailer contracts ("win-rate") would equal the win-rate observed during the benchmark period (i.e. 41%); that the average length of a retailer contract would equal 2.5 years; that the total number of available ISP placements in retail stores would equal the number of placements available in the actual world; that 40% of retailer contracts would become available each year; and that costs and operating expenses would equal the costs and expenses observed during the benchmark period.  (Id. at 20-25, Ex. 10).  Based on these assumptions, Levinsohn estimated damages of $368 million ($217.6 million in past damages from the third quarter of 2010 through 2016 and $150.6 million in future damages from 2017 through 2021).  (Id. at 3).  Levinsohn's model calculates that, in the but-for world, Valassis would have maintained an ISP profit margin approximately equal to Valassis's profit margin during the benchmark period.  (Def. 56.1 ¶ 15-17; Pl. 56.1 Resp. ¶ 15-17).

Levinsohn acknowledges that most of News's alleged anticompetitive conduct existed during his chosen benchmark period and concludes that his damages calculation is conservative as a result.  (Levinsohn Report at 3; Levinsohn Dep. at 132: 9-22).  For example, during the benchmark period, News used long term, staggered, and exclusive contracts with retailers.  (Def. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20).  But according to Levinsohn, News began increasing its retailer payments after the benchmark period.  (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18).

During deposition, Levinsohn testified regarding News's alleged anticompetitive retailer payments as follows:

> Q: So, the Court looks at this chart and it says that there is no problem with [the increased retailer payments] after 2010, okay?  All

> of the other alleged conduct is the same.  You are asked to come up
> with damages.  Could you reliably say that Valassis's win rate and
> the amount that it would pay retailers in the "but for" world after
> 2010 would be the same as what you observe in the 2010
> benchmark? . . .
> A: I think I could reliably estimate damages, but that reliable
> estimate would come out around zero, and let me explain why that
> is so. . . . [D]uring the benchmark period, the other alleged
> anticompetitive behavior is for the most part already present, and
> these commissions are the delta.  They are the new thing.  And now,
> if you tell me that the only thing different between the benchmark
> period I have selected  and  the  damages  period,  that  the
> differentiating  factor  just  went  away,  then  my  intuition  says
> damages would go away."

(Levinsohn Dep. Tr. 178:21-179:21).  In his declaration, Levinsohn clarified his deposition

testimony as follows:

> I understood that I was asked to make no changes to my approach to
> estimate damages other than to assume that the "differentiating
> factor" between "the benchmark period I have selected and the
> damages period" by stipulation "went away." . . . I understood that
> I was asked to use the same benchmark model that I had employed
> but to draw on the entire Damages Period as my "benchmark" to
> infer Valassis' but-for profit margin.  In other words, I understood
> that I was asked to assume that profits in the but-for world and the
> actual world were the same.  I responded that Valassis suffers zero
> damages in that scenario. Given the hypothetical, my response was
> a truism. . . . To be clear, my opinion has always been, and remains,
> that Valassis suffered quantifiable damages here, and would have
> suffered such damages whether or not News' retailer commissions
> were found by a jury to be anticompetitive.  I will so testify at trial,
> if asked.

(Levinsohn Decl. at p. 5).

News argues that Levinsohn's testimony reveals that all calculated damages flow

solely from News's payments to retailers and that no damages are attributable to News's

contracting practices.  This conclusion does not follow.  For one, Levinsohn's deposition

testimony is ambiguous, especially in light of his explanation of that testimony.  Moreover, an

examination of Levinsohn's damages model reveals that the calculated damages do not flow

solely from News's increased retailer commissions.  For example, in creating his damages

model, Levinsohn assumed that the length of the average retailer contract in the "but-for" world

would be only 2.5 years (as opposed to 4.5 years in the actual world) and that 40% of retailer

contracts would become available each year (as opposed to an annual average of 26.6% from

2010 through 2014 in the actual world).  (See MacKie-Mason Report at 95; MacKie-Mason

Rebuttal Report at 23).  These assumptions appear to take into account the effect of News's

exclusive, long-term, staggered retailer contracts, its autorenewal provisions, and its preemptive

renewals.

