# HOLWELL SHUSTER & GOLDBERG LLP

*425 Lexington Avenue*
*New York, New York 10017*
*Tel: (646) 837-5151*
*Fax: (646) 837-5150*
*www.hsgllp.com*

*Michael S. Shuster*
*(646) 837-5151*
*mshuster@hsgllp.com*

June 29, 2021

By ECF

The Honorable P. Kevin Castel
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007

    Re: *Valassis Communications, Inc. v. News Corp., et al.*, No. 17-cv-7378 (S.D.N.Y.)

Dear Judge Castel:

    I write on behalf of Valassis to respond to News's letter concerning the parties' opening statements. Dkt. No. 490 ("News Ltr."). News raises two issues. As to the first, Valassis should not be barred from playing Ms. Corsiglia-Keim's testimony simply because she uses the term "monopoly" in the course of providing a description of what options she had as a customer of ISP providers. As to the second, this Court should reserve on whether Mr. Mason and Mr. Dmochowski's testimony "opens the door" to any other evidence until such evidence is introduced. But, in the event the Court does rule now, it should find the door opened.

    We are prepared to address these issues at the Court's convenience before opening statements commence.

**I.    Ms. Corsiglia-Keim's Testimony On News's In-Store Monopoly**

    News's application to bar Ms. Corsiglia-Keim's testimony should be seen for what it is: a weak attempt to exclude important evidence simply because it uses a buzzword—"monopoly"—that News fears paints it in a bad light. But it is highly probative that a market participant views News as the only game in town based on her experience in the marketplace at the heart of this litigation.

At the time of her deposition in the *Dial* matter, Ms. Corsiglia-Keim had worked for fifteen years in executive marketing roles at Foster Farms, a consumer packaged goods manufacturer and customer of News. Corsiglia-Keim *Dial* Dep. Tr. at 16:3-20:11. In that role, she was responsible for purchasing in-store tactics for various Foster Farms brands. *Id.* at 62:23-65:13.

Ms. Coriglia-Keim's colloquial use of the term "monopoly" in her deposition testimony in response to a question about her decision to purchase from News (rather than a theoretical alternative) neither states a legal conclusion nor offers improper lay opinion testimony. Instead, it reflects her firsthand understanding of the third-party ISP market. Valassis seeks to play in its opening the bolded portion of the following colloquy:

> Q. What other factors went into the decision to sign with NAM instead of Valassis?
> A. So distribution within, you know, since we were negotiating for the entire business, the distribution. NAM's distribution. And then also the in-store component that NAM basically controls is important for us in this western market.
> **Q. Okay. NAM is -- when you say NAM controls or is important in the western market, what do you mean by that?**
> **A. I mean that they basically have a monopoly on the in-store execution of the Shelftalk and floor graphic tactic.**

Corsiglia-Keim *Dial* Dep. Tr. at 201:10-22 (emphasis added). Here, the term "monopoly" is Ms. Corsiglia-Keim's own. She defines "monopoly" as effectively synonymous with "only practical option" and provides that language only after the examining attorney (News's counsel here) pushed for elaboration. As the preceding question makes clear, Ms. Corsiglia-Keim testifies about "control" and "monopoly" in response to a fact-bound question within the realm of her personal knowledge: "What other factors went into the decision to sign with NAM instead of Valassis?" A jury could hardly confuse her business understanding of the ISP options available with her interpretations of statutes and case law.

The testimony is admissible for several independent reasons.

*First*, In the testimony at issue, Ms. Corsiglia-Keim sets forth background facts concerning the dynamics in the third-party ISP market—including News's dominance and how that impacts CPG choice and selection of tactics. These concepts fit easily within a factual paradigm, especially because the predicate question for the testimony calls for a description of the "factors" Foster Farm used to assess whether to sign with News. *See* Notes of Advisory Committee on Proposed Rules, Rule 701(b) (noting "[w]itnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion" and "the practical impossibility of determining by rule what is a 'fact.'")

*Second*, a percipient fact witness, whether offering a lay opinion or not, may testify about market dynamics, even though in antitrust cases, such topics are often the subject of expert

testimony. *See Lamoureaux v. Anazaohealth Corp.*, 2009 WL 1162875, at *2 (D. Conn. Apr. 30, 2009) (finding a lay witness can testify to "the impact of . . . competition" and "the market for . . . products"). The "perceptions and statements of major customers" like Ms. Corsiglia-Keim are probative of (among other things) market definition, an issue that Valassis expects News to make center stage. *See Moore Corp. v. Wallace Computer Servs., Inc.*, 907 F. Supp. 1545, 1576 (D. Del. 1995) (citing Von Kalinowski, 3 Antitrust Laws and Trade Regulation § 18.02[2] (1995) (collecting cases)).

