UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALASSIS COMMUNICATIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>NEWS CORPORATION; NEWS AMERICA MARKETING, a/k/a NEWS AMERICA INCORPORATED, a/k/a NEWS AMERICA MARKETING GROUP; NEWS AMERICA MARKETING FSI L.L.C., a/k/a NEWS AMERICA MARKETING FSI, INC.; and NEWS AMERICA MARKETING IN-STORE SERVICES L.L.C., a/k/a NEWS AMERICA MARKETING IN-STORE SERVICES, INC.,<br><br>Defendants. | Case No. 1:17-cv-07378-PKC |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

## <u>TABLE OF CONTENTS</u>

Preliminary Statement.............................................................................................................1

Legal Standard .......................................................................................................................3

Argument ...............................................................................................................................4

I.      Valassis Provided Insufficient Evidence That The Allegedly Anticompetitive Conduct
        Caused Antitrust Injury And Damages. ....................................................................4

        A.      Valassis Has Not Proved That The Contracting Practices Caused It To Exit The
                Market..................................................................................................................4

        B.      Valassis Has Not Proved That Its Damages Stem From The Contracting
                Practices. ..............................................................................................................7

II.     Valassis Has Not Established That The Contracting Practices Are Anticompetitive........10

III.    Valassis Has Not Proved That NAM Had Power In A Relevant Product Market............14

IV.     Valassis Has Not Proved That NAM's Conduct Harmed Competition...........................19

V.      Valassis Has Not Proved That News Corp Independently Participated In The Allegedly
        Anticompetitive Conduct. ..............................................................................................20

Conclusion .......................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press,*
  181 F.3d 216 (2d Cir. 1999).............................................................................14, 15

*Arandell Corp.* v. *Centerpoint Energy Servs., Inc.,*
  900 F.3d 623 (9th Cir. 2018) .........................................................................21, 23

*Atl. Richfield Co.* v. *USA Petroleum Co.,*
  495 U.S. 328 (1990).........................................................................................4, 10

*Balaklaw* v. *Lovell,*
  14 F.3d 793 (2d Cir. 1994)...................................................................................11

*Black* v. *JP Morgan Chase & Co.,*
  2011 WL 4102802 (W.D. Pa. Aug. 10, 2011) .......................................................23

*Blue Cross & Blue Shield United of Wisconsin* v. *Marshfield Clinic,*
  65 F.3d 1406 (7th Cir.1995) ................................................................................18

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977).............................................................................................20

*Chandler* v. *Phoenix Servs.,*
  2020 WL 1848047 (N.D. Tex. Apr. 13, 2020) ......................................................22

*Climax Molybdenum Co.* v. *Molychem, LLC,*
  414 F. Supp. 2d. 1007 (D. Colo. 2005).................................................................22

*Ferguson* v. *Greater Pocatello Chamber of Com., Inc.,*
  848 F.2d 976 (9th Cir. 1988) ...............................................................................11

*Heerwagen* v. *Clear Channel Commc'ns,*
  435 F.3d 219, 229 (2d Cir. 2006)..........................................................................18

*In re Fla. Cement & Concrete Antitrust Litig.,*
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) .................................................................23

*Indeck Energy Servs., Inc.* v. *Consumers Energy Co.,*
  250 F.3d 972 (6th Cir. 2000) ...............................................................................11

*K.M.B. Warehouse Distributors, Inc.* v. *Walker Mfg. Co.,*
  61 F.3d 123 (2d Cir. 1995)....................................................................................20

*Konik* v. *Champlain Valley Physicians Hosp. Med. Ctr.*,
733 F.2d 1007 (2d Cir. 1984)......................................................................................11

*Lenox MacLaren Surgical Corp.* v. *Medtronic, Inc.*,
847 F.3d 1221 (10th Cir. 2017) ................................................................................21

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
11-MDL-2262, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019)................................21

*MacDermid Printing Sols., LLC* v. *Corton Corp.*,
833 F.3d 172 (2d Cir. 2016).....................................................................................20

*Mattivi* v. *South African Marine Corp.*,
618 F.2d 163 (2d Cir.1980).........................................................................................3

*MCI Commc'ns Corp.* v. *Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ....................................................................................8

*Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*,
238 F. Supp. 2d 1024 (N.D. Ill. 2003) .....................................................................19

*Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004) .......................................................................... *passim*

*NicSand, Inc.* v. *3M Co.*,
507 F.3d 442 (6th Cir. 2007) ....................................................................................11

*Nobody in Particular Presents, Inc.* v. *Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004)................................................................23, 24

*Ohio* v. *Am. Express Co.*,
138 S. Ct. 2274 (2018)...............................................................................................17

*In re Pa. Title Ins. Antitrust Litig.*,
648 F. Supp. 2d 663 (E.D. Pa. 2009) ........................................................................23

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) ............18

*PepsiCo, Inc.* v. *Coca-Cola, Co.*,
315 F.3d 101 (2d Cir. 2002).......................................................................................15

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012)...........................................................................................4

*SEC* v. *Ginder*,
752 F.3d 569 (2d Cir. 2014)......................................................................................3, 4

*Spinelli* v. *Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015)............................................................10, 11

*Thrash* v. *State Farm Fire & Cas. Co.*,
   992 F.2d 1354 (5th Cir. 1993) ......................................................................24

*U.S. Football League* v. *NFL*,
   842 F.2d 1335 (2d Cir. 1988)........................................................................10

*United States* v. *Bestfoods*,
   524 U.S. 51 (1998).................................................................................21, 23

*United States* v. *Cont'l Can Co.*,
   378 U.S. 441 (1964)......................................................................................16

*United States* v. *E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)......................................................................................14

*United States* v. *Eastman Kodak Co.*,
   63 F.3d 95 (2d Cir. 1995) .............................................................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. 50(a)(1).................................................................................................3

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
   Their Application* ¶ 1821d3 ........................................................................12

## PRELIMINARY STATEMENT

At summary judgment, this Court ruled that Defendants cannot be held liable for claims based in whole or in part on the payments News America Marketing In-Store Services L.L.C. ("NAM") made to retailers to win exclusive contracts, because those payments are lawful and procompetitive.  The Court underscored that "[i]f the Court were to allow Valassis to present to the jury a monopoly broth claim inclusive of News's retailer payments, no jury instruction the Court could give regarding how to evaluate those payments would prevent 'courting intolerable risks of chilling legitimate procompetitive conduct.'"  Dkt. 260 at 20, quoting *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 325 (2007).  The Court declined to dismiss the case outright because it determined that the evidence could show, and thus Valassis should be given the opportunity to prove at trial, that the remaining challenged contracting practices "severely limited the number of retailer contracts that became available," that Valassis's small retail network and NAM's "long-term CPG commitments deterred CPGs from contracting with Valassis," and that "Valassis's inability to attract CPG revenue materially contributed to its exit from the ISP market."  Dkt. 260 at 24–25.