      Levinsohn's testimony, therefore, does not render Valassis's proof of antitrust

injury insufficient such that summary judgment is warranted on Valassis's remaining federal

antitrust claims.  Whatever modifications Levinsohn needs to make to the model in order to

remove the effect of News's retailer commissions is a matter that the Court can address in the

future in conjunction with the parties.  Thus, News's motion for summary judgment is denied

with respect to Valassis's remaining federal antitrust claims (Counts I, IV, V).

## II.    Valassis's State Law Antitrust Claims

      On the state law antitrust claims, News argues that Count IX, under the Michigan

Antitrust Reform Act, and Count X, under the California Cartwright Act, fail for the same

reasons that it asserts that the federal antitrust Counts fail.  News's motion for summary

judgment on Counts IX and X is denied to the same extent that this Court has denied News's

federal antitrust claims and granted to the same extent.  See Little Caesar Enters. v. Smith, 895 F.

Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law.");

Universal Grading Serv. v. eBay, Inc., 2012 WL 70644, at *10 (N.D. Cal. Jan. 9, 2012) ("[I]t is

well established that '[i]nterpretation of federal antitrust law is . . . applicable to the Cartwright Act.'").

III.   Valassis's State Law Claims of Unfair Competition and Tortious Interference

Valassis asserts the following five claims under Michigan common law, numbered according to the complaint: (XII) unfair competition, (XIII) tortious interference with CPG contracts, (XIV) tortious interference with CPG business relationships, (XV) tortious interference with retailer contracts, and (XVI) tortious interference with retailer business relationships.  News argues that this Court should grant summary judgment on these five claims because Valassis has not presented any evidence of "damages stemming from tortious interference or unfair competition."

As discussed, when the party requesting summary judgment does not bear the burden of proof at trial, "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).  However, "[a] moving defendant's mere assertion that a plaintiff 'has not produced' evidence that could prove its claim fails to show that the plaintiff lacks the necessary evidence, unless defendant also shows that plaintiff was obligated by discovery demand or court order to produce the evidence or that he voluntarily undertook to make the showing."  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 115 (2d Cir. 2017).  "Such a statement fails to show either that there is no genuine dispute as to any material fact or that the defendant is entitled to judgment as a matter of law."  Id.  If the movant does not satisfy its burden of production, then "summary judgment must be denied even if no opposing evidentiary matter is presented."  Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

On the common law claims, Counts XII through XVI, News has not met its burden as the movant.  In support of its request for summary judgment on all five claims, News dedicates one paragraph in its initial brief and eight lines in its reply brief.  None of News's Local Rule 56.1 statement is dedicated to the unfair competition or tortious interference claims. In its initial brief, News argues that summary judgment is warranted on the claims because "Valassis has not adduced any evidence to support a finding of damages, let alone liability, for them" and cites two cases for the simple proposition that damages are an element of unfair competition and tortious interference claims.  (Def. Brief at 25).  News's only support for its assertion, found in its reply brief, is that "Valassis's only evidence of damages fails to calculate damages attributable to the state law claims. . . . Valassis stated [in its Initial Disclosures] that the 'calculation of Valassis's damages will be the subject of expert testimony' . . . Yet the only expert testimony in the record (Levinsohn) does not even purport to measure damages stemming from tortious interference or unfair competition."  (Def. Reply at 10).

Valassis's initial disclosure statement does not amount to evidence that Valassis was "obligated by discovery demand or court order to produce" evidence of damages on these claims or that Valassis "voluntarily undertook" to make the showing.  See Nick's Garage, 875 F.3d at 115–16.  News's assertion that Valassis has presented no evidence of damages is, therefore, akin to the movant's "mere assertion" in Nick's Garage, and similarly "fails to show either that there is no genuine dispute as to any material fact or that the defendant is entitled to judgment as a matter of law."

This Court holds that News has not met its burden of showing that it is entitled to judgment as a matter of law on Valassis's state law claims of unfair competition or tortious

interference.  News's motion is, therefore, denied with respect to these claims.  See Vermont Teddy Bear, 373 F.3d at 244.

CONCLUSION

For the aforementioned reasons, the Court dismisses Counts II, III, VI, and XI and DENIES defendants' summary judgment motion (Doc. 202) with respect to the remaining claims.  The Court further concludes that any claim of predatory bidding asserted as part of a surviving claim is foreclosed.  The Clerk is directed to terminate the motion.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
        February 21, 2019