*Third*, News's principal authority, *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), is readily distinguishable from the situation here. In *Scop*, the Second Circuit excluded *expert* rather than lay testimony by a SEC investigator because it "drew directly on the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud.'" *Id.* Moreover, the Second Circuit has subsequently clarified that where a witness has personal knowledge of the events in question, he or she has far more latitude to testify as to language that also touches on a legal standard, a circumstance found here in spades but not present in *Scop*. *See United States v. Duncan*, 42 F.3d 97, 101–02 (2d Cir. 1994) (finding that an expert investigator's testimony based on "his own investigation of the facts and review of [] records" permissible even though in one instance it "c[a]me close to tracking the object of one of the charged conspiracies."); *United States v. Schwartz*, 924 F.2d 410, 426 (2d Cir. 1991) (finding expert investigator's testimony that conduct was "illegal" not improper because "[h]is statements were given not simply as an expert, but also as a witness to the investigation").

Thus, the fact that the term "monopoly" is used in the legal standard in this case is of no moment.[1] In antitrust cases, courts have repeatedly found that Rule 701 permits testimony on such terms. *See United States v. Misle Bus & Equipment Co.*, 967 F.2d 1227, 1234 (8th Cir. 1992) (permitting "lay witnesses to give opinion testimony as to whether 'agreements' to fix prices and allocate the market had been reached"); *It's My Party, Inc. v. Live Nation, Inc.*, 2012 WL 3655470, at *13 (D. Md. Aug. 23, 2012) (declining to exclude at summary judgment plaintiff's response to question concerning "what could constitute a monopoly" because "in light of the context of the testimony and Hurwitz's sophistication and experience, it may well be admissible"). Consistent with these cases and *Scop* itself, Ms. Corsiglia-Keim provided testimony based on personal experience that invokes the conventional meaning of the word "monopoly" as synonymous with "only practical option".[2]

*Finally*, News's request to preclude *all of* Valassis's fact witnesses from using the word "monopoly" or "monopolist" is especially baseless. News's request defies the "witness-by-witness and conversation-by-conversation" measure by which Rule 701 determinations are

---

[1] *See also United States v. Hoffecker*, 530 F.3d 137, 171 (3d Cir. 2008) ("scam"); *United States v. Levine*, 180 F.3d 869, 871–72 (7th Cir. 1999) ("forgery"); *United States v. Johnson*, 637 F.2d 1224, 1246–47 (9th Cir. 1980).

[2] Even under *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010), a fact "witness's testimony about her own subjective belief may be admissible" despite centering on a legal standard, and here, Ms. Corsiglia-Keim's "perceptions" are relevant as described above. *See Moore Corp.*, 907 F. Supp. at 1576 (D. Del. 1995).

3

made.  *See United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 705 (S.D.N.Y. 2011).  Additionally, News makes no effort to argue that the description of News as a "monopolist" could not be "rationally based on the witness's perception" using "a reasoning process familiar to the average person in everyday life".  *Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d at 703–04.  Common sense and testimony and documentary evidence from the consumer packaged manufacturers make clear it can.

**II.     Testimony In News's Opening that "Opens the Door"**

In its opening, News plans to play testimony by Valassis's former CEO (Mr. Mason) and Safeway's former Senior Vice President (Mr. Dmochowski) that, in a vacuum, would be highly misleading and likely to cause juror confusion.  During a meet-and-confer yesterday, Valassis informed News that it would not seek to prevent News from playing such testimony.  However, Valassis put News on notice that so doing may "open the door" to Valassis introducing other countervailing evidence that may be implicated by this Court's motion in limine rulings.  Such rulings were issued after News designated this testimony for use at trial.  *See generally* Dec. 20, 2019 H'rg Tr.

In its letter, News improperly twists Valassis's preservation of an objection into a ripe dispute, effectively seeking an advisory opinion that such testimony can never, under any circumstances, open the door to other evidence.  Valassis submits that this issue is premature and should be dealt with as trial proceeds, outside the presence of the jury.  *See* June 9, 2021 H'rg Tr. (stating a preference to resolve evidentiary disputes during the course of trial either "before court starts or at the end of the day").  Though we cannot at this juncture know the precise arguments News will advance, we provide below a high-level sense of the type of evidence Valassis seeks to reserve the right to use throughout trial in order to correct any misimpressions left by Mr. Mason's and Mr. Dmochowski's testimony.