Now, at the close of its case-in-chief, it is clear that the narrative the Court recognized as alive at summary judgment is not the narrative Valassis presented to the jury.  Instead, through each of its witnesses, Valassis has continued to present a monopoly broth claim inclusive of the retailer payments that this Court recognized as "the very essence of competition."  Dkt. 260 at 19.  Each of its fact witnesses has testified that NAM's retailer payments, combined with other conduct, contributed to Valassis's exit.  Dr. MacKie-Mason offered no opinion on the but-for cause of Valassis's exit, and admitted that the retailer payments were a contributing factor.  Dr. Levinsohn simply assumed that MacKie-Mason would prove that the challenged conduct, in the absence of the payments, caused Valassis's exit, and undertook no analysis of that question himself.  And even setting aside that incorrect assumption, Levinsohn's analysis measures the difference between the benchmark period and the but-for world, where the only change between the two is an assumption that Valassis would match NAM's retailer payments.  Such analysis

measures the effect of the retailer payments—not the challenged conduct—and cannot serve as the basis for any award.  Moreover, Levinsohn did not disaggregate the effect of the various challenged contracting practices, even though the so-called "preemptive renewals" are inextricably intertwined with retailer payments and therefore cannot constitute separate unlawful action.

On this record, Valassis's claims fail as a matter of law.  It has not established that the challenged conduct, without the lawful retailer payments, caused its exit.  It has not established that its damages stem from the challenged conduct, rather than the lawful retailer payments.  It has not even established that the challenged contracting practices are anticompetitive.  Instead, the evidence has shown that Valassis was able to enter the market, that it actively competed for and won retailer contracts away from NAM, and that it turned a profit in the first year—all while NAM had the same long-term, staggered, exclusive contracts with retailers.  Neither those contracts nor the challenged preemptive renewals stopped Valassis from having the chance to compete for each of the "top" retailers it wanted in its network.  Indeed, the evidence has shown that the only respect in which NAM's activities changed in the years after Valassis profitably entered the business was the amount of money NAM offered to retailers to win their contracts, showing once again that Valassis's inability to compete with the retailer payments—and not the contracting practices—led to Valassis's decision to exit.

Moreover, the record does not establish Valassis's proposed market definition or that NAM had power within that market.  The witness testimony failed to differentiate third-party in-store promotions from other promotional products, like retailer promotions, direct CPG promotions, or digital media.  Nor did MacKie-Mason conduct the necessary econometric analysis to determine that these products are not substitutes.  Rather, the evidence showed that retailer promotions and third-party in-store promotions are indistinguishable—even to Valassis's experts—and that many retailers forgo NAM's services altogether in favor of handling such in-store promotions on their own.  And further dooming Valassis's claims, it has failed to show that NAM's conduct harmed competition through either direct or indirect evidence.  Instead, the

undisputed evidence shows that retailer payments increased and NAM's prices to CPGs decreased—the precise opposite of what one would expect to see in a world in which NAM possessed and unlawfully exercised monopoly power.

Finally, even if Valassis could overcome each of these hurdles with respect to NAM, no reasonable juror could conclude that News Corp independently participated in the challenged conduct. Valassis has offered no evidence that News Corp had any role in the challenged contracting practices. Instead, Valassis has attempted to convince the jury to hold both Defendants liable by trying to refer to them generally as "News" in hopes that the jury will attribute NAM's conduct to its parent company and award damages across the board. Neither the law nor the evidence allows for such a finding. The Court should therefore grant Defendants judgment as a matter of law on all claims, but at minimum, the Court should enter judgment for News Corp.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a)(1) provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may resolve the issue by granting a motion for judgment as a matter of law against the party. In deciding whether to grant such a motion, the court considers "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached." *Mattivi* v. *South African Marine Corp.*, 618 F.2d 163, 167 (2d Cir.1980) (internal quotation marks and citation omitted). Courts will grant the motion where "there exists such a complete absence of evidence supporting" the claim at issue that a verdict for the plaintiff could only be attributed to "sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *SEC* v. *Ginder*,

752 F.3d 569, 574 (2d Cir. 2014) (internal quotation marks and citation omitted) (alterations in original).

## ARGUMENT

I.  **VALASSIS PROVIDED INSUFFICIENT EVIDENCE THAT THE ALLEGEDLY ANTICOMPETITIVE CONDUCT CAUSED ANTITRUST INJURY AND DAMAGES.**

### A.  **Valassis Has Not Proved That The Contracting Practices Caused It To Exit The Market.**

Through its case in chief, Valassis has attempted to prove that Defendants monopolized the alleged third-party in-store promotions market in violation of the antitrust laws.  To prove such a violation, Valassis must establish that Defendants engaged in anticompetitive conduct that caused Valassis to suffer antitrust injury.  The Supreme Court has held that "[a]ntitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct."  *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 339 (1990).  The anticompetitive conduct "need not be the *sole* cause of the plaintiffs' alleged injuries," but the plaintiff must "demonstrate that [the defendant's] conduct was a substantial or contributing factor in producing that injury" and that "the injuries alleged would not have occurred *but for* [the defendant's] antitrust violation."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) (internal quotation marks omitted; alterations and emphasis in original).  Valassis has failed to make that showing here.

Although Valassis has attempted to shift the focus of its case after this Court's summary judgment ruling recognizing the legality of the retailer payments, each of Valassis's fact witnesses has admitted that NAM's retailer payments played a significant role in Valassis's failure to attract retailers and remain in the business:

- Former Valassis General Manager of In-Store Mike Kowalczyk: "For the [retailers] that did come up, we put our best effort forward.  We put a bid in.  We

tried to win it.  We made what I thought were very lucrative offers, and it fell short.  We didn't get them." Tr. 142:2–9.

- Former Valassis CFO Robert Recchia:

    o "We had not closed the gap.  And I saw the store costs were starting to escalate very, very rapidly.  And the combination of those two was making this business very unprofitable for us."  Tr. 397:2–7.

    o "[A]s the retailers came up for bid, they were bidding up the contracts, so it was costing us more and more each time to get a new retailer or to hold on to an existing retailer."  Tr. 393:8–16.

    o "If the retailer would come up for bid, we would attempt to bid on it.  We would always bid on it.  But we were, as I said, they were being bid into places that, even if we got them, we were assured of losing money."  Tr. 401:13–18.

    o "[V]ery soon after [we entered the ISP business], the nature of the business changed.  And in order to get any type of retailer, you had to bid at very high levels and give big guarantees. . . . Their tactics of bidding up the retailer contracts coupled with their CPG contracts which leveraged the CPGs to buy from them . . . make this business unprofitable from both a short-term and longterm perspective."  Tr. 408:1–14.

    o "[W]e're coming in with a profit sharing deal . . . . That gets flipped on us by News immediately to fixed price guarantees to basically drive us out of the business."  Tr. 466:16–22.