Evidence at trial opens the door to otherwise inadmissible evidence when such evidence is necessary to "rebut false impressions".  *United States v. Vasquez*, 267 F.3d 79, 85 (2d Cir. 2001).  Courts regularly find that arguments raised in opening statements open the door to otherwise inadmissible testimony coming in at trial—even when the curative testimony was originally barred by a motion in limine.  *See, e.g.*, *Weyant v. Okst,* 182 F.3d 902, *2 (2d Cir. 1999) ("[D]efendants had originally won a similar in limine motion to preclude Charles's groin-punch testimony at the Weyants' first trial, only to have that ruling rescinded when defense counsel 'opened the door' during his opening statement at that trial."); *Ko v. Burge,* 2008 WL 552629, at *14 (S.D.N.Y Feb. 26, 2008) ("[T]he defense counsel's reference to "clothes" in his opening meant both the shirt and the sweatpants, and allowing admission of only a portion of Seong's statements would have misrepresented the statements."); *United States v. Griffith*, 2000 WL 1253265, at *12 (S.D.N.Y. Sept. 5, 2000); ("As to the first statement, 'After victimizing Ebony last spring, defendants did it again right in front of you", counsel for the defendants

4

opened the door to this statement by suggesting in opening statements that the victims were sexually experienced.'").

Depending on how the trial proceeds, it may be necessary to introduce certain previously excluded evidence to rebut false impressions left by the testimony by Messrs. Mason and Dmochowski that News intends to play in its opening.

***First***, Mr. Mason's testimony stands to create the misimpression that Valassis spent $500 million buying back stock and issuing dividends with funds taken from the company's ordinary course bottom line. Based on Mr. Mason's testimony, News presents a timeline showing that, in 2010-2013, "Valassis takes $500M out of the company." News apparently seeks to prove that at the same time Valassis was endeavoring to compete in the market, it was starving the company for funds to enrich its shareholders. If News proffers Mr. Mason's testimony in support of that argument, it opens the door for Valassis to argue that immediately prior to taking these actions, Valassis received $500 million in cash from a litigation settlement, and that the payments were made in part because of a decision *not* to buy back stock or issue dividends previously. PX-0893 (Valassis 2013 10-K) at 22. That is how Valassis's CFO Robert Recchia framed the issue at his deposition, in testimony preceding that quoted by News in its letter. *See* Recchia Dep. Tr. at 134:13-15 ("We had plenty of money to invest in businesses. We had just gotten $500 million."). Valassis was not bleeding its coffers dry, and it is entitled to present evidence to counter News's argument to the contrary. Notably, none of this requires Valassis to refer to the name of the case associated with that settlement, the underlying allegations, or the parties involved.

***Second***, Mr. Dmochowski's testimony creates a misleading picture of the circumstances under which News and Safeway entered into the 2004 ten-year contract. News presumably proffers this testimony to establish that this long-term contract was procompetitive and dictated entirely by Safeway's preferences, not News's. News's CEO Martin Garofalo, who will testify live, has testified as much in depositions. *See* Garofalo *Dial* Dep. Tr. 148:2-4 (noting Safeway proposed the 10-year contract term); Garofalo *Valassis I* July 7, 2009 Trial Tr. at 116:19-117:14 (same). But Mr. Dmochowski's (and Mr. Garofalo's) testimony does not tell the full story. The record reflects that News entered into the Safeway deal not to cater to Safeway, but to further its anticompetitive objective of excluding Safeway's then-existing provider of in-store promotions, Floorgraphics. Indeed, the evidence reflects that the parties understood that the contract may have the very anticompetitive effects that Valassis identifies here.

Valassis does not seek, as News contends, to endlessly rehash "long-settled allegations from prior lawsuits" of limited relevance. News Ltr. at 4. Valassis maintains that the duration of the Safeway contract, and its effect on competition in the market, is highly relevant to this case. That is precisely why if News submits evidence to support the assertion that the deal was

5

dictated by Safeway's objectives, Valassis must have the right to respond with evidence of News's objectives and the market participants (including Safeway's) understanding of the potential effect the contract would have on competition throughout agreement's ten-year duration.

                                                                         Respectfully submitted,

                                                                         /s/ *Michael S. Shuster*
                                                                         Michael S. Shuster

cc:       Counsel of Record