- Former Valassis VP of Sales and Marketing Suzie Brown:  "I think we had two problems: Number one, many of those contracts went on forever.  Like, some contracts we never had a chance to even bid on because they were locked up for so long.  Number two is that some of those contracts were rolled over early.  So we never got a chance to bid on them.  Then some of them that we got a chance to bid on were bid higher than we could afford to pay."  Tr. 524:2–9.

Kowalczyk and Recchia at times attempted to testify that it was the gap in CPG spending that caused Valassis's exit, but as explained *infra* at p. 14, they based that testimony on hearsay, which this Court recognized cannot serve as proof that NAM's contracting practices caused the CPGs not to buy from Valassis, Tr. 162:14–163:2, and Valassis has offered no other proof.

These witnesses have further confirmed that the challenged contracting practices did not prevent Valassis from entering the in-store business, competing for retailers, or winning bids. Tr. 199:5–200:4.  Indeed, they have even confirmed that Valassis engaged in the very same

practices.  Tr. 200:8–204:6 (long-term, staggered, exclusive contracts with retailers); Tr. 219:15–220:9 (exclusive contracts with CPGs and retailers); Tr. 547:18–550: 24 (preemptive renewals).

The opinion and testimony of Valassis's liability expert, MacKie-Mason, cannot save its case.  MacKie-Mason did not offer an opinion as to whether the challenged conduct, "alone or together, caused Valassis to exit the market."  Tr. 1013:5–13.  As elicited on cross-examination, in his expert reports (provided before summary judgment and never updated) MacKie-Mason opined that "but for the use of the payments by News America Marketing to retailers, it's likely Valassis would have won additional contracts, and . . . Valassis would have remained profitable."  Tr. 1015:2–1016:14.  And his report reiterated what Valassis's fact witnesses made clear: "the record shows that Valassis' decision to exit was due in large part to the difficulty it faced acquiring retailers at commission rates which would permit Valassis to make a profit."  Tr. 1017:3–14.  That testimony confirms that the evidence here does not and cannot show that Valassis would have remained in the business but for the challenged contracting practices, in the absence of the lawful retailer payments.

MacKie-Mason also opined that but for the other allegedly anticompetitive contracting practices, there would have been more contracts up for bid each year and thus "additional *opportunities* for Valassis to reach the critical mass of retailers needed to compete for CPG spending."  Tr. 1136:17–24 (emphasis added).  But he expressly admits that it was the retailer payments that prevented Valassis from winning such opportunities when it had them.  Tr. 1015:2–1016:14.  As he explained, Valassis "thought that they could use a different contracting model with retailers that turned out the market didn't support that."  Tr. 1071:4–6; 1124:14–1125:6.  In other words, Valassis offered profit sharing models and retailers preferred the high fixed guarantees that NAM offered.  Tr. 1124:14–1125:6.  Thus, the testimony regarding "opportunities" leads inexorably back to the fact, established again and again during the trial,

6

that the central reason Valassis did not convert opportunities into deals was NAM's lawful payments to retailers.

Moreover, MacKie-Mason testified that he did not analyze whether other issues in Valassis's business caused its exit. He did not analyze the impact of Valassis's promise to retailers that they would put 25% fewer placements in the stores. Tr. 1071:15–1072:6. He did not analyze the impact of Valassis's average tactic price dropping well below its initial projection. Tr. 1125:7–19. He did not analyze the impact of unauthorized signs in the retailers with which Valassis contracted and the loss in revenue that accompanied them. Tr. 1125:20– 1126:3. And he did not analyze the impact of the millions of dollars in losses Valassis sustained as a result of the A&P contract. Tr. 1126:4–16. In his own words, MacKie-Mason—somewhat astoundingly given his role—never "inquired into the specific reasons Valassis left the market." Tr. 1126:13.

The evidence and opinions are fatal to Valassis's case. At most, Valassis's witnesses have provided support for a monopoly broth claim inclusive of retailer payments—a claim that this Court recognized it could not "allow Valassis to present to the jury" because doing so would "invite the precise harm the [Supreme Court] sought to avoid.'" Dkt. 260 (quoting *Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*, 555 U.S. 438, 451–52 (2009) (alteration in original)). Consistent with that holding, this Court should recognize that "a reasonable jury would not have a legally sufficient evidentiary basis" to render a verdict for Valassis and enter judgment as a matter of law in favor of Defendants.

**B.      Valassis Has Not Proved That Its Damages Stem From The Contracting Practices.**

Even if Valassis could somehow establish liability, it has failed to prove damages stemming from the anticompetitive conduct. This Court recognized that its opinion granting summary judgment regarding the predatory bidding claim required Dr. Levinsohn to adjust his model to "remove the effect of News's retailer commissions." Dkt. 260 at 28. After two attempts to do so, Levinsohn now claims that damages attributable to the contested contracting

7

practices would be less than half of his original estimate.  But his analysis still cannot support a damages award because on the central issue of whether Valassis's exit was caused solely by NAM's contracting practices, he expressly made no analysis but instead assumed the jury would find liability based on MacKie-Mason's opinion and the rest of the evidence.  That is an opinion that MacKie-Mason has not offered and that cannot be supported by the remainder of the record.  Tr. 1192:14–16.  Thus, a key link in the logical chain of Levinsohn's opinion does not exist.

Moreover, Levinsohn's revised analysis merely confirms that it was the retailer payments that made the difference.  He admitted that multiyear, exclusive, staggered contracts exist in his benchmark period and his "but-for" world.  Tr. 1179:17–1181:20.  He also assumes that Valassis could have continued with the level of success it had in 2009 and 2010 in the but-for world by making only one change: matching NAM's retailer payments.  Tr. 1199:7–9.  That assumption confirms that it was the rise in NAM's payments—and Valassis's failure to match those higher payments in the real world—that stopped Valassis from succeeding.

In addition, Levinsohn does not disaggregate among the various forms of charged conduct.  Tr. 1198:8–18.  Although it is unnecessary to disaggregate among anticompetitive conduct for purposes of damages, "[i]t is essential . . . that damages reflect only the losses directly attributable to *unlawful* competition."  *MCI Commc'ns Corp.* v. *Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983).  That is problematic because Valassis has not shown that the preemptive renewals themselves function as an unlawful exclusionary tool.  Instead, the evidence shows that the preemptive renewals are inextricably intertwined with the retailer payments.  NAM was able to renew its contracts early *only because* it offered increased retailer payments.  Tr. 547:3–17 (Brown) ("When we went to compete for those contracts, News America would roll over contracts early and use large guarantees that we couldn't compete for."); Tr. 701:12–21 (Garofalo) (testifying that "in every instance" in which NAM renewed a contract early "the price of the retail agreements went up the entire time I was involved with the business"); Tr. 1019:24–1020:20 (MacKie-Mason) ("[T]o get somebody to sign up early, to renew early, you need to give them a reason to want to do so.  Some sort of inducement.  One way to do that is to offer them a

8

payment."); PX-0928 (Perkins Dep. 307:16–308:2; 308:5). (testifying that she could not recall "any instance where [NAM] approached a retailer and sought an early renewal of a contract and offered them the same amount of money that they were already getting").  In this way, the preemptive renewals differ from the other challenged conduct, which can exist separate and apart from large, guaranteed retailer payments.  Because the preemptive renewals are not standalone anticompetitive conduct, they cannot be a part of the damages calculus, and Levinsohn has provided no method of calculating any remaining damages.  Tr. 1199:3–6 ("Q: So if the jury were to conclude that the alleged preemptive renewals are lawful conduct, you cannot say, sitting here today, how that would affect your damages calculation, can you?  A: I could not give you an exact number, no.").

Levinsohn's assumption that Valassis would be able and willing to match NAM's retailer payments in the but-for world, though it failed to do so in the real world, is also baseless.  *See* Tr. 1200:12–17 ("I have not investigated whether they could have paid that in the real world.")  Indeed, that assumption is contradicted by the testimony of Mr. Recchia, who stated that in the real world, Valassis "always had plenty of cash to invest in the business," and yet decided not to use that cash to provide the higher payments to grow Valassis's retail network.  Tr. 476:13–19.  Recchia also testified that even if Valassis were able to attract a greater volume of CPGs, "[i]t doesn't mean that News America wouldn't have continued to drive those retailers up.  They probably would have."  Tr. 442:7–14.  *See also* Tr. 461:19–462:11 ("So, the answer to your question is we could have bid $24 million.  Do I think we would have gotten it at $24 million? Absolutely not.").  Levinsohn's assumption is rendered even more nonsensical by the fact that NAM had lower operating costs than Valassis, which Levinsohn admits would not change in his but-for world.  Tr. 1206:2–25.  NAM thus could have (and would have) continued to offer retailers higher payments than Valassis, while remaining profitable, just as it did in the real world.

At bottom, Levinsohn's damages calculations are premised on an assumption that, in the but-for world, NAM would *choose* to stop competing and simply hand over half of its market

share to Valassis.  Tr. 1204:13–1206:1.  Awarding damages based on this model would be "inimical to [the antitrust] laws," which prohibit an "award [of] damages for losses stemming from continued competition," like the retailer payments here.  *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see also U.S. Football League* v. *NFL*, 842 F.2d 1335, 1379 (2d Cir. 1988) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage[s].").  No reasonable juror could conclude otherwise.[1]

## II.    VALASSIS HAS NOT ESTABLISHED THAT THE CONTRACTING PRACTICES ARE ANTICOMPETITIVE.

The Court should also enter judgment as a matter of law for Defendants because there is no genuine dispute on key structural facts about NAM's retailer contracts that make clear that they are not anticompetitive as a matter of law.  And there is no evidence that shows that NAM's CPG contracts prevented Valassis from contracting with the same CPGs.

It is "well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."  *Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015).  Competition for exclusive contracts "may actually encourage, rather than discourage, competition, because the incumbent and other [competitors] . . . have a strong incentive continually to improve the [services] and prices they offer in order to secure the exclusive positions."  *Balaklaw* v. *Lovell*, 14 F.3d 793, 799 (2d Cir. 1994); *see also Konik* v. *Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1015 (2d Cir. 1984); *Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("[C]ompetition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws

---

[1] Even if the jury could somehow conclude that Valassis suffered damages caused by NAM's anticompetitive conduct, Levinsohn's assumption that Valassis would have achieved 41% ACV in food and drug stores is deeply flawed.  As he admitted, he calculated the benchmark ACV by looking at the percent of stores Valassis won in the food class of trade alone, and then calculated damages for both food and drug.  Tr. 1171:11–1173:17.  Correcting that error alone would reduce the benchmark ACV to 20% and cut down his damages estimate significantly.  Tr. 1177:6–15.

encourage rather than suppress."). That is precisely what happened here. As Recchia testified, after Valassis entered the ISP business, "the nature of the business changed. And in order to get any type of retailer, you had to bid at very high levels and give big guarantees." Tr. 407:15–408:7. Valassis's entry thus spurred NAM to improve its prices to secure exclusive contracts with retailers.

Moreover, as Mr. Garofalo testified at trial, the exclusivity guaranteed by the contracts was limited: it did not prevent retailers themselves from contracting directly with CPGs for in-store advertising, and it did not prevent other third parties from providing in-store promotions, so long as the tactics are not substantially similar to those received from NAM. Tr. 703:16–704:13.

The undisputed evidence also shows that NAM's retailer contracts are of limited duration. MacKie-Mason determined that the average length of contracts decreased over time in every year between 2008 and 2015, with an average length of 3.6 years across the classes of trade in which Valassis contracted. Tr. 981:9–21. Other courts have upheld exclusive contracts with similar terms, where competitors had the opportunity to bid for the contracts. *See Spinelli*, 96 F. Supp. 3d at 117 (holding that licensing agreements with 3-year exclusivity periods "do not foreclose competition and are not anticompetitive as a matter of law"); *NicSand, Inc.* v. *3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007) (dismissing claim that "multi-year" exclusive contracts, assumed to be 3–5 years long, were anticompetitive); *Indeck Energy Servs.*, *Inc.* v. *Consumers Energy Co.*, 250 F.3d 972, 977–78 (6th Cir. 2000) (upholding 5–10 year exclusive contracts because "customers were free to seek other [suppliers] at the conclusion of the contracts"); *Ferguson* v. *Greater Pocatello Chamber of Com., Inc.*, 848 F.2d 976, 982 (9th Cir. 1988) (upholding 6-year exclusive contracts). Moreover, as MacKie-Mason testified, the average years remaining on NAM's contracts during the time Valassis was in the market, which is much more relevant in considering the real-world competitive dynamics and opportunities, ranged from just 1.88 to 2.37 years. Tr. 1111:9–22.

The undisputed evidence also shows that large portions of NAM's retailer network are available to competition in each year. As the leading antitrust treatise explains, "in a large dealer

network, even contracts with long terms need not be anticompetitive.  For example, in a 300-dealer network where contracts average three years long with randomly distributed terminations, approximately 100 dealers should be free to renegotiate each year."  Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1821d3.  The retailer network here has precisely those characteristics.  Mr. Garofalo testified that "[a]nywhere from a third to about a half expired each year."  Tr. 693:16–19.  Even MacKie-Mason admits that approximately 25% of NAM's contracts expired in 2011-2014; 50% in 2014, and 60% in 2015.  *See* PX-1000; MacKie-Mason Demonstrative at 48.  And the evidence shows that nearly 100% of NAM's retailer contracts expired at some point during the period in which Valassis was competing for retailers.  PX-1000.  There is thus no basis to conclude that the staggered expiration dates foreclosed Valassis from competing.  Indeed, as the Seventh Circuit reasoned in considering the in-store business, "[o]ne might think that staggered expiration dates make entry easier" as any rival "can sign up chains as their exclusives expire, without having to enroll the entire retail industry at one go."  *Menasha*, 354 F.3d at 663.

Valassis has claimed that it was foreclosed from "key" retailers, including Kroger and Safeway, but the evidence shows that contracts with both retailers expired during the relevant period, *see* PX-1000, and Valassis met with both retailers on several occasions to pitch their products.  Tr. 247:13–248:8; Tr. 279:1–280:24; Tr. 1026:10–1027:16.  Nor is there any evidence that preemptive renewals prevented Valassis from competing.  Rather, the record shows that Valassis met with retailers like Kroger and Ingles that it claims NAM preemptively renewed.  Tr. 1026:11–16; Tr. 1114:12–1116:4.  And, as already discussed, those renewals were accomplished only through the concededly lawful retailer payments.

That Valassis itself employed similar long-term, exclusive, staggered contracts and preemptive renewals is further evidence that the practices are not anticompetitive.  Tr. 200:8–204:6 (long-term, staggered, exclusive contracts with retailers); Tr. 219:15–220:9 (exclusive contracts with CPGs and retailers); Tr. 547:18–550: 24 (preemptive renewals).  Rather, this evidence shows that the practices serve legitimate business purposes and are beneficial to

retailers and CPGs alike.  *See* Tr. 202:6–21 (Kowalczyk) (testifying that Valassis "did not force SuperValu to enter into a four-year deal" or an "exclusive deal" and that it was something SuperValu "wanted"); Tr. 704:22–705:14 (Garofalo) (testifying that limited exclusivity in retailer contracts allowed NAM to offer category exclusivity to CPGs); PX-0928 (Perkins Dep. 154:2–155:19) ("[T]he reason the brands buy our programs is because they want to be the only sign in their category up at that time and that the exclusivity is the reason the brands buy the program, so the retailer part we have to have the exclusivity to honor what we're selling."); Tr. 1063:20–1065:3; 1066:24–1067:23 (MacKie-Mason) (agreeing that "consumer packaged goods companies often want category exclusivity").  As the Seventh Circuit reasoned, "[t]he retailers most attractive to manufacturers are those that have signed exclusive contracts, for then when Nabisco places at-shelf [coupon] dispensers for Oreo cookies it knows that there will not be another dispenser on the adjoining shelf promoting Proctor & Gamble's sandwich cookies." *Menasha*, 354 F.3d at 662.

  As for the CPG contracts, which Valassis has blamed for creating the "gap" in its revenues, Valassis has produced no admissible evidence showing the content of these contracts or that they caused the "gap" in CPG spending.  Recchia testified that he had never seen one of NAM's contracts with CPGs.  Tr. 383:16–385:10.  Indeed, he testified that he "didn't know for sure what was happening" with NAM's CPG contracts and he "can't tell you there is a contract that was exclusionary that was causing us problems."  Tr. 418:20–419:5.  Moreover, Ms. Brown's testimony undermines any claim that NAM's CPG contracts prevented Valassis from closing the gap.  As she made clear, through her work with the sales team, she was able to increase Valassis's ratio by ten percent.  Tr. 521:4–12.  Nothing in NAM's CPG contracts prevented that improvement.  She also admitted that both NAM and Valassis sold to Proctor & Gamble—suggesting that there was no exclusionary term in NAM's contracts to prevent that. Tr. 565:21–566:8.  MacKie-Mason confirmed that fact, admitting that NAM's CPG contracts are not exclusive and do not prevent CPGs from buying from both NAM and Valassis at the same time.  Tr. 1074:22–1075:7.  And he further agreed that that he was not expressing an opinion on

the reason the CPGs might devote their spending to NAM's larger network versus Valassis's smaller one.  Tr. 972:13–973:12.  Indeed, he did not even undertake a quantitative study showing whether CPGs actually spent less with Valassis when they had a category rights deal with NAM.  Tr. 1077:13–18.  Valassis is thus left to rely on hearsay from the CPG representatives.  But as this Court ruled, "[a] customer's statement of the customer's reasons for not doing business with somebody are admissible as to that customer's belief, but not everything the customer says in that regard is admitted for its truth."  Tr. 175:13–17; Tr. 386:14–387:14.  Thus, even if CPG representatives told Valassis that NAM's contracts prevented them from buying from Valassis, that evidence is not admissible to show the content of NAM's contracts or that they caused the CPGs not to contract with Valassis.  No reasonable juror could conclude that NAM's CPG contracts are exclusionary based on those statements or any other evidence admitted.

## III.   VALASSIS HAS NOT PROVED THAT NAM HAD POWER IN A RELEVANT PRODUCT MARKET.

This Court should also enter judgment as a matter of law for Defendants because no reasonable juror could conclude that Defendants had power in a relevant product market.  A properly defined market must include all "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."  *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  "Products or services need not be identical to be part of the same market."  *AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press*, 181 F.3d 216, 227 (2d Cir. 1999).  Rather, products are considered "reasonably interchangeable if consumers treat them as 'acceptable substitutes.'"  *PepsiCo, Inc.* v. *Coca-Cola, Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  "In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand.  Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product."  *AD/SAT*, 181 F.3d at 227.  Plaintiffs here allege a market consisting of third-party ISP, which excludes all promotions where individual retailers and CPGs promote products directly in stores, as well as all forms of out-of-store and digital marketing and product

14

promotion.  There is no evidence in the record on which a reasonable jury could find that the

relevant market is as narrow as Valassis alleges.

The fundamental flaws in Valassis's proposed market definition are the same flaws that

led the Seventh Circuit to affirm summary judgment for NAM in a prior antitrust action.  In

*Menasha*, the plaintiff (a competing ISP supplier) alleged that NAM monopolized a market for

"at-shelf coupon dispensers."  354 F.3d at 661.  The district court granted summary judgment,

and the Seventh Circuit affirmed, finding that "[t]he number of ways to promote a product is

large, and even a stranglehold over at-shelf coupon dispensers would affect only a tiny portion of

these means."  *Id.* at 664.  While the market alleged in this case is slightly broader, Valassis's

inability to prove that market is a result of the same problem Menasha faced.  At-shelf coupon

dispensers and other third-party ISP products compete against numerous forms of marketing that

Valassis artificially omits from its market definition.  *Id.* at 664.  Indeed, in the more than 15

years since *Menasha* was decided, the market has only expanded.  Competing products include

direct retailer promotions—which Valassis's own experts admit "look the same or substantially

the same" as third-party ISP and serve the same basic purpose, Tr. 860:4–867:5—as well as

digital.  That CPG customers viewed such tools as serving different purposes does not show

otherwise.  As Mr. Hendrix explained, the CPGs viewed different products *within* Valassis's

proposed market of third-party ISP as serving different purposes, such that they are "not

interchangeable tools."  PX-0979 (Hendrix Dep. 343:2–345:7; 345:9–345:18).  The relevant

question is not whether the products serve identical functions, but whether the prices of those

other tools restrained the prices NAM could charge for third-party ISP.  *United States* v. *Cont'l

Can Co.*, 378 U.S. 441, 450, 456–57 (1964) (holding that it is "not sufficient" for the proponent

of an antitrust market to rely on "different characteristics" of glass and metal containers, even

where such characteristics "may disqualify one or the other [product] . . . from this or that

particular use" or there "may be some end uses for which glass and metal do not and could not

compete").

That was the case here.  As Mr. Garofalo explained, NAM was "always competing with the, the options that the retailer had for doing our services.  They could go with another party besides us, another outside vendor.  They could do these programs themselves, and many do." Tr. 750:9–12.  Indeed, Mr. Garofalo testified that "[a]bout 50 percent of the marketplace did not have a third party . . . doing what News America Marketing did."  Tr. 745:6–10.  Major retailers like Wal-Mart, Target, and Costco worked with CPGs directly rather than contracting with NAM.  Tr. 708:12–19.  The retailers with which NAM contracted expressly considered whether to forgo their contracts with NAM in favor of working directly with CPGs.  *Id.*; *see also* PX-0928 (Perkins Dep. 152:21–153:7; 153:13–153:25).  And even when the retailers maintained their contracts with NAM, "they would also have their own programs" with the CPGs directly. Tr. 772:17–22. Direct CPG spending with retailers meant that CPGs "had more opportunities to spend their dollars in other places besides [NAM's] products," which "exerted downward pressure on the prices" that NAM could charge.  Tr. 772:10–16.  In addition, as digital programs developed, there was a "shift in CPG spending to digital," and if CPGs got "a bigger return on their investment by doing a digital program, then it really required [NAM] to be able to fit into the return on investment model.  So it had significant downward pressure on [NAM's] pricing." Tr. 771:12–18.  *See also* DX-0573 (Valassis in-store employee writing that "the in-store industry is trending at about 27% overall decline. . . . I think the industry will remain flat for next year. As digital continues to split the overall pie.  I am not sure we will see a quick rebound so I would project flat for the following 2 years.  Because of the digital factor, the spending patterns are constantly changing."); PX-0980 (Gitkin Dep. 252:5–252:8; 252:10–252:19) (discussing document referencing "[r]eplac[ing] all Kroger NAM with digital coupons at same time").  Mr. Gitkin confirmed that analysis, explaining that CPGs analyze return on investment in deciding what advertising tool to use.  PX-0980 (Gitkin Dep. 31:13–31:17; 31:19–33:4).  Unsurprisingly, the evidence showed that marketing mix analysis—under which companies determine that certain forms of advertising may have a better return on investment—cut into Valassis's revenue.

DX-004 at 2 (Valassis email explaining that "MMA's have done significant damage to in-store interest" at Kellogg's).

As in *Menasha*, 354 F.3d at 664–66, Valassis's experts failed to offer any economic evidence to support their market definition. Professor Farris conceded that he is not an economist and was not offering an opinion on market definition, Tr. 848:9–21, or even suggesting the process by which the jury should evaluate whether various promotional products are reasonably interchangeable, Tr. 854:20–25. Nor did he consider "whether a change in the price of in-store promotions would cause a CPG brand manager to switch to a different promotional product." Tr. 856:5–25. And MacKie-Mason—who is an economist—did not perform any quantitative analysis to determine whether an increase in price for ISP would lead to product substitution. Tr. 1058:22–1060:13. Nor has he attempted to quantify the amount of CPG revenues Valassis lost to unauthorized signage, digital promotions, or marketing mix analysis. Tr. 1050:13–1051:20.

Instead, to define the market, MacKie-Mason largely relies on "direct evidence" of market power, including high profits, pricing practices, market share, and availability of choice to consumers. MacKie-Mason contends that when there is direct evidence of monopoly power, "there must be a market that's being monopolized." Tr. 939:20–24. But the Supreme Court has rejected that position, explaining that such direct evidence "cannot be evaluated unless the Court *first* defines the relevant market." *Ohio* v. *Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) (emphasis added); *accord Heerwagen* v. *Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) ([P]laintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition."), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). MacKie-Mason's contrary approach thus cannot support a finding of market power.

In any event, each of the four categories of "direct evidence" of NAM's market power is flawed. As for profitability, MacKie-Mason relies on the Lerner index to calculate NAM's profit

margin and claims that because NAM has been able to earn high profits, that is evidence that it has market power. Tr. 913:25–915:17. Although MacKie-Mason characterized the Lerner index as "the gold standard in economics for assessing whether a firm has monopoly power," Tr. 915:6–10, the Second Circuit has rejected its use when it found that "there was overwhelming evidence" that the defendant's "business is subject to enormous expenses that are not reflected in its short-run marginal costs." *United States* v. *Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995). That is precisely the case here. As MacKie-Mason conceded, the Lerner index does not take into account NAM's retailer payments, which the evidence has shown are a significant part of its costs. Tr. 1038:1–21. In such instances, high margins are not reliable evidence of market power. *See, e.g.*, *Blue Cross & Blue Shield United of Wisconsin* v. *Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir.1995); *cf. PepsiCo, Inc.* v. *Coca-Cola Co.*, 114 F. Supp. 2d 243, 257–58 (S.D.N.Y. 2000) (holding that "evidence of cost disparity . . . cannot be used to define the market itself"), *aff'd*, 315 F.3d 101 (2d Cir. 2002).

MacKie-Mason next claims that he considered NAM's pricing behavior and determined that the rate of increase in NAM's prices to CPGs slowed after Valassis entered. Tr. 925:6–927:7. Yet MacKie-Mason admitted that he "expected to see a bigger effect from Valassis entering" and could only conclude that such price effects were consistent with NAM having monopoly power "based on other evidence." Tr. 926:1–927:1. That "other evidence" was that Valassis was not a successful competitor, meaning that it did not achieve critical mass and therefore could not affect NAM's pricing. *Id.* MacKie-Mason ignores the obvious alternative explanation: that NAM's prices were constrained even before Valassis entered by the numerous alternative promotional products that CPGs could purchase.

MacKie-Mason also considered market share as between NAM, Valassis, Insignia, and FLOORgraphics, and determined that NAM had "the dominant share." Tr. 930:5–16. But this analysis assumes—without proving—that the market consists only of the four companies MacKie-Mason identifies that provided third-party ISP. If, as NAM has argued, the market is properly defined to include other promotions, including those provided directly by retailers and

CPGs, NAM's market share would drop significantly.  Tr. 1047:12–1049:22; 1055:5–12.  But MacKie-Mason testified that he would only include those retailers in the market definition if a company succeeded in selling them third-party ISP.  This type of heads-I-win, tails-you-lose analysis artificially inflates NAM's market share, ensuring that it remains high regardless of whether NAM fails or succeeds in convincing new retailers to accept ISP rather than sourcing the advertisements elsewhere.  Tr. 1055:25–1057:14.

Finally, MacKie-Mason considered the availability of choices.  In doing so, he considered the same evidence of CPG statements claiming that NAM's contracts prevented them from doing business with Valassis.  Tr. 931:11–936:6.  But as this Court has held, that evidence is not admissible to show that NAM's contracts actually constrained the CPGs.  Tr. 934:16–935:12.

MacKie-Mason's approach to market definition is thus unsupported by law or fact.  It represents an "awkward and forced attempt to 'define the elements of the relevant market to suit its desire for high market share, rather than letting the market define itself.'"  *Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1033 (N.D. Ill. 2003) (quoting *PepsiCo, Inc.* v. *Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000)).  Judgment as a matter of law is warranted.

## IV.    VALASSIS HAS NOT PROVED THAT NAM'S CONDUCT HARMED COMPETITION.

It is axiomatic that "the antitrust laws . . . were enacted 'for the protection of *competition*, not *competitors*.'"  *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe* v. *United States*, 370 U.S. 294, 420 (1962) (emphasis in original)).  For that reason, in order to prevail on a claim of unlawful exclusive dealing, "the plaintiff must show more than just that he was harmed by defendants' conduct."  *K.M.B. Warehouse Distributors, Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995).  A plaintiff may satisfy this requirement directly by proving "higher prices, reduced output, or lower quality in the market as a whole," or indirectly, "by establishing that the alleged conspirators had sufficient 'market

power' to cause an adverse effect, plus some other ground for believing that the challenged behavior has harmed competition." *MacDermid Printing Sols., LLC* v. *Corton Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (internal quotation marks omitted).  Valassis cannot rely on indirect proof because, as explained above, it has failed to demonstrate that NAM possesses market power.  Valassis has also failed to show any direct evidence of harm.  It made no attempt to prove reduced output or lower quality goods.  And there is no evidence that the challenged conduct resulted in NAM charging higher prices.  In fact, the evidence showed the opposite.  Mr. Garofalo testified that after Valassis exited "the prices went down for CPGs," Tr. 707:14–16, and "the retail payments continued to go up," Tr. 709:11–14, testimony that also deeply undercuts Valassis's alleged market definition.  For his part, MackKie-Mason attempted to prove NAM's high prices through the flawed Lerner index analysis and his interpretation of the minimal price effect of Valassis's entry discussed above.  Tr. 921:13–927:7; Tr. 1007:3–19.  But MacKie-Mason did not even attempt to determine how Valassis's CPG prices compared to NAM's when it was in the market.  Tr. 1063:3–18.  And, importantly, MacKie-Mason completely disregarded the effects of the challenged conduct on the retailers, despite the fact that their contracting preferences are relevant to whether the challenged practices were "procompetitive responses to supplier demands."  12/20/2019 Tr. 39:20–40:3.  The payments third-party ISP providers make to retailers depend in part on the price that the providers charge to CPGs and are a method of attracting the retailer network desired by CPGs.  It is therefore both necessary and appropriate to consider the effect of NAM's conduct on retailers as well as CPGs. And because it is undisputed that NAM's retailer payments increased and NAM's CPG prices decreased over the relevant period, there can be no claim that the challenged conduct resulted in adverse effects on competition.

## V.    VALASSIS HAS NOT PROVED THAT NEWS CORP INDEPENDENTLY PARTICIPATED IN THE ALLEGEDLY ANTICOMPETITIVE CONDUCT.

Even if this Court determines that there is sufficient evidence for a jury to conclude that (1) NAM possessed market power; (2) NAM's contracting practices are anticompetitive; (3)

NAM's contracting practices—not including the retailer payments—foreclosed Valassis; and (4) Valassis suffered damages attributable to those contracting practices and not the retailer payments, the Court should nevertheless enter judgment as a matter of law as to News Corp.  As the Court recognized, Valassis "has the burden to prove each of the elements of their claims against each of the [] defendants individually."  12/20/2019 Tr. 44:21–23.  Despite this warning, Valassis has repeatedly refused to distinguish between the defendants in preparing and presenting its case, choosing instead to refer the defendants generically as "News."  That is insufficient.  Because the record shows that only NAM participated in the challenged conduct, no reasonable juror could impose liability on News Corp.

Courts have held that affiliated corporations may be treated as a single entity for purposes of the antitrust laws when they engage in "coordinated activity."  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11-MDL-2262, 2019 WL 1331830, *37–38 (S.D.N.Y. Mar. 25, 2019); *Arandell Corp.* v. *Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018); *Lenox MacLaren Surgical Corp.* v. *Medtronic, Inc.*, 847 F.3d 1221, 1236–39 (10th Cir. 2017).  This requires "evidence that each defendant independently participated in the enterprise's scheme." *Lenox*, 847 F.3d at 1237.  Courts have held that the parent "independently participates" when it "controls, dictates, or encourages the subsidiary's anticompetitive conduct."  *Chandler* v. *Phoenix Servs.*, 2020 WL 1848047, at *14 (N.D. Tex. Apr. 13, 2020); *Climax Molybdenum Co.* v. *Molychem, LLC*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005); *Nobody in Particular Presents, Inc.* v. *Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004).  Such independent participation in the challenged conduct is required so as not to run afoul of the background principal that a "parent corporation . . . is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998).

There is no evidence that News Corp controlled, dictated, encouraged, or otherwise independently participated in NAM's challenged conduct.  Valassis elicited evidence that News America Marketing In-Store is a subsidiary of News Corp, Tr. 782:7–18, that Mr. Garofalo was employed by News Corp during some unknown period of time, Tr. 780:7–18, and that Mr.

Garofalo attended an annual budget meeting with News Corp senior executives where they discussed "News America Marketing's fiscal responsibilities for the coming year," Tr. 577:18–578:10.  Valassis also introduced the minutes of a single News America Marketing management board meeting, which state that "Chase Carey, President of News Corp" attended and that at the meeting, the CEO of NAM "asked Marty [Garofalo] to work with Finance to stagger the termination dates of the retail contracts.  He suggested that we look to extend the contracts for 6, 7, or 8 years."  PX-0610; *see also* Tr. 597:15–599:22.  But all this document can show is that Mr. Carey attended part of a meeting at which a discussion of staggered termination dates and contract length occurred, none of which standing alone constitutes monopolistic behavior, and even on Valassis's case could only contribute to a larger "monopoly broth."  Thus, this document cannot establish that Mr. Carey had knowledge of the anticompetitive scheme alleged.  Tr. 597:15–599:22.  More fundamentally, the document does not show that Mr. Carey was actually in attendance during that discussion, much less that he took an active part in it.  Valassis called no witness who could recall that meeting, let alone testify to those facts.  Mr. Garofalo also agreed that at times he may have "invoke[d] the fact that . . . News America was owned by News Corporation" when attempting to persuade retailers to contract with NAM, Tr. 680:9–14, PX-0254.2 at 5, and at times represented that NAM provided "[g]uaranteed incremental income . . . No risk, backed by News Corporation resources," Tr.786:24–787:1; PX-0254.2.  There is no evidence that News Corp was even aware of those representations, and Mr. Garofalo clarified that the contract was "our obligation at News America Marketing," Tr. 680:9–14.[2]  Regardless,

---

[2] Mr. Kowalczyk also testified that "someone from News Corp got to a senior-level person at Kmart and—and he got a call saying kill the deal."  Tr. 147:20–23.  But the record shows nothing about who Kowalczyk is referencing or for which entity he or she worked.  Kowalczyk himself did not distinguish between the entities in his testimony.  Instead, he referred generally to "News America, News Corp, Rupert Murdoch's company," when asked what he meant by "News."  Tr. 68:1–4.  But even if Kowalczyk had testified credibly that it was a News Corp employee who reached out to Kmart to assist in closing the deal, that vague and unsubstantiated testimony does not show that News Corp itself was involved in controlling, dictating, or encouraging the *terms* of the contract—its length, exclusivity, or termination date—which is all that is challenged here.  Indeed, it is undisputed that Kmart chose to contract with NAM because of its lawful retailer payments, Tr. 1029:2-6, so any possible involvement by News Corp is irrelevant to the challenged conduct.

such representations are connected only to the ability to pay retailer commissions and thus have no connection to the challenged contracting practices that are now at issue in this case.

The most charitable reading of Valassis's evidence can barely suggest that News Corp knew about the contract staggering and length due to Mr. Carey's attendance at a single meeting and the fact that Mr. Garofalo's may have been formally employed by News Corp at some point in time. Even if an inference of knowledge could be based on so thin a reed, courts have recognized that a parent company's knowledge is insufficient for liability, even where there is an overlap in officers and directors between the parent and subsidiary—something that Valassis has not shown here. *See Arandell Corp.*, 900 F.3d at 632–33; *Bestfoods*, 524 U.S. at 69. Indeed, courts have concluded that "assent and approval" or "acquiesce[nce]" in the subsidiaries conduct does not qualify as independent conduct that can support liability. *Black* v. *JP Morgan Chase & Co.*, 2011 WL 4102802, at *31–32 (W.D. Pa. Aug. 10, 2011) (quoting *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009)). Rather, the parent company must actually participate in the challenged conduct. Here, Valassis has no evidence of such participation. Its evidence shows only that News Corp's involvement was that of an ordinary parent/subsidiary relationship, which is insufficient for direct liability. *See, e.g.*, *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1322 (S.D. Fla. 2010) (holding that parent's authority over "operational or budgeting decisions" of the subsidiary are "ordinary, indirect management" and do not constitute direct involvement in anticompetitive conduct); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 689 ("[C]ircumstances . . . typical of any parent and subsidiary do not constitute specific [allegations] of coordinated activity between a parent and a subsidiary." (internal quotation marks and citations omitted) (alterations in original)).

*Nobody in Particular Presents, Inc.* v. *Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004), a nonbinding, out-of-circuit precedent, on which we expect Valassis will rely, is not to the contrary. The defendants in that case were a radio and entertainment conglomerate and three of its wholly-owned subsidiaries: one that owned several radio stations, and two others that promoted concerts. The plaintiff alleged that the *parent company* used its

23

position in radio and promotions to intimidate artists and their record labels into signing with its promotions subsidiaries by refusing to play the artists' songs as frequently on their radio stations if they declined.  The court denied the parent company's motion for summary judgment because it found that the "allegations in the complaint and the contents of the record create a dispute of material fact as to whether [the parent company] engaged in sufficient independent conduct." *Id.* at 1070.  Specifically, the complaint alleged that the parent company made statements about leveraging its assets to promote its subsidiaries' business, and that the parent "used its size and clout to coerce artists" into doing business with its subsidiaries.  *Id.* at 1071.  The parent company's coercive conduct thus formed the basis of the plaintiff's antitrust challenge, as the challenged "coordinated action emanat[ed] from the parent," rather than the subsidiaries.  *Id.*

Here, by contrast, there is no record evidence that the challenged contracting practices "emanat[ed] from" anyone other than NAM.  Unlike in *Nobody in Particular*, the challenged conduct here requires no cross-subsidiary coordination that would suggest the necessary participation of a parent company.  Instead, at most, the record shows that NAM informed News Corp of its activities to the same extent any subsidiary would inform any parent company, and that *NAM* referenced its relationship with News Corp in negotiations (as opposed to the parent leveraging its own clout to further the subsidiary, as in *Nobody in Particular*).  To state the obvious, *NAM's* practices of informing and leveraging its parent company cannot show *News Corp*'s independent conduct.  Based on this record, no reasonable juror could conclude that News Corp participated in the challenged conduct, and it should be dismissed from the case. Indeed, this issue is particularly appropriate for judgment as a matter of law because of the risk of juror confusion Valassis has sown in failing to refer to the defendants individually.  *See Thrash* v. *State Farm Fire & Cas. Co.*, 992 F.2d 1354, 1356 (5th Cir. 1993) (recognizing that a "jury occasionally may become confused," warranting judgment "as a matter of law").

## **CONCLUSION**

Defendants' motion for judgment as a matter of law should be granted.

24

Dated:  July 13, 2021                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/ Kenneth A. Gallo
Kenneth A. Gallo (kgallo@paulweiss.com)
Jane B. O'Brien (jobrien@paulweiss.com)
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300

William B. Michael (wmichael@paulweiss.com)
Brette Tannenbaum (btannenbaum@paulweiss.com)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000